## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NACS, NATIONAL RETAIL FEDERATION, FOOD MARKETING INSTITUTE, MILLER OIL CO., INC., and BOSCOV'S DEPARTMENT STORE, LLC,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,** 20th Street and Constitution Ave., N.W. Washington, DC 20551<br><br>**Defendant.** | **Case No.** _____ |

## COMPLAINT FOR DECLARATORY RELIEF

Plaintiffs NACS (formerly, the National Association of Convenience Stores), National Retail Federation, Food Marketing Institute, Miller Oil Co., Inc., and Boscov's Department Store, LLC (collectively, "Plaintiffs"), by and through their attorneys, Steptoe & Johnson LLP, file this Complaint for Declaratory Relief against Defendant Board of Governors of the Federal Reserve System ("Federal Reserve" or "Board").

## PRELIMINARY STATEMENT

1.      This action challenges components of a final rule ("Final Rule") adopted by the Board, 12 C.F.R. §§ 235.1-235.10 (2011)*, establishing debit "interchange transaction fees," *i.e.,* the transaction fee charged by debit card issuing banks to merchants that accept those debit cards. *See* Debit Card Interchange Fees and Routing, 76 Fed. Reg. 43,394 (July 20, 2011).  The Final Rule seeks to implement Section 920 of the Electronic Fund Transfer Act ("EFTA"),

15 U.S.C. § 1693o-2(a), as enacted by Section 1075 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, 124 Stat. 1376 (2010) ("Dodd-Frank Act"), a provision popularly referred to as the "Durbin Amendment."

2.      The Durbin Amendment directs the Board to establish standards for debit card "interchange transaction fee[s]."  *See* § 920(a)(1), 15 U.S.C. § 1693o-2(a)(1) (Supp. IV 2010). Specifically, the statute directs the Board to prescribe regulations ensuring that the "amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction."  *Id.* § 1693o-2(a)(2) & (3)(A).  In prescribing the regulation, the statute directs the Board to distinguish between the "incremental cost" incurred by an issuing bank "for the role of the issuer in the authorization, clearance or settlement of a particular debit transaction," which cost shall be included in the Board's interchange fee standard, and "other costs incurred by an issuer which are not specific to a particular electronic debit transaction," which costs shall not be considered in setting the standard.  *Id.* § 1693o-2(a)(4)(B).

3.      In a Notice of Proposed Rulemaking ("NPRM") published on December 28, 2010, the Board proposed a rule that largely followed the letter of the Durbin Amendment.  The proposed rule sought to establish a debit card interchange fee standard that limited allowable costs recoverable under the rule to "those associated with authorization, clearing and settlement of a transaction."  75 Fed. Reg. 81,734 (Dec. 28, 2010).   The Board's formulation of allowable costs "includ[ed] only those costs that are specifically mentioned for consideration in the statute."  *Id.* at 81,734-35.  Following the statute's terms, the Board sought to exclude all other costs incurred by an issuer in handling debit card transactions, including network processing fees (otherwise known as "switch fees"), "the costs of cardholder rewards programs," and all "other

costs of a particular transaction beyond authorization, clearing and settlement costs." *Id.* at 81,735. The Board thus proposed two alternative standards for complying with the rule. Under each, the allowable interchange fee could not exceed 12 cents per transaction, which the Board determined more than sufficient to cover the authorization, clearance and settlement costs of a transaction. *Id.* at 81,737-40.

4. After receiving extensive comments, including numerous objections from the banking community, the Board reversed course in its Final Rule. The Board rejected its previous view that the only allowable costs were the costs of "authorization, clearing and settlement of a transaction," and instead adopted a regulation that included in its calculation many additional costs, both fixed (or non-"incremental") and variable, associated with an issuing bank's debit card operations. The end result of the Final Rule was to essentially double the allowable costs recoverable by an issuing bank under the more generous of the alternative standards proposed in the NPRM. The Final Rule sets a per transaction fee applicable to purchases made with a debit card, equal to 21 cents per transaction plus an ad valorem adjustment for fraud losses of 5 basis points of a debit card transaction's value. *See* 12 C.F.R. § 235.3(b). The Final Rule became effective on October 1, 2011.

5. In vastly expanding the categories of recoverable costs and thus the allowable debit interchange transaction fee, the Final Rule exceeds the statutory authority delegated to the Board by the Durbin Amendment and is an unreasonable interpretation of that statute. It is thus invalid under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq* ("APA"), in several respects.

6. First, the Final Rule ignores the Durbin Amendment's statutory direction that the Board establish regulations setting standards for assessing whether the amount of any

3

interchange transaction fee "is reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(3)(A). In particular, the Board disregards the statute's direction that the final rule distinguish between the allowable "*incremental* cost" of "authorization, clearance, or settlement of a *particular* electronic debit transaction" and all "other costs incurred by the issuer which are not specific to a *particular* transaction," which are not includable in the interchange fee. 15 U.S.C. § 1693o-2(a)(4)(B) (emphasis added). The Board declined to determine incremental costs associated with particular debit transactions. Instead, it invented a third category of costs not mentioned in the statute and claimed unfettered discretion over the inclusion (and exclusion) of those costs in setting an allowable interchange transaction fee. In so doing, the Board disregarded Congress's carefully articulated statutory structure, which segregates costs into those that must be included and those that must be excluded. As one leading critic of the Durbin Amendment has described the Board's reversal in light of the plain language of the statute: "For the Fed to allow $0.24 cents in the teeth of this language was an act of calculated mercy." Richard A. Epstein, *The Debit Card Stealth Tax, Defining Ideas*, Oct. 4, 2011, http://www.hoover.org/ publications/defining-ideas/article/95011.

7. Second, the Final Rule impermissibly counts within the category of recoverable costs a 5-basis-point (0.05 percent) allowance for fraud *losses* incurred by issuing banks. 12 C.F.R. § 235.3(b)(2); *see* 76 Fed. Reg. § 43,431 ("fraud losses are best assessed through *ad valorem* component in the interchange fee standards"). The Durbin Amendment addresses fraud-related costs, however, and expressly limits the Board's authority regarding fraud-related costs to those "reasonably necessary to make allowance for costs incurred by the issuer in *preventing* fraud in relation to electronic debit transactions involving that issuer." 15 U.S.C. § 1693o-2(a)(5)(A)(i). The Durbin Amendment requires that the Board's standards "shall . . . be

4

designed to ensure that *any fraud-related adjustment of the issuer* is limited to the amount"
reasonably necessary to make allowance for these fraud prevention costs. *Id.* § 1693o-
2(a)(5)(A)(ii)(I) (emphasis added). The Board's fraud loss adjustment permits recovery of fraud
losses without regard to any measures by an issuer to prevent fraud. The fraud loss adjustment
violates the Durbin Amendment's plain language.

