**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

**NACS, NATIONAL RETAIL FEDERATION,
FOOD MARKETING INSTITUTE, MILLER
OIL CO., INC., BOSCOV'S
DEPARTMENT STORE, LLC**, and
**NATIONAL RESTAURANT ASSOCIATION,**

        **Plaintiffs,**

        **v.**

**BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM,**

        **Defendant.**

**Case No. 1:11-cv-02075-RJL**

<u>**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**</u>

Pursuant to Federal Rule of Civil Procedure 56, Plaintiffs NACS, National Retail

Federation, Food Marketing Institute, Miller Oil Co., Inc., Boscov's Department Store, LLC, and

National Restaurant Association (collectively, "Plaintiffs"), by and through the undersigned

counsel, respectfully move for summary judgment declaring invalid recently enacted regulations

issued by the Defendant Board of Governors of the Federal Reserve System (the "Board").  *See*

Final Rule, Debit Card and Interchange Fees and Routing, 76 Fed. Reg. 43,394 (July 20, 2011).

In particular, the Board's "interchange transaction fee" regulation (12 C.F.R. § 235.3) and

"network non-exclusivity" regulation (12 C.F.R. § 235.7) exceed the authority granted to it by

Congress in 15 U.S.C. § 1693o-2.  Plaintiffs respectfully move that the Court declare the Final

Rule to be arbitrary, capricious, an abuse of process and otherwise not in accordance with the

law in violation of Administrative Procedure Act.  *See* 5 U.S.C. § 701 *et seq.*

The grounds for this motion are set forth in the accompanying memorandum of law.

Pursuant to Local Rule 7(f), Plaintiffs request oral argument on this motion.

Dated: March 2, 2012

Respectfully Submitted,

/s Shannen W. Coffin
Shannen W. Coffin (D.C. Bar # 449197)
        Email:  scoffin@steptoe.com
Douglas S. Kantor (D.C. Bar # 455895)
Linda C. Bailey (D.C. Bar # 985081)
STEPTOE & JOHNSON LLP
1330 Connecticut Ave., N.W.
Washington, D.C.  20036
Tel:  (202) 429-3000
Fax: (202) 429-3902

*Counsel for Plaintiffs NACS, National Retail Federation, Food Marketing Institute, Miller Oil Co., Inc., Boscov's Department Store, LLC, and National Restaurant Association*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NACS, NATIONAL RETAIL FEDERATION, FOOD MARKETING INSTITUTE, MILLER OIL CO., INC., BOSCOV'S DEPARTMENT STORE, LLC**, and **NATIONAL RESTAURANT ASSOCIATION,**<br><br>         **Plaintiffs,**<br><br>    **v.**<br><br>**BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,**<br><br>         **Defendant.** | **Case No. 1:11-cv-02075-RJL** |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

Shannen W. Coffin (D.C. Bar # 449197)
    Email:  scoffin@steptoe.com
Douglas S. Kantor (D.C. Bar # 455895)
Linda C. Bailey (D.C. Bar # 985081)
STEPTOE & JOHNSON LLP
1330 Connecticut Ave., N.W.
Washington, D.C.  20036
Tel:  (202) 429-3000
Fax: (202) 429-3902

*Counsel for Plaintiffs NACS, National Retail Federation, Food Marketing Institute, Miller Oil Co., Inc., Boscov's Department Store, LLC, and National Restaurant Association*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 6

ARGUMENT .................................................................................................... 22

    I.       STANDARD OF REVIEW ................................................................. 22

    II.      THE FINAL RULE'S INTERCHANGE FEE STANDARD VIOLATES THE APA .................................................................................... 23

          A.    The Board's Interpretation of Its Interchange Fee Authority Cannot Survive Scrutiny Under *Chevron* Step One ............................. 24

               1.    The Durbin Amendment Limits Allowable Costs to Those Costs Specifically Delineated in 15 U.S.C. § 1693o-2(a)(4)(B)(i) .............................................................. 25

               2.    The Board Improperly Expanded the Costs Allowable Within Its Interchange Fee Standard............................ 31

               3.    The Particular Items of Costs Considered by the Board Are Foreclosed from Consideration by the Durbin Amendment......... 37

          B.    The Board's Interpretation Is Unreasonable ............................. 43

    III.    THE FINAL RULE'S IMPLEMENTATION OF THE DURBIN AMENDMENT'S NETWORK NON-EXCLUSIVITY PROVISION VIOLATES THE APA ...................................................................... 46

          A.    The Board's Non-Exclusivity Regulation Fails *Chevron*'s First Step ................................................................................. 48

               1.    The Plain Language of the Statute Requires that Merchants Be Given a Choice Between Multiple Unaffiliated Networks for Each *Transaction* ................................... 48

               2.    The Durbin Amendment's Legislative History Proves that the Statute Was Intended to Increase Competition by Mandating that Merchants Be Given a Choice of Network for Each Transaction ................................................ 52

          B.    The Board's Interpretation Is Unreasonable and Fails *Chevron*'s Second Step........................................................................ 53

CONCLUSION.................................................................................................. 56

ADDENDUM ................................................................................................. A1

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ABA v. FTC,*
   430 F.3d 457 (D.C. Cir. 2005) .......................................................................35, 46

*American Scholastic TV Programming Found. v. FCC,*
   46 F.3d 1173 (D.C. Cir. 1995) ...............................................................................30

*Associated General Contractors, Inc. v. California State Council of Carpenters,*
   459 U.S. 519 (1983).................................................................................................49

*Atl. City Elec. Co. v. FERC,*
   295 F.3d 1 (D.C. Cir. 2002) ....................................................................................35

*Begier v. IRS,*
   496 U.S. 53 (1990)...................................................................................................31

*Beverly Health & Rehab. Servs. v. NLRB,*
   317 F.3d 316 (D.C. Cir. 2003) ...............................................................................27

*Blair-Bey v. Quick,*
   151 F.3d 1036 (D.C. Cir. 1998) .............................................................................31

*Brown v. Gardner,*
   513 U.S. 115 (1994).................................................................................................34

*California State Bd. of Optometry v. FTC,*
   910 F.2d 976 (D.C. Cir. 1990) ...............................................................................27

*Cascade Health Solutions v. Peacehealth,*
   515 F.3d 883 (9th Cir. 2008) .................................................................................38

*Chevron U.S.A. Inc. v. NRDC,*
   467 U.S. 837 (1984)....................................................................................... *passim*

*City of Cleveland v. U.S. Nuclear Regulatory Comm'n,*
   68 F.3d 1361 (D.C. Cir. 1995) ...............................................................................43

*Davis v. Michigan Dep't of Treasury,*
   489 U.S. 803 (1989).................................................................................................30

*DXS, Inc. v. Siemens Med. Sys., Inc.,*
   100 F.3d 462 (6th Cir. 1996) .................................................................................38

*Ethyl Corp. v. EPA,*
   51 F.3d 1053 (D.C. Cir. 1995) ...............................................................................35

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000)..............................................................................................22

*First Nat'l Bank & Trust Co. v. Nat'l Credit Union*,
   90 F.3d 525 (D.C. Cir. 1996)..............................................................................25

*GTE Serv. Corp. v. FCC*,
   205 F.3d 416 (D.C. Cir. 2000)......................................................................43, 53

*Hammontree v. NLRB*,
   894 F.2d 438 (D.C. Cir. 1990)............................................................................25

*In re Visa Check/MasterMoney Antitrust Litigation*,
   192 F.R.D. 68 (E.D.N.Y. 2000)..........................................................................11

*Independent Ins. Agents of Am., Inc. v. Hawke*,
   211 F.3d 638 (D.C. Cir. 2000)............................................................................29

*Maine Public Serv. Co. v. FERC*,
   964 F.2d 5 (D.C. Cir. 1992)................................................................................38

*Massachusetts v. Dep't of Transp.*,
   93 F.3d 890 (D.C. Cir. 1996)........................................................................43, 46

*Meredith v. Federal Mine Safety & Health Review Comn'n*,
   177 F.3d 1042 (D.C. Cir. 1999)..........................................................................29

*Michigan v. EPA*,
   268 F.3d 1075 (D.C. Cir. 2001)..........................................................................35

*Morgan v. Ponder*,
   892 F.2d 1355 (8th Cir. 1989)............................................................................38

*National R.R. Passenger Corp. v. Boston & Me. Corp.*,
   503 U.S. 407 (1992)............................................................................................24

*Natural Resources Defense Council, Inc. v. Browner*,
   57 F.3d 1122 (D.C. Cir. 1995)......................................................................25, 30

*\*Natural Resources Defense Council, Inc. v. Daley*,
   209 F.3d 747 (D.C. Cir. 2000)....................................................25, 34, 43, 55

*National Resources Defense Council, Inc. v. Reilly*,
   983 F.2d 259 (D.C. Cir. 1993)............................................................................35

*Nuclear Energy Inst., Inc. v. EPA*,
   373 F.3d 1251 (D.C. Cir. 2004)..........................................................................34

*Public Citizen v. FTC*,
869 F.2d 1541 (D.C. Cir. 1989) ...................................................................30

*Qi-Zhuo v. Meissner*,
70 F.3d 136 (D.C. Cir. 1995) .....................................................................38

*\*Qwest Corp. v. FCC*,
258 F.3d 1191 (10th Cir. 2001) ......................................................28, 38, 44

*Sea-Land Serv., Inc. v. Dep't of Transp.*,
137 F.3d 640 (D.C. Cir. 1998) ...................................................................36

*Sec'y of Labor v. Fed. Mine Safety & Health Review Comm'n*,
111 F.3d 913 (D.C. Cir. 1997) ...................................................................23

*Shook v. Dist. of Columbia Fin. Responsibility & Management Assistance Auth.*,
132 F.3d 775 (D.C. Cir. 1998) ...................................................................29

*Southern California Edison Co. v. FERC*,
116 F.3d 507 (D.C. Cir. 1997) ...................................................................25

*Southern California Edison Co. v. FERC*,
195 F.3d 17 (D.C. Cir. 1999) ...............................................................24, 25

*Texas v. United States*,
497 F.3d 491 (5th Cir. 2007) .....................................................................35

*Theodore Roosevelt Conservation Partnership v. Salazar*,
616 F.3d 497 (D.C. Cir. 2010) ...................................................................22

*Thompson Ramo Wooldridge Inc. v. United States*,
361 F.2d 222 (Ct. Cl. 1966) ......................................................................33

*Transohio Sav. Bank v. Dir., Office of Thrift Supervision*,
967 F.2d 598 (D.C. Cir. 1992) ...................................................................23

*United States v. Indoor Cultivation Equip.*,
55 F.3d 1311 (7th Cir. 1995) .....................................................................27

*Whitman v. Am. Trucking Assns., Inc.*,
531 U.S. 457 (2001) ..................................................................................36

## ACTS

Dodd-Frank Wall Street Reform and Consumer Protection Act, § 1075, Pub. L. No. 111-203, 124 Stat. 1376, 2068-2074 (2010) ....................................................................1

## STATUTES

5 U.S.C. § 706 (2006) .......................................................................................2, 22, 23

15 U.S.C. § 1693o-2 (Supp. IV 2010) ..................................................................... *passim*

5 U.S.C.A. §§ 701 *et seq.* (2006 & Supp. IV 2010) .........................................................5

## LEGISLATIVE MATERIALS

156 Cong. Rec. S3,703-05 (daily ed. May 13, 2010) ....................................................53

156 Cong. Rec. S4,978 (daily ed. June 16, 2010) ........................................................20

156 Cong. Rec. S5,802 (daily ed. July 14, 2010).........................................................10

156 Cong. Rec. S5,925 (daily ed. July 15, 2010) ................................................. *passim*

H.R. 4,173, 111th Cong. (2009)...................................................................................52

H.R. 4,173, 111th Cong. (2010)...................................................................................53

H.R. Conf. Rep. No. 111-517 (2010).............................................................................53

## RULES

Fed. R. Civ. P. 56(c) ....................................................................................................22

## CODE OF FEDERAL REGULATIONS

12 C.F.R. § 235.3 .................................................................................................5, 17, 56

12 C.F.R. § 235.7 .................................................................................................5, 19, 56

## BOOKS AND ARTICLES

*Black's Law Dictionary* at 1119 (6th ed. 1990) ....................................................33, 38

*Webster's New College Dictionary* 417 (2007) ............................................... 26-27, 33

William Strunk Jr. & E.B. White, *The Elements of Style* 59 (3d ed. 1979)..................27

## OTHER AUTHORITIES

Final Rule, Debit Card and Interchange Fees and Routing, 76 Fed. Reg. 43,394 (July 20, 2011) ............................................................................................................... *passim*

Interim Final Rule, Debit Card Interchange Fees and Routing, 76 Fed. Reg. 43,478 (July 20, 2011) ...........................................................................................................................13

Notice of Proposed Rulemaking, Debit Card Interchange Fees and Routing, 75 Fed. Reg. 81,722 (Dec. 28, 2010) ................................................................................................. *passim*

# INTRODUCTION

As part of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Congress sought to contain the rapidly escalating costs that merchants incur for accepting debit cards as a method of payment.  As debit cards have become a dominant method of payment by American consumers, anticompetitive practices by and among the major debit card networks—Visa and MasterCard—and banks that issue those cards have led to significantly higher transaction fees for merchants that accept debit cards.   For many merchants, especially small businesses, payment card costs have become one of their largest operating costs—exceeding all other major operating costs except labor.  Because of a lack of competition among networks and issuing banks, the two major components of debit card fees paid by merchants—(a) "interchange fees" or "swipe fees," *i.e.,* the fees set by networks to compensate issuing banks for their role in a debit card transaction; and (b) "network fees," *i.e.,* the fees charged by networks for their role in processing the transaction—have risen steadily as debit card use has become more ubiquitous.

In an amendment sponsored by (and named for) Senator Richard Durbin, Congress adopted measures designed to curb these rising debit card fees.  The "Durbin Amendment" directed the Board of Governors of the Federal Reserve System ("Board") to adopt rules regulating, among other things, the transaction fees charged by debit card issuing banks and debit card networks.[1]

Plaintiffs, a group of retail merchants that accept debit cards as payment for retail transactions and trade associations comprised of such merchants, contest here the Board's

---

[1] Codified at Section 920 of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693o-2 (Supp. IV 2010) (set forth in Addendum).  *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, § 1075, Pub. L. No. 111-203, 124 Stat. 1376, 2068-2074 (2010) ("Dodd-Frank Act").

implementation of the two particular aspects of the Durbin Amendment's debit card cost control measures.  First, plaintiffs challenge recently adopted regulations establishing a debit card interchange fee standard to limit the amount of interchange fees that networks and issuing banks may charge merchants to process debit card transactions.  Second, plaintiffs challenge the Board's implementation of the statute's network routing requirements, which were designed to prohibit exclusivity arrangements limiting merchant choice among debit card networks.  In each case, the Board's regulation impermissibly implements the Durbin Amendment's statutory command and thus exceeds the authority delegated to the Board.   Because they run afoul of the Administrative Procedure Act, 5 U.S.C. § 706(2), these regulations must be invalidated.

*First*, the statute directs the Board to adopt regulations limiting "interchange transaction fees"—*i.e.*, the fees paid by the merchants that accept debit cards to the banks that issue those cards.  *See* 15 U.S.C. § 1693o-2(a).  In the years prior to the enactment of the Durbin Amendment, debit card interchange fees had skyrocketed as a result of anticompetitive practices among the dominant debit card networks, Visa and MasterCard, and banks that issue debit cards—costing merchants more than $16 billion in 2009 alone.  The average interchange fee for the most common type of debit transaction amounted to about 1.5% of every transaction.  *See* Notice of Proposed Rulemaking, Debit Card Interchange Fees and Routing, 75 Fed. Reg. 81,722, 81,725 (Dec. 28, 2010) ("NPRM") (attached as Ex. A).

