## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| NACS; NATIONAL RETAIL FEDERATION; FOOD MARKETING INSTITUTE; MILLER OIL CO.; BOSCOV'S DEPARTMENT STORE, LLC; and NATIONAL RESTAURANT ASSOCIATION, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 1:11-cv-02075-RJL |
| v. | ) ) ) | |
| BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, | ) ) ) | |
| Defendant. | ) ) ) | |

_____

### BRIEF AMICI CURIAE OF THE CLEARING HOUSE ASSOCIATION L.L.C., AMERICAN BANKERS ASSOCIATION, CONSUMER BANKERS ASSOCIATION, CREDIT UNION NATIONAL ASSOCIATION, THE FINANCIAL SERVICES ROUNDTABLE, INDEPENDENT COMMUNITY BANKERS OF AMERICA, MID-SIZE BANK COALITION OF AMERICA, NATIONAL ASSOCIATION OF FEDERAL CREDIT UNIONS, AND NATIONAL BANKERS ASSOCIATION IN SUPPORT OF NEITHER PARTY

Christopher R. Lipsett (DC Bar No. 929216)
Noah A. Levine (*pro hac vice* pending)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
399 Park Avenue
New York, NY 10022
Tel: (212) 230-8800
Fax: (212 230-8888

H. Rodgin Cohen
Matthew A. Schwartz
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004

Seth P. Waxman (DC Bar No. 257337)
  seth.waxman@wilmerhale.com
Steven P. Lehotsky (DC Bar No. 992725)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: (202) 663-6000
Fax: (202 663-6363

Paul Saltzman
Rob Hunter
THE CLEARING HOUSE ASSOCIATION L.L.C.
450 West 33rd Street
New York, NY  10001

*(Additional counsel listed on signature pages)*

# TABLE OF CONTENTS

Pages

TABLE OF AUTHORITIES ................................................................................................ iii

INTEREST OF AMICI CURIAE ......................................................................................... 1

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

I.     ELECTRONIC DEBIT TRANSACTIONS ............................................................... 3

II.    THE DURBIN AMENDMENT .................................................................................. 7

III.   THE BOARD'S PROPOSED RULE ........................................................................ 9

      A.     Interchange-Fee Proposals ......................................................................... 9

      B.     Network-Exclusivity Proposals ................................................................. 10

IV.   THE COMMENT PERIOD ....................................................................................... 11

V.    THE BOARD'S FINAL RULE .................................................................................. 12

      A.     The Interchange-Fee Rule .......................................................................... 12

      B.     The Network-Exclusivity Rule .................................................................. 13

SUMMARY OF ARGUMENT ........................................................................................... 13

ARGUMENT ...................................................................................................................... 15

I.     THE DURBIN AMENDMENT REQUIRES THE BOARD TO PERMIT ISSUERS TO RECEIVE
      INTERCHANGE FEES THAT COVER THE COSTS OF EFFECTING ELECTRONIC DEBIT
      CARD TRANSACTIONS PLUS A REASONABLE RETURN ........................................ 15

      A.     The Durbin Amendment's Text Requires That Interchange Fees Include
            A Reasonable Return For Issuers .............................................................. 15

      B.     The Canon Of Constitutional Avoidance Requires The Board To Interpret
            The Durbin Amendment To Allow A Reasonable Rate Of Return ...................... 18

      C.     The Durbin Amendment's Text Requires That Interchange Fees Allow
            For Recovery Of All Costs Incurred By Issuers With Respect To Electronic
            Debit Card Transactions .............................................................................. 23

II.      THE BELOW-COST FEE CAP IN THE BOARD'S FINAL RULE IS CONTRARY TO THE
         PUBLIC INTEREST ............................................................................................................27

         A.      The Final Rule Imposes Significant Burdens Upon Consumers ...........................27

         B.      The Final Rule Imposes Serious Harm On Financial Institutions Of
                 All Sizes ..............................................................................................................28

         C.      The Final Rule Grants A Windfall To Merchants With No Corresponding
                 Benefit To Consumers ..........................................................................................29

III.     THE DURBIN AMENDMENT DOES NOT REQUIRE ISSUERS TO ENABLE ADDITIONAL
         NETWORKS FOR ELECTRONIC DEBIT TRANSACTIONS OR MULTIPLE NETWORKS FOR
         EACH FORM OF TRANSACTION AUTHORIZATION ...............................................................31

CONCLUSION...................................................................................................................34

APPENDIX

# TABLE OF AUTHORITIES

## CASES

*Aetna Casualty & Surety Co. v. Commissioner of Insurance*, 263 N.E.2d 698 (Mass. 1970) ..................................................................................................19, 20

*Brooks-Scanlon Co. v. Railroad Commission*, 251 U.S. 396 (1920)...........................21

*Calfarm Insurance Co. v. Deukmejian*, 771 P.2d 1247 (Cal. 1989) ........................19, 20

*Clark v. Martinez*, 543 U.S. 371 (2005) ....................................................................21

*Duquesne Light Co. v. Barasch*, 488 U.S. 299 (1989)..................................................18

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. 568 (1988) ........................................................................18

*ExxonMobil Oil Corp. v. FERC*, 487 F.3d 945 (D.C. Cir. 2007) .................................17

*Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591 (1944)...............17, 19, 20

*Federal Power Commission v. Natural Gas Pipeline Co. of America*, 315 U.S. 575 (1942)..............................................................................................17

*Guaranty National Insurance Co. v. Gates*, 916 F.2d 508 (9th Cir. 1990) ...........................19, 20

*In re Permian Basin Area Rate Cases*, 390 U.S. 747 (1968)...................................17, 19

*Michigan Bell Telephone Co. v. Engler*, 257 F.3d 587 (6th Cir. 2001)...........................19, 20, 21

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) ........................................23

*TCF National Bank v. Bernanke*, 643 F.3d 1158 (8th Cir. 2011)..................................21

*University of Great Falls v. NLRB*, 278 F.3d 1335 (D.C. Cir. 2002) ...........................18

*Zadvydas v. Davis*, 533 U.S. 678 (2001) .....................................................................18

## STATUTES

5 U.S.C. § 552(a)(4)(A)(i) ...........................................................................................16

5 U.S.C. § 552(a)(4)(A)(ii)(I) .......................................................................................16

7 U.S.C. § 211(a) ..........................................................................................................17

7 U.S.C. § 940f(c)(2) ....................................................................................................16

12 U.S.C. § 248(s)(1) ...........................................................................................16

15 U.S.C. § 717c(a) ..............................................................................................17

15 U.S.C. § 1693b(a)(2) .......................................................................................27

15 U.S.C § 1693b(a)(2)(B) ...................................................................................27

15 U.S.C. § 1693b(a)(3) ........................................................................................27

15 U.S.C. § 1693o-2(a)(2) ............................................................................ *passim*

15 U.S.C. § 1693o-2(a)(3)(A) .............................................................8, 15, 16, 23

15 U.S.C § 1693o-2(a)(4)(B)(i) ......................................................................8, 24

15 U.S.C. § 1693o-2(a)(4)(B)(ii) ....................................................................8, 24

15 U.S.C. § 1693o-2(a)(5)(A) ..............................................................................13

15 U.S.C. § 1693o-2(a)(6)(A) ........................................................................8, 29

15 U.S.C. § 1693o-2(b)(1)(A) ........................................................................9, 31

15 U.S.C § 1693o-2(b)(1)(B) ...............................................................................9

15 U.S.C § 1693o-2(c)(2)(A) ..............................................................................33

15 U.S.C. § 1693o-2(c)(5) ...................................................................................33

16 U.S.C. § 824e(a) ..............................................................................................17

16 U.S.C. § 831k ..................................................................................................17

42 U.S.C. § 10222(a)(3) .......................................................................................16

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203,
    124 Stat. 1375 (2010) .........................................................................7, 16, 27

Mich. Comp. Laws § 484.2102(y) .......................................................................19

## REGULATIONS

12 C.F.R. § 235.3(a) .............................................................................................12

12 C.F.R. § 235.3(b) .............................................................................................12

12 C.F.R. § 235.4(a)................................................................................................12

12 C.F.R. § 235.4(b)...............................................................................................13

12 C.F.R. § 235.4(c)................................................................................................13

12 C.F.R. § 235.5(a)(1)...........................................................................................29

12 C.F.R. § 235.7(a)(1)...........................................................................................13

12 C.F.R. § 235.7(a)(2)...........................................................................................13

*Debit Card Interchange Fees and Routing,*

      75 Fed. Reg. 81,722 (Dec. 28, 2010)........................................................ *passim*

      76 Fed. Reg. 43,394 (July 20, 2011)........................................................ *passim*

      76 Fed. Reg. 43,478 (July 20, 2011)...............................................................13

## OTHER AUTHORITIES

American Bankers Association Comment Letter (Feb. 22, 2011)..................................4

Bank and Credit Union Trade Associations Comment Letter (Feb. 22, 2011),
      http://www.federalreserve.gov/SECRS/2011/November/20111103/R-1404/R-
      1404_093011 _87717_421100193837_1.pdf ..........................................2, 4, 26

William J. Baumol et al., *Contestable Markets and the Theory of Industry Structure*
      (1982)................................................................................................................25

BB&T Corp. Comment Letter (Feb. 18, 2011)............................................................31

Senator Carper et al. Comment Letter (Dec. 9, 2010) ...................................................8

Consumer Bankers Association Comment Letter (Feb. 22, 2011) ...............................31

David S. Evans et al., *Economic Analysis of the Effects of the Federal Reserve Board's
      Proposed Debit Card Interchange Fee Regulations on Consumers and Small
      Business* (Feb. 22, 2011), http://www.federalreserve.gov/SECRS/2011/
      March/20110308/R-1404/R1404_030811_69120_621655419027_1.pdf.................22, 30

David S. Evans & Richard Schmalensee, *Markets with Two-Sided Platforms*, 1 Issues in
      Competition Law and Policy 667 (2008).............................................................5

David S. Evans et al., *The Economic Principles for Establishing Reasonable Regulation of Debit-Card Interchange Fees that Could Improve Consumer Welfare* (Feb. 22, 2011), http://papers.ssrn.com/sol3/papers.cfm?abstract_id= 1769890 ............................5, 6