8.      Third, the Board reversed its prior determination that network switch fees not be
included among allowable costs in determining the interchange transaction fee standard. The
Final Rule includes those network fees as a component of allowable costs, notwithstanding the
fact that the Durbin Amendment creates a structure for regulation of network fees that is separate
and apart from the interchange fee calculations. 15 U.S.C. § 1693o-2(a)(8)(B)(i). By including
network fees in the interchange calculation, the Board contradicts the separate consideration of
network fees in the Durbin Amendment.

9.      In addition to adopting an interchange fee standard, the Final Rule also purports to
implement the Durbin Amendment's prohibitions against network or issuer exclusivity
arrangements.   The statute requires that no issuer or payment network restrict in any way the
number of payment card networks on which a debit "transaction" may be processed to (i) 1 such
network; or (ii) 2 or more such networks owned, controlled or operated by affiliated persons.
15 U.S.C. § 1693o-2(b)(1)(A).

10.      The Final Rule circumvents this provision by allowing issuing banks and
networks to satisfy the non-exclusivity requirement by providing only one personal-
identification-number ("PIN") network provider and one "signature" debit network provider per
debit card, and not allowing those networks to provide network services for all transactions
performed on the card. This outcome means that there will not be a competitive choice among

networks on many (and potentially all) debit transactions as the statutory language plainly requires. *Id.* In disregarding the plain meaning of 15 U.S.C. § 1693o-2(b)(1)(A), the Final Rule's network interoperability provision, 12 C.F.R. § 235.7(a)(2), is an impermissible interpretation of the Durbin Amendment's non-exclusivity requirement and is thus invalid.

11.    Plaintiffs, individual merchants and trade associations representing merchants that accept debit cards, are substantially harmed by the Board's misconstruction of the Durbin Amendment's interchange fee and network exclusivity provisions. The Board's Final Rule permits banks to recover significantly more costs than permitted by the plain language of the Durbin Amendment and deprives plaintiffs of the benefits of the statute's anti-exclusivity provisions. The Final Rule exceeds the Board's statutory authority and/or constitutes an unreasonable construction of the Durbin Amendment. Plaintiffs seek declaratory relief against the Final Rule's standards for reasonable and proportional interchange fees and its provisions implementing the Durbin Amendment's network exclusivity prohibitions.

## JURISDICTION AND VENUE

12.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (2006).

13.    The relief requested is authorized by 5 U.S.C. § 702 (APA), 28 U.S.C. § 1651 (2006) (All Writs Act), and 28 U.S.C. §§ 2201 & 2202 (2006) (Declaratory Judgment Act).

14.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391(e)(1) & (2) (2006). Defendant Board of Governors of the Federal Reserve System is a federal agency headquartered in this judicial district, and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

**PARTIES**

15.     Plaintiff NACS (formerly the National Association of Convenience Stores), headquartered in Alexandria, Virginia, is an international trade association representing more than 2,100 retail and 1,600 supplier company members.  NACS member companies do business in nearly 50 countries worldwide, with the majority of members based in the United States.  The U.S. convenience store industry includes about 146,000 stores in the United States, sells nearly 80 percent of the gasoline in the nation, and employs about 1.7 million workers.  It is truly an industry for small businesses; more than 60 percent of convenience stores are owned by one-store operators.

16.     Payment card cost, with interchange fees as the largest component, represents the single largest operating expense in the convenience store industry behind payroll expense, *see, e.g.*, 156 Cong. Rec. S4,978 (daily ed. June 16, 2010) (statement of Sen. Richard J. Durbin), and cost the industry $8.9 billion in 2010.  Because the Board's Final Rule erroneously inflates the debit card interchange fee payable by merchant members of NACS, its member companies are directly affected by the Board's Final Rule and suffer significant and irreparable monetary injury directly traceable to the Board's misconstruction of the Durbin Amendment.  As an association of those affected members, NACS has standing to pursue relief in this Court.  In addition, NACS itself accepts credit and debit card payments and, therefore, is directly subject to the interchange transaction fees.

17.     Plaintiff the National Retail Federation ("NRF"), headquartered in Washington, D.C., is the world's largest retail trade association.  It represents retailers of all types and channels of distribution, including department, specialty, discount, catalog, Internet, independent stores, chain restaurants, drug stores and grocery stores, from the United States and more than 45

countries broad.  In particular, NRF's National Council of Chain Restaurants division includes many the country's most well-respected quick-service and casual-dining companies.  As the industry umbrella group, NRF also represents more than 100 state, national and international retail associations as well as the industry's key trading partners of retail goods and services. Retailers operate more than 3.6 million U.S. establishments, support one in four U.S. jobs (approximately 42 million working Americans), and contribute $2.5 trillion to annual GDP. NRF's purpose is to foster and advance the interests of retailers.

18.     NRF member firms regularly accept debit cards as a means of payment in their retail operations and suffer significant monetary injury from the Board's impermissible construction of the Durbin Amendment.  In addition, NRF itself accepts credit and debit card payments and, therefore, is directly subject to the interchange transaction fees.  NRF thus has standing to challenge the Board's construction of the Durbin Amendment.

19.     Plaintiff the Food Marketing Institute ("FMI"), headquartered in Arlington, Virginia, advocates for 1,500 food retailers and wholesalers.  Its retail membership is composed of large multi-store chains, regional firms, and independent supermarkets with a combined annual sales volume of $680 billion (three-quarters of all retail food store sales in the United States).  FMI membership includes:  26,000 retail food stores, 14,000 pharmacies, supplier partners of its retail and wholesale members, and 200 companies from more than 50 countries.

20.     In 2010, approximately 28 percent of all supermarket sales were made on debit cards and the industry paid a total of $1.85 billion in debit card interchange fees on those sales. For all card payments, the industry paid more in fees than it made in after tax profits. FMI's members are directly impacted by the Board's Final Rule and suffer significant monetary injury from the Board's impermissible construction of the Durbin Amendment.  In addition, FMI itself

accepts credit and debit card payments and, therefore, is directly subject to the interchange transaction fees.  FMI thus has standing to challenge the Board's construction of the Durbin Amendment.