The Durbin Amendment sought to curb these rising costs by requiring that debit card interchange fees be reasonable and proportional to the cost incurred by the issuing bank (the "issuer") with respect to the debit card transaction.  In order to accomplish this objective, the statute directs the Board to set an interchange fee standard that takes into account certain statutory considerations.  Chief among them, the Board must distinguish between two categories

of costs associated with debit card transactions:  (a) the incremental cost incurred by an issuer for its role in the authorization, clearance or settlement of a particular electronic debit transaction, which *must be included* in the Board's interchange fee standard; and (b) other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which *must be excluded* from consideration.  15 U.S.C. § 1693o-2(a)(4)(B).

In a Notice of Proposed Rulemaking published in December 2010, the Board proposed to follow the letter of Congress's command.  It thus proposed an interchange fee standard that allowed issuing banks to recover only those costs that are specifically mentioned for consideration in the statute (*i.e.*, the variable cost incurred by an issuer in authorizing, clearing and settling a debit card transaction) and excluded from consideration all other costs.  75 Fed. Reg. at 81,734-35.  Based on its review of data regarding the components of allowable costs, the Board proposed two alternative interchange fee standards, allowing issuers to recover interchange fees in amounts ranging from 7 cents to 12 cents per debit card transaction.  *Id.* at 81,736.

After significant pushback from the banking community in the comment process, the Board reversed course and adopted a Final Rule that greatly expanded the costs allowed in the interchange fee standard.  *See* Final Rule, Debit Card and Interchange Fees and Routing, 76 Fed. Reg. 43,394 (July 20, 2011) ("Final Rule") (attached as Ex. B).  Where it had once proposed to properly distinguish between costs required to be included and costs required to be excluded from its interchange fee standard, the Board now invented a third category of costs over which it claimed unbridled discretion to consider in its standard.  As a result of this novel interpretation— at odds with the statute's plain text, purpose and legislative history—the Board adopted a Final Rule that ***doubled or even tripled*** the interchange fees allowable (as compared to the alternatives

proposed in the NPRM), shifting billions of dollars in additional costs from the issuing banks to merchants that accept debit cards.

The Board seeks refuge for its stunning reversal in the deferential judicial review required under *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837 (1984).  But the Board asks too much of *Chevron*.  In finding statutory ambiguity where it once saw clarity, the Board disregards the letter of the Durbin Amendment, which established a clear dichotomy between transactional costs that must be considered in the Board's interchange fee standard and all other costs, which must be excluded.  The Final Rule further includes within its interchange fee standard a number of individual cost items—such as fraud losses and fixed processing costs—specifically excluded by the statute's plain terms.  The Board's final rule is thus beyond the authority delegated by Congress, unreasonably implements the statute's terms, and should be invalidated.

**Second**, Congress also recognized the problem of rising network fees—the fees charged by Visa, MasterCard and other debit card networks for their role in processing debit card transactions.  In a legislative compromise, however, Congress declined to regulate the level of those fees directly, as it had with interchange fees.  Rather, it sought to control network fees through increased network competition, by removing prevailing restrictions on merchant routing of debit card transactions at the point of sale.  To enhance that competition, the Board is required to adopt regulations prohibiting debit card networks and issuing banks from "restrict[ing] the number of payment card networks on which an electronic debit transaction may be processed" to fewer than two unaffiliated networks.  15 U.S.C. § 1693o-2(b)(1).  As the Board acknowledged, this provision would "give merchants the flexibility to route transactions over the network that will result in the lowest cost to the merchant. . . ."  76 Fed. Reg. at 43,446.

- 4-

The Final Rule improperly implements this network non-exclusivity provision by requiring issuers to maintain two unaffiliated networks on each *debit card* issued to customers. By focusing on the debit card, the Board loses sight of the statute's requirement of network choice as to each electronic debit *transaction*.  The Board concluded that an issuer can comply with the network choice requirement by maintaining a single network for each method of debit card authentication—signature and personal identification number ("PIN") authentication.   But because of technological limitations and prevailing practices in the market, the majority of merchants are not enabled to accept both signature and PIN transactions.  Thus, as a result of the Board's interpretation, entire categories of debit card transactions—such as internet and telephone transactions, hotel stays, and car rentals—are not afforded the competitive network choice required by the statute.  The Board's interpretation deprives the nearly 75% of merchants that accept debit cards but that are not enabled for PIN transactions of any competitive network choice.  For these and other reasons explained below, the network non-exclusivity rule contravenes both the letter and purpose of the Durbin Amendment and cannot survive judicial review.

This case presents issues of statutory interpretation that are appropriate for summary judgment on the basis of an undisputed administrative record.  Because the Final Rule's "interchange transaction fee" provision (12 C.F.R. § 235.3) and "network exclusivity" provision (12 C.F.R. § 235.7) exceed the Board's statutory authority and arbitrarily and capriciously implement Congress's statutory command, they should be invalidated under the Administrative Procedure Act.  *See* 5 U.S.C.A. §§ 701 *et seq.* (2006 & Supp. IV 2010) ("APA").

## BACKGROUND

I.     **DEBIT CARDS AND DEBIT CARD NETWORKS**

Debit cards, introduced in the late 1960s and early 1970s, provided an additional means—other than checks and in-person withdrawals—by which consumers could access funds in their bank deposit accounts.  *See* 76 Fed. Reg. at 43,395.  Debit cards essentially operate like an electronic check, accessing funds in a consumer's deposit account when presented for payment to the merchant at the point of sale.  Originally used through banks' regional ATM networks, debit cards rapidly evolved from facilitating banking activities to a direct payment method for consumer purchases of goods or services.  *Id.*  They are generally issued by depository institutions to their deposit account holders and have "eclipsed checks as the most frequently used noncash payment method," estimated by the Board to account for about 50 billion transactions in 2011 alone.  *Id.* at 43,395 & n.8.

A typical debit card transaction involves four parties in addition to the network that processes the transaction:  (1) the consumer, who presents a debit card for payment for goods or services; (2) the issuing bank, the depository institution that holds the consumer's account and issues the debit card to the consumer (*see* 15 U.S.C. § 1693o-2(c)(9) (defining "Issuer")); (3) the merchant, which accepts payment by debit card; and (4) the merchant's bank (also known as an acquiring bank), which facilitates the authorization, clearance and settlement of a debit transaction on behalf of its the merchant.  *See* 76 Fed. Reg. at 43,395 (describing "the so-called four-party system").  The network provides the infrastructure and software for routing data for debit card authorization, clearance, and settlement.  *See* 15 U.S.C. § 1693o-2(c)(11) (defining "Payment Card Network").  It receives transaction information and data from the merchant and the merchant's bank, routes the information to the issuer bank, and determines each side's daily settlement position for interbank monetary transfers.  76 Fed. Reg. at 43,395.

Debit card transactions are segregated into two categories based on how the transaction is initiated and authenticated by the consumer:  PIN and "signature" transactions.  *See generally* 76 Fed. Reg. at 43,395.  Currently, PIN and signature transactions are processed over separate networks.  PIN debit networks evolved from ATM networks, *id.*, and include Interlink and Plus (Visa-affiliated PIN networks), Maestro (a MasterCard-affiliated PIN networks), Pulse (a Discover-affiliated PIN network), and independent PIN networks such as NYCE, STAR, and Shazam.  In a PIN debit transaction, the consumer typically enters a personal identification number ("PIN") to authorize the transaction.  *Id.*

Signature debit networks sprung from Visa and MasterCard's credit card network infrastructure, *id.,* and those networks are thus the dominant signature card networks, accounting for virtually all signature interchange fees.[2]  In a signature transaction, the consumer usually authenticates the transaction by signing a receipt.  Increasingly, however, signature debit transactions are authenticated without a customer signature (for instance, in transactions under $25).  76 Fed. Reg. at 43,395 & n.10.

Most debit cards issued by banks covered by the Durbin Amendment (88%, excluding prepaid cards) are configured to support both PIN and signature transactions.  76 Fed. Reg. at 43,395.  But not all transactions can be paid for through either method of authentication.  Certain transactions, such as hotel stays and car rentals, cannot generally be accommodated in

---

[2] Visa and MasterCard collectively have over 80% market share of all debit transactions. Visa alone has 65%—almost two-thirds—of all debit transactions, Visa's signature debit network accounts for 50% of all debit transactions and 74% of all signature debit transactions, and its Interlink PIN debit network accounts for 15% of all debit transactions. MasterCard's combined signature and PIN debit networks account for about 17% of all debit transactions. Discover Card is a recent entrant into the signature card market, but accounts for a negligible portion of the current market. *See generally* Steven C. Salop *et al.*, *Economic Analysis of Debit Card Regulation Under Section 920* ¶¶ 3, 26 & Ex. 2 (Oct. 27, 2010) (attached as Ex. C).

PIN-transactions because the exact amount of the transaction cannot be known at the time of

authorization (when clearance information is also sent in a PIN transaction). *Id.* Similarly, PIN-

based debit payments cannot generally be accepted for Internet, mail order or phone purchases.

*Id.* In adopting the Final Rule, the Board estimated that only "one-quarter of the merchant

locations in the United States that accept debit cards have the capability to accept PIN-based

debit transactions." *Id.*

## II.    THE RISE IN DEBIT CARD FEES

There are various fees associated with debit card transactions, the largest of which is the

interchange fee.  The interchange fee is set by the networks to compensate issuing banks for their

involvement in electronic debit transactions.  *See* 76 Fed. Reg. at 43,396; *see also* 15 U.S.C.

§ 1693o-2(c)(8).  This fee is borne by the merchants.  *See* 75 Fed. Reg. at 81,723.  The networks

also charge fees for their own services, known as "network fees" or "switch fees," which are

"charged by the network to [merchants'] acquirers and issuers to compensate the network for its

role in processing the transaction."  76 Fed. Reg. at 43,396; *see* 15 U.S.C. § 1693o-2(c)(10)

(defining "network fee").

In the early days of debit card transactions, issuing banks did not generally charge

interchange fees to merchants for accepting those cards as a form of payment.  To the contrary,

banks were so eager to realize the savings from debit transactions—as compared to the cost of

processing paper checks and operating brick-and-mortar teller operations—that many networks

paid merchants to install the equipment and accept debit transactions.  Many banks also

profitably provided debit services without charging any interchange (described as "at-par"

clearance).  This model prevailed until the early 1990s, a period that saw widespread expansion

of debit card services.  *See* Comments of the Merchants Payments Coalition ("MPC") in Docket

No. R-14 04 / RIN No. 7100AD63 (Debit Card Interchange Fees and Routing) (Feb. 22, 2011)

("MPC Comments") (attached as Ex. D) (citing Salop, *supra*, ¶¶ 21, 45, 136; Stephen Craig Mott, *Industry Facts Concerning Debit Card Regulation Under Section 920* ¶¶ 7, 8, 9, 11, 14, 23 (Oct. 29, 2010) (attached as Ex. E));[3] *see also* 76 Fed Reg. at 43,396.  As debit card use became more ubiquitous, the networks began to add interchange fees requiring merchants to compensate issuing banks on the transactions.  76 Fed. Reg. at 43,396.

Since the early 2000s, interchange fees have skyrocketed.  As explained by the MPC in comments filed with the Board, "merchants faced market-wide effective interchange increases of an estimated 234% between 1998 and 2006."  MPC Comments at 2 (citing Mott, *supra*, at 14).  These increases followed the entry of Visa and MasterCard into the debit card market.  Those networks "leverage[d their existing] credit card network infrastructure" to build a dominant market position in the debit card market.  *See* 76 Fed. Reg. at 43,395.  In his comments to the Board, Senator Durbin explained that "every time a sale is made with a Visa or MasterCard debit or credit card the person who makes the sale only receives 97 or 98 cents on the dollar because the card networks take an unregulated cut out of the transaction amount and share it with their issuing banks."  *See* Letter from Senator Durbin to Jennifer J. Johnson, Secretary Board of Governors of the Federal Reserve System, at 2 (Feb. 22, 2011) ("Durbin Letter") (attached as Exhibit F).

For most retailers, interchange fees have become a significant operational expense.  As explained by plaintiff NACS, an international trade association of convenience store operators, in its comments to the Board, payment card costs, "with interchange as the largest component, represents the single largest operating expense in our industry behind payroll expense, and is

---

[3] The Salop and Mott reports are also available at http://www.federalreserve.gov/ newsevents/files/merchants_ payment_coalition_meeting_20101102.pdf.

forecast to have cost the industry $8.9 billion in 2010."  Comments of the National Association

of Convenience Stores ("NACS") in Docket No. R-14 04 / RIN No. 7100AD63 (Debit Card

Interchange Fees and Routing), at 1 (Feb. 22, 2011) ("NACS Comments") (attached as Ex. G).

Debit card interchange grew by 8.1% annually for NACS members between 2007 and 2010.  *Id.*

    This sharp and steady rise in interchange fees has been due, in large measure, to the

absence of competition.  Issuing banks all receive the same schedule of fees for Visa and

MasterCard debit transactions because the fee schedules are set by the networks.  *See* 76 Fed.

Reg. at 43,396.  Because networks set the interchange fees, "there is no competition between

issuing banks over the fees they receive, and each bank that issues the network's cards receives

exactly the same network-established fee no matter how efficiently or inefficiently that bank

processes transactions or prevents fraud."  *See* Durbin Letter at 5.  The system, by its nature,

favors issuing banks and networks:  networks establish high fees for the issuing banks to collect,

and issuing banks issue more of the networks' cards in order to continue to collect these tens of

billions of dollars in fees.  *Id.*; *see generally* Salop, *supra*, ¶ 5.

    The lack of competition between banks resulted in upward pressure on interchange fees

as more banks participated in the networks.  Networks attracted more banks to issue cards by

increasing interchange fees, and issuers incentivized consumers to use the cards (especially for

signature transactions, which carried a higher interchange fee) by employing rewards programs

and other incentives.  Because accepting payment cards for point-of-sale transactions has

become an operational necessity, merchants have little leverage to negotiate with the networks

and issuers with respect to interchange fees.  *See* 156 Cong. Rec. S5,802 (daily ed. July 14, 2010)

(statement of Sen. Richard J. Durbin) (attached as Ex. H).  Visa and MasterCard, in turn, used

their market power in the credit card market to grab a dominant market share in the debit card

market, forcing merchants to accept their debit cards as a condition of accepting their prominent

credit cards.  These practices, among others, were the subject of antitrust tying claims, since

settled by a consent decree, against Visa and MasterCard.  *See In re Visa Check/MasterMoney*

*Antitrust Litigation*, 192 F.R.D. 68 (E.D.N.Y. 2000), *aff'd*, 280 F.3d 124 (2d Cir. 2001); *see also*

Salop*, supra*, ¶¶ 23-25.

 At the same time that they increased interchange fees for the benefit of issuing banks, the

major networks were also rapidly escalating their own network fees.  Visa and MasterCard

operating rules have long prohibited any other network from handling signature transactions on

their cards, permitting limited network competition only for PIN transactions.  The networks

sought to squelch even this limited competition through exclusivity agreements that provide

revenue to issuers if they include only one PIN network (either Visa's Interlink or MasterCard's

Maestro) on their debit cards.  With these exclusive deals in place, Visa and MasterCard were

able to dramatically increase their network fees charged to merchants without fear of losing

transaction volume because merchants had no other options for routing the transactions.  *See*

*generally* Salop*, supra*, ¶¶ 32-48.

## III.    THE DURBIN AMENDMENT

 In 2010, Congress adopted legislation to address the rapid escalation of debit card fees.