David S. Evans & Richard Schmalensee, *The Economics of Interchange Fees and Their Regulation:  An Overview*, MIT Sloan Working Paper No. 4548-05 (May 2005), http://ssrn.com/abstract=744705 ......................................................................30

Federal Reserve System, *The 2010 Federal Reserve Payments Study* (Dec. 8, 2010), http://www.frbservices.org/files/communications/pdf/press/ 2010_payments_study.pdf ...............................................................................3, 4

GAO, *Rising Interchange Fees Have Increased Costs for Merchants, but Options for Reducing Fees Pose Challenges*, GAO-10-45 (Nov. 2009) ..............................30

Independent Community Bankers of America Comment Letter (Feb. 22, 2011) ...........................8

Oliver Ireland, Comment Letter on Debit Interchange Fees and Routing (Feb. 22, 2011) ...........26

Letter from Acting Comptroller of the Currency, John Walsh, to Jennifer Johnson, Board of Governors of the Federal Reserve System (Mar. 4, 2011), http://www.federal reserve.gov/SECRS/2011/March/20110308/R-1404/R- 1404_030711_69110_478769283129_1.pdf ...................................................12

MasterCard Worldwide Comment Letter (Feb. 22, 2011) ...............................................................4

Representative Owens et al. Comment Letter (Feb. 22, 2011) ........................................................8

Andy Peters, *Small Bankers Avoiding Big Interchange Losses—For Now*, American Banker (Jan. 31, 2012), http://www.americanbanker.com/issues/177_21/debit- cards-Durbin-amendment-Dodd-Frank-1046230-1.html...................................29

Robin A. Prager et al., *Interchange Fees and Payment Card Networks: Economics, Industry Developments, and Policy Issues* (2009), http://www.federal reserve.gov/pubs/feds/2009/200923/200923pap.pdf ..........................................5, 6, 28, 30

Robert Stillman et al., *Regulatory Intervention in the Payment Card Industry by the Reserve Bank of Australia* (2008), http://www.crai.com/ecp/assets/Regulatory _Intervention.pdf......................................................................................................28, 30

Richard J. Sullivan, *Can Smart Cards Reduce Payments Fraud and Identity Theft*? (2008), http://www.kansascityfed.org/Publicat/Econrev/PDF/3q08Sullivan.pdf...............4

Jean-Charles Rochet & Jean Tirole, *Two-Sided Markets: A Progress Report*, 37 RAND J. of Econ. 645 (2006) ..................................................................................................5

Senate Banking Committee Hearing Transcript, LexisNexis (CQ Transcriptions database), Feb. 17, 2011 ....................................................................................................8

U.S. Census Bureau, *Banking, Finance & Insurance:  Payment Systems, Consumer Credit, Mortgage Debt* (2012), http://www.census.gov/compendia/statab/ 2012/tables/ 12s1187.pdf .............................................................................................3, 6

Webster's Third New International Dictionary (2002).....................................................16, 17, 23

**INTEREST OF AMICI CURIAE**

Amici, listed alphabetically in Appendix A to this brief, are an unprecedented coalition of every major nationwide bank and credit union trade association in the United States.  Over the past several decades, amici's members—many of which are issuers of debit cards and receive debit card interchange fees—have collectively invested (and continue to invest) billions of dollars to develop and maintain an efficient, convenient, and secure debit card payments system.

Throughout the rulemaking proceeding at issue in this case, amici unanimously opposed the imposition of unreasonable price controls on debit card interchange fees under the Durbin Amendment.  Nevertheless, Defendant the Board of Governors of the Federal Reserve System ("Federal Reserve Board" or "Board") promulgated a rule ("Final Rule") that caps the interchange fees that issuers may receive for debit card transactions at an amount substantially below what the Durbin Amendment requires (although at a higher level than the Board originally proposed).  The Final Rule thus grants merchants a multibillion-dollar windfall, capping fees well below the market-based rates that merchants would otherwise pay for the considerable benefits they receive through the electronic debit card payments system.

The merchants now ask the Court to direct the Board to impose *even greater* reductions in debit-interchange fees, thus enabling the merchants to reap these benefits practically for free.  Amici's members, which stand to suffer the consequences, therefore have a direct stake in the outcome of this litigation.

**INTRODUCTION**

Amici do not appear before the Court to defend the Board's Final Rule.  Rather, amici file this brief because it is important for the Court to be aware of the full spectrum of views from all parties affected by the Durbin Amendment and the Board's Final Rule before the Court

adjudicates the merchants' challenges to that rule.  The Final Rule is flawed, but for reasons that are diametrically opposite of those presented by the merchants.

The Board's initial proposal was subject to extensive debate:  the Board received more than 11,500 comments on its proposal to slash issuers' debit interchange fee revenues by approximately *$12 billion* annually—more than 70 percent.  The vast majority of the comments the Board received were opposed to that proposal.  The merchants generally favored the Board's original proposal, and sought (as they do now through their lawsuit) to extract billions of dollars from financial institutions through a low price cap on interchange fees.  Amici argued that the Durbin Amendment required the Board to act in a much different way than its proposed rule suggested (and its Final Rule imposed).[1]  Amici explained that the statute required the Board to issue regulations that permit issuers to recover their costs in connection with debit card transactions and to receive a reasonable return above those costs.

Although the Board's Final Rule represents an improvement over its original proposal, the Final Rule still prevents issuers from recovering interchange fees sufficient to cover the costs of electronic debit services and still fails to incorporate a reasonable rate of return above those costs.  Unlike the merchants, amici have not instituted litigation to challenge the Board's Final Rule, at least at this time.  But amici strongly believe that the statute required the Board to permit issuers to recover *more* costs than the Final Rule permits, as well as a reasonable return.  Nothing in the Durbin Amendment directed the Board to force issuers to subsidize merchants' use of the electronic debit payments system.  Amici's position directly contrasts with the central premise of

---

[1]     *See* Bank and Credit Union Trade Associations Comment Letter (Feb. 22, 2011), http://www.federalreserve.gov/SECRS/2011/November/20111103/R-1404/R-1404_093011 _87717_421100193837_1.pdf.  All comment letters cited in this brief may be found at the Board's web site, http://www.federalreserve.gov/apps/oia/ViewAllComments.aspx ?doc_id=R-1404&doc_ver=1.

the merchants' lawsuit, which faults the Board instead for not setting its cap on interchange fees

even more deeply below issuers' cost levels.

## BACKGROUND

### I.   ELECTRONIC DEBIT TRANSACTIONS

Over the past several decades, the financial institutions represented by amici have

collectively invested (and continue to invest) billions of dollars to develop, maintain, and

improve an efficient, convenient, innovative, and secure debit card payments system.  As a result

of that investment, debit cards have become the primary form of non-cash payment for millions

of Americans and tens of thousands of merchants, who conducted almost 38 billion transactions

worth more than $1.4 trillion in 2009 alone.[2]  During 2009, debit cards constituted 35% of all

non-cash transactions, compared to 20% for credit cards and 22% for checks.[3]  The importance

of debit cards to the economy is reflected in their proliferation, growing from 235 million cards

in 2000 to 509 million cards in 2009, with estimates of 530 million cards in use in 2012.[4]

The innovation of electronic debit card payment has produced a tremendous economic

boon for consumers, merchants, the financial-services industry, and the country as a whole.

Consumers benefit from an efficient, prompt, convenient, and secure method of payment.

Merchants, in turn, are able to accept customers' preferred method of payment to facilitate

efficient, prompt, and convenient service in stores, at unattended locations (*e.g.*, gas pumps), and

online, which in turn attracts more customers and increases merchants' sales volumes and

---

[2]      *See Debit Card Interchange Fees and Routing*, 76 Fed. Reg. 43,394, 43,395, 43,397 (July 20, 2011); Federal Reserve System, *The 2010 Federal Reserve Payments Study*, at 16 (Dec. 8, 2010), http://www.frbservices.org/files/communications/pdf/press/2010_payments_study.pdf.

[3]      *See The 2010 Federal Reserve Payments Study*, at 5, 14.

[4]      *See* U.S. Census Bureau, *Banking, Finance & Insurance:  Payment Systems, Consumer Credit, Mortgage Debt* (2012), http://www.census.gov/compendia/statab/2012/tables/ 12s1187.pdf (Table 1187) ("Census Bureau, Debit Table 1187").

profits.  Debit transactions also enable both consumers and merchants to avoid the safety and security risks—misappropriation, theft, robbery, and so forth—associated with cash and check transactions.[5]

Electronic debit payment also has special value to merchants over checks—a guarantee against insufficient funds and fraud.  Under the electronic debit card payments system, debit card issuers, rather than merchants, bear the full risk of insufficient customer funds in the underlying deposit account (credit losses) and bear most of the risk of fraud (fraud losses).  That is not the case for checks, where merchants retain those risks themselves—risks that cost merchants billions of dollars each year.  In 2009, for example, the total value of checks returned unpaid was *$127 billion*, an amount which dwarfs the costs of merchants' annual interchange fees.[6]  Check fraud also cost merchants approximately $10 billion (as of 2006).[7]  Merchants could pay for check guarantee services—but they would pay between 1.0 and 1.5% of the face value of the check *plus* a 14-25 cent-per-check fee (and a monthly customer service fee of up to $15 on top of that), which is far more than the average interchange fee merchants paid prior to the Final Rule.[8]

These myriad benefits are why so many merchants voluntarily accept debit cards for the small price of interchange fees.  The debit card market is a classic two-sided market—*i.e.*, "a

---

[5]    For all of these and other reasons noted by commenters and the Board during the rulemaking, the merchants are wrong that electronic debit payment functions simply as an electronic check.  *See, e.g.*, Bank and Credit Union Trade Associations Comment Letter, at 34-39 (Feb. 22, 2011); American Bankers Association Comment Letter, at 5-11 (Feb. 22, 2011); *Debit Card Interchange Fees and Routing*, 76 Fed. Reg. 43,394, 43,399-43,401 (July 20, 2011).

[6]    *The 2010 Federal Reserve Payments Study* at 9.

[7]    Richard J. Sullivan, *Can Smart Cards Reduce Payments Fraud and Identity Theft?*, at 38 (2008), http://www.kansascityfed.org/Publicat/Econrev/PDF/3q08Sullivan.pdf.