21.     Plaintiff Miller Oil Company, Inc. ("Miller"), headquartered in Norfolk, Virginia, sells residential heating oil, heating and air-conditioning service, commercial fuels, and wholesale fuels, in addition to running convenience store and gasoline retailing business. Founded in 1977, the company employs over 400 workers.  Miller's convenience and fuel retailers, some branded (BP, Shell, and 7-11) and some unbranded, accept all major credit and debit cards.  Sixty-five percent of their retail transactions are completed via credit or debit card. In 2009 and 2010, card transaction fees were over $2.1 million and constituted Miller's third largest expense (under salaries and rent).  Currently, Miller's average transaction in its retail convenience stores amounts to only $3.72.  Prior to the Board's Final Rule, Miller would pay an interchange transaction fee of approximately 10 cents plus 1.5 percent of the total purchase, amounting to less than 16 cents for the average transaction.  Under the Board's Final Rule, Miller will now have to pay a 21-cent standard base amount for the same transaction plus an *ad valorem* amount of 5 basis points of the transaction's value (0.05%).  Contrary to the purpose of the Durbin Amendment, Miller will actually pay *higher* interchange transaction fees on the average transaction under the Board's Final Rule than it would have under the prior system. Miller will suffer significant and irreparable monetary injury directly traceable to the Board's misconstruction of the Durbin Amendment.  Miller has standing to pursue relief in this Court.

22.     Plaintiff Boscov's Department Store, LLC ("Boscov's"), headquartered in Reading, Pennsylvania, currently has a chain of 40 full-service department stores, reaching across five states in the Mid-Atlantic region of the country, as well as an online store.  It has

approximately 7,500 employees. Boscov's offers credit cards through HSBC bank and offers customers closed-loop gift cards. It accepts all major credit cards. Boscov's also accepts debit cards, but only for signature debit transactions. Its stores—each of which houses between 60 to 65 points of sale—do not have the equipment to process PIN transactions. In 2010, Boscov's processed about $200 million in debit transactions and $419 million in credit transactions. It paid an average rate of 1.59% to process these debit transactions, 90% of which is attributable to interchange transaction fees. Altogether, Boscov's pays between $7-8 million a year in interchange transaction fees and will be directly impacted by the Board's erroneous implementation of the Durbin Amendment. Boscov's has standing to pursue relief in this Court.

23.     Defendant Board of Governors of the Federal Reserve System is an agency of the United States with its principal address at 20th Street and Constitution Ave., N.W., Washington, D.C. The Board is the federal agency responsible for the operation of the Federal Reserve System and the promulgation of rules and regulations regarding banking institutions, including the Final Rule at issue. The Board is sued in its official capacity only.

## BACKGROUND AND FACTUAL ALLEGATIONS

### I.   THE NEED FOR REGULATION OF DEBIT-CARD INTERCHANGE FEES

24.     Debit cards, introduced in the late 1960s and early 1970s, originally provided an additional means by which consumers could access funds in their bank deposit accounts. The system rapidly developed from facilitating banking activities to direct use for consumer purchases of goods or services. As a result, debit cards now play a significant role in the U.S. payments system. *See* 76 Fed. Reg. 43,395. Indeed, debit transactions account for about 40 percent of interchange in the United States.

25.     In addition to consumers, there are several key players in debit card transactions: (1) payment card networks ("networks"), (2) issuing banks, and (3) merchants that accept payment by debit card; and (4) the merchant's banks (known as acquiring banks). *See* 76 Fed. Reg. 43,395 (describing "the so-called four-party system"). Networks provide the infrastructure and software for routing data for debit card authorization, clearance, and settlement. *See* 15 U.S.C. § 1693o-2(c)(11) (defining "Payment Card Network"). Networks also provide similar routing services for merchants to use in order to accept debit cards as a form of payment. *Id.* Visa and MasterCard are the dominant networks but several others that do not have their own branded cards have some share of the market for network facilitation of transactions. These smaller networks include companies such as NYCE, Pulse, STAR, and Shazam. Issuing banks distribute debit cards that run over these networks to their customers to be used as a form of currency and merchants accept debit cards as payment. *See id.* § 1693o-2(c)(9) (defining "Issuer"). And the merchant's banks play a role in clearing and settling the transaction on behalf of their customers, the merchants that accept payment by debit cards. *See* 76 Fed. Reg. 43,396.

26.     Visa and MasterCard separate debit-card transactions into two categories based on how the transaction is initiated. The two categories are PIN transactions, in which the consumer typically enters a personal identification number ("PIN") to authorize a transaction, and signature transactions, in which the customer does not enter a PIN—and in some instances signs a receipt. *See* 76 Fed. Reg. 43,395. Most debit cards can be used for transactions in either category.

27.     There are various fees associated with debit card transactions, the largest of which is the interchange fee. The interchange fee is established by networks to compensate the network's issuing banks for their involvement in electronic debit transactions. *See* 76 Fed. Reg. 43,396. It is the fee paid by the merchant's bank to the issuing bank. This fee, in turn, is

passed on by the merchant's bank and paid by the merchant.  *See* 75 Fed. Reg. 81,723.  There are also network fees, or "switch fees," which include "any fee charged and received by a payment card network with respect to an electronic debit transaction, other than an interchange transaction fee."  15 U.S.C. § 1693o-2(c)(10); *see* 76 Fed. Reg. 43,396.

28.     Over the years, interchange fees have skyrocketed.  As Senator Durbin described, "every time a sale is made with a Visa or MasterCard debit or credit card the person who makes the sale only receives 97 or 98 cents on the dollar because the card networks take an unregulated cut out of the transaction amount and share it with their issuing banks."  *See* Letter from Senator Durbin to Jennifer J. Johnson, Secretary Board of Governors of the Federal Reserve System, at 2 (Feb. 22, 2011) ("Durbin Letter") (attached hereto as Exhibit 1).  In less than a decade between 2001 and 2010 the fees more than tripled from $16 billion to $50 billion per year.  On debit alone, the fees grew 234 percent from 1998 to 2006.  *See* Stephen Mott, *Industry Facts Concerning Debit Card Regulation Under Section 920*, Oct. 27, 2010, at 14, *available at* http://www.federalreserve.gov/newsevents/files/merchants_payment_coalition_meeting_201011 02.pdf.