The Durbin Amendment was enacted as part of the Consumer Financial Protection Act of 2010,

which in turn is part of the Dodd-Frank Act, enacted on July 21, 2010.  The legislation addressed

the problems of rapidly rising debit interchange transaction fees and network fees in different

manners.  For interchange fees, the statute directs the Board to establish specific standards

governing those fees, effectively regulating for the first time on a national level the amount of

those fees.  For network fees, the statute does not directly establish a similar fee standard, but

requires instead increased competition and merchant choice among debit networks.

A.      **The Interchange Fee Standard**

The Durbin Amendment requires that a debit-card interchange fee be "reasonable and proportional" to the issuer's costs relating to a particular debit transaction.  The statute places this requirement in a new § 920(a)(2) of the pre-existing EFTA, 15 U.S.C. § 1693o-2(a)(2):

> (2) Reasonable Interchange Transaction Fees.  The amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction.

Congress directs the Board to promulgate regulations establishing "standards for assessing whether the amount of any interchange transaction fee" meets the requirement set forth in Section 1693o-2(a)(2) that the fee be "reasonable and proportional to the cost incurred by the issuer with respect to the transaction."  15 U.S.C. § 1693o-2(a)(3)(A).

In developing these standards, Congress directs the Board to take into account certain statutory "Considerations."  *Id.* § 1693o-2(a)(4).  Specifically, the Board is required, first, to "consider the functional similarity between—(i) electronic debit transactions; and (ii) checking transactions that are required within the Federal Reserve bank system to clear at par," *i.e.,* at face value with no transactions fees.  *Id.* § 1693o-2(a)(4)(A).

Next, to create a closer equivalency between the debit card system and the checking system in which transactions are regulated and clear at par, Congress directed the Board to "distinguish between" two categories of cost items:

> (i) the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered under paragraph (2); and

> (ii) other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered under paragraph (2). . . .

*Id.* § 1693o-2(a)(4)(B).

Once the Board determines the interchange transaction fee standard, Congress permits the Board to allow a separate "fraud-related adjustment" to that fee. *See* 15 U.S.C. § 1693o-2(a)(5). Congress specifically limited this adjustment, however, to an "allowance for costs incurred by the issuer in *preventing* fraud," *id.* § 1693o-2(a)(5)(i) (emphasis added). The Board is directed to require issuers to take effective steps to reduce the occurrence of and cost from debit card fraud. *Id.* § 1693o-2(a)(5)(A)(ii)(II). No other provision grants the Board authority to account for other fraud-related costs.[4]

## B.    Network Regulation

The Durbin Amendment explicitly withholds from the Board similar authority over network fees. Instead, the statute limits the Board's authority to prescribe regulations regarding network fees to those regulations necessary to ensure that:

> (i)    a network fee is not used to directly or indirectly compensate an issuer with respect to an electronic debit transaction; and
>
> (ii)    a network fee is not used to circumvent or evade the restrictions of this subsection and regulations prescribed under such subsection.

15 U.S.C. § 1693o-2(a)(8)(B)(i)-(ii).

---

[4] This fraud prevention cost adjustment is currently the subject of a separate, but related, rulemaking proceeding before the Board. In an interim final rule adopted on July 20, 2011, the Board allowed for an upward adjustment of no more than 1 cent to an issuer's debit card interchange fee if the issuer develops and implements policies and procedures reasonably designed to achieve the fraud-prevention standards set out in the interim final rule. *See* Interim Final Rule, Debit Card Interchange Fees and Routing, 76 Fed. Reg. 43,478 (July 20, 2011) (attached as Ex. I). The Board is still considering comments on that interim final rule.

While withholding from the Board the authority to establish a network fee standard, the Durbin Amendment addressed the problem of network fees through a market-oriented approach. The statute adopts a pair of restrictions designed to expand the range of networks through which merchants may route transactions. *See* 15 U.S.C. § 1693o-2(b). First, the statute requires the Board to promulgate regulations prohibiting exclusivity arrangements between issuers and networks. The Durbin Amendment directs the Board to adopt regulations providing that issuers or payment card networks shall not "restrict the number of payment card networks on which *an electronic debit transaction* may be processed" to—

      (i)      1 such network; or

      (ii)     2 or more such networks which are owned, controlled, or otherwise operated by—

            (I) affiliated persons; or

            (II) networks affiliated with such issuer.

*Id.* § 1693o-2(b)(1)(A) (emphasis added).

In a companion provision, the statute directs the Board to prescribe regulations that prevent networks and issuers from imposing network routing restrictions on merchants. It prohibits networks and issuers from "inhibit[ing] the ability of any person who accepts debit cards for payments to direct the routing of electronic debit transactions for processing over *any* payment card network that may process such transactions." *Id.* § 1693o-2(b)(1)(B) (emphasis added).

## IV.   THE BOARD'S PROPOSED RULE

In formulating its proposed rule, the Board collected and compiled cost and fee information from issuers, networks and merchant banks. The Board calculated that the median per-transaction variable processing cost for a debit transaction was 6.7 cents for signature

transactions and 4.5 cents for PIN debit—or 7.1 cents for all debit card transactions (including prepaid cards).  *See* 75 Fed. Reg. at 81,722, 81,725 & n.26.  The median *total* processing cost, including fixed and variable costs, was 13.7 cents for signature transactions and 7.9 cents for PIN debit transactions.  *Id.* at 81,725 & n.25.  Total interchange fees (including prepaid cards) amounted to $16.2 billion in 2009, with the average fee for all debit transactions equaling 44 cents per transaction—56 cents for signature transactions and 23 cents for PIN debit transactions.  *Id.* at 81,725.

The Board published its Notice of Proposed Rulemaking on December 28, 2010.  75 Fed. Reg. at 81,722.  The Board's proposed interchange fee standard was based on its determination to include "only those costs that are specifically mentioned for consideration in the statute."  *Id.* at 81,734-35.  It thus proposed to limit recovery to only those costs "associated with authorization, clearing, and settlement of a transaction."  *Id.* at 81,734.

Based in part on "the statute's mandate to consider the functional similarities between debit transactions and check transactions," the Board explicitly rejected including other costs associated with a particular transaction.  *Id.* at 81,735.  Thus, the Board explicitly proposed to exclude recovery of any network fees as part of the interchange standard, "because the Board recognize[d] that if network processing fees were included in allowable costs, acquirers (and, by extension, merchants) might be in the position of effectively paying all network fees associated with debit card transactions."  *See id.*  The Board also specifically excluded fraud losses from allowable costs.  *Id.* at 81,760.

Drawing on its proposed interpretation of the statute and its survey of cost data relating to allowable costs, the Board proposed to adopt an allowable interchange fee set in cents-per-transaction and left for public comment which of two alternative standards should be adopted.

Alternative 1 was an issuer-specific standard with both a safe harbor and a cap.  This alternative would allow each issuer the opportunity to recover its actual incremental costs of authorization, clearance and settlement, up to a cap of 12 cents per transaction.  Under Alternative 1, if an issuer chose not to determine its individual allowable costs, the issuer could collect a safe harbor interchange fee not to exceed 7 cents.  *See id.* at 81,736-38.  Alternative 2 set a safe harbor and cap at a flat 12 cents per transaction.  *See id.* at 81,738.

The Board also offered two alternative approaches for implementing the restrictions on debit card network exclusivity.  *Id.* at 81,749.  Alternative A required that at least two unaffiliated payment card networks be made active on each debit card.  *Id.*  An issuer could comply with this requirement by having one payment card network available for signature debit transactions and a second, unaffiliated payment card network available for PIN debit transactions.  *Id.*  Alternative B required that a debit card have at least two unaffiliated payment card networks available for processing each electronic debit transaction.  That meant that two options would be necessary for each method of authorization available to the cardholder.  *Id.* at 81,750.  Thus, if a debit card could be used for both signature and PIN debit transactions, the issuer would need to offer at least two unaffiliated networks available to process signature transactions and at least two unaffiliated networks available to process PIN transactions.  *Id.*

The Board requested comment by February 22, 2011.  *See id.* at 81,722.  Several of the named plaintiffs, including NACS, NRF, and FMI submitted extensive comments supporting the proposed rule.  *See* NACS Comments; Comments of the National Retail Federation in Docket No. R-14 04 / RIN No. 7100AD63 (Debit Card Interchange Fees and Routing) (Feb. 22, 2011) ("NRF Comments"); Comments of the Food Marketing Institute ("FMI") in Docket No. R-14 04

/ RIN No. 7100AD63 (Debit Card Interchange Fees and Routing) (Feb. 21, 2011) ("FMI

Comments") (attached as Ex. G, J, and K respectively).

## V.    THE FINAL RULE

On July 20, 2011, the Board released the Final Rule.  *See* 76 Fed. Reg. 43,394 (July 20,

2011).  The Final Rule became effective on October 1, 2011.

**The Interchange Fee Standard.**  With respect to the interchange fee standard, the Board

rejected both of its own proposed alternatives.  Based on a new interpretation of the statute, it

instead adopted "a modified version of the approach in proposed Alternative 2."  *See* 76 Fed.

Reg. at 43,422.  Under this modified approach, the allowable interchange fee increased

markedly, from the proposed cap of 12 cents per transaction to a statutory cap of 21-cents *plus* an

*ad valorem* amount of 5 basis points of the transaction's value (0.05%).  12 C.F.R. § 235.3.  For

the average transaction, then, the Final Rule nearly *doubled* the amount of fees recoverable as

compared to maximum amount recoverable under the NPRM.[5]

The Board reached this drastically different outcome only by rejecting its prior

interpretation of the statute.  Where it had proposed including only those costs of authorization,

clearance and settlement that Congress directed it to consider and excluding all other costs, the

Board now invented a third category of costs—"those that are specific to a particular electronic

debit transaction but that are not incremental costs related to the issuer's role in authorization,

clearance, and settlement."  *See* 76 Fed. Reg. at 43,426.  The Board then stretched its authority

─────────────────────

[5] The Board determined that the average transaction had a value of $35.58 in 2009.
75 Fed. Reg. at 81,725.  The NPRM  proposed a maximum allowable interchange fee of 12 cents
for such a transaction.  Under the Final Rule, the interchange fee for the same transaction would
be 21 cents plus an *ad valorem* allowance of 1.78 cents, for a total of 22.78 cents—or a 90%
increase.

even further by defining "*specific* to a *particular* electronic debit transaction" to mean "specific to effecting debit transactions *as a whole*." *Id.* (emphasis added)   It thus interpreted "costs that 'are not specific to a particular electronic debit transaction,' and therefore cannot be considered by the Board, to mean those costs that are not incurred in the course of effecting *any* electronic debit transaction." *Id.* (emphasis added).

Under the Board's new interpretation, the Board claimed discretion to decide which of such costs in this third category it would include in allowable cost.  It reasoned "all costs related to a particular transaction *may* be considered, and some—the incremental costs incurred by the issuer for its role in authorization, clearance, and settlement—*must* be considered."  *See* 76 Fed. Reg. at 43,427 (emphasis added).  This interpretation, the Board concluded, allowed it to forego entirely defining several critical statutory terms:  "This interpretation would not require identification of the cost of a given electronic debit transaction."  *Id.* at 43,426.  Thus, the "Board does not find it necessary to determine whether costs are 'incremental,' fixed or variable, or incurred in connection with authorization, clearance, and settlement."  *Id.* at 43,427.

Employing its newfound construction of the statute, the Board permitted recovery under the Final Rule of a range of costs that had been excluded under the Interim Rule, including: (1) fixed costs related to authorization, clearance, and settlement, (2) network processing fees (*e.g.*, switch fees), (3) transactions monitoring costs, and (4) the issuer's fraud losses.  *Id.* at 43,429-30.  The Board also permitted issuers to recover an allowance for fraud losses through an *ad valorem* charge of 5 basis points of the total amount of the debit card transaction.  *Id.* at 43,431.

The only costs the Final Rule excludes as "other costs incurred by an issuer which are not specific to a particular electronic debit transaction," *see* 15 U.S.C. § 1693o-2(a)(4)(B)(ii), are the

costs of rewards programs and customer inquiries; corporate overhead (such as senior executive compensation); establishing the account relationship; card production and delivery; marketing; research and development; and network membership fees.  *See* 76 Fed. Reg. at 43,404, 43,427-29.

**Network Exclusivity.**  With respect to the Durbin Amendment's non-exclusivity provision, 15 U.S.C. § 1693o-2(b)(1)(A), the Board concluded that "[t]he plain language of the statute does not require that there be two unaffiliated payment card networks available to the merchant for each method of authentication."  76 Fed. Reg. at 43,447.  The Board reasoned that "the statute does not expressly require issuers to offer multiple unaffiliated signature *and* multiple unaffiliated PIN debit card network choices on each card."  *Id.* (emphasis added).

Based on this interpretation, the Final Rule requires only that all debit *cards* be interoperable with at least two unaffiliated payment card networks, 12 C.F.R. § 235.7(a)(2) & Official Cmt. 1, which means that a card may have only one network choice for signature transactions and one network choice for PIN transactions and that not a single individual *transaction* need have two network choices available.  As a result, the 75% of merchants— including Boscov's—that do not process PIN transactions are limited to one network choice on all of their transactions as a result of the Board's interpretation of the statute.  76 Fed. Reg. at 43,395.

## VI.    THE PLAINTIFFS

Plaintiffs are a group of individual retailers that accept debit cards as a form of payment and trade associations made up of such retailers.  The Board's final rule imposes substantial additional costs on the plaintiffs and their members beyond those permitted by statute.

NACS (formerly the National Association of Convenience Stores) is a trade association representing more than 2,100 retail and 1,600 supplier company members, mostly in the United

States, but also abroad.  The U.S. convenience store industry includes about 146,000 stores, sells

nearly 80 percent of the gasoline in the nation, and employs about 1.7 million workers.  For

NACS members, payment card cost, with interchange fees as the largest component, is the

second largest operating expense, *see, e.g.*, 156 Cong. Rec. S4,978 (daily ed. June 16, 2010)

(Sen. Durbin) (attached as Ex. L), amounting to $8.9 billion industry-wide in 2010.  Amended

Compl. ¶¶ 15-16.

The National Retail Federation ("NRF") is the world's largest retail trade association.  It

represents retailers of all types and channels of distribution, including department, specialty,

discount, catalog, Internet, independent stores, chain restaurants, drug stores and grocery stores,

from the United States and more than 45 countries abroad.  Retailers operate more than

3.6 million U.S. establishments, support one in four U.S. jobs (approximately 42 million working

Americans), and contribute $2.5 trillion to annual GDP.  Debit cards play a critical role in NRF-

represented retailers' operations.  *Id.* ¶¶ 17-18.

The Food Marketing Institute ("FMI") advocates for 1,500 food retailers and wholesalers.

Its retail membership is composed of large multi-store chains, regional firms, and independent

supermarkets with a combined annual sales volume of $680 billion.  FMI membership includes

26,000 retail food stores, 14,000 pharmacies, supplier partners of its retail and wholesale

members, and 200 companies from more than 50 countries.  In 2010, approximately 28% of all

supermarket sales were made on debit cards—resulting in $1.85 billion in debit card interchange

fees.  *Id.* ¶¶ 19-20.

The National Restaurant Association ("NRA"), represents the restaurant and foodservice

industry, which contains over 970,000 locations and roughly 12.9 million employees.  NRA is

the leading national association representing this industry, and its members account for over one-

third of the industry's retail locations.  With annual sales of $632 billion, a significant portion of which are made via electronic payments, the restaurant and foodservice industry—including NRA members—incurs substantial debit card interchange costs.  *Id.* ¶ 23.