[8]    *See, e.g.*, MasterCard Worldwide Comment Letter, at 14 & n18 (Feb. 22, 2011); American Bankers Association Comment Letter, at 9-10 & n.7.

market for the provision of a product whose value is realized only if a member of each of two distinct and complementary sets of users simultaneously agrees to its use."[9]  To succeed, the debit card market requires the participation of both debit card holders, who must use their cards to pay for goods and services, and merchants, who must accept the cards as a form of payment. Both sides benefit from the attraction of the other side to the market, without which the product would not exist.  The costs of the product, however, must be allocated appropriately between the two sides to best preserve and grow the market.[10]  Debit card networks charge higher prices to merchants and lower (or no) prices to individual debit card holders—who are, unsurprisingly, the more price-sensitive side of the market—in order to attract the latter to the product.  In this manner, the debit card market functions like any other two-sided market—including both traditional markets such as shopping malls and broadcast television and new markets such as online social networking platforms—wherein one side of the market (here, merchants) pays more than the other side (consumers).[11]

Until the Board's Final Rule took effect, merchants paid average debit-interchange fees of only 1.15% per transaction—in 2009, a total of only $16.2 billion in interchange fees on

---

[9]      Robin A. Prager et al., *Interchange Fees and Payment Card Networks:  Economics, Industry Developments, and Policy Issues*, at 14-15 (2009) ("Prager et al., *Interchange Fees*"), http://www.federalreserve.gov/pubs/feds/2009/200923/200923pap.pdf (citing Jean-Charles Rochet & Jean Tirole, *Two-Sided Markets:  A Progress Report*, 37 RAND J. of Econ. 645 (2006)).

[10]      *See generally* David S. Evans & Richard Schmalensee, *Markets with Two-Sided Platforms*, 1 Issues in Competition Law and Policy 667, 671-672 (2008).

[11]      Contrary to the merchants' assertion, the allocation of prices in the debit card payments system in no way suggests an anticompetitive result.  Rather, that unbalanced outcome maximizes consumer welfare by minimizing costs for consumers.  *See* David S. Evans et al., *The Economic Principles for Establishing Reasonable Regulation of Debit-Card Interchange Fees that Could Improve Consumer Welfare*, at 21-26 (Feb. 22, 2011) ("Evans, et al., *Economic Principles*"), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1769890.

transactions worth more than $1.4 *trillion*—an amount commensurate with the benefits they receive from issuers' substantial investments in debit card systems.[12]  Those fees compensated issuers for the substantial costs they have incurred (and continue to incur) in providing consumers and merchants the electronic debit payment option.  Constantly maintaining and updating the debit-payments system to enhance functionality, increase security, and provide innovative debit-payment products requires issuers to expend substantial resources.  Issuers also incur costs of authorizing, clearing, and settling electronic debit transactions—such as the costs of software, hardware, equipment, labor, network processing fees, and transaction monitoring— as well as other costs, such as those related to billing and collection, data processing, protection of consumer data, fraud prevention, card production and replacement, and the costs of providing customer service for debit transactions.  And on top of all those costs, issuers bear the majority of the costs of fraud losses and credit losses on debit card transactions, which amount to billions of dollars each year.  *See* 76 Fed. Reg. at 43,397.  Issuers created the electronic debit card payments system, and continue to provide electronic debit payment services, on the reasonable understanding that they may earn sufficient revenue to cover all these substantial costs while

---

[12]      Since the mid-2000s, interchange rates for both PIN and signature debit have remained roughly constant.  *See* Prager et al., *Interchange Fees*, *supra*, at 75 (Figure 3).  The merchants' focus on the increase in the total amount of interchange fees since 2000 is misleading:  that increase is largely attributable to the phenomenal growth in debit card transaction volume and transaction value over that time, and not (as they suggest) to anticompetitive behavior.  Over the last decade the number of electronic debit transactions grew by more than 400%—to approximately 38 billion in 2009 from only 8.4 billion in 2000.  *See* Census Bureau, Debit Table 1187, *supra*; Evans, et al., *Economic Principles*, *supra*, at 6.  Likewise, the value of electronic debit transactions rose to $1.4 trillion in 2009 from merely $311 billion in 2000.  *Id.*  Accordingly, it is not surprising that merchants paid more in interchange fees, reflecting the significantly greater volume and value of debit transactions.  Nor is it improper for issuers and payment card networks to adjust their rates to cover the additional costs of maintaining and upgrading the electronic debit payment system to handle the explosion in debit card transactions.

earning a reasonable return on their investment, which provides them with the capital to create additional innovative electronic payment products that benefit consumers and merchants alike.

## II.   THE DURBIN AMENDMENT

The Board's interpretation of the Durbin Amendment upsets this financial balance.  The Amendment was enacted as part of the Consumer Financial Protection Act of 2010, which in turn is part of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 1075, 124 Stat. 1375, 2068-2074 (2010) ("Dodd-Frank Act").  Contrary to the merchants' suggestion, there were no committee hearings on the Durbin Amendment, no prior opportunity for meaningful input from the bank regulatory agencies regarding debit interchange fee legislation, mere minutes of total debate on the Amendment in the House and the Senate combined, little to no consideration by Congress of the legislation's ramifications, and no stand-alone vote on the legislation in the House of Representatives (the Durbin Amendment having been hurriedly added to the Dodd-Frank Act during the House-Senate Conference process shortly after it was introduced on the Senate floor).

The Durbin Amendment sets forth a clear standard for the amount of the debit card interchange fees that issuers may receive.  The statute says that the fee amount shall be "reasonable and proportional" to the issuer's costs with respect to a transaction.  15 U.S.C. § 1693o-2(a)(2).  The statute places this requirement in a new § 920(a)(2) of the Electronic Fund Transfer Act ("EFTA"):

> (2) Reasonable interchange transaction fees.
>
> The amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction.

15 U.S.C. § 1693o-2(a)(2).  This requirement applies to an "issuer"—*i.e.*, an entity that issues

debit cards—although the statute technically exempts "any issuer that, together with its affiliates,

has assets of less than $10,000,000,000." *Id.* § 1693o-2(a)(6)(A).[13]

The Durbin Amendment directs the Board to promulgate regulations establishing

"standards for assessing whether the amount of any interchange transaction fee" meets the

requirement set forth in § 1693o-2(a)(2)—*i.e.*, whether the fee is "reasonable and proportional to

the cost incurred by the issuer with respect to the transaction."  15 U.S.C. § 1693o-2(a)(3)(A).

Congress instructed the Board to "consider" certain matters, such as "the incremental cost

incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a

particular electronic debit transaction."  *Id.* § 1693o-2(a)(4)(B)(i).  Congress also instructed the

Board not to "consider" "other costs incurred by an issuer which are not specific to a particular

electronic debit transaction."  *Id.* § 1693o-2(a)(4)(B)(ii).  These two instructions, read together,

authorize the Board to consider costs that issuers incur beyond simply "authorization, clearance,

[and] settlement" costs.  Indeed, Congress's ultimate direction to the Board, importantly, is to

establish standards for assessing whether an interchange fee is "reasonable and proportional to,"

broadly, "the cost incurred by the issuer with respect to the transaction."  *Id.* § 1693o-2(a)(3)(A).

---

[13]     It is doubtful, however, that this exemption can be practically implemented.  Merchants have an economic incentive to drive debit transactions to the lowest-cost cards (from regulated large issuers)—an effect enhanced by the Board's regulations on transaction routing—and, thus, smaller issuers will face enduring competitive pressures to lower their interchange fees to the level of large issuers.  Accordingly, the Chairman of the Board, the Chairwoman of the FDIC (at the time), several Members of Congress, and all major trade associations representing smaller issuers have all expressed grave concerns about the effectiveness of the exemption in protecting the debit card businesses of more than 15,000 financial institutions of all sizes.  *See, e.g.*, Senate Banking Committee Hearing Transcript, LexisNexis (CQ Transcriptions database), Feb. 17, 2011, at 16 (statement of Chairman Bernanke); *id.* at 32 (statement of Chairwoman Bair); Sen. Carper et al., Comment Letter, at 1-2 (Dec. 9, 2010) (comment letter on behalf of bipartisan group of 13 Senators); Rep. Owens et al. Comment Letter, at 1 (Feb. 22, 2011) (comment letter on behalf of seven Members of the House of Representatives); Independent Community Bankers of America Comment Letter, at 1, 3-4, 10-19 (Feb. 22, 2011).

Congress also directed the Board to promulgate regulations to prohibit payment card networks and issuers from restricting—by "contract, requirement, condition, penalty, or otherwise"—the number of networks on which an electronic debit transaction may be processed to either a single network or to an affiliated group of networks.  15 U.S.C. § 1693o-2(b)(1)(A). The Board is also required to issue regulations prohibiting payment card networks and issuers from "inhibit[ing]"—by "contract, requirement, condition, penalty, or otherwise"—"the ability of any person who accepts debit cards for payment to direct the routing of electronic debit transactions for processing" over a particular network.  *Id.* § 1693o-2(b)(1)(B).

### III.   THE BOARD'S PROPOSED RULE

The Board announced its proposed rule in December 2010.  *See Debit Card Interchange Fees and Routing*, 75 Fed. Reg. 81,722 (Dec. 28, 2010) ("Proposed Rule").

#### A.   Interchange-Fee Proposals

The Proposed Rule offered for comment two alternative debit card interchange fee restrictions.  Under either alternative, debit card interchange fees, which in 2009 averaged 44 cents per transaction, would have been capped at no more than 12 cents—a reduction of more than 70%, resulting in revenue losses to issuers of approximately $12 billion annually.