29.     The sharp and continuous rise in interchange fees is due, in large measure, to the absence of competition.  Issuing banks all charge the same schedule of fees for Visa debit transactions.  The same is true for MasterCard debit transactions.  The lack of competition between banks, coupled with merchants' inability to steer toward lower cost tenders by charging more for these higher cost tenders, is a major reason why none of the banks reduces its fees.

30.     Because networks set the interchange fees on behalf of their issuing banks, "there is no competition between issuing banks over the fees they receive, and each bank that issues the network's cards receives exactly the same network-established fee no matter how efficiently or

inefficiently that bank processes transactions or prevents fraud." *See* Durbin Letter at 5.  The system, by its nature, favors issuing banks and networks:  networks establish high fees for the issuing banks to collect, and issuing banks issue more of the networks' cards in order to continue to collect these tens of billions of dollars in fees.  *Id.*

31.     To increase further revenue generated from interchange fees, the primary networks, Visa and MasterCard, and issuers have manipulated the market.  To encourage issuers to promote signature transactions, Visa and MasterCard set higher interchange fee rates for this type of transaction.  To earn the higher interchange fees, issuers use incentives to encourage consumers to use signature debit transactions and assess fees to discourage PIN debit transactions.  Thus, despite inferior safeguards against fraud, signature debit card products are the single fastest growing tender type within the convenience store industry and now comprise more than 50 percent of the industry's interchange expense.  This disparity has helped drive an 8.1 percent annual growth rate for debit interchange between 2007 and 2010.

32.     The consequences for merchants are devastating.  For many merchants these fees are now the second-highest operating cost behind labor costs.  Those fees are also the fastest-growing cost these businesses face, rising faster even than health care.  Merchants small and large have reported that these unpredictable, uncontrollable cost increases have stopped them from hiring new employees and opening new locations.  In some cases, the fees have even contributed to merchants closing stores and laying off employees.

33.     Because accepting payment cards for point-of-sales transactions has become an operational necessity, merchants have no leverage to negotiate with the networks and issuers with respect to interchange fees.  *See* 156 Cong. Rec. S5,802 (daily ed. July 14, 2010) (statement of Sen. Richard J. Durbin).

34.     Network fees have also escalated rapidly.   These fees increased 30 percent last year alone.   That is in part due to the aggressive use of exclusivity agreements between Visa, MasterCard and some issuing banks.   Visa and MasterCard operating rules have long prohibited any other network from handling signature transactions on their cards, but there has been some network competition for PIN transactions.   The exclusivity agreements provided revenue to issuers for having only one PIN network (either Visa's Interlink or MasterCard's Maestro) on the issuer's cards.   With these exclusive deals in place, Visa and MasterCard were able to dramatically increase their network fees charged to merchants without fear of losing transaction volume because merchants had no other options for routing the transactions.

## II.   THE DURBIN AMENDMENT

35.     In 2010, Congress adopted legislation to address this untenable situation.   The Durbin Amendment was enacted as part of the Consumer Financial Protection Act of 2010, which in turn is part of the Dodd-Frank Act, 124 Stat. 1375, 2068-2074, enacted on July 21, 2010.

### A.  Interchange Fees

36.     The Durbin Amendment requires that a debit-card interchange fee be "reasonable and proportional" to the issuer's costs relating to a particular debit transaction.   The statute places this requirement in a new § 920(a)(2) of the pre-existing EFTA, 15 U.S.C. § 1693o-2(a)(2):

> (2) Reasonable Interchange Transaction Fees.  The amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction.

37.     Congress directs the Board to promulgate regulations establishing "standards for assessing whether the amount of any interchange transaction fee" meets the requirement set forth

in § 1693o-2(a)(2) that the fee be "reasonable and proportional to the cost incurred by the issuer

with respect to the transaction."  15 U.S.C. § 1693o-2(a)(3)(A).

38.     The Durbin Amendment directs the Board, in developing these standards, to

> consider the functional similarity between—
>
> (i)      electronic debit transactions; and
>
> (ii)     checking transactions that are required within the
> Federal Reserve bank system to clear at par; [and]
>
> distinguish between—
>
> (i)      the incremental cost incurred by an issuer for the
> role of the issuer in the authorization, clearance, or
> settlement of a particular electronic debit transaction, which
> cost shall be considered under paragraph (2); and
>
> (ii)     other costs incurred by an issuer which are not
> specific to a particular electronic debit transaction, which
> costs shall not be considered under paragraph (2)

*Id.* § 1693o-2(a)(4)(A)-(B).

39.     To create a closer equivalency between the debit card system and the checking

system in which transactions are regulated and clear at par (that is, with no interchange fees at

all), the Durbin Amendment limited the Board's consideration of allowable costs to "incremental

costs" relating to "authorization, clearance or settlement of a particular electronic debit

transaction."  These costs must be included in the Board's standard.  All "other costs incurred by

the issuer which are not specific to a particular electronic debit transaction" may not be included.

Thus, the plain language of the statute establishes a dichotomy between costs that must be

included and costs that must be excluded.

40.     The legislation's main Senate sponsor, Senator Richard Durbin, confirmed in his

statements discussing the proposed legislation on the Senate floor that this provision should be

interpreted as permitting the Board to include only costs incurred by the issuer related to the

authorization, clearance, or settlement of a particular electronic transaction as allowable costs for

determining the interchange transaction fee:

> Paragraph (a)(4) makes clear that the cost to be considered by the Board in conducting its reasonable and proportional analysis is the incremental cost incurred by the issuer for its role in the authorization, clearance, or settlement of a particular electronic debit transaction, *as opposed to other costs* incurred by an issuer *which are not specific to the authorization, clearance, or settlement of a particular electronic debit transaction.*

*See* 156 Cong. Rec. S5,925 (daily ed. July 15, 2010) (statement of Sen. Richard J. Durbin)

(emphasis added).

## B.  Fraud-Prevention Adjustments

41.     Once the Board determines the interchange transaction fee based on the

reasonable and proportional costs that issuers incur with respect to an electronic debit

transaction, Congress permits the Board to adjust the fee to account for fraud prevention costs.

*See* 15 U.S.C. § 1693o-2(a)(5).