Interchange fees on small purchases (those that total $15 or less) have significantly increased for NRA members as a result of network decisions made following the issuance of the Board's final rule.  Small purchases are commonplace in the restaurant and foodservice industry, particularly at quick service restaurants where the average purchase is $5 to $6.  Prior to the Durbin Amendment, quick service chain restaurants were paying an average debit interchange fee of 11.75 cents on a $5 sale (1.55% + 4 cents).  After the Board's promulgation of the Final Rule, NRA members are paying double the debit interchange swipe fee on that average $5 ticket, or 23.5 cents (21 cents + 5 basis points).  Similarly, on a $2 cup of coffee, food service retailers were paying an average debit interchange fee of 7.1 cents (1.55% + 4 cents) prior to the Board's final rule; that amount has now effectively tripled to over 22 cents on that same $2 sale (21 cents + 5 basis points).  *Id.* ¶ 24.

Individual plaintiff merchants are also harmed by the Final Rule.  Miller Oil Company, Inc. ("Miller"), headquartered in Norfolk, Virginia, sells residential heating oil, heating and air-conditioning service, commercial fuels, and wholesale fuels, in addition to running convenience store and gasoline retailing business.  Miller's convenience and fuel retailers accept all major credit and debit cards.  Sixty-five percent of their retail transactions are completed via credit or debit card.  In 2009 and 2010, card transaction fees were over $2.1 million and constituted Miller's third largest expense (behind salaries and rent).  *Id.* ¶ 21.  Because the average debit card transaction at its convenience stores is less than $4, Miller will pay higher debit card interchange under the Board's final rule than it did prior to the Durbin Amendment.  *Id.*

Boscov's Department Store, LLC ("Boscov's"), currently has a chain of 40 full-service department stores (with 7,500 employees), reaching across five states in the Mid-Atlantic region of the country, as well as an online store. Boscov's accepts debit cards, but only for signature debit transactions. Its stores—each of which houses between 60 to 65 points of sale—do not have the equipment to process PIN transactions. In 2010, Boscov's processed about $200 million in debit transactions. It paid an average rate of 1.59% to process these debit transactions, 90% of which is attributable to interchange transaction fees. Altogether, Boscov's pays between $7-$8 million a year in interchange transaction fees. *Id.* ¶ 22.

## ARGUMENT

### I.     STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact" and "the [moving party] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In a challenge to agency rulemaking, the court makes that determination in light of the administrative record before the agency. *See, e.g., Theodore Roosevelt Conservation Partnership v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010); *see also* LCvR 7(h).

The Administrative Procedure Act requires this court to "hold unlawful and set aside agency action, findings and conclusions found to be . . . (A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law [or] . . . (C) in excess of statutory jurisdiction, authority or limitations, or short of statutory right." 5 U.S.C. § 706(2). "Regardless of how serious the problem an administrative agency seeks to address, . . . it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'" *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) (citation omitted). Thus, when an agency has acted beyond its delegated authority, the Court must hold

- 22-

such action *ultra vires*. *Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 621 (D.C. Cir. 1992); *see also* 5 U.S.C. § 706(2)(A), (C).

Under the APA, this Court has the ultimate responsibility to decide legal questions, including issues of statutory interpretation. 5 U.S.C. § 706 (2006). However, review of an agency's statutory interpretation is guided by the familiar two-pronged analysis of *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 842 (1984). In short, the Court first asks "whether Congress has directly spoken to the precise question at issue"; if so, it must give effect to Congress's unambiguously expressed intent. *Chevron*, 467 U.S. at 842-43; *see Sec'y of Labor v. Fed. Mine Safety & Health Review Comm'n*, 111 F.3d 913, 917 (D.C. Cir. 1997). If, however, the statute is silent or ambiguous with respect to the specific question over which the agency has claimed authority, then the court will review the agency's interpretation to determine whether it is reasonable and consistent with the statute's purpose. *Chevron*, 467 U.S. at 842-43.

## II.   THE FINAL RULE'S INTERCHANGE FEE STANDARD VIOLATES THE APA

This case is a case in which Congress *has spoken* to the precise question at issue. Yet the Board has failed to give effect to Congress's unambiguously expressed intent. *Chevron*, 467 U.S. at 842-43. In setting an interchange fee that allows issuing banks to recover costs beyond those explicitly delineated by Congress, the Board clearly exceeds its statutory authority under the Durbin Amendment. The interchange fee standard must be invalidated by this Court.

The Durbin Amendment directs the Board to promulgate regulations to ensure that any interchange fee charged by an issuing bank "is reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(3). This language clearly focuses on the costs associated with an individual transaction. Congress then implemented this overarching legislative command by dividing relevant costs into two basic categories—allowable and not allowable. Under the key provision at the heart of this dispute, the Board shall

"distinguish between":  (1) the "incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered" in setting the standard; and (2) "other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered . . . ."  *Id.* § 1693o-2(a)(4)(B).

Notwithstanding this statutory dichotomy, the Board concluded that it had much broader authority to include within its final standard a *third* category of costs found nowhere in the statute's plain text —costs "that are specific to a particular electronic debit transaction but that are not incremental costs related to the issuer's role in authorization, clearance, and settlement." *See* 76 Fed. Reg. at 43,426.  It reached that conclusion only by significantly narrowing—well beyond its ordinary meaning—the class of "other costs" explicitly excluded from consideration in Section 1693o-2(a)(4)(B)(ii), and misconstruing or disregarding entirely critical limiting statutory terms.  The Board's final standard thus included several types of costs—*e.g., fixed* authorization, clearance, and settlement costs; network fees; and fraud losses—that it had originally proposed to exclude from consideration and that must not be considered under the plain language of the statute.  *See* 75 Fed. Reg. at 81,735-36.  The Board's reading of Section (a)(4)(B) rests upon a shaky countertextual foundation in willful disregard of the plain text and purpose of key statutory provisions.  It cannot survive scrutiny under *Chevron*.

### A.    The Board's Interpretation of Its Interchange Fee Authority Cannot Survive Scrutiny Under *Chevron* Step One

The starting point for any analysis of an agency's statutory authority under *Chevron* is the language of the statute itself.  *See Southern California Edison Co. v. FERC*, 195 F.3d 17, 22-23 (D.C. Cir. 1999).  Under the first step of *Chevron*, judicial deference is due only "[i]f the agency interpretation is not in conflict with the plain language of the statute."  *National R.R. Passenger*

*Corp. v. Boston & Me. Corp.*, 503 U.S. 407, 417 (1992) (citation omitted).  The Board's reading

of the Durbin Amendment cannot satisfy this initial *Chevron* inquiry.

In examining the Durbin Amendment's meaning, the Court "must first exhaust the

'traditional tools of statutory construction' to determine whether Congress has spoken to the

precise question at issue."  *Natural Resources Defense Council, Inc. v. Browner*, 57 F.3d 1122,

1125 (D.C. Cir. 1995) (quoting *Chevron*, 467 U.S. at 843 n.9).  The statutory text itself is the

"most traditional tool" of statutory construction.  *Southern Cal. Edison*, 195 F.3d at 23.  But the

court must also examine the structure, purpose, and legislative history of the statute as a whole.

*See Southern California Edison Co. v. FERC*, 116 F.3d 507, 515 (D.C. Cir. 1997); *First Nat'l

Bank & Trust Co. v. Nat'l Credit Union*, 90 F.3d 525, 529-30 (D.C. Cir. 1996), *aff'd*, 522 U.S.

479 (1998).  If this yields a clear result, "then Congress has expressed its intention as to the

question, and deference is not appropriate."  *Natural Resources Defense Council, Inc. v. Daley*,

209 F.3d 747, 752 (D.C. Cir. 2000) (citation omitted); *see Hammontree v. NLRB*, 894 F.2d 438,

441 (D.C. Cir. 1990).

### 1.    The Durbin Amendment Limits Allowable Costs to Those Costs Specifically Delineated in 15 U.S.C. § 1693o-2(a)(4)(B)(i)

Here, the plain language of the Durbin Amendment does not grant the Board the

discretion it claims to consider costs beyond those delineated in the statute.  *See* 15 U.S.C.

§ 1693o-2(a)(4)(B)(i).   Rather, the statute requires that the interchange fee standard be based on

considerations defined by Congress.  The Durbin Amendment directs the Board to promulgate

regulations to ensure that any interchange fee charged by an issuing bank "is reasonable and

proportional to the cost incurred by the issuer with respect to the transaction."  15 U.S.C.

§ 1693o-2(a)(3).  Congress provided explicit guidance to the Board in implementing that

command, prescribing a series of statutory "considerations" that the Board must take into

account in establishing the interchange fee standard.  *Id.* § 1693o-2(a)(4).  Most relevant here, Congress required the Board to "distinguish between" two categories of costs:  (1) the "incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered" in setting the standard; and (2) "other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered."  *Id.* § 1693o-2(a)(4)(B).

The statute thus establishes a dichotomy between costs that *must be included* in the fee standard and "other costs" that *must be excluded*.  That is, Congress requires the Board to include the "incremental costs" of processing (authorizing, clearing, and settling) a particular transaction and to exclude all "other costs."  This language was intended to encompass the entire universe of costs that the Board could consider in setting an interchange fee allowance.  *See* 156 Cong. Rec. S5,925 (daily ed. July 15, 2010) (statement of Sen. Richard J. Durbin) (attached as Ex. M).

The specific language that Congress chose in prescribing these considerations reinforces that conclusion.  Congress directed the Board to "distinguish between" the two categories of delineated costs, thus requiring the Board to differentiate between the two groups.  *See Webster's New College Dictionary* 417 (2007) (defining "distinguish" as "to separate or mark off by differences; perceive or show the difference in; differentiate").  The statute describes in detail that category of costs which must be included in the standard, setting forth numerous specifications—costs that are "incremental," incurred by an issuing bank for its role in the "authorization, clearance, or settlement," and that relate to a "particular electronic debit transaction."  15 U.S.C. § 1693o-2(a)(4)(B)(i).

From that defined group of includable costs, the statute directs the Board to differentiate all "other costs," which the Board "shall not" consider in setting the standard.  *Id.* § 1693o-2(a)(4)(B)(ii).  The very use of the term "other costs"—as opposed to simply "costs"—indicates the universe of costs that is remaining after consideration of the includable costs.  *See Webster's New College Dictionary* 1021 (2007) ("other" defined as "being the remaining one or ones of two or more; different or distinct from that or those referred to or implied . . . .").  Congress's use of the non-restrictive pronoun "which" in describing this category of "other costs" confirms that these "other costs" excluded all costs not specifically addressed in Section 1693o-2(a)(4)(B)(i).  In directing that "other costs *which* are not specific to a particular transaction" be excluded, Congress indicated that the clause that follows "other costs" is merely descriptive and not intended to limit its meaning.  *See United States v. Indoor Cultivation Equip.*, 55 F.3d 1311, 1315 (7th Cir. 1995) ("Congress's use of the pronoun 'which' is significant; it introduces a nonrestrictive clause . . . that does not limit the meaning of the word it modifies . . . .'"); *accord* William Strunk Jr. & E.B. White, *The Elements of Style* 59 (3d ed. 1979) ("*That* is the defining, or restrictive, pronoun, *which* the nondefining, or nonrestrictive.").

Traditional tools of statutory construction—specifically, the canons of avoiding surplusage and *expressio unius, exclusio alterius*—provide further support for this plain reading of the statute.  These canons apply "in tandem" here, and their interpretive force is thus "'at their zenith.'"  *Beverly Health & Rehab. Servs. v. NLRB*, 317 F.3d 316, 321 (D.C. Cir. 2003) (citation omitted); *see also California State Bd. of Optometry v. FTC*, 910 F.2d 976, 979 (D.C. Cir. 1990) (citation omitted) ("If employment of an accepted canon of construction illustrates that Congress had a specific intent on the issue in question, then the case can be disposed of under the first prong of *Chevron*.").

- 27-

First, the Board's interpretation fails to give meaning to several critical statutory terms. In particular, its interpretation effectively renders surplusage each of the various defining characteristics of allowable costs in Section 1693o-2(a)(4)(B)(i)—*e.g.,* "incremental," "authorization, clearance, or settlement."  Congress did not describe with particularity the characteristics of those costs that must be considered for the Board to simply ignore those characteristics in setting the interchange fee standard.  But that is precisely the reading of the statute the Board embraced.  Rather than seeking to give meaning to the various characteristics of an allowable cost delineated by Congress, the Board concluded that it was not "necessary to determine whether costs are 'incremental,' fixed or variable, or incurred in connection with authorization, clearance, and settlement."  76 Fed. Reg. at 43,427.  Under the Board's construction, then, the terms "incremental" and "incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement," 15 U.S.C. § 1693o-2(a)(4)(B)(i), serve no statutory purpose.  Where, as here, an agency wholly fails to define critical statutory terms, this court is not required to defer to the agency's interpretation.  *See Qwest Corp. v. FCC*, 258 F.3d 1191, 1202 (10th Cir. 2001) ("deference is inappropriate" where agency "has failed to define [statutory] terms at all.").

Similarly, the Board concluded that its interpretation does "not require identification of the cost of a given electronic debit transaction."  *See* 76 Fed. Reg. at 43,426.  The Board's interpretation thus does violence to the statute's principal mandate that interchange fees be "reasonable and proportional to the cost incurred by the issuer with respect to *the transaction*."  *Id.* § 1693o-2(a)(2) (emphasis added).  The Board simply cannot make a proper determination of reasonableness and proportionality without identifying the cost of a given (or even a typical) transaction or identifying the components of cost that Congress directs it to consider.

Second, the Board's interpretation conflicts with the canon of *expressio unius*, which

provides that a statute's "special mention of one thing indicates an intent for another thing not to

be included elsewhere. . . ."  *Independent Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 644

(D.C. Cir. 2000).[6]  The Board's *proposed* reading of the statute comported with this maxim.  The

NPRM concluded, for instance, that the rule "would *not* consider costs that are common to all

debit card transactions and could never be attributed to any *particular* transaction (*i.e.*, fixed

costs), even if those costs are specific to debit card transactions as a whole."  75 Fed. Reg.

at 81,736.  In rejecting that statutory reading, the Final Rule disregards the *expressio unius*

canon, concluding that statutory *silence* elsewhere permits it to include not only costs *not*

*mentioned* anywhere in Section 1693o-2(a)(4)(B)(i), but also costs that *fail* to meet the standards

set forth in that provision.  Thus, where the statute requires inclusion of cost "A" (*e.g.*,

"incremental" costs) the Board now claims authority to include "not A" (*e.g.*, fixed costs).  But

the statutory context indicates that Congress defined with specificity the category of allowable

costs and required the exclusion of "other costs" for a reason—to cabin the Board's authority.  It

did not delegate to the Board, *sub silentio*, the power to consider an even broader range of costs.

That conclusion is even clearer when considered in the broader context of related

statutory provisions.[7]  For instance, as part of its delegation of rulemaking authority over

---

[6] Although the D.C. Circuit has rejected the applicability of this interpretive maxim in
some administrative law cases, the rule is applicable where the statutory "context" shows that the
"draftsmen's intention of one thing, like a grant of authority, does necessarily, or at least
reasonably, imply the preclusion of alternatives."  *Id.* (citing, *inter alia*, *Shook v. Dist. of
Columbia Fin. Responsibility & Management Assistance Auth.*, 132 F.3d 775, 782 (D.C. Cir.
1998)) (explaining that the canon is rejected only in administrative cases where it "simply did
not hold up in the statutory context") (citations omitted).