Alternative 1 was an issuer-specific rule with both a safe harbor and cap.  It would have allowed an issuer to receive a per-transaction interchange fee up to a 7-cent safe harbor.  75 Fed. Reg. at 81,738.  If an issuer's allowable costs per transaction exceeded 7 cents, then the rule would have allowed the issuer the option of demonstrating its costs and receiving a higher per-transaction interchange fee equal to such allowable costs, but no more than 12 cents.  *Id.* at 81,737-81,738.  Per-transaction costs would be determined by taking the issuer's total "allowable" costs for the prior year divided by the total number of debit card transactions during that year.  *Id.* at 81,735.  The Board narrowly limited "allowable" costs to only certain costs that

an issuer incurs for the authorization, clearance, and settlement of debit card transactions. *Id.* at 81,734. By the Board's own acknowledgment, its definition of "allowable" costs excluded a substantial amount of costs that issuers incur in the provision of debit card services, such as network fees, fraud losses, customer service, and card production and distribution. *Id.* at 81,734-81,735. Moreover, even within the limited category of "authorization, clearance, and settlement" costs, the Board admitted that this alternative was narrowly confined to only those costs that vary with the number of debit card transactions, up to an issuer's existing capacity levels ("average variable cost"). *Id.* at 81,735.

Alternative 2 was simpler, but remained harsh. It would have set a hard cap on interchange fees of 12 cents per transaction. 75 Fed. Reg. at 81,738. The cap also would have operated as a safe harbor, allowing any issuer to charge up to the cap without demonstrating its allowable costs. *Id.*

### B.      Network-Exclusivity Proposals

The Board also offered two alternatives for implementing the Durbin Amendment's exclusivity restrictions. Under Alternative A, the Board would require issuers to enable two unaffiliated networks for the processing of each *electronic debit transaction* regardless of the means by which a transaction may be authorized. 75 Fed. Reg. at 81,749. An issuer accordingly could have one network for the processing of a transaction by means of PIN authorization and another (unaffiliated) network for the processing of that transaction by means of signature authorization. Under Alternative B, the Board would instead require issuers to enable two unaffiliated networks for each *method* by which a transaction may be authorized—*i.e.*, two unaffiliated PIN networks *and* two unaffiliated signature networks. *Id.* Under both Alternatives, the Board did more than simply prohibit exclusivity restrictions. In both instances, the Board

- 10 -

proposed to affirmatively require the issuer to enable additional unaffiliated networks on debit cards to process transactions.  *Id.* at 81,756.

## IV.   THE COMMENT PERIOD

Speaking with a single voice, every major nationwide bank and credit union trade association—amici here—submitted a 65-page comment letter expressing their strong opposition to the Board's flawed approach.  The letter explained that the Board's price control proposals exceeded any permissible interpretation of the Durbin Amendment.  Amici explained that the statute requires the Board to establish standards for assessing whether an interchange fee is reasonable and proportional to issuers' costs for debit card transactions, and therefore requires the Board to allow issuers to receive interchange fees sufficient to cover those costs plus a reasonable rate of return.  The comment letter also demonstrated that the Final Rule would have profound adverse consequences for consumers (particularly low-income Americans), financial institutions (particularly the nation's smaller banks and credit unions), and the domestic payments system.  None of these was accounted for in the Board's Proposed Rule.

In addition to amici's omnibus comment letter, the Proposed Rule generated a tremendous volume of comments from financial industry trade associations, banks, credit unions, and payment-card networks, and many others opposing the Board's Proposed Rule on the same or similar grounds.  The Acting Comptroller of the Currency even weighed in against the Board's Proposed Rule, raising concerns that inflicting such drastic revenue reductions on financial institutions could create safety and soundness concerns and urging the Board "to

reconsider its rate-cap based approach" and to allow issuers to recover costs "that are recognized and indisputably part of conducting a debit card business."[14]

## V.    THE BOARD'S FINAL RULE

The Board announced its Final Rule last summer.  *See Debit Card Interchange Fees and Routing*, 76 Fed. Reg. 43,394 (July 20, 2011).

### A.    The Interchange-Fee Rule

With respect to debit card interchange fees, the Board adopted a modified version of Alternative 2 in the Proposed Rule.  The Board first repeated the statutory requirement that an issuer's interchange fee "shall be reasonable and proportional to the cost incurred by the issuer with respect to the electronic debit transaction."  12 C.F.R. § 235.3(a).  But it specified that "[a]n issuer complies with the requirements of [§ 235.3(a)] only if each interchange transaction fee received or charged by the issuer for an electronic debit transaction is no more than the sum of … 21 cents" plus an *ad valorem* component of "5 basis points" of the transaction's value.  *Id.* § 235.3(b).  The Board set the 21-cent amount based only on "certain costs incurred" by issuers "to effect an electronic debt transaction."  76 Fed. Reg. at 43,404.  The Board did not include *all* costs that issuers incur in effecting debit card transactions.  For example, it excluded the costs of customer inquiries and customer service and of debit card production and distribution.  *Id.*  The Board's *ad valorem* component allowed for issuers to charge a percentage of the value of the transaction, which the Board viewed as permitting issuers to cover the costs of fraud losses (which are borne primarily by issuers).  *Id.*

In a separate rulemaking published in *The Federal Register* the same day, the Board also promulgated an interim final rule, 12 C.F.R. § 235.4(a), authorizing a one-cent adjustment for

---

[14]    Letter from Acting Comptroller of the Currency, John Walsh, to Jennifer Johnson, Board of Governors of the Federal Reserve System, at 1, 3 (Mar. 4, 2011), http://www.federalreserve .gov/SECRS/2011/March/20110308/R-1404/R-1404_030711_69110_478769283129_1.pdf.

eligible issuers for fraud-prevention costs.  *See Debit Card Interchange Fees and Routing*, 76

Fed. Reg. 43,478 (July 20, 2011).  Accordingly, an issuer that complies with the fraud-

prevention standards specified in the Durbin Amendment, 15 U.S.C. § 1693o-2(a)(5)(A), and in

the Board's regulation, 12 C.F.R. § 235.4(b), (c), would be eligible to receive interchange fees

for each transaction of up to 22 cents plus 5 basis points of the transaction's value.

      **B.**    **The Network-Exclusivity Rule**

      With regard to the Durbin Amendment's exclusivity restrictions, the Board adopted

Alternative A.  The regulation states that payment card networks and issuers "shall not … by

contract, requirement, condition, penalty, or otherwise, restrict the number of payment card

networks on which an electronic debit transaction may be processed to less than two unaffiliated

networks."  12 C.F.R. § 235.7(a)(1).  The regulation further states that an issuer "satisfies the

requirements of [§ 235.7(a)(1)] only if the issuer allows an electronic debit transaction to be

processed on at least two unaffiliated … networks."  *Id.* § 235.7(a)(2).  The Board therefore

continued to read the statute's prohibitions on network-exclusivity restrictions as an affirmative

requirement that issuers enable multiple unaffiliated networks to process transactions on their

cards.  The Board did not require that there be multiple unaffiliated payment card networks for

*both* PIN authorization *and* signature authorization (or for any other authorization methods), but

instead required an issuer to have two unaffiliated networks for an electronic debit transaction,

regardless of the particular authorization method (*e.g.*, PIN *or* signature) used at the point of sale.

*See id.* § 235.7(a)(1).

## SUMMARY OF ARGUMENT

      Amici are not here to defend the Final Rule.  That rule drastically reduces the debit-

interchange fees that issuers may receive, resulting in anticipated annual revenue losses to

amici's member institutions of $6-8 billion.  The merchants bring their lawsuit in pursuit of even

deeper cuts in issuers' interchange-fee revenues, seeking to reap the benefits of debit card transactions and innovation in the electronic-payments system practically for free—an unwarranted, unfair, and unprecedented windfall.  The Board's Final Rule is already flawed precisely because it imposes below-cost caps on interchange fees and fails to provide for recovery of a reasonable return.  In these respects, the Final Rule contravenes the Durbin Amendment's requirement that the interchange fee that an issuer may receive "shall" be "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(2).  The merchants' position would exacerbate the Board's error, depriving issuers of further revenues required to cover their costs and earn a reasonable return. Far from improving consumer welfare, the Final Rule leads to reduced financial services and higher fees for millions of Americans.  It also threatens to reduce lending and investment by banks and credit unions during an already fragile economic recovery.  The Final Rule will not benefit merchants' customers, but rather will only serve to line the pockets of merchants.

The network-exclusivity rule fares no better.  The merchants contend that the Board should have required issuers to enable *more* networks to process each electronic debit transaction.  But the Durbin Amendment's text need not be read to require issuers to enable *any* networks.  The statute sets forth a negative prohibition—it precludes issuers and networks from agreeing to limit processing to only one network.  The Board's Final Rule, in contrast, imposes an affirmative obligation, requiring issuers to negotiate and enter into arrangements with multiple payment card networks for processing of electronic debit transactions.  That requirement is not the best reading of the statute.  And, even if the Durbin Amendment were to require enablement, there is no plausible way to read the statute to permit original Alternative B from the Board's Proposed Rule, which would have required enablement of many more networks

(at least four, and potentially more) for each electronic debit transaction.  Again, the merchants'

position would exacerbate the Board's error.

## ARGUMENT

**I.      THE DURBIN AMENDMENT REQUIRES THE BOARD TO PERMIT ISSUERS TO RECEIVE INTERCHANGE FEES THAT COVER THE COSTS OF EFFECTING ELECTRONIC DEBIT CARD TRANSACTIONS PLUS A REASONABLE RETURN**

The Durbin Amendment does not authorize the Board to issue standards that preclude an

issuer from receiving an interchange fee sufficient to cover its debit card transaction costs plus a

reasonable rate of return, much less to mandate a fee amount that is below issuers' actual costs.

The Board's deliberate exclusion of a reasonable return from the amount issuers may receive

through interchange fees also raises constitutional concerns under the Takings and Due Process

Clauses of the Fifth Amendment to the Constitution of the United States.

### A.      The Durbin Amendment's Text Requires That Interchange Fees Include A Reasonable Return For Issuers

The Board's Final Rule contravenes the Durbin Amendment because, by its very design,

the Board's Rule fixed its fee cap to be *equal to* certain costs that the Board deemed allowable,

but to *exclude* a reasonable return above those costs.  The Durbin Amendment imposes a single

requirement on issuers regarding the "amount of any interchange transaction fee" that they may

receive:  The amount of the fee "shall be reasonable and proportional to the cost incurred by the

issuer with respect to the transaction."  15 U.S.C. § 1693o-2(a)(2).  The Amendment then

charges the Board with establishing "standards for assessing" whether a fee satisfies this

requirement.  *Id.* § 1693o-2(a)(3)(A).