42.     Congress specifically limited this adjustment to "costs incurred by the issuer in

*preventing* fraud," *id.* § 1693o-2(a)(5)(i) (emphasis added), and no other provision grants the

Board authority to account for other fraud-related costs.  As such, the Board does not have the

power to create a mechanism for the issuers to recover their fraud *losses*:

> Adjustments to interchange transaction fees for fraud prevention costs.
>
> (A)     Adjustments. The Board may allow for an adjustment to the fee amount received or charged by an issuer under paragraph (2), if—
>
> (i)     such adjustment is reasonably necessary to make allowance for costs incurred by the issuer in *preventing fraud* in relation to electronic debit transactions involving that issuer; and

          (ii)     the issuer complies with the fraud-related standards established by the Board under subparagraph (B), *which standards shall—*

          (I)     *be designed to ensure that any fraud-related adjustment of the issuer is limited to the amount described in clause (i)* and takes into account any fraud-related reimbursements (including amounts from charge-backs) received from consumers, merchants, or payment card networks in relation to electronic debit transactions involving the issuer; and

          (II)     require issuers to take effective steps to reduce the occurrence of, and costs from, fraud in relation to electronic debit transactions, including through the development and implementation of cost-effective fraud prevention technology.

*Id.* § 1693o-2(a)(5) (emphasis added).

43.    In statements on the Senate floor, Senator Durbin described how banks affirmatively resist fraud-prevention technology and, at the same time, urge customers to use payment methods that run a higher risk of fraud because those methods involve higher interchange fees. *See* 156 Cong. Rec. S4,841 (daily ed. June 10, 2010) (statement of Sen. Richard J. Durbin). This recklessness does not create a significant risk for the banks because, if fraud occurs, the banks often charge the loss back to merchants. Senator Durbin made clear that one of the main goals for the amendment was to incentivize fraud prevention by controlling and reducing interchange revenue and eliminating the incentive to increase interchange to cover gaps in fraud prevention efforts. *Id.*

44.    To achieve that end, Congress omitted any compensation for fraud-related costs from the interchange transaction fee, in favor of permitting an adjustment to the fee if an issuer demonstrates that it complied with the standards the Board was required to establish for the banks' fraud-prevention measures. *See* 15 U.S.C. § 1693o-2(a)(5).

45.     Senator Durbin further clarified that any fraud-prevention adjustment should only be made on an issuer-specific basis:

> Further, any fraud prevention cost adjustment would be made on an issuer-specific basis, as each issuer must individually demonstrate that it complies with the standards established by the Board, and as the adjustment would be limited to what is reasonably necessary to make allowance for fraud prevention costs incurred by that particular issuer.

See 156 Cong. Rec. S5,925 (daily ed. July 15, 2010) (statement of Sen. Richard J. Durbin).

46.     This fraud prevention cost adjustment is currently the subject of a separate rulemaking proceeding before the Board.   In an interim final rule adopted on July 20, 2011, the Board allowed for an upward adjustment of no more than 1 cent to an issuer's debit card interchange fee if the issuer develops and implements policies and procedures reasonably designed to achieve the fraud-prevention standards set out in the interim final rule.  See Interim Final Rule, Debit Card Interchange Fees and Routing, 76 Fed. Reg. 43,478 (July 20, 2011).  The Board is still considering comments on that interim final rule.

47.     As that separate proceeding itself indicates, the Board's inclusion of fraud losses in the allowable costs recoverable in its interchange transaction fee standard cannot be justified by the statute's allowance for fraud prevention costs.  That statutory provision, in fact, forecloses separate inclusion of fraud losses in allowable costs by limiting the Board's authority to permit "any fraud related adjustment" to those fraud *prevention* costs permitted by Section 1693o-2(a)(5).  Neither the plain text of the Durbin Amendment nor its legislative history contemplates the inclusion of fraud *losses* incurred by issuer banks directly into the interchange fee.  And they certainly do not contemplate a blanket adjustment for all issuers to reflect a portion of fraud losses potentially incurred, irrespective of whether the issuer has adopted measures to prevent fraud.

18

### C.  Network Fees

48.     The Durbin Amendment permits the Board to continue prescribing regulations, pursuant to 5 U.S.C. § 553, regarding network fees, but only to the extent that the regulations ensure that:

> (i)     a network fee is not used to directly or indirectly compensate an issuer with respect to an electronic debit transaction; and
>
> (ii)    a network fee is not used to circumvent or evade the restrictions of this subsection and regulations prescribed under such subsection.

15 U.S.C. § 1693o-2(a)(8)(B)(i)-(ii).

49.     Congress did not give the Board authority to promulgate any other regulations with respect to network fees and, indeed, affirmatively prohibited it.   15 U.S.C. § 1693o-2(a)(8)(B) (the Board's "authority . . . shall be limited to regulations to ensure that . . . .").

### D.  Network Non-Exclusivity

50.     The Durbin Amendment also requires the Board to promulgate regulations preventing networks and issuers from imposing network exclusivity on merchants and consumers:

> The Board shall . . . prescribe regulations providing that an issuer or payment card network shall not . . . restrict the number of payment card networks on which *an electronic debit transaction* may be processed to—
>
> (i)     1 such network; or
>
> (ii)    2 or more such networks which are owned, controlled, or otherwise operated by—
>
>> (I)     affiliated persons; or
>>
>> (II)    networks affiliated with such issuer.

*Id.* § 1693o-2(b)(1)(A) (emphasis added).

> The Board shall . . . prescribe regulations providing that an issuer or payment card network shall not, directly or through any agent, processor, or licensed member of the network, by contract, requirement, condition, penalty, or otherwise, inhibit the ability of any person who accepts debit cards for payments to direct the routing of electronic debit transactions for processing over any payment card network that may process such transactions.

*Id.* § 1693o-2(b)(1)(B).

51.    This language requires that the Board promulgate rules to ensure that merchants have the option of at least two unaffiliated networks over which to run any given debit card *transaction*, regardless of how the transaction is authorized, thereby creating an opportunity for competition between networks.

52.    The legislative history confirms the plain meaning of the statute.  On July 15, 2010, Senator Durbin remarked as follows during a speech on the floor of the senate:

> Paragraph (b)(1) . . . is intended to enable each and every electronic debit transaction—*no matter whether that transaction is authorized by a signature, PIN, or otherwise*—to be run over at least two unaffiliated networks, and *the Board's regulations should ensure that networks or issuers do not try to evade the intent of this amendment by having cards that may run on only two unaffiliated networks where one of those networks is limited and cannot be used for many types of transactions.*

*See* 156 Cong. Rec. S5,926 (daily ed. July 15, 2010) (statement of Sen. Richard J. Durbin) (emphasis added).