[7] *See Meredith v. Federal Mine Safety & Health Review Comn'n*, 177 F.3d 1042, 1054
(D.C. Cir. 1999) (in applying *Chevron*, "we 'follow the cardinal rule that a statute is to be read as

interchange fees, Congress granted the Board authority to collect information from regulated banks and networks in order to "carry out the provisions of this subsection," and required the Board to publicly disclose that data in aggregate or summary form on a bi-annual basis. *Id.* § 1693o-2(a)(3)(B). But in so requiring, Congress explicitly mandated disclosure only of information "concerning the costs incurred, and the interchange transaction fees charged or received . . . *in connection with the authorization, clearance or settlement of electronic debit transactions* as the Board considers appropriate and in the public interest." *Id.* (emphasis added). That Congress limited this public disclosure requirement to those costs specifically enumerated in Section 1693o-2(a)(4)(B)(i) reinforces the conclusion that those were the only costs it intended to include in the interchange fee standard. Indeed, it is doubtful that Congress would allow more costs to be factored into the interchange fee standard than it contemplated would be disclosed in the public interest.

Finally, the legislative history leaves no doubt that Congress intended that only specifically enumerated costs to be included in the interchange fee standard.[8] In addressing the meaning of the Amendment on the floor of the Senate prior to its final passage, Senator Richard Durbin, the Amendment's chief sponsor and namesake, explicitly confirmed that 15 U.S.C.

---

a whole'"); *see also Public Citizen v. FTC*, 869 F.2d 1541, 1553 (D.C. Cir. 1989) ("[I]nquiry into congressional intent must encompass both the particular language as well as the broader design of the statute.") (citation omitted); *see also Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("words of a statute must be read in their context and with a view to their place in the overall statutory scheme").

[8] "[W]hile the immediate statutory text is the '"best evidence" of congressional intent,' it is not 'the *only* such evidence.'" *See Browner*, 57 F.3d at 1127 (citation omitted); *see also American Scholastic TV Programming Found. v. FCC*, 46 F.3d 1173, 1178 (D.C. Cir. 1995) ("*ASTV*"). "Reference to statutory design and pertinent legislative history may often shed new light on congressional intent, notwithstanding statutory language that appears "'superficially clear.'" *Browner*, 57 F.3d at 1127; *ASTV*, 46 F.3d at 1180 (citation omitted).

§ 1693o-2(a)(4)(B) allows an issuer to recover *only* its incremental cost of authorization,

clearance, or settlement of a particular electronic transaction:

> Paragraph (a)(4) makes clear that *the cost* to be considered
> by the Board in conducting its reasonable and proportional analysis
> is the incremental cost incurred by the issuer for its role in the
> authorization, clearance, or settlement of a particular electronic
> debit transaction, *as opposed to other costs incurred by an issuer
> which are not specific to the authorization, clearance, or
> settlement of a particular electronic debit transaction.*

*See* 156 Cong. Rec. S5,925 (daily ed. July 15, 2010) (statement of Sen. Richard J. Durbin)

(emphasis added) (attached as Ex. M).[9]  Thus, Congress quite explicitly sought to bifurcate a

universe of relevant costs into (a) incremental authorization, clearance, and settlement costs

includable in the interchange fee standard, and (b) *all* other costs, which must be excluded.

### 2.   The Board Improperly Expanded the Costs Allowable Within Its Interchange Fee Standard

The plain language, structure and purpose of the Durbin Amendment demonstrate that

Congress intended that the Board exclude all "other costs" beyond those specifically delineated

in the statute from consideration in its interchange fee standard.  Yet the Board concluded that

there was a third category of costs—"those that are specific to a particular electronic debit

transaction but that are not incremental costs related to the issuer's role in authorization,

clearance, and settlement," *see* 76 Fed. Reg. at 43,426—that it could decide, in its discretion,

---

[9] Floor statements from members of Congress cannot *amend* a statute's plain meaning, but courts frequently look to floor statements to *confirm* a statute's plain terms.  *See, e.g., Blair-Bey v. Quick*, 151 F.3d 1036, 1040 (D.C. Cir. 1998) (examining floor statements of Prison Litigation Reform Act's two Senate sponsors). This legislative history is especially relevant where, as here, it is the only legislative record and represents the explanation of the statute's terms by the legislator most involved in the negotiation and enactment of the legislation.  *See Begier v. IRS*, 496 U.S. 53, 64 & n.5 (1990) (treating floor manager's floor statements "as persuasive evidence of congressional intent" in light of "absence of a conference and the key roles played" managers in legislative process).

whether to include or exclude.  A close examination of how the Board conjured this third

category of costs provides even further statutory evidence that the Board's reasoning runs

counter to Congress's design.

Curiously, in determining which costs to consider in setting the interchange fee standard,

the Board did not start with the costs that Congress directed it to consider.  Where the Board

proposed to define the "the incremental cost incurred by an issuer for the role of the issuer in the

authorization, clearance, or settlement of a particular electronic debit transaction," 15 U.S.C.

§ 1693o-2(a)(4)(B)(i), in its NPRM, *see* 75 Fed. Reg. at 81,734-36, it opted to forego any

definition of those terms in its Final Rule.  *See* 76 Fed. Reg. at 43,426-27.

Instead, the Board started its analysis of Congressional intent by considering the costs

that Congress directed it to *exclude* from its calculation.  *See* 76 Fed. Reg. at 43,426

("Section 920(a)(4)(B) does not define which types of costs are 'not specific to a particular debit

transaction.'  Therefore, the Board must define those costs.").  The Board read "not specific to a

particular electronic debit transaction" in 15 U.S.C. § 1693o-2(a)(4)(B)(ii) to mean "those costs

that are not incurred in the course of effecting *any* electronic debit transaction."  76 Fed. Reg.

at 43,426 (emphasis added).  Its newfound definition was an about-face from the NPRM, where

it had proposed to define costs that are "specific" to a "particular" transaction to exclude from

consideration any "costs that are common to all debit card transactions and could never be

attributed to any *particular* transaction (*i.e.,* fixed costs), even if those costs are specific to debit

card transactions as a whole."  75 Fed. Reg. at 81,736.  Under its final interpretation, it does not

matter whether costs are variable and arise only as a result of a particular transaction or fixed and

thus common to all.  *See* 76 Fed. Reg. at 43,427 (costs are "specific" to "each and every

electronic debit transaction" where "no electronic debit transaction can occur without incurring these costs").

In addition to ignoring the basic structure of the statute (*see* discussion, *supra*, Section II.A.1), this reading ignores the statute's critical limiting terms.  The statutory terms "specific" and "particular," especially when used in combination, are clear and do not admit of the Board's interpretation.  A cost is "specific" if it is "limiting or limited; specifying or specified; precise; definite; explicit."  *Webster's New College Dictionary* at 1376 (2007).  "[P]articular," in turn means "[o]f or belonging to a single, definite person, part group or thing, not general; distinct."  *Id.* at 1050; *see also Black's Law Dictionary* at 1119 (6th ed. 1990) ("relating to a part or portion of anything; separate; sole; single; individual; specific; local; comprising a part only; partial in extent; not universal").  Put otherwise, "particular" designates "a proposition that deals with only some members of a class rather than all of them; not universal."  *Webster's New College Dictionary* at 1050*; see also Thompson Ramo Wooldridge Inc. v. United States*, 361 F.2d 222, 229 (Ct. Cl. 1966) ("'Particular' signifies a separate or specific, single portion or part of a class or thing.").  Read together, then, a cost "specific" to a "particular" debit transaction refers to a cost that is limited to a single debit transaction—that is, a cost that is incurred only in connection with a particular transaction, not costs incurred only in common with all debit transactions.

The Board's interpretation renders the statute's use of the terms "particular" and "specific" meaningless.  Rather than requiring that a cost *specific* to *particular* debit card transactions, the Board declares that it has authority to consider any costs that are *common* or *universal* to all debit transactions.  So long as a cost is incurred to effect "debit card transactions as a whole," the Board concludes that cost may be considered in its interchange fee standard.

76 Fed. Reg. at 43,426.  A more counter-textual reading of these statutory terms is difficult to imagine.  To borrow from the D.C. Circuit's application of *Chevron* in another context, "[o]nly in Superman Comics' Bizarro world, where reality is turned upside down," could the *specific* be defined to include *the general* or could a *particular* debit card transaction refer to debit card transactions *as a whole*.  *See Daley*, 209 F.3d at 754; *see also Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1272 (D.C. Cir. 2004) ("Only in a world where 'based upon' means 'in disregard of' and 'consistent with' means 'inconsistent with'" could the agency's implementation of statute be considered permissible).

Through this artifice of narrowing the category of excludable costs, the Board finds authority to expand the categories of allowable costs beyond those expressly defined by Congress.  Once it improperly narrowed the class of "other costs," the Board declared that "there exist costs that are not encompassed in either the set of costs the Board must consider under Section 920(a)(4)(B)(i), or the set of costs the Board may not consider under Section 920(a)(4)(B)(ii)."  76 Fed. Reg. at 43,426.   Those costs, with respect to which the Board declares the statute "silent," are "those that are specific to a particular electronic debit transaction but that are not incremental costs related to the issuer's role in authorization, clearance, and settlement." *Id.*  Given this purported statutory silence, the Board claims "discretion to consider costs that fall into neither category" addressed in the statute.  *Id.*

The Board's strained interpretation cannot be justified on the basis of ambiguity.  As the Supreme Court has instructed, "[a]mbiguity is a creature not of definitional possibilities but of statutory context." *Brown v. Gardner*, 513 U.S. 115, 118 (1994).  Here, deference does not automatically follow from a mere hypothetical prospect that Congress might be deemed, through logical and textual contortions, not to have addressed a particular third category of costs. *See*

*Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 11 (D.C. Cir. 2002) ("[m]ere ambiguity in a statute is

not evidence of congressional delegation of authority' in the first instance") (quoting *Michigan v.*

*EPA*, 268 F.3d 1075, 1082 (D.C. Cir. 2001)).  The statute simply is *not* silent—that is, there is no

phantom third category of costs under its plain terms.  Properly interpreted, the "other costs"

excluded from consideration under Section (a)(4)(B)(ii) covers *all* "other costs" not explicitly

addressed in Section (a)(4)(B)(i).  This court owes no deference to the Board's determination to

the contrary.  *See ABA v. FTC*, 430 F.3d 457, 468 (D.C. Cir. 2005) ("We owe the agency no

deference on the existence of ambiguity.").

　　　　Even if the statute did not, in fact, explicitly foreclose the consideration of a third group

of costs—a conclusion that can only be reached by ignoring numerous statutory terms—the mere

failure of Congress to foreclose a particular agency decision does not necessarily imply an

affirmative delegation of authority to make that decision.  As the D.C. Circuit has repeatedly

held, a court should not "presume a delegation of power merely because Congress has not

expressly withheld such power."  *See Ethyl Corp. v. EPA*, 51 F.3d 1053, 1060 (D.C. Cir. 1995).

Thus, Congress does not implicitly delegate to the Board authority to include all manner of other

costs in the interchange transaction fee merely by disregarding them.  "To suggest . . . that

*Chevron* step two is implicated any time a statute does not expressly negate the existence of a

claimed administrative power . . . , is both flatly unfaithful to the principles of administrative law

. . . and refuted by precedent."  51 F.3d at 1060 (citation omitted); *see also Texas v. United*

*States*, 497 F.3d 491, 501-02 (5th Cir. 2007).

　　　　Instead, there must be affirmative evidence of legislative intent to delegate this broad

authority before the Board's interpretation may receive deferential review under the second

prong of *Chevron*.  *NRDC v. Reilly*, 983 F.2d 259, 266 (D.C. Cir. 1993) (citation omitted); *see*

*also Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640, 645 (D.C. Cir. 1998) (*Chevron*

deference "comes into play . . . . only as a consequence of statutory ambiguity, and then only if

the reviewing court finds an implicit delegation of authority to the agency.") (citation omitted).

But here, there is no evidence that Congress, by its purported silence, sought to massively

expand the allowable costs.

The Board's survey of industry costs demonstrated that the average per-transaction

variable processing cost for a debit transaction was 6.7 cents for signature transactions and 4.5

cents for PIN debit.  Permitting only the recovery of those variable processing costs as required

by the statute, the NPRM proposed alternative standards that would have allowed a recovery of

interchange fees based on safe harbor amounts of 7 cents per transaction (assuming the 50th

percentile of estimated per-transaction variable costs) or 12 cents (80th percentile).  75 Fed. Reg.

at 81,736-38.  But with its newfound interpretation of the statute in the Final Rule, the Board

more than doubled or even tripled the maximum recoverable fee to a base amount of 21 cents,

plus an *ad valorem* amount of .05% of each transaction's value.[10]

The Durbin Amendment's statutory language plainly does not permit such a major

expansion of recoverable costs.  As Justice Scalia famously wrote for the Supreme Court,

"Congress . . . does not, one might say, hide elephants in mouseholes."  *See Whitman v. Am.*

*Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001) (citation omitted).  The mere suggestion of

---

[10] The Board complains in the Final Rule that a literal interpretation of the statute "would
appear to exclude almost all costs related to electronic debit transactions because very few costs
could be specifically assigned to a given transaction."  *See* 76 Fed. Reg. at 43,426.  Of course,
the Board's proposed rule belies that assertion, allowing recovery of up to 12 cents per
transaction.  In any event, the Board's objection simply quarrels with Congress's policy
determination to limit the amount of recoverable costs.  That policy determination is for
Congress alone to make.

statutory silence—a statutory silence that here rests on the artifice of countertextualism—cannot delegate such vast discretion to the Board.  There is no indication in the Durbin Amendment's text, purpose, or legislative history that Congress meant, by carefully delineating the cost factors that the Board must consider and not consider in setting an interchange fee standard, to delegate to the Board by what it *did not say* the unbounded discretion to consider any other cost factor relating to a debit card transaction.  The Board exceeded its statutory power in assuming that authority.

### 3. The Particular Items of Costs Considered by the Board Are Foreclosed from Consideration by the Durbin Amendment

Further evidence that the Board's statutory interpretation is foreclosed by the plain text of the statute is found in the particular items of costs that the Board included in its final interchange fee standard as a result of its misreading of Section (a)(4)(B).  The Board had explicitly proposed not to include these same costs in its NPRM.  75 Fed. Reg. at 81,734-35.  But in the Final Rule, it again reversed course and permitted the fee allowance to include the following items of cost: (1) fixed authorization, clearance, and settlement costs, (2) transactions monitoring, (3) fraud losses, and (4) network processing fees (*e.g.*, switch fees).  76 Fed. Reg. at 43,439.  In each case, the statute plainly indicates that Congress did not intend the cost item to be included in the interchange fee standard.

*Fixed costs of authorization, clearance, and settlement*.  The Final Rule includes all costs—both fixed and variable—associated with the authorization, clearance, and settlement of transactions.  76 Fed. Reg. at 43,429.  But Section (a)(4)(B) explicitly limits the costs associated with authorization, clearance and settlement to the "*incremental cost* incurred by an issuer" for its role in processing a "particular transaction."  15 U.S.C. § 1693o-2(a)(4)(B) (emphasis added). *See* discussion, *supra*, at Section II.A.1-2.  The statute's use of the term "incremental cost"

plainly requires the consideration of only the "additional or increased costs" associated with a particular transaction. *See Black's Law Dictionary* at 767 (6th ed.). Indeed, numerous courts equate "incremental" with "variable" costs—*i.e.*, those costs that change with a particular transaction—in contrast to those that are fixed.[11] *See also* 75 Fed. Reg. at 81,735 (proposing to define "incremental cost" of "particular" transaction to mean "costs that vary with the number of transactions (*i.e.*, average variable cost) within the reporting period").

Here, the Board refused to define "incremental cost" at all. 76 Fed. Reg. at 43,427. Thus, even if there were some range of flexibility in that statutory term, the Board's non-interpretation is not entitled to deference. *Qwest Corp.*, 258 F.3d at 1202. But whatever the term's precise meaning, it plainly cannot mean "non-incremental." By including *fixed* costs in its interchange fee standard, the Board has thus bent the plain meaning of the statute beyond recognition and deprived the limiting term "incremental" of any function in the statutory scheme. *See Qi-Zhuo v. Meissner*, 70 F.3d 136, 139 (D.C. Cir. 1995) ("all words in a statute are to be assigned meaning" and "nothing therein is to be construed as surplusage").