Had Congress intended to require the Board to restrict interchange fees to cost alone, it

would have done so explicitly and directly.  Yet Congress did not use terms like "limited to" or

"equal to" that it has typically employed to confine the permissible level of fees, rates, or prices.

For example, elsewhere in the Dodd-Frank Act, Congress directed the Board to collect from certain companies "a total amount of assessments, fees, or other charges . . . that is *equal to* the total expenses the Board estimates are necessary or appropriate to carry out the supervisory and regulatory responsibilities of the Board with respect to such companies."  12 U.S.C. § 248(s)(1), 124 Stat. at 1527 (emphasis added).[15]  In more traditional rate-making contexts, Congress has been direct and explicit when it instructs an agency to set a fee, rate, or price equivalent or limited to only certain costs.  *See, e.g.*, 7 U.S.C. § 940f(c)(2) ("The amount of the fee paid shall be *equal to* the modification cost[.]" (emphasis added)); 42 U.S.C. § 10222(a)(3) (prescribing fee to be "in an amount *equivalent to* an average charge of 1.0 mil per kilowatt-hour for electricity generated by such spent nuclear fuel, or such solidified high-level waste derived therefrom" (emphasis added)).

These examples contrast starkly with the "reasonable and proportional" phrasing of the Durbin Amendment.  Here, Congress provided for issuers to receive an "amount" for interchange fees that is both "reasonable" and "proportional to" the costs incurred in relation to electronic debit transactions.  The phrase "reasonable and proportional" in relation to costs incurred by an issuer requires allowance of a fee that covers those costs (as described in 15 U.S.C. § 1693o-2(a)(2) and (a)(3)(A)) *plus* a reasonable and proportional rate of return above those costs.

That issuers are entitled to receive a reasonable rate of return is clear from both the ordinary meaning of the statutory text and the well-known interpretation of similar textual formulations used in federal rate-making statutes.  The ordinary meaning of a "reasonable" fee is one that is "moderate" or "that allows a fair profit."  Webster's Third New International

---

[15]      *See also* 5 U.S.C. § 552(a)(4)(A)(i), (ii)(I) (directing agencies to "promulgate regulations . . . specifying the schedule of [certain] fees," which, in specified circumstances, "shall be *limited to* reasonable standard charges for document search, duplication, and review" (emphasis added)).

Dictionary 1892 (2002).  Given the foundational premise of private enterprise in our free-market economy—that firms sell goods and services in order to earn a profit for their owners—an interchange fee would not be reasonable if the government compelled firms to set prices at a level that precludes a reasonable profit or, worse, precludes the recovery of even all the costs of providing the relevant service.  Congress's pairing of the term "reasonable" with the words "and proportional to" confirms this reading of the statute.  "Proportional" in this context means "corresponding in size, degree, or intensity" to, or "regulated or determined in size or degree with reference to," the costs of the issuer.  *Id.* at 1819.  The statute requires that an interchange fee include a fair, moderate profit that corresponds by degree with, or that is determined in reference to, the issuer's costs.  By no means can it be fairly read to say that *no* profit is permitted.

The phrase "reasonable and proportional" invokes the well-established interpretation of the similar phrase "just and reasonable" used in other federal rate-making statutes.  *See, e.g.*, 7 U.S.C. § 211(a); 15 U.S.C. § 717c(a); 16 U.S.C. § 824e(a); *see also* 16 U.S.C. § 831k ("reasonable, just, and fair").  For decades Congress has used the term "reasonable," frequently paired with "just" or "fair," in rate-making statutes.  And courts have construed the terms used in that context to mean that the rate in question must "yield[] sufficient revenue to cover all proper costs … plus a specified return on invested capital."  *ExxonMobil Oil Corp. v. FERC*, 487 F.3d 945, 951 (D.C. Cir. 2007) (per curiam); *see, e.g.*, *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 770 (1968); *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 603 (1944); *Federal Power Comm'n v. Natural Gas Pipeline Co. of Am.*, 315 U.S. 575, 585-586 (1942).

Interpreting the "reasonable and proportional" standard in the Durbin Amendment to comport with the construction of similar statutory schemes authorizing rates that are

"reasonable" and "just" or "fair" thus requires inclusion of *both* costs *and* a reasonable rate of return within the scope of permissible interchange fees.

### B.     The Canon Of Constitutional Avoidance Requires The Board To Interpret The Durbin Amendment To Allow A Reasonable Rate Of Return

Even if there were any ambiguity in the text of the Durbin Amendment on this point, the Board should have allowed a reasonable rate of return in order to avoid the serious constitutional concerns raised by capping interchange fees at a portion of issuers' costs. It is well established that a court is obligated to adopt a plausible interpretation of a statute that avoids a serious constitutional issue. *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) ("It is a cardinal principle of statutory interpretation . . . that when an Act of Congress raises a serious doubt as to its constitutionality, this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." (internal quotation marks omitted)). This obligation is in no way lessened by the fact that the Board is directed in the first instance to implement the Durbin Amendment. *See Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 574-577 (1988) (declining to adopt agency interpretation of ambiguous statute which raised "serious questions of the validity of [the statute]"); *University of Great Falls v. NLRB*, 278 F.3d 1335, 1340-1341 (D.C. Cir. 2002) ("[T]he constitutional avoidance canon of statutory interpretation trumps *Chevron* deference.").

The Board's interpretation, however, raises serious concerns under the Due Process and Takings Clauses of the Fifth Amendment to the Constitution of the United States. The Supreme Court has held that these provisions forbid the government from dictating a price at an amount that has a "confiscatory" effect, meaning a price that is so low as to be "inadequate to compensate current equity holders for the risk associated with their investments." *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307, 312 (1989). Although the government may limit

returns, it is "plain that the power to regulate is not a power to destroy." *Permian Basin Area Rate Cases*, 390 U.S. at 769 (internal quotation marks omitted).  The Supreme Court has long declared that where the government regulates prices, it must at minimum "enable [a] company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed." *Hope Natural Gas*, 320 U.S. at 605.

Following this constitutional requirement, courts have routinely held that where a price-control regulation on its face precludes a regulated company from recovering a reasonable return on its capital, the constitutional infirmity is plain. *See, e.g.*, *Michigan Bell Tel. Co. v. Engler*, 257 F.3d 587, 595-596 (6th Cir. 2001); *Guaranty Nat'l Ins. Co. v. Gates*, 916 F.2d 508, 515 (9th Cir. 1990); *Calfarm Ins. Co. v. Deukmejian*, 771 P.2d 1247, 1255-1256 (Cal. 1989); *Aetna Cas. & Sur. Co. v. Commissioner of Ins.*, 263 N.E.2d 698, 703 (Mass. 1970).  For example, in *Michigan Bell Telephone*, the Sixth Circuit held that a state statute abolishing a fee charged to consumers by two telephone companies and freezing the rates charged by those companies was facially unconstitutional.  The law at issue deemed a rate impermissibly low only if it is less than the "'total service long run incremental cost' of providing the service." 257 F.3d at 595 (quoting Mich. Comp. Laws § 484.2102(y) (2001)).  Because that formula guaranteed only that the companies would recover their costs and disallowed any reasonable return above long run incremental cost, the court held that the law "clearly" "does not guarantee the constitutionally required fair and reasonable rate of return." 257 F.3d at 595; *see id.* at 596 ("merely" covering costs without "consider[ing] the need for a return on investment" is "inadequate under well-established due process standards.").

In *Guaranty National Insurance*, the Ninth Circuit held that a statute reducing automobile-insurance rates by 15 percent for a single year—significantly less than the reduction

the Final Rule would impose on debit-interchange fees—on its face deprived insurance companies of due process. *See* 916 F.2d at 509. The resulting rate permitted an insurer only to "break even" on its costs and, therefore, failed to "guarantee the constitutionally required 'fair and reasonable return.'" *Id.* at 515 (quoting *Hope Natural Gas*, 320 U.S. at 603).

In *Calfarm*, too, the California Supreme Court held that an initiative that reduced automobile-insurance rates by 20 percent for one year facially deprived insurance companies of due process. *See* 771 P.2d at 1250-1251, 1255-1256. The court held that the resulting rates were likely to be confiscatory, *id.* at 1250-1251, and the avenues for insurance companies to obtain administrative relief from the rates on the ground of overall "insolvency" were inadequate to ensure a reasonable rate of return for the underwriting of automobile insurance, *id.* at 1255-1256. And in *Aetna*, the Supreme Judicial Court of Massachusetts held that a law reducing automobile-insurance rates by at least 15 percent was unconstitutionally confiscatory. Massachusetts could not, the court said, "constitutionally fix rates which are so low that if the insurers engage in business they may do so only at a loss." 263 N.E.2d at 703.

On its face, the Final Rule "clearly" does not guarantee "the constitutionally required fair and reasonable rate of return." *Michigan Bell Tel.*, 257 F.3d at 595; *see Guaranty Nat'l Ins.*, 916 F.2d at 515 (similar). The Final Rule excludes from its calculation of reasonable interchange fees *any* return on debit card products and services, much less a reasonable return. Indeed, by the Board's own acknowledgment, the Final Rule caps interchange fees at an amount below issuers' costs of providing debit card services. *See* 76 Fed. Reg. at 43,404, 43,427 & n.119. In the aggregate, and at a minimum, the Final Rule will immediately reduce issuers' interchange fee revenues by approximately $6-8 billion in annual revenues, which is a drastic cut by any measure.

The decision in *TCF National Bank v. Bernanke*, 643 F.3d 1158 (8th Cir. 2011), does not undermine amici's argument regarding the proper interpretation of the Durbin Amendment. There, the court concluded that the district court did not abuse its discretion in denying a preliminary injunction in a facial constitutional challenge.  The court held that TCF National Bank had not met its burden to establish that the Durbin Amendment (on its face) imposed an actual confiscatory rate because the bank was theoretically free to charge debit card holders higher prices for use of their debit cards in order to recoup lost interchange fee revenue necessary to cover the bank's costs and earn a reasonable rate of return on its debit card investments.  *See id.* at 1164.  And, in the alternative, the court concluded that the statute nonetheless satisfied the rational-basis test.  *See id.* at 1165.