53.    The statute also ensures that merchants maintain an option of which network to use for processing electronic debit transactions.  This merchant-choice provision requires that the Board promulgate regulations preventing an issuer from "inhibit[ing] the ability of any person who accepts debit cards for payments to direct the routing of electronic debit transactions for

processing over any payment card network that may process such transactions." 15 U.S.C. § 1693o-2(b)(1)(B).

54.     Neither the statute nor the legislative history addresses how many networks must be available on a particular debit *card*.   The statute instead requires that issuers provide at least two unaffiliated network options for each *transaction* and cannot interfere with the merchant's choice in favor of its network affiliate.

55.     Because Visa and MasterCard have divided transactions into two categories (PIN and signature) and do not allow issuing banks to brand their cards with a second network that could carry signature transactions, the Board's rule does not implement the law.  Those signature transactions, and many others potentially including PIN transactions, will not have two network choices and the network requirement per transaction and the merchant choice provision of the new law will be eviscerated.

## III.   THE BOARD'S INITIAL ACTION

56.     On December 16, 2010, the Board announced its initial action under the Durbin Amendment, which subsequently was published in a notice of proposed rulemaking in the Federal Register. *See* Debit Card Interchange Fees and Routing, 75 Fed. Reg. 81,722 (Dec. 28, 2010) ("Initial Action").

57.     In the Initial Action, the Board offered two alternative debit interchange transaction fee restrictions.   Alternative 1 permitted an issuer to receive a per-transaction interchange fee up to a 7-cent safe harbor. *See id.* at 81,736-38.  If an issuer's allowable costs per transaction exceeded 7 cents, then the rule allowed each issuer the opportunity to demonstrate its individual costs and receive a higher per-transaction interchange fee equal to such allowable costs, but not more than a cap of 12 cents. *Id.* at 81,737-38.  Alternative 2 both

set a cap on interchange fees of 12 cents per transaction and operated as a safe harbor allowing an issuer to charge up to the cap without demonstrating its actual allowable costs per transaction. *See id.* at 81,738.

58.    The Board's proposed standards were based on its determination that only the incremental costs of authorizing, clearing and settling a particular transaction were includable in the costs recoverable as part of the allowable interchange fee.  Based in part on "the statute's mandate to consider the functional similarities between debit transactions and check transactions," and even though they were encouraged to do otherwise by representatives of financial institutions, the Board explicitly rejected including other costs associated with a particular transaction that are not incurred by an issuer in the authorization, clearance, or settlement of that transaction. *Id.* at 81,735.  The Board instead proposed "that allowable costs should be limited to those that the statute specifically allows to be considered, and not be expanded to include additional costs that a payor's bank in a check transaction would not recoup through fees from the payee's bank."  *See id.*; *see also* Transcript of Open Board Meeting (Dec. 16, 2010).

59.    The Board excluded network fees from allowable costs, "because the Board recognize[d] that if network fees were included in allowable costs, acquirers (and, by extension, merchants) might be in the position of effectively paying all network fees associated with debit card transactions." *See* 75 Fed. Reg. 81,735.

60.    The Board also specifically excluded fraud losses from allowable costs. *Id.* at 81,760.

61.    In the Initial Action, the Board offered two alternative approaches for implementing the restrictions on debit card network exclusivity. *Id.* at 81,749.  Alternative A

22

required that a debit card have at least two unaffiliated payment card networks available for processing an electronic debit transaction. *Id.* An issuer could comply with this requirement by having one payment card network available for signature debit transactions and a second, unaffiliated payment card network available for PIN debit transactions. *Id.* Alternative B required that a debit card have at least two unaffiliated payment card networks available for processing an electronic debit transaction for each method of authorization available to the cardholder. *Id.* at 81,750. Thus, if a debit card could be used for both signature and PIN debit transactions, the issuer would need to offer at least two unaffiliated networks available to process signature transactions and at least two unaffiliated networks available to process PIN transactions. *Id.*

62.    The Board requested comment on the Initial Action by February 22, 2011. *See id.* at 81,722.

63.    Several of the named plaintiffs, including NACS, NRF, and FMI submitted extensive comments supporting the proposed rule.

## IV.    THE FINAL RULE

64.    On July 20, 2011, the Board released the Final Rule purporting to implement Section 920 of EFTA. *See* 76 Fed. Reg. 43,394 (July 20, 2011). The Final Rule became effective on October 1, 2011.

65.    According to the Board, with respect to the final interchange fee standard, after it considered all the comments it received, it "determined to adopt in the final rule a modified version of the approach in proposed Alternative 2." *See* 76 Fed. Reg. 43,422.

66.     Under this approach, each issuer receives a 21-cent standard base amount for each transaction plus an *ad valorem* amount of 5 basis points of the transaction's value (0.05%). 12 C.F.R. § 235.3.

67.     The Board's Final Rule as much as tripled the base amount recoverable as allowable costs from the 7 to 12 cents range included in its proposed rule to the Final Rule's 21-cent standard (before *ad valorem* fraud loss adjustment).  The Board explained this significant increase to the standard base amount by rejecting its prior interpretation of the statute.  Rather than including only those costs of authorization, clearance and settlement which Congress directed it to consider and excluding all other costs, which Congress directed it not to consider, *see* 15 U.S.C. § 1693o-2(a)(4)(B), the Board invented a third category of costs—"those that are specific to a particular electronic debit transaction but that are not incremental costs related to the issuer's role in authorization, clearance, and settlement"  *See* 76 Fed. Reg. 43,426.

68.     Under the Board's new interpretation, the Board claimed unfettered discretion to decide which of such costs in this third category it would include in allowable cost.  It thus read the statute to provide that "all costs related to a particular transaction *may* be considered, and some—the incremental costs incurred by the issuer for its role in authorization, clearance, and settlement—*must* be considered."  *See* 76 Fed. Reg. 43,427 (emphasis added).