**Transactions monitoring**. Transactions monitoring involves pre-transaction efforts by issuers to prevent fraudulent transactions—such as computerized algorithms designed to detect suspicious patterns of debit card activity. 76 Fed. Reg. at 43,430. According to the Board, transaction monitoring is the "most commonly reported fraud-prevention activity," for which issuers spend, on average, 0.7 cents per transaction. *Id.* at 43,397. The Board included the costs

---

[11] *See, e.g., Cascade Health Solutions v. Peacehealth*, 515 F.3d 883, 910 (9th Cir. 2008) (using average variable cost as appropriate measure of "incremental costs" in bundled discounting antitrust context); *Maine Public Serv. Co. v. FERC*, 964 F.2d 5, 9 (D.C. Cir. 1992) (describing certain utility costs as "'incremental' (*i.e.*, variable, as opposed to fixed)"); *Morgan v. Ponder*, 892 F.2d 1355, 1362 n.17 (8th Cir. 1989) (equating "variable" with "incremental" costs); *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 474 (6th Cir. 1996) (same).

of transactions monitoring in its final interchange standard as an authorization cost, though not one associated with any "particular" transaction. *Id*. at 43,430.  The Board did so notwithstanding Section (a)(5)(A), which explicitly directs the Board to permit a *separate* adjustment (currently the subject of a separate rulemaking) to the interchange fee "to make allowance for costs incurred by the issuer in preventing fraud."  15 U.S.C. § 1693o-2(a)(5)(A)(i); *see* 75 Fed. Reg. at 81,741 (discussing transaction monitoring as part of discussion of fraud adjustment).   The Board's interpretation improperly collapses this separate calculation into the interchange fee standard itself.

The Board justifies its departure from the plain text of the statute by suggesting that "the types of fraud-prevention activities considered in connection with the fraud-prevention adjustment . . . are those activities that prevent fraud with respect to transactions at times other than when the issuer is effecting the transaction."  76 Fed. Reg. at 43,431.  But there is no indication in the statute that Congress intended to parse fraud prevention activities by their relation to any particular aspect of the transaction.  This is apparent when considering that transaction monitoring costs are not "specific" to any "particular" transaction, but are fraud prevention activities relating to debit card transactions as a whole.  Moreover, the inclusion of transaction monitoring costs within the base fee allowance circumvents the statute's requirement that the fraud prevention adjustment be conditioned on an issuer's compliance with fraud-related standards established by the Board.  *See* 15 U.S.C. § 1693o-2(a)(5)(A)(ii).

In explaining the final Conference Report on the Senate Floor, Senator Durbin noted "that any fraud prevention adjustment to the fee amount would occur *after* the base calculation of the reasonable and proportional interchange fee amount takes place, and fraud prevention costs *would not be considered* as part of the incremental issuer costs upon which the reasonable and

proportional fee amount is based." *See* 156 Cong. Rec. S5,925 (daily ed. July 15, 2010) (statement of Sen. Richard J. Durbin) (emphasis added).  That the Board claims authority to treat transactions monitoring costs, a key component of fraud prevention, separately from other such costs as part of the basic interchange fee standard flatly contradicts the statute's design and further undermines its conclusion that Section (a)(4)(B) permits consideration of costs beyond those explicitly delineated.

*Fraud losses*.  Section (a)(5)(A)'s fraud adjustment provision plainly bars the consideration of fraud losses in the interchange fee calculus.  That provision directs that "any fraud-related adjustment of the issuer is limited to the amount described in clause (i) [an amount 'reasonably necessary to make allowance for costs incurred by the issuer *in preventing fraud*']." 15 U.S.C. § 1693o-2(a)(5)(B) (emphasis added).  The Board recognized this limitation in its proposed rulemaking, concluding that "[f]raud losses . . . .are not includable as allowable costs." 75 Fed. Reg. at 81,760 (proposed Official Commentary, Section 235.3(c), Cmt. 3(iv)).  Yet it determined in the Final Rule to allow such costs because they are "generally" the result of authorization, clearance and settlement, and thus includable under the Board's expanded interpretation of allowable costs.  76 Fed. Reg. at 43,431.

The Board's allowance of fraud losses ignores the plain language of the statute. Congress specifically addressed "fraud-related adjustment[s]" to the allowable interchange fee and explicitly limited that fraud-related component to the amount reasonably necessary to "prevent[] fraud."  *See* 15 U.S.C. § 1693o-2(a)(5)(A).  The Board does not acknowledge or address this limitation in its determination that fraud losses are an allowable cost.  Nor could it.

Congress would not have limited the amount of any fraud-related adjustment to fraud *prevention* if it intended to allow the inclusion of fraud *losses* in the Board's interchange fee standard.[12]

Section (a)(5)'s plain terms negate such an inference.  The statute directs the Board to establish a fraud-adjustment that permits an issuer to charge an additional amount (currently set by the Board at 1 cent per transaction) *only if* the issuer complies with fraud-related standards that "require the issuers to take effective steps to reduce the occurrence of, and costs from, fraud in relation to electronic debit transactions."  15 U.S.C. § 1693o-2(a)(5)(A)(ii)(II).  Congress further directs that the Board's fraud-prevention standards consider numerous factors, including "the costs of fraudulent transactions absorbed by each party involved in such transactions" and "*the extent to which interchange transaction fees have in the past reduced or increased incentives for parties involved in electronic debit transactions to reduce fraud on such transactions*."  *Id.* § 1693o-2(a)(5)(B)(ii)(V), (VI) (emphasis added).

Thus, though Congress expressly required the Board to consider the extent to which interchange fees might "reduce incentives" for issuing banks to "reduce fraud," the Board determined that those same interchange fees permitted issuers to recover some part of the very fraud losses that Congress was seeking to reduce.  The Board's inclusion of fraud losses in the interchange fee standard is directly contrary to Congress's stated purpose of reducing fraud losses.  The Board downplays this inconsistency, asserting that the inclusion of fraud losses in

---

[12] By allowing a blanket *ad valorem* fraud loss adjustment, the Final Rule also ignores the statute's requirement that the fraud prevention adjustment be made on a bank-specific basis.  *Id.* § 1693o-2(a)(5)(A)(i) (adjustment must be "reasonably necessary to make allowance for costs incurred by the issuer in preventing fraud in relation to electronic debit transactions *involving that issuer*") (emphasis added); *see also* 156 Cong. Rec. S5,925 (daily ed. July 15, 2010) (statement of Sen. Richard J. Durbin) ("any fraud prevention cost adjustment would be made on an issuer-specific basis").

the interchange fee standard will not eliminate an issuer's incentives to reduce fraud losses. *See* 76 Fed. Reg. at 43,431. But permitting a bank an allowance for fraud losses certainly *reduces* those incentives, since issuers are permitted to pass at least part of their fraud losses off to merchants. Given this flat inconsistency with the statute's stated purpose, the *ad valorem* fraud loss allowance cannot stand.

*Network processing fees*. Finally, the Board included network processing fees in the interchange fee standard, while acknowledging that "network fees typically are not associated with one specific component of authorization, clearance, or settlement of the transaction." *See* 75 Fed. Reg. at 81,735. Network fees (or "switch fees") are "charged by the network to acquirers and issuers to compensate the network for *its role* in processing the transaction." 76 Fed. Reg. at 43,396 (emphasis added). By its plain terms, however, the Durbin Amendment limits the Board's authority to permit recovery of issuer costs to those incurred "for the *issuer*'s role" in processing the transaction. 15 U.S.C. § 1693o-2(a)(4)(B)(i) (emphasis added).

Moreover, the Durbin Amendment limits the authority of the Board to regulate network fees. *Id.* § 1693o-2(a)(8)(B). The statute gives the Board authority to regulate network fees for only two purposes: to ensure that they are not used either "to directly or indirectly compensate an issuer with respect to an electronic debit transaction" or "to circumvent or evade" regulations promulgated under the Durbin Amendment. *Id.* Indeed, the statute's definition of "network fee"—"any fee charged and received by a payment card network with respect to an electronic debit transaction, *other than an interchange transaction fee*"—suggests that Congress did not intend for it to be subsumed within the interchange transaction fee standard. *Id.* § 1693o-2(c)(10). The Final Rule exceeds the Board's authority and countermands these provisions by using network fees as a basis to directly compensate an issuer as part of interchange fees.

### B.      The Board's Interpretation Is Unreasonable

Because the Board's interchange fee standard is foreclosed by the plain language of the Durbin Amendment, this case should be decided under *Chevron*'s first step.  But even if this Court were to determine that the statute is ambiguous with respect to the Board's favored interpretation, the Final Rule would still fail under the *Chevron*'s second step, which asks whether the Board's interpretation is "reasonable *and consistent with the statutory purpose*."  *See GTE Serv. Corp. v. FCC*, 205 F.3d 416, 421 (D.C. Cir. 2000) (citation omitted) (emphasis added); *City of Cleveland v. U.S. Nuclear Regulatory Comm'n*, 68 F.3d 1361, 1367 (D.C. Cir. 1995) (providing that an agency's interpretation must be "reasonable and consistent with the statutory scheme and legislative history") (emphasis added).  While deferential, this "judicial function is neither rote nor meaningless[.]"  *Daley*, 209 F.3d at 752.  An interpretation "that diverges from any realistic meaning of the statute" must be struck down.  *Id.*; *Massachusetts v. Dep't of Transp.*, 93 F.3d 890, 893 (D.C. Cir. 1996).

Many of the same arguments discussed above also demonstrate the unreasonableness of the Board's final interchange fee standard.  As noted (*see* discussion, *supra*, at Section II.A), the entire rule rests on the Board's unreasonable construction of those costs that are "specific" to a "particular electronic debit transaction" to mean *general costs* common to *all* debit card transactions.  *See* 76 Fed. Reg. at 43,427.  Even if these terms admitted of *some* ambiguity, that ambiguity would permit the Board only to adopt a definition that fell within the range of permissible meaning.  Congress would not have directed the Board to exclude an issuing bank's costs that are not *specific* to a *particular* debit transaction if it meant to permit the Board to include costs common to all debit card transactions.  *See* discussion, *supra*, at Section II.A.2. Indeed, in excluding from consideration fixed corporate overhead costs, such as management salaries and costs "incurred with respect to the cardholder account relationship," the Board seems

- 43-

to recognize some limitation on its authority to consider *generalized* costs of debit card

transactions.  *See* 76 Fed. Reg. at 43,427-28.  Its failure to observe the statute's specificity and

particularity requirements limitation with respect to all costs is unreasonable.

Nor did Congress include certain statutory terms—such as "incremental" costs and the

costs of "authorization, clearance or settlement"—only to have the Board ignore those terms

entirely.  But that is precisely what the Board claims that its "interpretation" of the statute

permits it to do.  *Id.* at 43,427.  A court need not defer to an "interpretation" of these key

statutory terms that is not an interpretation at all.  *See Qwest Corp.*, 258 F.3d at 1202.

Congress's explicit commands cannot be so readily disregarded by an agency.

Finally, the Board's favored interpretation of the Durbin Amendment disregards in large

part another key requirement of the statute.  Congress directed the Board in developing its

interchange fee standard to consider the "functional similarity" between electronic debit card

transactions and checks that clear the Federal Reserve System at par.  15 U.S.C. § 1693o-

2(a)(4)(A).  In its proposed rule, the Board read this requirement to reinforce its determination

not to expand the category of allowable costs beyond those explicitly delineated by Congress:

"Given the statute's mandate to consider the functional similarities between debit transactions

and check transactions, the Board proposes that allowable costs . . . not be expanded to include

additional costs that a payor's bank in a check transaction would not recoup through fees from

the payee's bank."  75 Fed. Reg. at 81,735.  In the Board's final rule, it disregards this

consideration, permitting a large group of costs, such as transactions monitoring and fraud losses,

not recoverable by a payor's bank in a check transaction.  Yet the Board failed to address the

"functional similarities" of these additional costs to check transactions that clear at par in

including them in the interchange fee standard.  Compare, *e.g.*, 75 Fed. Reg. at 81,736 (fixed

issuer costs "are not recovered from the payee's bank in the case of check transactions") *with* 76 Fed. Reg. at 43,429-30 (permitting fixed costs without discussion of functional similarities to checking).  Its failure to consider the functional similarity of these costs to check transactions further renders their inclusion unreasonable.

At bottom, the Board has failed in its assigned task.  Congress directed that the Board "distinguish between" two categories of costs—those that must be included and those that must be excluded.  15 U.S.C. § 1693o-2(a)(4)(B).  The Board fails to "distinguish between" those two categories of costs because it never makes an effort to determine whether any specific item of cost falls within one category or the other.  By choosing to consider other costs not included within the statute's plain terms, the Board never discerns whether a cost *must* be included in the fee standard under Section 1693o-2(a)(4)(B)(i).  The Board's decision not to define the first category of costs—the allowable costs—renders the differentiation required by the statute impossible and cannot be regarded as a reasonable implementation of Congressional will.

The Board's interpretation cannot be squared with the basic purpose of the Durbin Amendment.  Assuming the 50 billion transactions projected by the Board in 2011, the Board posits that Congress meant to delegate *by statutory silence* alone the authority to shift as much as $4.5 billion annually from merchants to issuing banks, growing the interchange fee amounts allowable from $6 billion (at a proposed 12 cents per transaction) to $10.5 billion (at the final 21 cents actually permitted), even before the *ad valorem* allowance for fraud losses.[13]  It strains

---

[13] The actual effect may be somewhat less when considering that some debit card transactions involve issuing banks excluded from the regulation (including banks with assets of less than $10 billion, *see* 15 U.S.C. § 1693o-2(a)(6)(A)).  While those transactions account for a minority of debit transactions in the marketplace, the exact percentage of excluded transactions is not known to the Plaintiffs at this time.

credulity to suggest that Congress would have defined with particularity the category of costs that the Board must include in its fee standard—costs estimated at 7.1 cents per transaction (75 Fed. Reg. at 81,725)—yet grant to the Board, by its silence, the discretion to allow issuing banks to recover as much as three times the amount of those costs.

To defer to the Board here, as Judge Sentelle colorfully built on the elephant-in-mousehole metaphor, this Court "would have to conclude that Congress not only had hidden a rather large elephant in a rather obscure mousehole, but had buried the ambiguity in which the pachyderm lurks beneath an incredibly deep mound of specificity, none of which bears the footprints of the beast or any indication that Congress even suspected its presence." *ABA*, 430 F.3d at 469.  Congress did not intend to delegate such enormous and unchecked discretion to the Board.  The Final Rule's interpretation of the interchange fee standard "diverges from any realistic meaning of the statute," and is unreasonable in light of the statute's terms. *Massachusetts*, 93 F.3d at 893.  It must be invalidated even under *Chevron*'s deferential second step.

## III.    THE FINAL RULE'S IMPLEMENTATION OF THE DURBIN AMENDMENT'S NETWORK NON-EXCLUSIVITY PROVISION VIOLATES THE APA

In addition to regulating interchange fees collected by issuing banks, the Durbin Amendment also sought to address the problem of rising debit card *network* fees, *i.e.,* the fees charged to merchants by the networks for their role in routing debit card transactions over their network infrastructure.  Congress recognized that merchants often have limited choices with respect to the networks on which they process debit transactions.  This is particularly true with respect to signature transactions, where the dominant networks, Visa and MasterCard, maintained exclusivity rules prohibiting banks that issue their cards from permitting other

signature networks on those cards.  *See* Salop, *supra*, at 11 ¶ 30 & n.17.[14]  That limited network

competition led to higher network prices, as Visa and MasterCard had relatively free rein to

increase those prices at will.