The Eighth Circuit's decision was erroneous and should not be adopted in this Circuit. As the Sixth Circuit correctly held in *Michigan Bell Telephone*, firms are "not required to subsidize their regulated services"—here, providing electronic debit functionality to merchants— "with revenues generated from unregulated services."  257 F.3d at 594 (citing *Brooks-Scanlon Co. v. Railroad Comm'n*, 251 U.S. 396 (1920)).

Here, the Court need not adjudicate the facial constitutionality of the Durbin Amendment, because the relevant issue is instead whether the Amendment must be interpreted to avoid a serious constitutional issue.  Under the constitutional-avoidance canon, a court construes a statute to avoid serious constitutional *issues* raised by the statute.  *See Clark v. Martinez*, 543 U.S. 371, 379-382 (2005).  Thus, the question for the Court is not whether the Durbin Amendment *might* be constitutionally applied to some issuer; it is whether interpreting the Durbin Amendment to require all issuers to receive below-cost interchange fee revenues raises a

serious constitutional issue that could be avoided by a reasonable interpretation of the statute. And, as this brief demonstrates, it could be.

The theoretical ability of institutions to offset interchange revenue losses with fee increases charged to debit card users or fees on other financial products or services does not mitigate the constitutional issue.  To begin with, it does not account for the substantial loss of customer goodwill that results from forcing issuers to raise new revenues from their debit card users or for the customers who would end their use of debit cards in the face of price hikes and new fees.  Even if issuers could charge their customers more, the overall economic effect for issuers is likely to be negative.  The evidence from unsuccessful attempts by large issuers to raise debit card fees on customers in response to the Board's Final Rule demonstrates that financial markets are highly competitive and customers are (unsurprisingly) highly price sensitive, thus making it difficult for issuers actually to recoup their interchange revenue losses from their customers.[16]  At a minimum, it cannot be known with any certainty, and not for some time, whether an issuer actually could recoup all or even substantially all of the revenues confiscated by the Final Rule.  Speculation about what financial institutions might be able to do in the long run to adjust to their losses and potentially return to equilibrium—predictions the Board did not even make—does not mitigate the immediate confiscatory effect of the Board's Final Rule.

---

[16]     *See* David S. Evans et al., *Economic Analysis of the Effects of the Federal Reserve Board's Proposed Debit Card Interchange Fee Regulations on Consumers and Small Business*, at 28-44 (Feb. 22, 2011), http://www.federal reserve.gov/SECRS/2011/March/20110308/R-1404/R1404_030811_69120_621655419027_1.pdf (hereinafter "Evans et al., *Consumer Impact Study*").

**C.  The Durbin Amendment's Text Requires That Interchange Fees Allow For Recovery Of All Costs Incurred By Issuers With Respect To Electronic Debit Card Transactions**

Not only does the Final Rule's price cap deny issuers a reasonable rate of return, but it also denies them the ability to receive interchange fees that cover basic costs of providing electronic debit transaction services.[17]  Under the Durbin Amendment, the "amount of any interchange transaction fee" an issuer receives "shall be reasonable and proportional to *the cost incurred by the issuer with respect to the transaction*."  15 U.S.C. § 1693o-2(a)(2) (emphasis added).  Congress did not authorize the Board to vary this statutory requirement by regulation.  Rather, it directed the Board to implement that requirement by promulgating "standards for assessing" whether an interchange fee is "reasonable and proportional" to an issuer's costs with respect to a debit card transaction.  *Id.* § 1693o-2(a)(3)(A).

The Board's unduly limited view of allowable costs stems from a fundamental misunderstanding of the Durbin Amendment's text.  The statute provides that the amount of the interchange fee that an issuer may receive shall be "reasonable and proportional" to any "cost incurred by the issuer with respect to the [electronic debit] transaction."  15 U.S.C. § 1693o-2(a)(2), (a)(3)(A).  The meaning of the phrase "with respect to" is straightforward in ordinary usage, meaning "in relation to," Webster's Third New International Dictionary at 1934.  The Supreme Court has recognized that term as having a "broad" meaning.  *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992).  Therefore, any category of cost that is reasonably related to the issuer's role in the debit card transaction is within the cost baseline specified in the Durbin Amendment.  That baseline includes not only the operational costs for authorizing,

---

[17]     Among other costs, the Final Rule excludes from the allowable costs for which an issuer may receive interchange fees:  the costs of addressing customer inquiries and providing customer service; the costs of debit card production and distribution; and the costs of providing payment guarantee to merchants.

clearing, and settling transactions, but also (for example) the substantial capital investments (including maintenance costs and depreciation charges) that issuers reasonably incur in providing electronic debit transaction services.

Congress did not authorize the Board to alter that baseline.  Rather, the only costs that the statute prohibits the Board from "consider[ing]" are certain "*other* costs incurred by an issuer which are not specific to a particular electronic debit transaction."  15 U.S.C. § 1693o-2(a)(4)(B)(ii) (emphasis added).  That phrase reinforces subsections (a)(2) and (a)(3)(A), which provide that the cost is allowable so long as it is "with respect to [an electronic debit] transaction."  *Id.* § 1693o-2(a)(2), (a)(3)(A).  Only "other costs" that are not specifically related to an electronic debit transaction are excluded.  Thus, whereas § 1693o-2(a)(2) and (a)(3)(A) dictate that a category of cost *must* be included if it reasonably relates to an electronic debit transaction, § 1693o-2(a)(4)(B)(ii) decrees that a cost that is not reasonably related to providing debit card services, such as the costs of (among other things) operating physical branch locations, is excluded from the costs recoverable through interchange fees.  Apart from this one matter, Congress did not place any limitation on issuers' recovery of costs incurred with respect to a debit card transaction.

The merchants wrongly contend that the command that the Board "distinguish between" the incremental costs of authorizing, clearing, and settling electronic debit transactions and "other costs" that are not specific to particular electronic debit transactions functions as an implied *limitation* on the allowable cost baseline for interchange fees.  15 U.S.C. § 1693o-2(a)(4)(B)(i).  It does not.  It is implausible that Congress would impose such a significant constraint on the costs recoverable through interchange fees in such an elliptical and convoluted manner.  If Congress had meant to limit the allowable costs to only authorization, clearance, and

settlement costs, it would have said so directly in 15 U.S.C. § 1693o-2(a)(2) by stating that interchange fees shall be limited to those precise costs.  As noted, Congress knows how to implement such caps.  *See supra*, pp.15-16.  But Congress did not do that.  Instead, it set the statutory baseline cost for the Board's interchange-fee standards at the aggregate of "the cost" incurred by issuers with respect to electronic debit transactions.

The Durbin Amendment thus requires the Board to allow recovery of *all* categories of costs incurred by issuers that are reasonably related to an issuer's involvement in an electronic debit transaction.  Thus, the cost recoverable through interchange fees includes all processing costs (including hardware, software, infrastructure, and labor) for authorization, clearance, and settlement of a transaction and the costs of network processing fees, payment guarantee and insufficient funds handling, chargebacks and other non-routine transactions, the costs of transaction monitoring, and fraud losses.  It also includes the necessary operating costs of debit card programs, such as card production and distribution—the debit card itself being an integral part of any debit card transaction.  And it includes the costs of receiving and responding to customer service inquiries related to those debit card transactions.[18]

---

[18]    Contrary to the views of the merchants, issuers' fixed costs relating to authorization, clearance, and settlement of debit transactions and their costs relating to transaction monitoring, network fees, and fraud losses are all independently required to be included as incremental costs in the authorization, clearance, and settlement of particular electronic debit transactions.  The standard economic definition of incremental cost is "the difference between the cost incurred by a firm if it produces a particular quantity of a good and the cost incurred by that firm if it does not produce the good at all."  75 Fed. Reg. at 81,735; *see* William J. Baumol et al., *Contestable Markets and the Theory of Industry Structure* (1982).  Here, that includes every cost related to authorizing, clearing, or settling a transaction—whether fixed or variable, direct or indirect—that an issuer would not have incurred but for the provision of debit card transaction services.  It therefore encompasses fixed costs specifically attributable to authorizing, clearing, and settling functions and capital costs (*e.g.*, depreciation and amortization) for the assets and infrastructure used in executing those three functions for particular debit transactions.  It also includes issuers' costs for monitoring each particular debit transaction and the amount of network fees and fraud losses the issuer incurs on each transaction.

The Board did not fulfill the statute's command.  For example, it rejected the inclusion of customer-service and cardholder-inquiry expenses, even though they are indisputably "cost[s] incurred … with respect to" electronic debit transactions within the meaning of the Durbin Amendment.  15 U.S.C. § 1693o-2(a)(2).  They would not be incurred but for the issuer's role in the transaction.  Indeed, the Board had to concede that "some customer service inquiries relate to particular [electronic debit] transactions."  76 Fed. Reg. at 43,429.  The Board excluded such costs not because they do not relate to electronic debit transactions—they plainly do—but because the Board believed it could not "accurately separate out and assess cost data for customer inquiries related solely to particular debit transactions."  *Id.*  As a factual matter, that is incorrect.  Numerous commenters, including amici, submitted information that would have enabled the Board to determine accurate estimates of the costs for customer service and inquiries that reasonably relate to electronic debit transactions.  *See, e.g.*, Bank and Credit Union Trade Associations Comment Letter, at 33; Oliver Ireland, Comment Letter on Debit Interchange Fees and Routing, at 7 (Feb. 22, 2011) ("Ireland Comment Letter").  But even if there were challenges in estimating precisely the costs attributable to electronic debit customer service inquiries, that would not justify failing to implement the congressional mandate to include all costs incurred with respect to electronic debit transactions in the cost baseline.[19]  The statute does not demand absolute precision, but it also does not permit the Board to avoid any attempt to identify the amount of customer-service costs attributable to particular electronic debit transactions.

---

[19]     The same is true for the allocable costs of debit card production and distribution, which are prerequisites to consumers' use of debit cards and thus indisputably necessary to the issuer's role in each debit transaction.  *See, e.g.*, Bank and Credit Union Trade Associations Comment Letter, at 33; Ireland Comment Letter, at 7.  The Final Rule, however, excludes any recovery of those costs from the permissible interchange fee.  *See* 76 Fed. Reg. at 43,428-43,429.