69.     As a result, the new standard base amount includes a much broader group of costs, deemed by the Board to be specific to a particular transaction.  The Board defines costs "specific to a *particular* transaction" in the *aggregate*—as costs that "[e]ach transaction uses" and that "no particular transaction can occur without incurring."  *Id.* at 43,430.  The Board thus transforms "costs specific to a particular transaction" into costs common to *all* transactions.  The Board expressly declined to define or consider whether a particular cost is an "incremental cost"

associated with a "particular" transaction, as directed by Section 920, *see* 15 U.S.C. § 1693o-2(a)(4)(B), reasoning that its new reading of its discretionary authority under the statute rendered such a determination unnecessary.   76 Fed. Reg. 43,427.   In fact, the Board's construction permits charging for costs on particular transactions that are not part of the costs of these transactions (such as chargebacks—instances in which the issuing bank does not provide the merchants with the funds to cover the transaction—and call center inquiries, which only occur on a small minority of transactions).

70.   Employing its newfound construction of the statute, the Board permits recovery under the Final Rule of the following costs that had been excluded under the Interim Rule: (1) processing costs, including fixed system costs (such as network connectivity, computer, and software costs) and labor costs related to the processing of banking transactions, (2) costs of processing chargebacks and other non-routine transactions, (3) network "switch" fees incurred by an issuing bank, and (4) transactions monitoring costs (costs for monitoring transactions before authorization). *Id.* at 43,429-30.   The only costs the Final Rule excludes as "other costs incurred by an issuer which are not specific to a particular electronic debit transaction," *see* 15 U.S.C. § 1693o-2(a)(4)(B)(ii), are "costs of corporate overhead (such as senior executive compensation); establishing the account relationship; card production and delivery; marketing; research and development; and network membership fees." *see* 76 Fed. Reg. 43,404.

71.   Notwithstanding the statute's express direction that the Board permit only a fraud-related adjustment for fraud *prevention* costs, the Board included a new *ad valorem* component to compensate issuers for fraud *losses*. *Id.* at 43,431.   Fraud losses, as defined by the Board, "are those losses incurred by the issuer, other than losses related to nonsufficient funds, that are not recovered through chargebacks to merchants or debits to or collections from customers." *Id.*

The amount of the *ad valorem* component corresponds to the average per-transaction fraud losses of the median issuer. *Id.* at 43,434. The Final Rule permits issuers that incur fraud losses smaller than the 5 basis-point cap to keep the difference between their costs and the cap. *Id.*

72.   In including network processing, or switch, costs in allowable costs, the Board also failed to address the impact of Section 1693o-2(a)(8)(B), which separately dealt with the regulatory issues related to network fees by indicating that such fees were not part of the allowable interchange structure.

73.   With respect to EFTA's provision requiring at least two unaffiliated payment card networks to be available for every debit card transaction, 15 U.S.C. § 1693o-2(b)(1)(A), the Board concluded that "[t]he plain language of the statute does not require that there be two unaffiliated payment card networks available to the merchant for each method of authentication." 76 Fed. Reg. 43,447. As such, the Board asserts that "the statute does not expressly require issuers to offer multiple unaffiliated signature *and* multiple unaffiliated PIN debit card network choices on each card." *Id.* (emphasis added). Based on this interpretation, the Final Rule requires only that all debit cards be interoperable with at least two unaffiliated payment card networks, 12 C.F.R. § 235.7(a)(2), which means that a card may have only one network choice for signature transactions and one network choice for PIN transactions and that not a single individual transaction need have two network choices available for the merchant to exercise competitive choice. As a result, merchants such as Boscov's that do not process PIN transactions will be limited to one network. Even if Boscov's were to invest the hundreds of thousands of dollars it would require to install PIN pads and process PIN transactions, the choice of network will be dictated by the customer—not Boscov's.

**CAUSE OF ACTION**

**Count I:  The Final Rule's Interchange Fee Standard Violates the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A), 706(2)(C)**

74.     Plaintiffs repeat and re-allege the allegations in paragraphs 1-73 as if set forth fully herein.

75.     A reviewing court shall hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority or limitations, or short of statutory right."  *See* 5 U.S.C. §§ 706(2)(A) & 706(2)(C) (2006).

76.     Several components of the Final Rule are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and in excess of the statutory jurisdiction of the Board under the Durbin Amendment.  They are thus invalid under the APA.

**The Interchange Transaction Fee Standard Violates the APA**

77.     In adopting 12 C.F.R. 235.3's definition of "reasonable and proportional" interchange transaction fees, the Board acted arbitrarily, capriciously, and not in accordance with the law.  For similar reasons, the Board exceeded its statutory authority to implement the Durbin Amendment.

78.     The Durbin Amendment requires that a debit-card interchange fee be "reasonable and proportional" to the issuer's costs.  15 U.S.C. § 1693o-2(a)(2).  To achieve that end, Congress directs the Board "to establish standards for assessing whether the amount of any interchange transaction fee" is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction."  *Id.* § 1693o-2(a)(3)(A).  These standards must "distinguish between"—

> (i)     the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or

27

settlement of a particular electronic debit transaction, which cost shall be considered under paragraph (2); and

(ii)   other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered under paragraph (2)

*Id.* § 1693o-2(a)(4)(B).

79.   Senator Durbin, in a statement on the Senate floor, confirmed that EFTA requires that the Board only include as allowable costs for determining the interchange transaction fee those costs incurred by the issuer related to the authorization, clearance, or settlement of a particular electronic transaction.  *See* 156 Cong. Rec. S5,925 (daily ed. July 15, 2010) (statement of Sen. Richard J. Durbin).

80.   After initially—and properly—limiting allowable costs to those costs associated with authorizing, clearing, and settling transactions in its NPRM, *see* 75 Fed. Reg. 81,755-56, the Board acted unreasonably and in excess of its statutory authority by adopting the Final Rule. That Final Rule includes multiple impermissible costs in base for computing the interchange fee, including:  (1) processing costs, including fixed system costs (such as network connectivity, computer, and software costs) and labor costs related to the processing of banking transactions, (2) costs of processing chargebacks and other non-routine transactions, (3) network fees (specifically and separately dealt with under 15 U.S.C. § 1693o-2(a)(8)(B)), and (4) transactions monitoring costs (costs for monitoring transactions before authorization).  The Board improperly expanded its authority to consider in its discretion a broad category of costs, in contravention of the statute's clear direction that only the incremental costs of authorizing, clearing and settling a particular transaction be included in allowable costs.

**The Fraud Loss Component of the Final Rule Violates the APA**

81.     The Board's interchange fee standard also exceeds its authority by including fraud losses as a component of allowable costs.  In adopting 12 C.F.R. § 235.3's blanket 5 basis point *ad valorem* component to the interchange fee standard, the Board clearly exceeded its statutory rulemaking authority under EFTA and adopted an unreasonable, and thus arbitrary and capricious, construction of the Durbin Amendment.