Congress addressed rising network fees by attacking this lack of network choice in two

related statutory provisions.  First, the statute sought to foster network competition by precluding

networks and issuers from restricting the number of available networks on which any given debit

card transaction may be processed to either one network or multiple affiliated networks.

15 U.S.C. § 1693o-2(b)(1)(A).  Second, the statute prevents networks and issuers from inhibiting

a merchant's ability to direct the routing of debit transactions over any available network.  *Id.*

§ 1693o-2(b)(1)(B).  The Board must adopt regulations to implement these provisions.  *Id.*

The Final Rule contravenes both the letter and purpose of these statutory provisions.  By

its plain terms, the statute requires that a merchant be given a choice of networks for *each

transaction* that it processes.  *Id.* § 1693o-2(b)(1)(A) (preventing networks and issuers from

restricting the "networks on which *an electronic debit transaction* may be processed") (emphasis

added).  The Board sought to implement this provision, however, by requiring only that *each

debit card* issued to a consumer be configured with two networks.  Issuers and networks can

comply by providing one signature network and one PIN network per card.  *See* Official

Commentary to Section 235.7(a), Cmt. 1, 76 Fed. Reg. at 43,474.  But, as the Board itself found,

the vast majority of merchants that accept debit cards are not configured to accept PIN debit

transactions, and large categories of other transactions, including Internet, telephone, and mail

---

[14] *See*, *e.g.*, Visa International Operating Regulations, April 1, 2010, ID#: 010410-
010410-0006300 ("Competitive Marks—U.S. Region: No U.S. member may use the marks of
the American Express Company, MasterCard International (including Maestro), Morgan Stanley
Dean Witter & Co., or the subsidiaries or affiliates of these entities on Visa Cards.").

order purchases, generally cannot be processed over PIN networks.  *See* 76 Fed. Reg. at 43,395.

The Rule thus effectively deprives merchants of the network choice required by the statute for

the vast majority of debit card transactions in the marketplace today.  Rather than enhancing

network choices as required by the statute, the Final Rule largely maintains the status quo in

derogation of Congress's express wishes.  Because it fails to implement the directions of

Congress, the Board's non-exclusivity regulation cannot survive APA review.

> **A.      The Board's Non-Exclusivity Regulation Fails *Chevron*'s First Step**
>
> > **1.      The Plain Language of the Statute Requires that Merchants Be Given a Choice Between Multiple Unaffiliated Networks for Each *Transaction***

Review of the Final Rule's non-exclusivity provisions is governed by *Chevron*.  Thus, as

explained above, the primary questions are "whether Congress has directly spoken to the precise

question at issue" and, if so, whether the Board's action is inconsistent with congressional intent.

*Chevron*, 467 U.S. at 842.  The answer to both questions is indisputably "yes."

The Durbin Amendment directs the Board to "prescribe regulations providing that an

issuer or payment card network shall not . . . restrict the number of payment card networks on

which *an electronic debit transaction* may be processed" to less than two unaffiliated networks.

15 U.S.C. § 1693o-2(b)(1)(A) (emphasis added).  The Board reads that provision to require each

"debit card subject to the regulation to be enabled on at least two unaffiliated payment card

networks."  Official Cmt. 1 to Section 235.7(a).  By focusing on the number of networks on

which each debit *card* is enabled, the Board disregards the statute's plain language requirement

of network choice with respect to the networks "on which an electronic debit *transaction* may be

processed."  15 U.S.C. § 1693o-2(b)(1)(A) (emphasis added).  Under the Board's interpretation,

large numbers of electronic debit transactions are *guaranteed* not to have that choice of

networks.

The problem arises from the prevailing practices in the debit card industry.  *See*

*Associated General Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519,

530 (1983) ("A proper interpretation of the section cannot . . . ignore the larger context in which

the entire statute was debated.").  As the Board explains, under current practices, the two

authentication methods available for processing debit card transactions—PIN and signature

debit—route over different networks using differing infrastructure.  76 Fed. Reg. at 43,395.

Where a merchant can process both signature and PIN transactions, the customer generally

determines the authentication method at the point of sale, by choosing "debit" for PIN

authentication or "credit" for signature authentication.  *See* 76 Fed. Reg. at 43,448.

In a transaction where a customer chooses a particular method of authentication, the

statute unambiguously requires that the issuer not restrict the merchant's routing choices for that

transaction to a single network.  Yet this single network routing is precisely what the Final Rule

allows in those circumstances, permitting compliance with the network non-exclusivity

requirement without considering the fact that these are separate types of authentication.  An

issuer can comply by enabling its card to work on one signature debit network and one

unaffiliated PIN-debit network.  For instance, if a customer elects "credit" (and thus signature

authentication) at the point of sale, the regulation deprives the merchant of the *transactional*

routing choice guaranteed by the Durbin Amendment because it permits the issuer to comply by

providing only a single signature network on which that "electronic debit transaction may be

processed."  15 U.S.C. § 1693o-2(b)(1)(A).

The Board rationalizes away this problem by concluding that, where the consumer has

elected one method of authentication over another, it is "the consumer, and not the issuer or the

payment card network, [that] has restricted the available routing choices."  76 Fed. Reg.

- 49-

at 43,448.  But the Final Rule permits Visa and MasterCard to maintain their own network

exclusivity rules prohibiting issuing banks from enabling competing signature card networks on

their debit cards.  *See* discussion, *supra*, at 46.  Thus, it is very much the *networks* that restrict

competitive choice with respect to such signature card networks.  Given that consumer election

of authentication methods is a predominant practice in the marketplace, a rule that permits one

signature card network and one PIN-network effectively restricts the network choice required by

the statute because those networks do not compete with one another for merchant business.  *See*

*Chevron*, 467 U.S. at 865-66 (agency's implementation of Congressional policy to be resolved

"in light of everyday realities").

        More importantly, as the Board itself concludes, there are entire categories of transactions

where limiting the available networks to one network per method of authentication results in no

network choice at all.  As the Board explains, "certain transactions, such as transactions for hotel

stays or car rentals, where the exact amount of the transaction is not known at the time of

authorization, cannot readily be accommodated on PIN-based, single-message systems."

76 Fed. Reg. at 43,395.  In addition, "PIN debit transactions generally are not currently accepted

for Internet, telephone, and mail transactions."  *Id.*[15]  By its own admission, the Board's final

rule "provides merchants fewer routing options" with respect to these transactions.  76 Fed. Reg.

at 43,448.  Indeed, in the vast majority of such transactions, the Rule provides no routing options

at all.  The Board takes comfort in the hope that "emerging PIN debit products and technologies"

will allow PIN debit "to be used in additional retail environments where PIN debit is not

_____

        [15] While the Board notes that one internet merchant, Amazon.com, has begun processing
customer payments as PIN-less PIN transactions, 76 Fed. Reg. at 43,448 n.163, this option is not
generally available to other online merchants.

generally offered." *Id.* But wishing for future technological changes does not ensure proper *current* implementation of the statute with respect to those transactions.

The Board finds support for its interpretation in the fact that "the statute does not expressly require issuers to offer multiple unaffiliated signature and multiple unaffiliated PIN debit card network choices on each card." 76 Fed. Reg. at 43,447. But its objection misses the point. The statute does not expressly require multiple unaffiliated networks for each method of authentication on each debit card because the statute does not set requirements relating to *debit cards* at all. Instead, it sets a target of two unaffiliated networks for each *transaction*, irrespective of the number of network choices on a card. 15 U.S.C. § 1693o-2(b)(1)(A).

While the Board might reasonably implement this requirement by requiring multiple unaffiliated networks for each method of authentication, it could also do so through equally viable non-card based requirements. Thus, for example, the Board could implement the statute's non-exclusivity requirement by breaking down the prevailing, artificial wall between signature and PIN networks so that every network can process either type of transaction. *See* NRF Comments at 7 (discussing signature network exclusivity rules). Such a division is certainly not required as a matter of law and is not logistically necessary. The Board could have ensured multiple routing options for every transaction by barring the dominant networks' anti-competitive rules to allow PIN-only networks to process signature transactions, and vice versa. In that scenario, increased network competition would be ensured by a rule that required an issuer to make available two unaffiliated networks on a debit card, since any network could process any debit transaction.

Finally, the Board's interpretation renders the Durbin Amendment's companion provision regarding merchant routing options a virtual dead letter in a substantial number of transactions.

- 51-

In addition to prohibiting network exclusivity, the statute sought to enhance merchant network choice by prohibiting issuers and networks from imposing routing restrictions on debit card transactions. *See* 15 U.S.C. § 1693o-2(b)(1)(B). The statute directed the Board to prescribe regulations prohibiting issuers and networks from "inhibit[ing] the ability of any person who accepts debit cards for payments to direct the routing of electronic debit transactions for processing over any payment card network that may process such transactions." *Id.*

The Board acknowledged in its NPRM that a failure to require issuers to make at least two unaffiliated networks available for each method of authorization "could limit the effectiveness of the separate prohibition on merchant routing restrictions." 75 Fed. Reg. at 81,749-50. "[O]nce the cardholder has authorized the transaction using either a signature or PIN entry, the merchant would have only a single network available for routing the transaction." *Id.* Despite these reservations, the Final Rule ensured that, for any issuer maintaining only one unaffiliated signature and PIN network, compliance with the non-exclusivity rule effectively inhibits a merchant's network routing choices. Congress would not seek to ensure a merchant's choice of networks over which to route a particular transaction at the same time it delegated authority to the Board to deprive the merchant of any choice at all by a lax interpretation of the statute's non-exclusivity provision. To ensure a meaningful implementation of Section 1693o-2(b)(1)(B), the Court must reject the Board's non-exclusivity rule.

**2.      The Durbin Amendment's Legislative History Proves that the Statute Was Intended to Increase Competition by Mandating that Merchants Be Given a Choice of Network for Each Transaction**

The legislative history of the Durbin Amendment confirms that Congress intended to rein in network fees by fostering competition between the networks. In its original bill, the House did not include any regulation of interchange or network fees. *See* H.R. 4,173, 111th Cong. (2009). The Senate bill, on the other hand, authorized the Board to regulate network fees

in the same manner that interchange transaction fees are currently regulated under the statute.

*See* H.R. 4,173, 111th Cong. (2010); *see also* 156 Cong. Rec. S3,703-05 (daily ed. May 13,

2010) (attached at Ex. N).  In conference, a compromise was reached to control network costs

through enhanced market competition.  *See* H.R. Conf. Rep. No. 111-517, at 704-11 (2010).

This compromise alleviated the need for the Board to delve into individual cost items at

the network level and instead allowed it to simply ensure that each and every transaction—no

matter the method of authentication—could be processed over at least two competing networks

and that merchants would have the unimpeded ability to choose between the available networks.

*See* 156 Cong. Rec. S3,704 (daily ed. May 13, 2010) (statement of Sen. Richard J. Durbin) (The

statute is designed so that "[a] merchant may decide to favor one network over another.").

Senator Durbin confirmed this point in explaining the Conference Report's final compromise:

> Paragraph (b)(1) . . . is intended to enable each and every
> electronic debit transaction—*no matter whether that transaction is
> authorized by a signature, PIN, or otherwise*—to be run over at
> least two unaffiliated networks, and *the Board's regulations should
> ensure that networks or issuers do not try to evade the intent of this
> amendment by having cards that may run on only two unaffiliated
> networks where one of those networks is limited and cannot be
> used for many types of transactions.*

*See* 156 Cong. Rec. S5,926 (daily ed. July 15, 2010) (statement of Sen. Richard J. Durbin)

(emphasis added).  The Board's final rule ignores this legislative history and, as a result, fails to

implement the statute's plain text and obvious purpose.

### B.    The Board's Interpretation Is Unreasonable and Fails *Chevron*'s Second Step

For all of the same reasons, the Board's non-exclusivity rule should be invalidated even if

the Court were to reach *Chevron*'s second step.  The Final Rule also fails *Chevron's* deferential

review because it does not implement the statute's purpose.  *See GTE Serv. Corp.*, 205 F.3d

at 421.

As the Board reasoned in the comments to the Final Rule, promoting merchant choice among networks was a principal objective of the non-exclusivity requirement.  "From the merchant perspective, the availability of multiple card networks for processing debit card transactions and the elimination of routing restrictions are attractive because they give merchants the flexibility to route transactions over the network that will result in the lowest cost to the merchant, such as through the network with the lowest interchange fee."  76 Fed. Reg. at 43,446. This flexibility, the Board states, "may promote direct price competition for merchants among the debit card networks that are enabled on the debit card."  *Id.*  The routing restrictions targeted for elimination by Section 1693o-2(b)(1)(A) "limit merchants' ability to route transactions over lower-cost networks and may reduce network price competition."  *Id.*

The Board's final rule does not effectively enhance this network price competition.  In its comments to the proposed rule, the Board acknowledged that "the effectiveness of the rule promoting network competition could be limited in some circumstances if an issuer can satisfy the requirement simply by having one payment card network for signature debit transactions and a second unaffiliated payment card network for PIN debit transactions."  75 Fed. Reg. at 81,749. It nevertheless adopted that option, while conceding that its final rule provides "fewer routing options" than alternative constructions. 76 Fed. Reg. at 43,448.

The Board seeks to blunt this disregard for statutory purpose, noting that, under the Final Rule, "merchants that currently accept PIN debit would have routing choice with respect to PIN debit transactions in many cases where an issuer chooses to participate in multiple PIN debit networks."  *Id.*  But that result is not compelled by the Final Rule in any circumstance—it would merely result from voluntary over-compliance.  And, as the Board acknowledges, only one in four merchant locations in the United States that accept debit cards have the technical capability

to accept PIN-debit transactions.  76 Fed. Reg. at 43,395.  Its observation is thus cold comfort to the vast majority of merchants affected by the Final Rule.  *Id.*  Where, as here, the Board's rule is not likely to implement the statute's direction in such a large percentage of real world circumstances, it is unreasonable.  *See Daley*, 209 F.3d at 754 (measure that "is at least four times as likely to fail as to succeed" declared unreasonable under second step of *Chevron*).[16]

Rather than enhancing competitive choice for merchants, the Board's final rule does little more than preserve the status quo.  The Board admits that the Final Rule requires little change from issuers and networks and may not provide any relief to merchants, noting that, for the many issuers already in compliance with the Final Rule, "it [will] require little if any re-programming of routing logic by issuers, networks, issuer processors, and acquirers."  76 Fed. Reg. at 43,447.  But Congress did not enact the anti-exclusivity provisions for the purpose of preserving the status quo.  By failing to enhance the competitive choices available to merchants in the majority of transactions occurring in the marketplace, the Board has adopted an impermissible construction of the statute.  The Court should thus invalidate Section 235.7 and its Official Commentary.

---

[16] At the same time the Board expresses great concern for the financial and technological burden that requiring multiple signature networks would create for issuers and networks, *see* 75 Fed. Reg. at 81,749; 76 Fed. Reg. at 43,447, it fails to address the costs that its rule imposes on merchants in order to reap some potential benefits of the statute enacted for their benefit.  *See* 76 Fed. Reg. at 43,448.  Many merchants do not accept PIN-based debit transactions because of the significant costs associated with those transactions, such as the cost of maintaining PIN-readers at each individual point of sale.  The Board suggests that its rule complies with the statute in these circumstances because it is the merchant that restricts network choice by failing to maintain equipment needed to process PIN transactions.  *Id.* at 43,448.  But that fails to take account the "everyday realities" the backdrop of which Congress legislated against.  *See Chevron*, 467 U.S. at 865-66.  A regulation that fails to ensure merchant choice in the vast majority of transactions cannot be said to comport with the statute's command.  *See Daley*, 209 F.3d at 754.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment, invalidate the Final

Rule's interchange fee standard (12 C.F.R. § 235.3) and network exclusivity provisions (12

C.F.R. § 235.7), and remand to the Board to adopt a rule in compliance with the plain language

of the Durbin Amendment.