## II.   THE BELOW-COST FEE CAP IN THE BOARD'S FINAL RULE IS CONTRARY TO THE PUBLIC INTEREST

Congress situated the Durbin Amendment within the existing EFTA, *see* Pub. L. No. 111-203, § 1075(a), 124 Stat. 1375, 2068 (2010), and granted the Board "sole authority to prescribe rules … to carry out the purposes of" the new § 920(a)(2) of the EFTA, 15 U.S.C. § 1693b(a)(2)(B).   In "prescribing such regulations," the Board was required to "prepare an analysis of economic impact which considers the costs and benefits to financial institutions, consumers, and other users of electronic fund transfers" and also "the effects upon competition in the provision of electronic banking services among large and small financial institutions and the availability of such services to different classes of consumers, particularly low income consumers," *id.* § 1693b(a)(2).   The Board was also required, "to the extent practicable," to "demonstrate that the consumer protections of the proposed regulations outweigh the compliance costs imposed upon consumers and financial institutions."   *Id.* § 1693b(a)(3).   The Board's Final Rule, however, inflicts substantial harm on financial institutions and consumers, with no tangible offsetting economic benefit to the public.

### A.   The Final Rule Imposes Significant Burdens Upon Consumers

Under the Final Rule, millions of consumers (particularly low-income Americans) who used to benefit from receiving a variety of free banking products and services, including free checking, will now be subject to reduced services and increased fees.   By imposing artificially low debit card interchange fees, the Final Rule leaves banks and credit unions no option but to try to recoup some of their $6-8 billion annual revenue shortfall by either reducing the availability of current debit and checking benefits and services, increasing fees for banking products or services, or both.

Already, many banks have been forced to institute fees on checking, thereby eliminating a free service that has served the public interest by bringing a substantial number of Americans into the financial system.  The results of these changes are likely particularly acute for low-income consumers less able to afford newly imposed fees who could therefore be forced out of the mainstream financial system and relegated to check cashers and other loosely regulated non-bank sources of financial services.  Mandatory reductions in interchange fees in Australia had these effects after the government required substantial reductions in interchange fees:  Australian consumers suffered as their banking costs rose and their benefits and services fell.[20]

**B.      The Final Rule Imposes Serious Harm On Financial Institutions Of All Sizes**

The Final Rule also harms the well-being of American financial institutions and the stability of the debit card payments system.  The Final Rule will slash billions from financial institutions' annual revenues during a period of continuing financial uncertainty.  Losses of this magnitude raise the prospect of job losses and reduced investment in the debit card payment system.  The Board's Final Rule also adversely impacts the capital position of banks and credit unions, thus undermining their ability to lend to businesses and consumers to support the nascent economic recovery.  Although the Board believes the precise scope and magnitude of the changes imposed upon financial institutions by the Final Rule may be uncertain, *see* 76 Fed. Reg. at 43,461, even an uncertain potential for major negative consequences outweighs the very slim chance that those compelled changes will benefit financial institutions, consumers, or the economy more generally.

---

[20]      *See* Prager et al., *Interchange Fees*, *supra*, at 39; Robert Stillman et al., *Regulatory Intervention in the Payment Card Industry by the Reserve Bank of Australia*, at 1, 3, 12, 13-14 (2008) ("Stillman, et al., *Regulatory Intervention*"), http://www.crai.com/ecp/assets/Regulatory _Intervention.pdf (regulation of credit card interchange fees in Australia "led to an increase in cardholder fees and a decrease in card benefits," which "represent harm to consumers").

In addition, debit card issuers will have fewer resources to use to foster innovation in new and enhanced electronic-payment services and products that benefit consumers, such as expanded customer service, anti-hacking and other technologies to protect the security of the electronic debit system, and new electronic-payment options.  Issuers will have scant incentive and reduced ability to invest in the maintenance and security of the debit card payments system if they are unable to recoup the costs of such investments, let alone realize any return on capital. And the precedent of below-cost price controls in this area blunts the entrepreneurial motivation to innovate by increasing uncertainty about the ability to recover the costs of significant capital investments and earn a reasonable return on those investments.

Finally, notwithstanding the exemption for institutions with less than $10 billion in assets, 15 U.S.C. § 1693o-2(a)(6)(A); 12 C.F.R. § 235.5(a)(1), as a practical matter the Durbin Amendment puts at risk the debit card businesses of more than 15,000 financial institutions of all sizes.  Although both VISA and MasterCard have moved to a two-tier interchange fee system, they are not required to do so.  And due to competitive market forces—including new forces unleashed by the Board's price controls and exclusivity regulations—in the long run merchants and payment-card networks will likely exert significant downward pressure on supposedly exempt smaller entities, thus erasing the practical benefit of the statutory exception.[21]

### C.    The Final Rule Grants A Windfall To Merchants With No Corresponding Benefit To Consumers

There is no evidence to date—and the merchants in this litigation have tellingly made no attempt to identify any—that the Final Rule's transfer of $6-8 billion to merchants will result in any benefit for the American consumer.  There is no guarantee that merchants will pass along the

---

[21]    *See* Andy Peters, *Small Bankers Avoiding Big Interchange Losses—For Now*, American Banker (Jan. 31, 2012), http://www.americanbanker.com/issues/177_21/debit-cards-Durbin-amendment-Dodd-Frank-1046230-1.html.

economic benefit from reduced interchange fees to consumers in the form of lower prices, improved service, or otherwise.  Neither the Durbin Amendment nor the Board's Final Rule requires it.  Whereas financial institutions face competitive pressures that compel them to pass along cost savings to their customers, multiple considerations make it unlikely that merchants will in fact pass on any cost savings from reduced interchange fees to their customers.  Merchants aim to set prices based on "focal points" ($9.99) and to maintain price predictability, and even under the merchants' desired rule the per-transaction savings would be cents.[22]  Merchants—especially big-box retailers—have an incentive to hold onto any gains, which, although small to consumers on a per-transaction basis, aggregate substantially for merchants.  Therefore, there is little if any prospect that consumers will realize any advantages from reduced interchange fees.[23]  Indeed, when similar caps on debit interchange fees were imposed in Australia, they yielded no measurable benefit for Australian consumers.[24]  Accordingly, the actual effect of the Final Rule is to grant merchants a tremendous windfall.

---

[22]   *See* Evans et al., *Consumer Impact Study*, *supra*, at 48-54.  Merchants' decisions whether to pass on savings from lower interchange fees would also depend on "the merchants' market power in the final product market."  Prager et al., *Interchange Fees*, *supra*, at 47; *see* Evans et al., *Consumer Impact Study*, *supra*, at 51-54.

[23]   By contrast, prior to the Board's below-cost cap on interchange fees, amici's financial institution members reinvested their interchange-fee revenues in services and products that benefitted consumers—for example, in free-checking services and rewards programs.

[24]   *See, e.g.*, GAO, *Rising Interchange Fees Have Increased Costs for Merchants, but Options for Reducing Fees Pose Challenges*, GAO-10-45, at 45-46 (Nov. 2009); Stillman et al., *Regulatory Intervention*, *supra*, at 3, 13-15; David Evans & Richard Schmalensee, *The Economics of Interchange Fees and Their Regulation:  An Overview*, MIT Sloan Working Paper No. 4548-05, at 35-36 (May 2005), http://ssrn.com/abstract=744705.

**III.   THE DURBIN AMENDMENT DOES NOT REQUIRE ISSUERS TO ENABLE ADDITIONAL NETWORKS FOR ELECTRONIC DEBIT TRANSACTIONS OR MULTIPLE NETWORKS FOR EACH FORM OF TRANSACTION AUTHORIZATION**

The Durbin Amendment directs the Board to issue regulations *prohibiting* issuers and networks from *restricting* the number of networks over which an electronic debit transaction may be processed to one network.  Yet the Board imposed a Final Rule that instead *requires* issuers to *enable* multiple networks on a debit card.  The merchants contend that the Board must require issuers to enable even *more* networks on each debit card.  There is no statutory authority for that position, and the statutory basis for even a narrower enablement requirement is questionable.[25]

Congress required the Board to issue regulations "providing that an issuer or payment card network *shall not* …, by contract, requirement, condition, penalty, or otherwise, *restrict* the number of payment card networks on which an electronic debit transaction may be processed" to one network.  15 U.S.C. § 1693o-2(b)(1)(A) (emphases added).  The statute thus calls for the Board to prohibit issuers from undertaking certain conduct—namely, entering into arrangements with networks or other issuers to restrict the number of networks available for processing debit card transactions.  The Board read the statute, instead, as authority to mandate that issuers affirmatively engage in certain conduct.  The Final Rule thus requires issuers to seek out and negotiate transactions with networks, even if the issuer has determined for legitimate business reasons, unconnected to any "restriction," to enable only one network on its debit card.  The Board's position thus requires a highly unnatural reading of a negative prohibition—"shall not restrict"—as an affirmative obligation—"must enable."  But nothing in the statutory text or

---

[25]      In its Final Rule, the Board considered, but erroneously rejected, 76 Fed. Reg. at 43,451, arguments made by several of the amici in their individual comment letters and several banks that are members of amici's associations that the Board's proposed multiple-network-enablement requirement contravened the Durbin Amendment, *see, e.g.*, Consumer Bankers Association Comment Letter, at 24 (Feb. 22, 2011); BB&T Corp. Comment Letter, at 8 (Feb. 18, 2011).

context requires the Board to mandate that issuers enter into contracts with at least two networks. Congress knows the difference between a negative prohibition and an affirmative requirement, and enacted only the former here.

Reading the statute as authorizing the Board only to prohibit agreements to restrict networks—rather than to require enablement of multiple networks—is also more congruent with the statute's purpose.  As the Board itself notes, that purpose is to prevent restrictive arrangements between issuers and payment-card networks that limit merchants' network choice. *See* 76 Fed. Reg. at 43,446 ("For example, certain issuers have agreed to make a payment card network, or group of affiliated networks, the exclusive network(s) associated with the issuer's debit cards in exchange for certain benefits.").  The merchants' brief likewise notes that these statutory provisions "were designed to prohibit *exclusivity arrangements limiting merchant choice* among debit card networks."  Mem. of Law in Support of Pls.' Mot. for Summ. J., at 2 (Mar. 2, 2012) (Dkt. No. 20); *see id.* at 11, 46-47 (identifying exclusive network arrangements as the problem Congress addressed).  Prohibiting exclusivity agreements serves that purpose; going further to require issuers to enable multiple networks on a debit card does not.