82.     Congress did not grant the Board authority to adjust the interchange transaction fee in order to compensate issuers for fraud losses.  In a section entitled "Adjustment to Interchange Transaction Fees for Fraud Prevention Costs," the statute expressly limits the Board's discretion to allow recovery for fraud-related costs to those deemed reasonably necessary to *prevent* fraud, not to recover for *losses* from fraud.  EFTA authorizes the Board only to "allow for an adjustment to the fee if . . . such adjustment is reasonably necessary to make allowance for costs incurred by the issuer in *preventing fraud* in relation to electronic debit transactions involving that issuer."  *See* 15 U.S.C. § 1693o-2(5)(A)(i) (emphasis added).  The statute expressly directs that the Board's standards "be designed to ensure that any fraud related adjustment of the issuer is limited to the amount described in clause (i) [permitting allowance for 'costs incurred by the issuer in prevent fraud in relation to electronic debit transactions involving that issuer.']"

83.     Moreover, under EFTA, the Board has authority to adjust the interchange fee for fraud prevention costs on an individual basis only.  *See* 15 U.S.C. § 1693o-2(a)(5)(A)(i) (adjustment must be "reasonably necessary to make allowance for costs incurred by the issuer in preventing fraud in relation to electronic debit transactions *involving that issuer*") (emphasis added); *see also* 156 Cong. Rec. S5,925 (daily ed. July 15, 2010) (statement of Sen. Richard J.

Durbin) ("any fraud prevention cost adjustment would be made on an issuer-specific basis"). Nowhere does EFTA permit a blanket adjustment given to all issuers "to reflect a portion of fraud losses," irrespective of any issuer's efforts to deter that fraud. *See* Staff Memorandum to the Board, "Final Rule on Debit Card Interchange Fees and Routing and Interim Final Rule on Fraud-Prevention Adjustment" (June 22, 2011) (attached hereto as Exhibit 2).

84.    In adopting 12 C.F.R. § 235.3's addition of a blanket 5 basis point *ad valorem* component to the interchange fee standard to compensate for fraud losses, the Board clearly exceeded its statutory rulemaking authority under EFTA.

**The Final Rule's Inclusion of Network Fees In Interchange Fee Violates the APA**

85.    The Board's interchange fee standard also contravenes express statutory limits on the Board's authority by including network fees in the allowable costs recoverable as part of the interchange transaction fee. *See* 15 U.S.C. § 1693o-2(a)(8)(B).

86.    Under EFTA, the Board's authority to "prescribe regulations, pursuant to section 553 of title 5, United States Code, regarding any network fee" is expressly limited "to ensure that—(i) a network fee is not used to directly or indirectly compensate an issuer with respect to an electronic debit transaction; and (ii) a network fee is not used to circumvent or evade the restrictions of this subsection and regulations prescribed under such subsection." *Id.* Network fees are thus considered an issue entirely separate and distinct from the interchange fee standard and the Board's discretion to promulgate regulations regarding network fees is thus limited to preventing the use of those fees to compensate issuers for electronic debit transactions and to circumvent EFTA's restrictions.

87.     In light of each of these problems with the Board's implementation of the Durbin Amendment, the Court should, therefore, set aside 12 C.F.R. § 235.3(b) standard for reasonable and proportional interchange transaction fee as violative of the APA, 5 U.S.C. § 706(2)(C).

## The Final Rule's Implementation of EFTA's Network-Exclusivity Prohibition Violates the APA.

88.     The Board acted arbitrarily, capriciously, and not in accordance with the law by adopting a Final Rule that requires that all debit *cards* be interoperable with at least two unaffiliated payment card networks, regardless of authorization method, 12 C.F.R. § 235.7(a)(2), rather than requiring that all debit *transactions* be able to be run over at least two unaffiliated networks.

89.     The Durbin Amendment requires the Board to promulgate regulations preventing issuers and payment card networks from restricting the number of networks on which an electronic debit *transaction* may be processed to either one network or two affiliated networks. *See* 15 U.S.C. § 1693o-2(b)(1)(A); *see also* 156 Cong. Rec. S5,926 (daily ed. July 15, 2010) (statement of Sen. Richard J. Durbin) (the statute requires that the Board ensure that issuers permit "each and every electronic debit transaction—*no matter whether that transaction is authorized by a signature, PIN, or otherwise*—to be run over at least two unaffiliated networks") (emphasis added).   The statute further requires that merchants be able to choose the network on which they will process an electronic debit transaction. *See* 15 U.S.C. § 1693o-2(b)(1)(B).

90.     The Final Rule requires only that all debit *cards* be interoperable with at least two unaffiliated payment card networks, regardless of authorization method.   12 C.F.R. § 235.7(a)(2).   Thus, despite EFTA's requirement that at least two unaffiliated networks be available for each *transaction*, under the Final Rule a card may provide only one network choice for signature transactions and one network choice for PIN transactions.   Depending on the type

31

of transaction the consumer chooses or the merchant's point-of-sales capabilities, the merchant could be limited to only one network for processing the transaction.  The Board's decision to ignore Congress' express direction that there be multiple network options per transaction and that merchants have the opportunity choose their preferred transaction constitutes arbitrary and capricious action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs requests that this Court:

(1)     Enter a declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring that the portions of the Final Rule setting standards for reasonable and proportional interchange fees (12 C.F.R. § 235.3(b)) and networks necessary for routing debit transactions (12 C.F.R. § 235.7(a)(2)) are arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

(2)     Award Plaintiffs their costs and reasonable attorneys' fees incurred in this action pursuant to 28 U.S.C. § 2412.

(3)     Grant Plaintiffs such other relief as the Court deems reasonable and proper.

Dated:  November 22, 2011

Respectfully Submitted,

_____
Shannen W. Coffin (D.C. Bar # 449197)
    Email:  scoffin@steptoe.com
Douglas S. Kantor (D.C. Bar # 455895)
Linda C. Bailey (D.C. Bar # 985081)
STEPTOE & JOHNSON LLP
1330 Connecticut Ave., N.W.
Washington, D.C.  20036
Tel:  (202) 429-3000
Fax:  (202) 429-3902

*Counsel for Plaintiffs NACS, National Retail Federation, Food Marketing Institute, Miller Oil Co., Inc., and Boscov's Department Store, LLC*