Dated: March 2, 2012

Respectfully Submitted,

/s Shannen W. Coffin

Shannen W. Coffin (D.C. Bar # 449197)
    Email:  scoffin@steptoe.com
Douglas S. Kantor (D.C. Bar # 455895)
Linda C. Bailey (D.C. Bar # 985081)
STEPTOE & JOHNSON LLP
1330 Connecticut Ave., N.W.
Washington, D.C.  20036
Tel:  (202) 429-3000
Fax: (202) 429-3902

*Counsel for Plaintiffs NACS, National Retail Federation, Food Marketing Institute, Miller Oil Co., Inc., Boscov's Department Store, LLC and National Restaurant Association*

## ADDENDUM

### 15 U.S.C. § 1693o-2

**§ 1693o-2.  Reasonable fees and rules for payment card transactions**

**(a) Reasonable interchange transaction fees for electronic debit transactions.**

(1) Regulatory authority over interchange transaction fees. The Board may prescribe regulations, pursuant to section 553 of title 5, United States Code, regarding any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction, to implement this subsection (including related definitions), and to prevent circumvention or evasion of this subsection.

(2) Reasonable interchange transaction fees. The amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction.

(3) Rulemaking required.

(A) In general. The Board shall prescribe regulations in final form not later than 9 months after the date of enactment of the Consumer Financial Protection Act of 2010 [enacted July 21, 2010], to establish standards for assessing whether the amount of any interchange transaction fee described in paragraph (2) is reasonable and proportional to the cost incurred by the issuer with respect to the transaction.

(B) Information collection. The Board may require any issuer (or agent of an issuer) or payment card network to provide the Board with such information as may be necessary to carry out the provisions of this subsection and the Board, in issuing rules under subparagraph (A) and on at least a bi-annual basis thereafter, shall disclose such aggregate or summary information concerning the costs incurred, and interchange transaction fees charged or received, by issuers or payment card networks in connection with the authorization, clearance or settlement of electronic debit transactions as the Board considers appropriate and in the public interest.

(4) Considerations; consultation. In prescribing regulations under paragraph (3)(A), the Board shall--

(A) consider the functional similarity between--

(i) electronic debit transactions; and

(ii) checking transactions that are required within the Federal Reserve bank system to clear at par;

(B) distinguish between--

(i) the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered under paragraph (2); and

(ii) other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered under paragraph (2); and

(C) consult, as appropriate, with the Comptroller of the Currency, the Board of Directors of the Federal Deposit Insurance Corporation, the Director of the Office of Thrift Supervision, the National Credit Union Administration Board, the Administrator of the Small Business Administration, and the Director of the Bureau of Consumer Financial Protection.

(5) Adjustments to interchange transaction fees for fraud prevention costs.

(A) Adjustments. The Board may allow for an adjustment to the fee amount received or charged by an issuer under paragraph (2), if--

(i) such adjustment is reasonably necessary to make allowance for costs incurred by the issuer in preventing fraud in relation to electronic debit transactions involving that issuer; and

(ii) the issuer complies with the fraud-related standards established by the Board under subparagraph (B), which standards shall--

(I) be designed to ensure that any fraud-related adjustment of the issuer is limited to the amount described in clause (i) and takes into account any fraud-related reimbursements (including amounts from charge-backs) received from consumers, merchants, or payment card networks in relation to electronic debit transactions involving the issuer; and

(II) require issuers to take effective steps to reduce the occurrence of, and costs from, fraud in relation to electronic debit transactions, including through the development and implementation of cost-effective fraud prevention technology.

(B) Rulemaking required.

(i) In general. The Board shall prescribe regulations in final form not later than 9 months after the date of enactment of the Consumer Financial Protection Act of 2010 [enacted July 21, 2010], to establish standards for making adjustments under this paragraph.

(ii) Factors for consideration. In issuing the standards and prescribing regulations under this paragraph, the Board shall consider--

(I) the nature, type, and occurrence of fraud in electronic debit transactions;

(II) the extent to which the occurrence of fraud depends on whether authorization in an electronic debit transaction is based on signature, PIN, or other means;

-A2-

(III) the available and economical means by which fraud on electronic debit transactions may be reduced;

(IV) the fraud prevention and data security costs expended by each party involved in electronic debit transactions (including consumers, persons who accept debit cards as a form of payment, financial institutions, retailers and payment card networks);

(V) the costs of fraudulent transactions absorbed by each party involved in such transactions (including consumers, persons who accept debit cards as a form of payment, financial institutions, retailers and payment card networks);

(VI) the extent to which interchange transaction fees have in the past reduced or increased incentives for parties involved in electronic debit transactions to reduce fraud on such transactions; and

(VII) such other factors as the Board considers appropriate.

(6) Exemption for small issuers.

(A) In general. This subsection shall not apply to any issuer that, together with its affiliates, has assets of less than $ 10,000,000,000, and the Board shall exempt such issuers from regulations prescribed under paragraph (3)(A).

(B) Definition. For purposes of this paragraph, the term "issuer" shall be limited to the person holding the asset account that is debited through an electronic debit transaction.

(7) Exemption for government-administered payment programs and reloadable prepaid cards.

(A) In general. This subsection shall not apply to an interchange transaction fee charged or received with respect to an electronic debit transaction in which a person uses--

(i) a debit card or general-use prepaid card that has been provided to a person pursuant to a Federal, State or local government-administered payment program, in which the person may only use the debit card or general-use prepaid card to transfer or debit funds, monetary value, or other assets that have been provided pursuant to such program; or

(ii) a plastic card, payment code, or device that is--

(I) linked to funds, monetary value, or assets which are purchased or loaded on a prepaid basis;

(II) not issued or approved for use to access or debit any account held by or for the benefit of the card holder (other than a subaccount or other method of recording or tracking funds purchased or loaded on the card on a prepaid basis);

(III) redeemable at multiple, unaffiliated merchants or service providers, or automated teller machines;

(IV) used to transfer or debit funds, monetary value, or other assets; and

(V) reloadable and not marketed or labeled as a gift card or gift certificate.

(B) Exception. Notwithstanding subparagraph (A), after the end of the 1-year period beginning on the effective date provided in paragraph (9), this subsection shall apply to an interchange transaction fee charged or received with respect to an electronic debit transaction described in subparagraph (A)(i) in which a person uses a general-use prepaid card, or an electronic debit transaction described in subparagraph (A)(ii), if any of the following fees may be charged to a person with respect to the card:

(i) A fee for an overdraft, including a shortage of funds or a transaction processed for an amount exceeding the account balance.

(ii) A fee imposed by the issuer for the first withdrawal per month from an automated teller machine that is part of the issuer's designated automated teller machine network.

(C) Definition. For purposes of subparagraph (B), the term "designated automated teller machine network" means either--

(i) all automated teller machines identified in the name of the issuer; or

(ii) any network of automated teller machines identified by the issuer that provides reasonable and convenient access to the issuer's customers.

(D) Reporting. Beginning 12 months after the date of enactment of the Consumer Financial Protection Act of 2010 [enacted July 21, 2010], the Board shall annually provide a report to the Congress regarding --

(i) the prevalence of the use of general-use prepaid cards in Federal, State or local government-administered payment programs; and

(ii) the interchange transaction fees and cardholder fees charged with respect to the use of such general-use prepaid cards.

(8) Regulatory authority over network fees.

(A) In general. The Board may prescribe regulations, pursuant to section 553 of title 5, United States Code, regarding any network fee.

(B) Limitation. The authority under subparagraph (A) to prescribe regulations shall be limited to regulations to ensure that--

(i) a network fee is not used to directly or indirectly compensate an issuer with respect to an electronic debit transaction; and

(ii) a network fee is not used to circumvent or evade the restrictions of this subsection and regulations prescribed under such subsection.

(C) Rulemaking required. The Board shall prescribe regulations in final form before the end of the 9-month period beginning on the date of the enactment of the Consumer Financial Protection Act of 2010 [enacted July 21, 2010], to carry out the authorities provided under subparagraph (A).

(9) Effective date. This subsection shall take effect at the end of the 12-month period beginning on the date of the enactment of the Consumer Financial Protection Act of 2010 [enacted July 21, 2010].

**(b) Limitation on payment card network restrictions.**

(1) Prohibitions against exclusivity arrangements.

(A) No exclusive network. The Board shall, before the end of the 1-year period beginning on the date of the enactment of the Consumer Financial Protection Act of 2010 [enacted July 21, 2010], prescribe regulations providing that an issuer or payment card network shall not directly or through any agent, processor, or licensed member of a payment card network, by contract, requirement, condition, penalty, or otherwise, restrict the number of payment card networks on which an electronic debit transaction may be processed to--

(i) 1 such network; or

(ii) 2 or more such networks which are owned, controlled, or otherwise operated by-

(I) affiliated persons; or

(II) networks affiliated with such issuer.

(B) No routing restrictions. The Board shall, before the end of the 1-year period beginning on the date of the enactment of the Consumer Financial Protection Act of 2010 [enacted July 21, 2010], prescribe regulations providing that an issuer or payment card network shall not, directly or through any agent, processor, or licensed member of the network, by contract, requirement, condition, penalty, or otherwise, inhibit the ability of any person who accepts debit cards for payments to direct the routing of electronic debit transactions for processing over any payment card network that may process such transactions.

(2) Limitation on restrictions on offering discounts for use of a form of payment.

(A) In general. A payment card network shall not, directly or through any agent, processor, or licensed member of the network, by contract, requirement, condition, penalty, or otherwise, inhibit the ability of any person to provide a discount or in-kind incentive for payment by the use of cash, checks, debit cards, or credit cards to the extent that--

-A5-

(i) in the case of a discount or in-kind incentive for payment by the use of debit cards, the discount or in-kind incentive does not differentiate on the basis of the issuer or the payment card network;

(ii) in the case of a discount or in-kind incentive for payment by the use of credit cards, the discount or in-kind incentive does not differentiate on the basis of the issuer or the payment card network; and

(iii) to the extent required by Federal law and applicable State law, such discount or in-kind incentive is offered to all prospective buyers and disclosed clearly and conspicuously.

(B) Lawful discounts. For purposes of this paragraph, the network may not penalize any person for the providing of a discount that is in compliance with Federal law and applicable State law.

(3) Limitation on restrictions on setting transaction minimums or maximums.

(A) In general. A payment card network shall not, directly or through any agent, processor, or licensed member of the network, by contract, requirement, condition, penalty, or otherwise, inhibit the ability--

(i) of any person to set a minimum dollar value for the acceptance by that person of credit cards, to the extent that --

(I) such minimum dollar value does not differentiate between issuers or between payment card networks; and

(II) such minimum dollar value does not exceed $ 10.00; or

(ii) of any Federal agency or institution of higher education to set a maximum dollar value for the acceptance by that Federal agency or institution of higher education of credit cards, to the extent that such maximum dollar value does not differentiate between issuers or between payment card networks.

(B) Increase in minimum dollar amount. The Board may, by regulation prescribed pursuant to section 553 of title 5, United States Code, increase the amount of the dollar value listed in subparagraph (A)(i)(II).

(4) Rule of construction[:]. No provision of this subsection shall be construed to authorize any person--

(A) to discriminate between debit cards within a payment card network on the basis of the issuer that issued the debit card; or

(B) to discriminate between credit cards within a payment card network on the basis of the issuer that issued the credit card.

**(c) Definitions. For purposes of this section, the following definitions shall apply:**

(1) Affiliate. The term "affiliate" means any company that controls, is controlled by, or is under common control with another company.

(2) Debit card. The term "debit card"--

(A) means any card, or other payment code or device, issued or approved for use through a payment card network to debit an asset account (regardless of the purpose for which the account is established), whether authorization is based on signature, PIN, or other means;

(B) includes a general-use prepaid card, as that term is defined in section 915(a)(2)(A) [15 USCS § 1693m(a)(2)(A)]; and

(C) does not include paper checks.

(3) Credit card. The term "credit card" has the same meaning as in section 103 of the Truth in Lending Act [15 USCS § 1602].

(4) Discount. The term "discount"--

(A) means a reduction made from the price that customers are informed is the regular price; and

(B) does not include any means of increasing the price that customers are informed is the regular price.

(5) Electronic debit transaction. The term "electronic debit transaction" means a transaction in which a person uses a debit card.

(6) Federal agency. The term "Federal agency" means--

(A) an agency (as defined in section 101 of title 31, United States Code); and

(B) a Government corporation (as defined in section 103 of title 5, United States Code).

(7) Institution of higher education. The term "institution of higher education" has the same meaning as in 101 and 102 of the Higher Education Act of 1965 (20 U.S.C. 1001, 1002).

(8) Interchange transaction fee. The term "interchange transaction fee" means any fee established, charged or received by a payment card network for the purpose of compensating an issuer for its involvement in an electronic debit transaction.

(9) Issuer. The term "issuer" means any person who issues a debit card, or credit card, or the agent of such person with respect to such card.

-A7-

(10) Network fee. The term "network fee" means any fee charged and received by a payment card network with respect to an electronic debit transaction, other than an interchange transaction fee.

(11) Payment card network. The term "payment card network" means an entity that directly, or through licensed members, processors, or agents, provides the proprietary services, infrastructure, and software that route information and data to conduct debit card or credit card transaction authorization, clearance, and settlement, and that a person uses in order to accept as a form of payment a brand of debit card, credit card or other device that may be used to carry out debit or credit transactions.

**(d) Enforcement.**

(1) In general. Compliance with the requirements imposed under this section shall be enforced under section 918 [15 USCS § 1693o].

(2) Exception. Sections 916 and 917 [15 USCS §§ 1693m and 1693n] shall not apply with respect to this section or the requirements imposed pursuant to this section.

CREDIT(S):

(May 29, 1968, P.L. 90-321, Title IX, § 920, as added July 21, 2010, P.L. 111-203, Title X, Subtitle G, § 1075(a)(2), 124 Stat. 2068.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

**NACS, NATIONAL RETAIL FEDERATION,
FOOD MARKETING INSTITUTE, MILLER
OIL CO., INC., BOSCOV'S
DEPARTMENT STORE, LLC, and
NATIONAL RESTAURANT ASSOCIATION**

       **Plaintiffs,**

     **v.**

**BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM,**

       **Defendant.**

**Case No. 1:11-cv-02075-RJL**

---

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 2nd day of March 2012, I caused the foregoing Plaintiffs'

Motion for Summary Judgment, Memorandum in Support of Plaintiffs' Motion for Summary

Judgment, and Proposed Order to be filed with the Clerk of the Court using the CM/ECF system,

which will send notification of such filing to:

            Joshua P. Chadwick
            Katherine H. Wheatley
            Yvonne F. Mizusawa
            20th Street and Constitution Avenue, N.W.
            Washington, DC  20551
            joshua.p.chadwick@frb.gov
            kit.wheatley@frb.gov
            yvonne.f.mizusawa@frb.gov

Respectfully Submitted,

   /s/   Linda C. Bailey
Linda C. Bailey (D.C. Bar # 985081)
STEPTOE & JOHNSON LLP
1330 Connecticut Ave., N.W.
Washington, D.C.  20036
Tel:  (202) 429-3000
Fax: (202) 429-3902

*Counsel for Plaintiffs NACS, National Retail Federation, Food Marketing Institute, Miller Oil Co., Inc., Boscov's Department Store, LLC, and National Restaurant Association*