At a minimum, the Durbin Amendment cannot be read—as the merchants would have it—to authorize the Board's original Alternative B proposal.  That proposal would have required that payment card networks and issuers enable at least two unaffiliated networks *for each method by which an electronic debit transaction may be authorized* (*e.g.*, two for signature and two for PIN).  That is contrary to the plain text of the statute.  The Durbin Amendment regulates the routing of "electronic debit transactions" *without respect to* the particular authorization method—PIN or signature debit—chosen by the merchant and consumer for a transaction.  An "electronic debit transaction" is defined as any "transaction in which a person uses a debit card."

15 U.S.C. § 1693o-2(c)(5).  And "debit card" is, in turn, defined to mean "any card, or other

payment code or device, issued or approved for use through a payment card network to debit an

asset account . . . *whether authorization is based on signature, PIN, or other means*."  *Id.*

§ 1693o-2(c)(2)(A) (emphasis added).  Thus, the Durbin Amendment's regulation of the number

of networks over which an "electronic debit transaction" may be processed cannot properly be

read as authority for requiring enablement of multiple networks for *both* signature authorization

*and* PIN authorization.

That reading would also improperly conflate a restriction imposed by issuers and

networks (which are covered by the Durbin Amendment) with a restriction that is self-imposed

by a merchant through its voluntary decision to limit its own routing choices.  Under the Board's

Final Rule, so long as a merchant does not refuse to participate in PIN or signature debit, that

merchant will have the ability to process "electronic debit transactions" on multiple unaffiliated

networks whenever a consumer presents a debit card enabled with PIN and signature capability

on unaffiliated networks.  It is merchants who make the decision how to accept payment for their

services and whether to offer PIN, signature, or other methods to their customers for authorizing

debit transactions.[26]  The issuers and networks do not limit a merchant from participating in any

of the different authorization methods for a debit card.  If a merchant, on its own accord, chooses

not to accept a debit card for one or the other of PIN and signature debit, then it is the

merchant—and not the issuer or the network—that "restricts" the networks on which the

transaction can be processed.  The Durbin Amendment has nothing to say about those merchant-

---

[26]     For example, Plaintiff Boscov's Department Store, which could accept PIN debit
payment, says it has voluntarily elected not to do so.  It is Boscov's decision alone that limits its
own network options.

imposed restrictions.  The statute therefore provides no authority for a rule like the Board's

Alternative B proposal.

## CONCLUSION

The Final Rule is flawed, although for the opposite reasons presented by the merchants.

By this brief, amici present the Court with additional views, separate from those of the merchants

or the Board, on the Durbin Amendment and the Board's Final Rule, so that the Court can decide

this case based on a full understanding of the views of all interested parties in the rulemaking.


Respectfully submitted,


  /s/ Seth P. Waxman          _

Christopher R. Lipsett (DC Bar No. 929216) Seth P. Waxman (DC Bar No. 257337)
Noah A. Levine (*pro hac vice* pending)  seth.waxman@wilmerhale.com
WILMER CUTLER PICKERING  Steven P. Lehotsky  (DC Bar No. 992725)
 HALE AND DORR LLP  WILMER CUTLER PICKERING
399 Park Avenue   HALE AND DORR LLP
New York, NY 10022  1875 Pennsylvania Avenue, NW
Tel: (212) 230-8800  Washington, DC 20006
Fax: (212 230-8888  Tel: (202) 663-6000
  Fax: (202 663-6363

*Counsel for Amici Curiae*


H. Rodgin Cohen  Paul Saltzman
Matthew A. Schwartz  Rob Hunter
SULLIVAN & CROMWELL LLP  THE CLEARING HOUSE ASSOCIATION L.L.C.
125 Broad Street  450 West 33rd Street
New York, NY 10004  New York, NY  10001

Dawn Causey  Steven I. Zeisel
Nessa Feddis  Jeffrey Bloch
AMERICAN BANKERS ASSOCIATION  CONSUMER BANKERS ASSOCIATION
1120 Connecticut Avenue, NW  1225 Eye Street, NW, Suite 550
Washington, DC  20036  Washington, DC 20005

Eric L. Richard
CREDIT UNION NATIONAL ASSOCIATION
601 Pennsylvania Avenue, NW
Washington, DC 20004

Karen M. Thomas
INDEPENDENT COMMUNITY BANKERS OF
  AMERICA
1615 L Street, NW, Suite 900
Washington, DC 20036

Carrie R. Hunt
NATIONAL ASSOCIATION OF FEDERAL
  CREDIT UNIONS
3138 10th Street North
Arlington, VA  22201

Richard M. Whiting
THE FINANCIAL SERVICES ROUNDTABLE
1001 Pennsylvania Avenue, NW, Suite 500
Washington, DC 20004

Russell Goldsmith
MID-SIZE BANK COALITION OF AMERICA
555 South Flower Street
18th Floor
Los Angeles, CA 90071

Michael Grant
NATIONAL BANKERS ASSOCIATION
1513 P Street, NW
Washington, DC 20005

Dated:  March 15, 2012

## APPENDIX A

## ALPHABETICAL LIST OF AMICI CURIAE

### American Bankers Association

The American Bankers Association ("ABA") is the principal national trade association of the financial services industry in the United States.  Founded in 1875, the ABA is the voice for the nation's $13 trillion banking industry and its 2 million employees.  ABA members are located in each of the fifty States and the District of Columbia, and include financial institutions of all sizes and types, both large and small.

### The Clearing House Association L.L.C.

Established in 1853, The Clearing House is the nation's oldest banking association and payments company.  Its members include the world's largest commercial banks, which employ 1.4 million people in the United States and hold more than half of all U.S. deposits.  The Clearing House is a nonpartisan advocacy organization representing through regulatory comment letters, amicus briefs and white papers the interests of its owner banks on a variety of systemically important banking issues.  The Clearing House frequently represents the interests of the banking industry as amicus curiae in litigation concerning a variety of systemically important banking issues, including recent cases in the United States Supreme Court, the United States Courts of Appeals for the First, Second, Third, Fifth, Eighth, Ninth, Eleventh, and Federal Circuits, and numerous United States District Courts.  The Clearing House Payments Company provides payment, clearing, and settlement services to its member banks and other financial institutions, clearing almost $2 trillion daily.

### Consumer Bankers Association

The Consumer Bankers Association ("CBA") is the only national financial trade group focused exclusively on retail banking and personal financial services—banking services geared

toward consumers and small businesses.  As the recognized voice on retail banking issues, CBA provides leadership, education, research, and federal representation on retail banking issues. CBA members include most of the nation's largest bank holding companies as well as regional and super-community banks that collectively hold two-thirds of the industry's total assets.

### Credit Union National Association

The Credit Union National Association ("CUNA") is the largest credit union advocacy organization in the country, representing approximately 90 percent of the nation's nearly 7,300 state and federal credit unions, which serve approximately 94.5 million members.  CUNA benefits its members by partnering with its state leagues to provide proactive representation, the latest information on credit union issues, economic reports, regulatory analyses, compliance assistance, and education.

### The Financial Services Roundtable

The Financial Services Roundtable ("Roundtable") represents 100 of the largest integrated financial services companies providing banking, insurance, and investment products and services to the American consumer.  Member companies participate through the Chief Executive Officer and other senior executives nominated by the CEO.  Roundtable member companies provide fuel for America's economic engine, accounting directly for $92.7 trillion in managed assets, $1.2 trillion in revenue, and 2.3 million jobs.

### Independent Community Bankers of America

The Independent Community Bankers of America ("ICBA"), the nation's voice for community banks, represents nearly 5,000 community banks of all sizes and charter types throughout the United States and is dedicated exclusively to representing the interests of the community banking industry and the communities and customers of ICBA's members.  With

A2

nearly 5,000 members, representing more than 20,000 locations nationwide and employing

nearly 300,000 Americans, ICBA members hold over $1.2 trillion in assets, $960 billion in

deposits and $750 billion in loans to consumers, small businesses and the agricultural

community.

### Mid-Size Bank Coalition of America

The Mid-Size Bank Coalition of America ("MBCA") is a nonpartisan financial and

economic policy organization composed of the CEOs of mid-size banks doing business in the

United States.  Founded in 2010, the MBCA was formed for the purpose of providing the

perspectives of mid-size banks on financial regulatory reform.  The MBCA's banks do business

through more than 3,800 branches in 41 States, the District of Columbia, and three territories.

The MBCA's 28 members lead banks with combined assets of more than $450 billion (ranging

in individual size from $7 to $30 billion) that hold nearly $336 billion in deposits and have total

outstanding loans of more than $260 billion and employ approximately 77,000 people.

### National Association of Federal Credit Unions

Founded in 1967, the National Association of Federal Credit Unions ("NAFCU")

exclusively represents the interests of federal credit unions before the federal government.

Membership in NAFCU is direct; no state or local leagues, chapters or affiliations stand between

NAFCU members and its headquarters in Arlington, Virginia. NAFCU provides its members

with representation, information, education, and assistance to meet the constant challenges that

cooperative financial institutions face in today's economic environment.  NAFCU represents

nearly 800 federal credit unions, accounting for 63.9 percent of total FCU assets and 58 percent

of all FCU member-owners.  NAFCU represents many smaller credit unions with limited

operations as well as many of the largest and most sophisticated credit unions in the nation, including 82 out of the 100 largest FCUs.

**National Bankers Association**

Founded in 1927, the National Bankers Association is the trade association for the nation's 103 minority and women-owned banks.  Its members include banks owned by African-Americans, Native-Americans, American-Indians, East-Indians, Hispanic-Americans, Asian-Americans, and women.  Its members are located in 29 States and two territories spanning 60 cities and the District of Columbia.  In the aggregate, its members have assets of more than $31 billion and service more than 3 million depositors.  The purposes of the National Bankers Association include serving as an advocate for its members on legislative and regulatory matters concerning and affecting its members and the communities they serve.