**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| NACS, NATIONAL RETAIL FEDERATION, FOOD MARKETING INSTITUTE, MILLER OIL CO., INC., BOSCOV'S DEPARTMENT STORE, LLC, and NATIONAL RESTAURANT ASSOCIATION, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 1:11-cv-02075-RJL |
| v. | ) ) | |
| BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, | ) ) ) | |
| Defendant. | ) ) | |

_____

**BRIEF AMICI CURIAE OF 7-ELEVEN, INC., AUNTIE ANNE'S, INC., BURGER KING CORPORATION, CKE RESTAURANTS, INC., INTERNATIONAL DAIRY QUEEN, INC., JACK IN THE BOX INC., STARBUCKS CORPORATION, AND THE WENDY'S COMPANY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S CROSS-MOTION**

David D. Golden (DC Bar No. 985047)
  dgolden@constantinecannon.com
CONSTANTINE CANNON LLP
1301 K Street, NW, Suite 1050 East
Washington, DC 20005
Tel: (202) 204-3500
Fax: (202) 204-3501

Jeffrey I. Shinder
Alee N. Scott
CONSTANTINE CANNON LLP
335 Madison Avenue, 9th Floor
New York, NY 10017
Tel: (212) 350-2700
Fax: (212) 350-2701

*Counsel for Amici Curiae 7-Eleven, Inc., Auntie Anne's, Inc., Burger King Corporation, CKE Restaurants, Inc., International Dairy Queen, Inc., Jack in the Box Inc., Starbucks Corporation, and The Wendy's Company*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .............................................................................................. ii

INTEREST OF AMICI CURIAE .................................................................................... 1

INTRODUCTION ........................................................................................................... 2

BACKGROUND ............................................................................................................ 6

I.      Market Failure in the Debit Card Market Enabled Interchange
Fees on Debit Transactions ........................................................................... 6

II.     Merchants Have No Choice But To Pay These Supracompetitive
Fees…………………………………………………………………………..8

III.    The Durbin Amendment ................................................................................ 10

IV.    The NPRM and Commentary Regarding the Potential Impact to
Small-Ticket Transactions ........................................................................... 11

V.      The Final Rule ................................................................................................ 16

VI.    The Impact on Small-Ticket Merchants ...................................................... 19

ARGUMENT ................................................................................................................ 23

I.      The Final Rule is Not Entitled to Judicial Deference ........................... 25

II.     The Board's Analysis is Not Reasonable ................................................... 27

      A.      The Inclusion of Fraud Losses in the Interchange Standard is
Unreasonable……………………………………………………………..28

      B.      The Inclusion of Network Fees in the Interchange Standard
is Unreasonable……………………………………………………………30

III.    The Final Rule on Network Routing Also Should Be Invalidated ...................... 31

CONCLUSION ............................................................................................................. 33

APPENDIX (May 1, 2012 *PaymentsSource* Article) ..................................................... A1

# TABLE OF AUTHORITIES

## CASES

*Anderson Bros. Ford v. Valencia*,
452 U.S. 205 (1981) .................................................................................................6

*Bell Atl. Tel. Cos. v. FCC*,
131 F.3d 1044 (D.C. Cir. 1997) ..............................................................................26

*Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156 (1962) ...............................................................................................27

*Chevron U.S.A., Inc. v. NRDC*,
467 U.S. 837 (1984) ...........................................................................24, 25, 26, 27

*Cnty. of Los Angeles v. Shalala*,
192 F.3d 1005 (D.C. Cir. 1999) .........................................................................24, 28

*First Nat'l Bank & Trust Co. v. Nat'l Credit Union Admin.*,
90 F.3d 525 (D.C. Cir. 1996) ..................................................................................25

*Home Box Office, Inc. v. FCC*,
567 F.2d 9 (D.C. Cir. 1977) ....................................................................................27

*In re Visa Check/MasterMoney Antitrust Litig.*,
297 F. Supp. 2d 503 (E.D.N.Y. 2003) ......................................................................7

*In re Visa Check/MasterMoney Antitrust Litig.*,
No. 96-cv-5238(JG), 2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003) ..........................3, 10

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984) ..............................................................................................10, 25

*Marsh v. Or. Natural Res. Council*,
490 U.S. 360 (1989) ...............................................................................................27

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........................................................................................6, 24, 27

*NCAA v. Bd. of Regents of the Univ. of Okla.*,
468 U.S. 85 (1984) ..................................................................................................25

*Nat'l R.R. Passenger Corp. v. Boston & Me. Corp.*,
503 U.S. 407 (1992) ...............................................................................................25

*Nat'l Cable & Telecomms. Ass'n v. FCC*,
  567 F.3d 659 (D.C. Cir. 2009) ...................................................................26

*NRDC v. EPA*,
  859 F.2d 156 (D.C. Cir. 1988) ...................................................................28

*Pharm. Research and Mfrs. of Am. v. Thompson*,
  251 F.3d 219 (D.C. Cir. 2001) ...................................................................26

*Pub. Citizen, Inc. v. FAA*,
  988 F.2d 186 (D.C. Cir. 1993) ...................................................................27

*Schurz Commc'ns, Inc. v. FCC*,
  982 F.2d 1043 (7th Cir. 1992) .....................................................................6

*Sierra Club v. EPA*,
  294 F.3d 155 (D.C. Cir. 2002) ...................................................................29

*S. Cal. Edison Co. v. FERC*,
  116 F.3d 507 (D.C. Cir. 1997) ...................................................................25

*United Parcel Serv., Inc. v. U.S. Postal Serv.*,
  184 F.3d 827 (D.C. Cir. 1999) ..............................................................28, 29

*United States v. Visa U.S.A. Inc.*,
  163 F. Supp. 2d 322 (S.D.N.Y. 2001),
  *aff'd*, 344 F.3d 229 (2d Cir. 2003) ..........................................................3, 10

## STATUTES

5 U.S.C. § 701 ...................................................................................................6

5 U.S.C. § 706(2) ............................................................................................29

15 U.S.C. § 1693 ...............................................................................................3

15 U.S.C. § 1693o-2 ..........................................................................................4

15 U.S.C. § 1693o-2(a)(2) ............................................................................4, 11

15 U.S.C. § 1693o-2(a)(4)(A) .........................................................................11

15 U.S.C. § 1693o-2(a)(4)(B)(i ) and (ii) .........................................................11

15 U.S.C. § 1693o-2(a)(5) ...............................................................................28

15 U.S.C. § 1693o-2(b)(1)(A) ........................................................................31

Dodd-Frank Wall Street Reform and Consumer Protection Act,
  Pub. L. No. 111-203, 124 Stat. 1376, 2068-74 (July 21, 2010) ......................3


## REGULATIONS

12 C.F.R. § 235.3 ..................................................................................6, 33

12 C.F.R. § 235.7 ..................................................................................6, 33

*Regulation II, Debit Card Interchange Fees and Routing*,
  75 Fed. Reg. 81,722 (proposed Dec. 28, 2010) ...................5, 8, 12, 29, 30, 32

*Regulation II, Debit Card Interchange Fees and Routing,*
  *Final Rule*, 76 Fed. Reg. 43,394 (July 20, 2011) ........................2, 16, 17, 19, 29, 30, 32


## LEGISLATIVE MATERIALS

156 Cong. Rec. S3,695–96 (daily ed. May 13, 2010) ......................................11

156 Cong. Rec. S5,802–03 (daily ed. July 14, 2010) ........................................4

156 Cong. Rec. S5,926 (daily ed. July 15, 2010) ...........................................31


## OTHER AUTHORITIES

7-Eleven Website, "About Us" ......................................................................22

Anand Goel Comments (Jan. 3, 2011) ............................................................14

"Applying the Durbin Maximum, Visa And MasterCard Could Squash
  Small Tickets," *Digital Transactions News* (Sept. 27, 2011) ........................19

Board of Governors of the Federal Reserve System, *2009 Interchange
  Revenue, Covered Issuer Cost, and Covered Issuer and Merchant
  Fraud Loss Related to Debit Card Transactions* (June 2011) ......................29

Coinstar News Release, "Coinstar, Inc. Announces 2011 Third Quarter
  Results," *PRNewswire* (Oct. 27, 2011) ........................................................23

Federal Reserve Board Press Release, *Federal Reserve issues a final rule
  establishing standards for debit card interchange fees and prohibiting
  network exclusivity arrangements and routing restrictions* (June 29, 2011) ................17

Fumiko Hayashi *et al.*, "A Guide to the ATM and Debit Card Industry—
2006 Update," Federal Reserve Bank of Kansas City .....................................................8

Interlink Interchange Reimbursement Fees (Oct. 16, 2010)................................................8

International Franchise Association/National Council of Chain Restaurants
("IFA/NCCR") Comments (Feb. 22, 2011)..................................................12, 13, 14, 32

Kate Fitzgerald, "Despite Durbin, Debit Still Offers Issuers Many Benefits,
MasterCard Exec Says," *PaymentsSource* (May 1, 2012)................................................5

Kenneth J. Morrison, *The Canadian Experience with PIN Debit*, On Behalf
of the Merchants Payments Coalition, Submitted to the Board of Governors
of the Federal Reserve System Concerning Its Rulemaking Pursuant to
Section 920 of the Electronic Fund Transfer Act (Oct. 27, 2010)...................................8

MasterCard Fact Sheet, "Setting a Minimum or Maximum Transactions
Amount—Frequently Asked Questions" (Nov. 2010) ...................................................15

MasterCard Rules, MasterCard Worldwide (Apr. 11, 2012)............................................15

McDonald's Comments (Feb. 22, 2011) ...........................................................................12

Merchants Payments Coalition Comments (Feb. 22, 2011) ...........................16, 29, 30, 32

Merchants Payments Coalition Submission for Meeting between the Federal
Reserve Board and Staff, the Merchants Payments Coalition and Consumer
Group Representatives (Feb. 23, 2011) .........................................................................16

National Restaurant Association ("NRA") Comments (Undated)..............................12, 14

Starbucks Corporation Form 10-K for Fiscal Year Ended October 2, 2011
(Nov. 18, 2011)..............................................................................................................22

Steven C. Salop, *Economic Analysis of Debit Card Regulation Under
Section 920*, On Behalf of the Merchants Payments Coalition,
Submitted to the Board of Governors of the Federal Reserve
System Concerning Its Rulemaking Pursuant To Section 920 of
the Electronic Fund Transfer Act (Oct. 27, 2010) ...................................2, 3, 7, 8, 20, 30

Stephen Craig Mott, *Industry Facts Concerning Debit Card Regulation
Under Section 920*, On Behalf of the Merchants Payments Coalition,
Submitted to the Board of Governors of the Federal Reserve System
Concerning its Rulemaking Pursuant to Section 920 of the Electronic
Fund Transfer Act (Oct. 29, 2010)......................................................3, 7, 8, 25, 29, 30

Submission of the Merchants Payments Coalition to the Board of
  Governors of the Federal Reserve System Regarding Section 920 of
  the Electronic Fund Transfer Act (Oct. 27, 2011) ........................................................28

"Visa Hikes Prepaid Interchange But Chops Some Debit Rates," *Digital
  Transactions News* (Sept. 9, 2011) ................................................................................19

Visa Inc. Comments (Feb. 22, 2011) ...........................................................................5, 16

Visa International Operating Regulations (Apr. 15, 2012)................................................15

Visa Website, "Ask Visa—Popular Topics—Minimum Purchase" ..................................15

Wendy's (formerly Wendy's/Arby's Group, Inc.) Comments
  (Feb. 22, 2011)..........................................................................................................12, 14

Yum! Brands Comments (Feb. 21, 2011)..................................................................12, 15

**INTEREST OF AMICI CURIAE**

Amici are 7-Eleven, Inc., Auntie Anne's, Inc., Burger King Corporation, CKE

Restaurants, Inc. (Carl's Jr. and Hardee's), International Dairy Queen, Inc., Jack in the Box Inc.

(Jack in the Box and Qdoba Mexican Grill ("Qdoba")), Starbucks Corporation, and The Wendy's

Company ("Amici").  Their operations include tens of thousands of small business franchises

and licensed stores that are convenience stores, quick service restaurants ("QSRs") and/or

specialty coffee shops, which accept substantial volumes of debit transactions that are almost

exclusively small-ticket transactions—or transactions of $15 or less.  Amici are in the fastest-

growing merchant segment for debit transactions, as customers increasingly convert small

transactions from cash to debit for convenience.  Their debit volumes have tripled in less than a

decade.

Amici, and all like-situated small-ticket merchants (including such widely-used services

as transit authorities, vending operators, and newsstands) probably have more at stake in this

case than any other interested segment.  Amici provide a powerful example of the

anticompetitive debit market that motivated Congress to regulate debit interchange, as well as the

failure of the Board of Governors of the Federal Reserve System (the "Board") to follow

Congress's clear directives and implement regulations that prevented further exercises of market

power by the dominant debit networks.  In fact, rather than putting in place regulations that

restrained further exercises of market power by the networks and the banks, the Board

empowered them to implement price increases ranging from approximately 15 percent to more

than 200 percent on the vast majority of debit transactions accepted by small-ticket merchants

like Amici.  Nothing could better demonstrate the unlawful nature of the Board's rulemaking

than the fact that, just a few months after the ink was dry on the Board's Final Rule,[1] the debit

networks used it to justify hitting small businesses in the fastest-growing debit segment—the

"holy grail" of debit growth (according to MasterCard)—with a massive price increase.

Moreover, the Board enabled this exercise in market power even though it received

comments from some Amici and their trade association representatives, advising the Board that

its initial proposal, which was far better than the Final Rule, could result in a substantial price

increase on many small-ticket transactions.  Now, Amici submit this brief in support of the

plaintiffs' motion for summary judgment to vacate the Board's Final Rule and in opposition to

defendant's cross-motion.  No party's counsel has authored this brief in whole or in part, and no

person or party has contributed money to writing the brief other than Amici, their members, and

their counsel.

## INTRODUCTION

For decades there has been little or no competition for merchants in the debit card market.

Prior to 1990, debit cards experienced robust growth based on a competitive at-par pricing model

that mirrored the system that prevailed (and still prevails) for checks.  Under that competitive

model, merchants typically paid no interchange (sometimes called "swipe fees") for virtually all

debit transactions and, because debit cards replaced more expensive and inefficient check and

cash transactions, banks had strong incentives to issue debit cards to their customers.  Debit

cards were thriving under this model, as they have around the world where debit cards have been

priced to merchants at par, without swipe fees.[2]

---

[1] *Regulation II, Debit Card Interchange Fees and Routing*, *Final Rule*, 76 Fed. Reg. 43,394 (July 20, 2011) ("Final Rule"), http://www.gpo.gov/fdsys/pkg/FR-2011-07-20/pdf/2011-16861.pdf.

[2] As of 2010, seven of the eight countries with the highest debit usage utilize an at-par pricing model—Canada, Denmark, Finland, Iceland, the Netherlands, New Zealand, and Norway.  *See* Steven C. Salop, *Economic Analysis of Debit Card Regulation Under Section 920*, On Behalf of the Merchants Payments Coalition, Submitted to the Board of Governors of the Federal Reserve System Concerning Its Rulemaking Pursuant To Section 920 of the Electronic

In the early 1990s, however, competition began to fail when Visa and MasterCard leveraged their market power in credit cards to gain a dominant position in debit cards. In doing so, they eliminated the at-par pricing model that was thriving in the United States and replaced it with a system that was based on continually-escalating interchange fees. The dominant networks were owned and controlled by competing debit card issuers, including the largest banks in the country, and the networks collectively set interchange fees on the banks' behalf and used those fees to reward the banks that owned and controlled them. This strategy worked because merchants were (and are) powerless to resist these fees, even as they increased dramatically over the past decade, because merchants cannot stop accepting debit card transactions without devastating their businesses. As a result of this failed marketplace, debit card swipe fees increased 234 percent between 1998 and 2006 for PIN debit alone, and they have continued to increase since then.[3]

When several wide-ranging antitrust cases failed to redress this market failure,[4] Congress chose to address it through regulation, by way of Section 1075 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, 2068-74 (July 21, 2010), which amended the Electronic Fund Transfer Act (15 U.S.C. § 1693 *et seq*.) ("EFTA")

---

Fund Transfer Act (Oct. 27, 2010) ("Salop Report") ¶ 68 (attached as Exhibit C to Memorandum in Support of Plaintiffs' Motion for Summary Judgment (Mar. 2, 2010) ("Plaintiffs' Mem.")) (The Salop Report is also available at http://www.federalreserve.gov/newsevents/files/merchants_payment_coalition_meeting_20101102.pdf.).

[3] *See* Stephen Craig Mott, *Industry Facts Concerning Debit Card Regulation Under Section 920*, On Behalf of the Merchants Payments Coalition, Submitted to the Board of Governors of the Federal Reserve System Concerning its Rulemaking Pursuant to Section 920 of the Electronic Fund Transfer Act (Oct. 29, 2010) ("Mott Report") ¶ 24 (attached as Exhibit E to Plaintiffs' Mem.) (The Mott Report is also available at http://www.federalreserve.gov/newsevents/files/merchants_payment_coalition_meeting_20101102.pdf.); *see also* Salop Report Exhibits 1a-1d.

[4] While Visa and MasterCard lost several landmark antitrust cases in the last decade, none of them materially impacted their dominance in the industry. *See In re Visa Check/MasterMoney Antitrust Litig.*, No. 96-cv-5238(JG), 2003 WL 1712568, *3, *4 (E.D.N.Y. Apr. 1, 2003) (granting partial summary judgment to merchant class against Visa, finding that it had market power and tied its debit cards to its dominant credit cards); *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d 322, 329 (S.D.N.Y. 2001) (finding that Visa's and MasterCard's exclusionary rules harmed competition, including by barring entry into the debit card market), *aff'd*, 344 F.3d 229 (2d Cir. 2003).

with a new Section 920, codified at 15 U.S.C. § 1693o-2 (the "Durbin Amendment").

Specifically, Congress sought to restrain the dominant networks from exercising market power

through the imposition of supracompetitive debit interchange fees by requiring that such fees be

"reasonable and proportional to the cost incurred by the issuer."  15 U.S.C. § 1693o-2(a)(2)

(EFTA Section 920(a)(2)).  That this provision was designed to fix the market power that has

crippled competition in this industry was made clear by its principal author, Senator Richard J.

Durbin, in numerous statements made on the floor of the Senate, including the following:

> For years, Visa and MasterCard, and their big bank backers, have unilaterally
> fixed prices on the fees small businesses pay every time they accept a debit card
> from a customer.  The two giant card networks control 80 percent of the debit
> card market—that is Visa and MasterCard.  And it is no surprise that debit
> interchange fees have risen, even as the price of processing the transaction has
> fallen.  They can impose these prices and say to the local businessperson: Take it
> or leave it.  Small businesses in Illinois and throughout the country have pleaded
> over and over again with these card network giants: Give us some way to reduce
> these costs so that we can reach profitability, hire more people, and prosper as a
> business and pass on savings to consumers.
>
> The conference report that we have before us will require the Federal Reserve to
> ensure that Visa, MasterCard, and their big bank allies can only charge debit
> interchange fees that are reasonable and proportional to the cost of processing
> each transaction.  It also prevents Visa and MasterCard from engaging in certain
> specific anticompetitive practices. … Finally, Visa, MasterCard, and the Wall
> Street banks will face some check against their unbridled market power in the
> credit and debit industries.
>
> Finally, small businesses and merchants are going to have relief that will lead to
> real savings, profitability, and reduced cost for consumers.  The Dodd-Frank Wall
> Street Reform and Consumer Protection Act is a landmark bill, including the most
> sweeping reforms to Wall Street since the New Deal.

156 Cong. Rec. S5,802–03 (daily ed. July 14, 2010).[5]

Yet, notwithstanding Congress's clear directive that the dominant networks' ability to

impose "take it or leave it" pricing be restrained going forward, the Board's Final Rule on debit

---

[5]  Senator Durbin's July 14, 2010 floor statement is also available at http://www.gpo.gov/fdsys/pkg/CREC-2010-07-14/pdf/CREC-2010-07-14-pt1-PgS5801.pdf.

interchange did the opposite.  Contrary to the letter and spirit of the Durbin Amendment, the Final Rule empowered the networks to drastically raise debit card interchange fees for small-ticket transactions, the "holy grail" of debit growth and fastest-growing segment of debit card use.[6]  Moreover, the Board enabled this massive price increase in the face of comments from Amici and others that the Board's Notice of Proposed Rulemaking (*Regulation II, Debit Card Interchange Fees and Routing*, 75 Fed. Reg. 81,722 (proposed Dec. 28, 2010)) ("NPRM")[7]— which proposed debit card interchange fees ranging from $0.07 to $0.12—likely would result in increased debit interchange for some small-ticket transactions.  And it did so in the face of numerous comments that, given the market failures that have plagued this industry, competition could not be counted upon to restrain debit interchange fees for the foreseeable future.

The Board disregarded these submissions and configured a Final Rule that increased the permissible range for debit interchange by approximately 100-243 percent over that set forth in the NPRM.  This resulted in the imposition of the very "take it or leave it" pricing that the Durbin Amendment was supposed to prevent, as each of the debit networks quickly implemented the highest possible fees for regulated small-ticket transactions.  As a result, hundreds of thousands of small businesses are experiencing punitive increases in debit card interchange fees.  Amici, and the small businesses that operate as franchisees or licensees under their brands, are paying substantially more in debit card swipe fees because of the Board's failure to faithfully

---

[6]  According to MasterCard's Group Executive for Global Debit, Carlos Menendez, "'[t]he holy grail' for increasing debit card purchase volume is increasing small-ticket purchases across a broad array of everyday expenditures." Kate Fitzgerald, "Despite Durbin, Debit Still Offers Issuers Many Benefits, MasterCard Exec Says," *PaymentsSource* (May 1, 2012), available by subscription at http://www.paymentssource.com/news/Debit-Still-Offers-Issuers-Many-Benefits-MasterCard-Exec-Says-3010533-1.html (attached as Appendix A to this brief).  And as Visa noted in its comments submitted to the Board, "[t]oday, more than 30% of Visa Check Card (or signature) transactions are at relatively small ticket sizes."  Visa Inc. Comments (Feb. 22, 2011), at 7 n.16, http://www.federalreserve.gov/SECRS/2011/March/20110304/R-1404/R-1404_022211_67810_571316902268_1.pdf.

[7]  The NPRM is available at http://www.gpo.gov/fdsys/pkg/FR-2010-12-28/pdf/2010-32061.pdf.

implement Congress's clear directive.  At the end of the day, a statute designed to constrain

market power was somehow interpreted by the Board to empower it.

Such a result cannot withstand scrutiny under the Administrative Procedure Act, 5 U.S.C.

§ 701 *et seq*. ("APA").  The Final Rule reflects an "obvious repugnance to the statute,"

"unprincipled compromises," and a complete "fail[ure] to consider an important aspect of the

problem."[8]  For these reasons and the reasons set forth below, Amici urge this Court to invalidate

the Final Rule's interchange fee standard (12 C.F.R. § 235.3) and the rules concerning network

routing (12 C.F.R. § 235.7), and remand to the Board with a direction to adopt rules that comply

with the plain language of the Durbin Amendment.

## BACKGROUND

Rather than restate the facts surrounding the evolution of the debit market that are

adequately described in other submissions, we instead focus on the facts that are most germane

to the market failures that motivated the passage of the Durbin Amendment.  Virtually all of

these facts were drawn from the record that was before the Board when it crafted the Final Rule.

## I.      Market Failure in the Debit Card Market Enabled Interchange Fees on Debit Transactions

Interchange is not necessary to motivate banks to issue debit cards and, thus, the

proliferation of interchange fees for debit transactions in the United States is a function of market

failure.  Banks have strong incentives to provide debit cards even without substantial income

from interchange.  When banks first began to offer PIN debit cards, they did not charge

interchange fees.  To the contrary, they sometimes paid merchants to provide debit services, a

practice known as "reverse," "negative," or "issuer-paid" interchange.  Under that structure,

---

[8] *Anderson Bros. Ford v. Valencia*, 452 U.S. 205, 219 (1981); *Schurz Commc'ns, Inc. v. FCC*, 982 F.2d 1043, 1050 (7th Cir. 1992); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

banks profitably provided debit services without interchange.  This model prevailed until the early 1990s, a period that saw widespread expansion of debit card services.[9]

In fact, this model prevailed until Visa and MasterCard and their bank owner/members leveraged their power in the credit card market to dominate the debit market.  Beginning in the early 1990s, the dominant networks began to implement and enforce a strategy to require merchants to pay higher debit interchange through their "Honor All Cards" rules.  This policy forced merchants to accept signature debit cards as a condition of accepting the networks' dominant credit cards.  The networks set the same or similar interchange rates for merchants' debit card transactions as they did for credit card transactions, and merchants had to pay these fees.  The networks then used the lucrative interchange stream created by this practice to reward their bank owners and thereby entrench their dominance in the debit market.[10]  As banks became accustomed to receiving high interchange rates for signature debit transactions—rates which bore no relationship to costs—a dynamic of merchants being required to pay ever-increasing interchange rates to underwrite the networks' need to reward their bank owners became the norm for the industry.[11]

The experience in other G-20 countries reinforces the conclusion that the development of debit in the United States, with a high credit card-style interchange fee, was simply a function of the market failures in the debit industry in this country.  Tellingly, seven of the eight countries with the highest debit usage utilize an at-par pricing model.  For example, the Canadian debit system has always been based on an at-par pricing model, and Canada traditionally has had

---

[9]  *See* Salop Report ¶¶ 21, 45, 136; Mott Report ¶¶ 7, 8, 9, 11, 14, 23.

[10]  The practice of tying debit card acceptance to credit card acceptance was challenged in a landmark antitrust lawsuit, which resulted in a settlement involving over $3 billion in past damages and an estimated $25–$87 billion in injunctive relief.  *See In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003).

[11]  *See* Mott Report ¶¶ 12-14, 16; Salop Report ¶¶ 4, 11, 24, 33, 43-44, 55, 139, 145.

higher per-capita debit usage than the United States, as well as higher debit penetration in merchant categories that do not accept PIN debit in the United States.[12]

Visa also used its acquisition of the leading PIN debit network, Interlink, to push a high credit card-style interchange structure into the PIN debit segment as well.  In PIN debit alone, for example, merchants faced market-wide effective interchange increases of an estimated 234 percent between 1998 and 2006.[13]  These increases were even more severe for small non-supermarket merchants who had faced an estimated 467 percent increase in Interlink PIN debit prices between 1998 and 2010.[14]

## II.    Merchants Have No Choice But To Pay These Supracompetitive Fees

This strategy worked because merchants had no choice but to accept the networks' debit cards—because rejecting those cards would severely harm merchants' operations—and thus the networks could raise (collusively-set) interchange prices to merchants with impunity.[15]  Against this backdrop, banks had no incentive to compete for merchant acceptance, as acting collectively through Visa and MasterCard (and thereby exercising collective market power over merchants) was far more lucrative than competing for merchants.

---

[12]  *See* Kenneth J. Morrison, *The Canadian Experience with PIN Debit*, On Behalf of the Merchants Payments Coalition, Submitted to the Board of Governors of the Federal Reserve System Concerning Its Rulemaking Pursuant to Section 920 of the Electronic Fund Transfer Act (Oct. 27, 2010) ¶¶ 2, 13-14, 42-43, http://www.federalreserve.gov/newsevents/files/merchants_payment_coalition_meeting_20101102.pdf.); Salop Report ¶¶ 48, 64-68.

[13]  *See* Mott Report ¶ 24.  Moreover, the interchange associated with PIN debit has continued to increase since 2006. *Id.* ¶ 24; Salop Report Exhibits 1a-1d.  Even if the $0.23-per-PIN-debit-transaction figure reported in the NPRM (75 Fed. Reg. at 81,725) is used to calculate the growth rate after 1998, that growth is still 166 percent, which likely understates the escalation of PIN debit costs for merchants.

[14]  *See* Fumiko Hayashi *et al.*, "A Guide to the ATM and Debit Card Industry—2006 Update," Federal Reserve Bank of Kansas City, at 13 (Figure 8), http://www.kc.frb.org/publicat/psr/BksJournArticles/ATMDebitupdate.pdf; Interlink Interchange Reimbursement Fees (Oct. 16, 2010), at 2, http://usa.visa.com/download/merchants/october-2010-interlink-interchange-rate-sheet.pdf (percentage increase based on calculation of interchange fees using default non-supermarket rate on a $50 debit transaction).

[15]  *See* discussion of merchant-side network market power in Salop Report ¶¶ 35-39.

The experience of the convenience store, QSR, and coffee shop industries highlights this market failure. Because of their low margins and smaller tickets, the overwhelming majority of these merchants did not accept payment cards until the early-to-mid 2000s, many years after most other merchant segments began to accept them.[16] At the outset, the networks extended "incentive" interchange rates to make it cost effective for these merchants to start accepting debit cards. Within a few years after introducing plastic to their customers, many small-ticket merchants experienced massive growth in card-based transactions, with the vast majority of that growth on debit cards.[17] Moreover, once these merchants started to see significant volumes on these cards, they began to experience the same market power that was exercised over the rest of the merchant community. With such volumes, convenience stores, QSRs, and coffee shops (and other small-ticket merchants) had no choice but to accept these transactions to remain competitive. Put simply, what happened to these industries is exactly what has happened to every other merchant segment that widely accepts debit cards. Once these cards have gained widespread acceptance and use, merchants cannot stop taking them without causing significant harm to their businesses. That gives the networks and the banks the power to raise interchange fees to merchants, and they have wielded that power liberally over the past twenty years.

---

[16]  For instance, Hardee's began accepting debit cards in approximately 2003 (*see* Declaration of Luis Farias of CKE Restaurants, Inc. ("Farias Decl.") ¶ 6); Jack in the Box restaurants in 2002 (*see* Declaration of Stephen M. Brigandi of Jack in the Box Inc. ("Brigandi Decl.") ¶ 4); Auntie Anne's restaurants in 2003 (*see* Declaration of Joseph R. Hainthaler of Auntie Anne's, Inc. ("Hainthaler Decl.") ¶ 4); Wendy's restaurants in 2004 (*see* Declaration of Mark Inzetta of The Wendy's Company ("Inzetta Decl.") ¶ 5); Burger King restaurants in 2005 (*see* Declaration of Craig S. Prusher of Burger King Corporation ("Prusher Decl.") ¶ 4); and Dairy Queen required its franchisees to accept debit cards beginning on October 1, 2007 (*see* Declaration of Shelly O'Callaghan of International Dairy Queen, Inc. ("O'Callaghan Decl.") ¶ 4).

[17]  For example, Jack in the Box's payment card transactions were approximately 14 percent of sales in 2004 and they have steadily risen to approximately 35 percent in 2012 (and debit currently represents 90 percent of total card transactions) (*see* Brigandi Decl. ¶¶ 6-7); Wendy's payment card transactions currently represent 42 percent of total transactions (and debit transactions represented 81 percent of overall card transactions in 2011) (*see* Inzetta Decl. ¶¶ 7-8); Burger King's percentage of transactions paid with payment cards is now 30 percent (and debit represents 80 percent of total card transactions) (*see* Prusher Decl. ¶ 6).

Notably, courts have recognized this phenomenon and have repeatedly found that the leading

networks have market power over merchants.[18]

### III.   The Durbin Amendment

The Durbin Amendment was passed as a direct response to this persistent market failure.

In one of many speeches on the Senate floor describing the Durbin Amendment's underlying

rationale, Senator Durbin stated that:

> Credit and debit cards are now used in more than half the retail sales in the United
> States of America.  Yes, being able to pay with plastic is a great convenience, but
> there is another reality.  The shift from cash and checks to credit and debit means
> that the way we do business in America is increasingly falling under the control of
> these two giants of the credit and debit card industry—Visa and MasterCard.
>
> These card networks dominate the credit and debit industries .… Unfortunately,
> these two companies are looking for profits, and they are not always looking out
> for the best interests of the merchants, the small businesses, the retail businesses
> or the consumers.  Interchange fees are a classic example. ...
>
> In a normal market, you see banks competing with one another to do business
> with the restaurants, shops, and the merchants.  With that competition, things
> would be a lot better.  But, in fact, the real world of credit cards with the two
> giants, Visa and MasterCard, is a world where there is little or no competition.
>
> The credit and debit card markets are not normal.  Visa and MasterCard
> unilaterally set interchange fee rates that apply to all banks within their card
> networks.  There is no negotiation between the banks and merchants over
> reducing interchange rates.  Individual businesses in New Hampshire, Illinois,
> New York, and all across America have no bargaining power with these giant
> credit card companies.  They set the rules, they fix the fees, take it or leave it. …

---

[18] For example, in *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d at 340, the court found that "merchants …
cannot refuse to accept Visa and MasterCard even in the face of significant price increases because the cards are
such preferred payment methods that customers would choose not to shop at merchants who do not accept them."
"Defendants' ability to price discriminate also illustrates their market power.  Both Visa and MasterCard charge
differing interchange fees based, in part, on the degree to which a given merchant category needs to accept general
purpose cards." *Id.*  "Because Visa and MasterCard have large shares in a highly concentrated market with
significant barriers to entry, both defendants have market power in the general purpose card network services
market, whether measured jointly or separately; furthermore plaintiff has demonstrated that both Visa and
MasterCard have raised prices and restricted output without losing merchant customers." *Id.* at 342.  *See also In re
Visa Check*, 2003 WL 1712568, *4 (recognizing that "Visa [alone] indisputably possesses sufficient market power
'to force [merchants] to do something that [they] would not do in a competitive market'") (quoting *Jefferson Parish
Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 13-14, 26-29 (1984)).

What can businesses do to stop these rising interchange fees?  Almost nothing.
Some—very rarely—businesses say they do not accept credit or debit cards, but
the vast overwhelming number of businesses do.  They have to.  It is part of doing
business in America.

Visa and MasterCard have 80 percent of the credit and debit market.  Merchants
have to use them.  They tell the merchants: If you want to take our card, you live
with the fees we charge.  That is not a competitive situation at all.

156 Cong. Rec. S3,695–96 (daily ed. May 13, 2010).[19]

To restrain the debit networks from exercising market power going forward, the Durbin

Amendment requires that "[t]he amount of any interchange transaction fee that an issuer may

receive or charge with respect to an electronic debit transaction shall be reasonable and

proportional to the cost incurred by the issuer with respect to the transaction."  15 U.S.C. §

1693o-2(a)(2) (EFTA Section 920(a)(2)).  The Durbin Amendment further requires that in

prescribing regulations regarding debit interchange, the Board shall consider the "functional

similarity between (i) electronic debit transactions; and (ii) checking transactions that are

required within the Federal Reserve bank system to clear at par."  15 U.S.C. § 1693o-2(a)(4)(A)

(EFTA Section 920(a)(4)(A)).  Moreover, the statute requires the Board to consider "the

incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or

settlement of a particular electronic debit transaction," but not "other costs incurred by an issuer

which are not specific to a particular electronic debit transaction."  15 U.S.C. § 1693o-

2(a)(4)(B)(i) and (ii) (EFTA Section 920(a)(4)(B)(i) and (ii)).

## IV.    The NPRM and Commentary Regarding the Potential Impact to Small-Ticket Transactions

In December 2010, the Board released the NPRM.  In it, the Board set forth two

proposals for comment regarding the base regulation of debit interchange.  Proposed Alternative

---

[19]  Senator Durbin's May 13, 2010 floor statement is also available at http://www.gpo.gov/fdsys/pkg/CREC-2010-05-13/pdf/CREC-2010-05-13-pt1-PgS3684-2.pdf.

1 called for a safe harbor of $0.07 per transaction for debit interchange fees, with an upward

adjustment up to a cap of $0.12 based upon an issuer's allowable costs.  In contrast, proposed

Alternative 2 called for what was effectively both a safe harbor and a cap of $0.12 per

transaction for debit interchange fees.  *See* NPRM, 75 Fed. Reg. at 81,726; 81,736-39; 81,755-

56.

     The NPRM motivated several trade associations representing small-ticket merchants to

express concerns about the rule potentially enabling price increases for certain small-ticket

transactions.  For example, the Board received detailed comments from the International

Franchise Association ("IFA") and the National Council of Chain Restaurants ("NCCR") (a

division of the National Retail Federation, one of the plaintiffs in this litigation), as well as the

National Restaurant Association ("NRA") (another plaintiff in this litigation).[20]  Additional

comments came from small-ticket merchants, such as amicus Wendy's, as well as McDonald's

and Yum! Brands, Inc. (owners of KFC, Pizza Hut, Taco Bell, A&W Restaurants and Long John

Silver's), among others.[21]

     These submissions advised the Board that small-ticket transactions represent the fastest-

growing segment of debit transactions.  The IFA, for its part, noted that:

---

[20]  The IFA "represents more than 90 different industries, including more than 11,000 franchisee, 1,100 franchisor and 500 supplier members nationwide," and the NCCR "is the leading trade association exclusively representing chain restaurant companies."  *See* IFA/NCCR Comments (Feb. 22, 2011), http://www.federalreserve.gov/SECRS/2011/March/20110323/R-1404/R-1404_022211_67493_559268623510_1.pdf (beginning at p. 3 of the document).  The NRA "represents the restaurant and foodservice industry, which contains over 970,000 locations," and its "members account for over one-third of the industry's retail locations."  Plaintiffs' Mem. at 20-21; *see also* NRA Comments (Undated), http://www.federalreserve.gov/SECRS/2011/March/20110303/R-1404/R-1404_022211_67254_584334237408_1.pdf).

[21]  *See, e.g.*, Wendy's (formerly Wendy's/Arby's Group, Inc.) Comments (Feb. 22, 2011), http://www.federalreserve.gov/SECRS/2011/March/20110302/R-1404/R-1404_022211_67972_575538896396_1.pdf; McDonald's Comments (Feb. 22, 2011), http://www.federalreserve.gov/SECRS/2011/March/20110323/R-1404/R-1404_022211_67493_559268623510_1.pdf; Yum! Brands Comments (Feb. 21, 2011), http://www.federalreserve.gov/generalinfo/foia/R1404formletters.pdf (beginning at p. 25 of the document).

Electronic debit transactions that have an average per transaction amount less than $15 ("Small-Ticket Transactions") represent a growing and vibrant segment of the retail industry.  Small-Ticket Transactions are common to retailers of all sizes across a broad range of industries.  In particular, quick service restaurants, sellers of inexpensive and/or consumable goods, transit authorities, self-service and vending operators, convenience stores, taxi services and other consumer service-oriented businesses accept a disproportionate number of Small-Ticket Transactions.

Today, the majority of noncash payment tender types are electronic debit transactions.  The proportion of these electronic debit transactions that are Small-Ticket Transactions is significantly higher than that of large-ticket electronic debit transactions that have an average per transaction amount greater than $15.  This market reality exacerbates the relative burden on Small-Ticket Transactions of the high flat interchange fees supported under the Proposed Regulations. According to the 2010 Federal Reserve Payments Study on Noncash Payment Trends, 35% of noncash payment transactions in 2009 were electronic debit transactions, representing only 2% of the noncash payment dollar value.  Although the mean dollar value of electronic debit transactions in 2009 was $38, the median dollar value would likely have fallen within the Small-Ticket Transaction dollar value of below $15.  This assumption is supported by a prior Cash Product Office payment size study which estimated 30% of electronic debit transaction volume was under $15 in 2006.  Debit growth rates and the introduction of transit, vending and other Small-Ticket Transaction industry segments suggest this share has increased since that study.  Given the increasing prevalence of electronic debit transactions and the number of these transactions that are Small-Ticket Transactions, we submit that it is imperative that the Board consider the impact of proposed Regulation II on these transactions, including the consumers that initiate them and the retailers that accept them.

IFA/NCCR Comments at 2 (citations omitted).

Moreover, these submissions emphasized that flat interchange fees can be harmful to small-ticket transactions because as transaction sizes decrease, the cost per transaction increases. As a result, the Board was urged to reduce the caps to ensure that its final rules avoid implicitly endorsing a price increase.  The IFA, in this regard, emphasized that:

[T]he Durbin Amendment did not authorize, and a plain reading of the statute does not support, interchange transaction fees as high as 7 to 12 cents per transaction.  Further, such high interchange transaction fee levels would be particularly burdensome on merchants in connection with Small-Ticket Transactions.  While we do not oppose, and in fact encourage, a flat fee approach to the Interchange Fee Restrictions, we are concerned about the harm the high

interchange transaction fee amounts contemplated in the Proposed Regulations may cause to retailers accepting Small-Ticket Transactions.  Of particular concern is the negative financial impact of the high interchange transaction fees allowed under the Proposed Regulations on electronic debit transactions under $5 ("Micro-Payments").  ***Under current published Visa and MasterCard Small-Ticket Transaction debit interchange fee rates (both set at 1.55% + 4 cents), a $5 transaction incurs 11.75 cents in interchange transaction fees, which is below the proposed 12 cent cap contemplated in the Proposed Regulations. Similarly, under the same Visa and MasterCard Small-Ticket Transaction debit interchange fee rates, a $1 transaction incurs 5.6 cents in interchange transaction fees, which is lower than the proposed 7 cent safe harbor and less than half of the proposed 12 cent cap.  Thus, Micro-Payments will likely incur higher interchange transaction fees under the Proposed Regulations than under the existing interchange transaction fee regime, contrary to the intended results of the Durbin Amendment.***

IFA/NCCR Comments at 6 (emphasis added; citations omitted).  The NRA reiterated the IFA/NCCR Comments.  *See* NRA Comments at 2-3.  Amicus Wendy's also expressed its support for the IFA/NCCR position in its comments, as did McDonald's.  *See also* Wendy's Comments (urging "the Board to thoroughly examine the proposed regulations and consider the unique circumstances surrounding small-ticket transactions").  Put simply, these comments advised the Board that the NPRM could result in a price increase on some of the fastest-growing debit transactions.

Concerns similar to those articulated by the IFA/NCCR were highlighted in other submissions that are in the record.  For example, a payments industry expert asked the Board to "[c]onsider lower interchange rate for industries with low average tickets," stating that:[22]

Capping debit interchange fees at $0.12 will benefit all merchants whose average ticket is greater than $5.  Many industries where the average ticket is less than $5 will pay more in interchange fees if issuers set debit interchange fees at $0.12. For instance, cities and private companies that run parking meters and parking garages where the average ticket is typically $2-$4 will incur higher interchange fees at $0.12.

---

[22]  *See* Anand Goel Comments (Jan. 3, 2011), http://www.federalreserve.gov/SECRS/2011/January/20110106/R-1404/R-1404_010311_59549_558300671921_1.pdf.

Likewise, Yum! Brands expressed the following:

> Please consider the impact of the maximum interchange cap to Small Ticket merchants, like our businesses. We have a significant number of transactions under $5, where the fees could actually become more expensive under your current proposed cap of $0.12 per item. For example, under the current Visa and MasterCard Small Ticket Interchange Fee, a $3.00 transaction costs us $0.0865 (1.55% + $0.04) which is much less than the $0.12 cap. And, by the way, if we accept debit cards, we must accept ALL debit cards, regardless of the type of card, interchange charged, or size of transaction. We may now be allowed to put a minimum dollar amount on a credit transaction, but not a debit transaction.

> We believe the Board should consider that Small Ticket transactions, and merchants like us who have a very high proportion of these transactions, will be particularly burdened by the proposed regulations if the cap remains at $0.12 per transaction.

Yum! Brands Comments at 2. Notably, Yum! Brands's comments went a step further by advising the Board that it had no choice but to accept all debit cards and that, while the Durbin Amendment allows the imposition of minimum payment amounts for credit card transactions, it does not provide such relief for debit transactions.[23]

Even the comments filed by Visa raised similar concerns (although Amici take issue with Visa's description of the then-proposed cap as "below cost"):

> A cap-based approach also presents practical challenges for low-value or low-risk transactions. Given the below cost "cap" that the Board proposed, issuers will have significant incentives to select networks that provide the highest possible

---

[23] Visa and MasterCard have historically prohibited merchants from imposing a minimum purchase amount requirement to prevent consumers from using their cards for low-ticket transactions. The Durbin Amendment prohibited such rules on credit cards, but did not extend that prohibition to debit cards. As such, Visa and MasterCard (and the other debit networks) can continue to prohibit small-ticket merchants from limiting acceptance to transactions above a certain amount. *See, e.g.,* Visa Website, "Ask Visa—Popular Topics—Minimum Purchase," http://usa.visa.com/about_visa/ask_visa/index.html ("U.S. retailers may require a minimum purchase amount on credit card transactions. The minimum purchase amount must not exceed $10 and does not apply to transactions made with a debit card."); Visa International Operating Regulations (Apr. 15, 2012), at 467, 1233, http://usa.visa.com/download/merchants/visa-international-operating-regulations-main.pdf (same); MasterCard Fact Sheet, "Setting a Minimum or Maximum Transactions Amount—Frequently Asked Questions" (Nov. 2010), http://www.mastercard.com/us/merchant/pdf/UO_14b_Fact%20Sheet.pdf ("MasterCard permits any U.S. merchant to set a minimum transaction amount (not to exceed USD 10 or any higher amount established by the Federal Reserve by regulation) to accept MasterCard cards that access a credit account. MasterCard does not permit merchants to set a minimum transaction amount to accept MasterCard cards that access a debit account."); MasterCard Rules, MasterCard Worldwide (Apr. 11, 2012), at Chs. 5-16, 15-11, http://www.mastercard.com/us/merchant/pdf/BM-Entire_Manual_public.pdf (same).

interchange rate for each and every transaction…. Applying such rates to low-value transactions, including, for example, quick-service meals and beverages, or other small convenience purchases, may force merchants with a significant number of such transactions to stop accepting debit cards. … Some merchant segments with significant numbers of smaller-value transactions (e.g., coffee shops, newsstands, and vending machines) may find it impossible or uneconomic to continue to accept transactions with a $0.12 interchange fee. ***This is a higher debit interchange rate than Visa applies today on low ticket transactions of this type***.

Visa Inc. Comments at pp. 5, 7 (emphasis added).

While Visa correctly noted that certain merchant segments faced a potential price increase under the NPRM, it was incorrect in its assumption that such merchants could respond by stopping the acceptance of debit cards.  In truth, such merchants faced the same insurmountable pressure to maintain acceptance—even at higher supracompetitive interchange fees—because dropping debit cards risked devastating their businesses.  Critically, the Board was warned about this dynamic in submissions made by merchants, including the Merchants Payments Coalition.[24]  The Board acknowledged this concern in the Final Rule—noting merchant commenters' statements that "as a practical matter, they cannot discontinue acceptance of debit cards because of their widespread adoption by consumers" (76 Fed. Reg. at 43,459)—but failed to take heed of its implications.

## V.    The Final Rule

The Final Rule made matters much worse.  Under the Final Rule, which generally became effective on October 1, 2011, the maximum permissible interchange fee that an issuer

---

[24]  The Merchants Payments Coalition is a group of retailers, supermarkets, drugstores, convenience stores, fuel stations, online merchants and other businesses that represents more than 29 national and 80 state trade associations that represent 2.7 million stores and approximately 50 million employees. *See, e.g.*, Merchants Payments Coalition Submission for Meeting between the Federal Reserve Board and Staff, the Merchants Payments Coalition and Consumer Group Representatives (Feb. 23, 2011), at 2, http://www.federalreserve.gov/newsevents/files/MPC_Consumer_Meeting_20110223.pdf ("Simply put, merchants cannot reject the dominant networks' debit cards without seriously harming their businesses."); Merchants Payments Coalition Comments (Feb. 22, 2011), at 2, http://www.federalreserve.gov/SECRS/2011/March/20110303/R-1404/R-1404_022211_67840_571559563177_1.pdf ("merchants had no choice but to accept the networks' debit cards—as rejecting those cards would severely harm merchants' operations").

may receive for an electronic debit transaction is an amount equal to the sum of $0.21 plus 5 basis points (multiplied by the value of the transaction) plus up to a $0.01 fraud prevention adjustment per transaction (if applicable).[25]   This amount translates to an interchange fee of up to about $0.24 for the average debit transaction,[26] and thus represents a very large increase relative to the interchange fees proposed under the NPRM.[27]   Importantly, the range of allowable interchange fees under the Final Rule permits price *increases* relative to pre-Durbin rates on all small-ticket debit transactions under $12.

    As the following chart reflects, a $12 debit transaction is the break-even dollar value at which the pre-Durbin small-ticket signature debit interchange rate is exactly equal to the maximum permissible interchange rate under the Final Rule.[28]   For all regulated small-ticket debit transactions under the $12 threshold, the Final Rule cap represents a significant price *increase* over pre-Durbin rates, and the smaller the transaction size the larger the effective price increase.   The chart also shows the extent to which the Final Rule was much worse than the NPRM proposals for small-ticket transactions.   In short, after being warned that a $0.12 cap would raise the interchange fees associated with all debit transactions below approximately $5, the Board ultimately made things much worse by instead enabling higher fees for all transactions below $12.   As the chart shows, under the Final Rule, the vast majority of small-ticket debit transactions now face higher interchange fees.

---

[25]  76 Fed. Reg. 43,394.  *See also* Federal Reserve Board Press Release, *Federal Reserve issues a final rule establishing standards for debit card interchange fees and prohibiting network exclusivity arrangements and routing restrictions* (June 29, 2011), http://www.federalreserve.gov/newsevents/press/bcreg/20110629a.htm.  The Final Rule also prohibits issuers and payment card networks from (1) restricting the number of networks on which electronic debit transactions may be processed to less than two unaffiliated networks; and (2) inhibiting a merchant's ability to direct the routing of those transactions over a particular network.  *Id.*

[26]  The Board calculated the average debit transaction at $38 in terms of mean dollar value.  *Id.*

[27]  The Final Rule's $0.24 interchange fee (for the average debit transaction) is approximately 200–343 percent of the NPRM's $0.07–$0.12 range of fees.

[28]  The price of a $12 transaction at the pre-Durbin interchange rate for Visa and MasterCard small-ticket signature debit transactions (1.55% + $0.04) was $0.226; it is likewise $0.226 under the Final Rule, when set at the full cap.



In configuring the Final Rule, the Board brushed aside the comments regarding small-ticket transactions, except to note as follows:

> Merchants suggested that the Board establish different standards for small-ticket sales (under $5) because the proposed cap likely would result in higher interchange fees than merchants currently are paying on those transactions. …

> For the reasons stated above, the final rule permits an *ad valorem* component such that the total amount of an interchange transaction fee does not exceed the sum of the 21-cent base component and 5 basis points of the transaction value (plus the fraud-prevention adjustment, if applicable).  Networks are not prohibited from varying the amount of either interchange fee component by transaction type, transaction value, or merchant type, provided the interchange fee for any transaction not exceed the maximum permissible amounts in § 235.3(b) (plus the fraud-prevention adjustment, if the issuer is eligible to receive the adjustment). … The flexibility to vary the amounts of interchange fee components below the cap enables networks to establish interchange fees that reflect variation in transaction risk and to account for other factors that affect a network's ability to increase its transaction volume. …

> [O]ne merchant group was concerned that merchants with a high proportion of small-ticket transactions may stop accepting debit cards because the interchange fees for these types of transactions could increase under the proposed rule. …
>
> [T]he Board does not believe that the rule would adversely affect small and medium-sized merchants. ***Although it is possible that merchants with a large proportion of small-ticket transactions may experience an increase in total interchange fees, the rule does not require networks to raise the current interchange fees for very-small-value transactions.***

Final Rule, 76 Fed. Reg. at 43,435; 43,462 (emphasis added; internal citations omitted).

Tellingly, in dismissing the concerns of small-ticket merchants in this manner, the Board made no reference to the contention expressed by merchants that, against the backdrop of the market failure that has persisted in this industry for years, the Board could not expect that competition between the debit networks would result in significant interchange reductions.

## VI.    The Impact on Small-Ticket Merchants

Within two months of the Final Rule, the debit networks announced that they would be pricing debit transactions at the cap for all regulated debit transactions.[29]  As such, the price increase about which the Board had been warned came to pass only a few months after the Final Rule was announced.  As merchants had advised the Board, competitive forces could not be counted upon to restrain this price increase.  In fact, to the extent competition did exist, it favored paying the highest possible interchange to debit-issuing banks—a dynamic which even Visa

---

[29]  *See, e.g.*, "Applying the Durbin Maximum, Visa And MasterCard Could Squash Small Tickets," *Digital Transactions News* (Sept. 27, 2011), http://www.digitaltransactions.net/news/story/3217 ("MasterCard Inc. earlier this month came out with its own October schedule that makes no provision for small-ticket transactions originating on debit cards from big [*i.e.*, regulated] issuers.  Instead, MasterCard will simply apply the Fed's cap across the board for regulated issuers.  Last week, Visa reportedly matched MasterCard by issuing a revised schedule replacing the small-ticket rate announced in August with the Fed's rate for regulated issuers, no matter the size of the transaction.").  Visa had earlier "planned a moderate increase in small-ticket debit interchange, from 1.55% plus 4 cents to 1.60% plus a nickel.  For transactions on cards from big [*i.e.*, regulated] issuers, the same interchange rate would have applied but would have been capped at the Federal Reserve Board's regulated rate of 21 cents plus 0.05%, with a 1-cent addition for fraud-control expenses under consideration."  *Id.* (citing "Visa Hikes Prepaid Interchange But Chops Some Debit Rates," *Digital Transactions News* (Sept. 9, 2011), http://www.digitaltransactions.net/news/story/3200).

acknowledged in its comments—and thus this perverse competition resulted in pressure to increase prices to merchants. The Board also had been advised about this market failure.[30]

As a result, for the reasons discussed above, all regulated debit transactions below $12—the "holy grail" of debit card growth—are now substantially more expensive than they were before the Final Rule. The harmful impact on small-ticket merchants increases as transaction sizes decrease. For example, as reflected in the chart below, the interchange fee on a $10 debit transaction is now 15 percent higher, whereas the interchange fee on a $2 debit transaction is now a whopping 211 percent more expensive.[31]

---

[30] *See, e.g.,* Salop Report ¶¶ 49, 51 ("The structure of the debit network market has led to a perverse situation whereby the exercise of market power over merchants and competition for issuers among debit networks likely leads to consumer harm. When debit networks raise their interchange fee, they gain issuance and cardholders, but they do not lose merchant acceptance. This gives the networks incentives to raise interchange fees. … This analysis of the exercise of debit network market power over merchants and competition for issuers has important implications for the regulation of … interchange fees … [and] makes it clear that the Board cannot simply rely on market forces to lead to reasonable interchange fees. Because of their power over merchants, Visa and MasterCard have the ability and the incentive to set high interchange and network fees that harm consumers. Competition for issuers gives all the networks the incentive to use the interchange fee to transfer money from merchants to issuers.").

[31] The chart reports the percent increase in small-ticket interchange fees over various transaction sizes resulting from the rate set by the Final Rule (0.05% + $0.21 plus up to a $0.01 fraud adjustment) as compared to the pre-Durbin rate (1.55% + $0.04) for Visa and MasterCard signature debit transactions.



Because the Durbin Amendment regulated only interchange payments to banks with more than $10 billion in assets, the networks implemented two sets of interchange rates after the Final Rule—one for regulated banks and another for banks that are exempt from the regulations. For regulated banks, as noted, the networks implemented price increases for all transactions below $12, hitting the vast majority of small-ticket transactions.  For unregulated banks, by contrast, the interchange rates for small-ticket transactions today are the same as the rates that prevailed before the Final Rule.  As such, the Final Rule has created the perverse situation where regulated transactions are now more expensive than unregulated transactions.

These interchange price increases for regulated debit transactions are harming hundreds of thousands of small businesses across the country.  Amici are franchised or licensed operations that often sell to consumers through numerous franchisees or licensees, which are almost always

small businesses.[32]  In a few short years, debit cards have become the fastest-growing tender type at small-ticket merchants, often comprising more than 30 percent of their transactions.[33]  The vast majority of these merchants' debit card volumes are consummated at transaction sizes below $12 and, thus, they are now paying higher debit interchange as a result of the Final Rule. Critically, every year these percentages are poised to increase as more and more consumers switch from cash to debit cards to make small-ticket purchases.

The following is a mere sampling of the injury that the Final Rule is inflicting on small-ticket merchants:[34]

- Donald Pace, who owns six Auntie Anne's locations, has been paying approximately $1,000 per month in additional debit interchange fees since the Final Rule's October 1, 2011 effective date;[35]

- The average Burger King restaurant is projected to pay $2,700 per year in additional debit card interchange because of the rate increases;[36]

- Nicole Dreier, who operates Burger King restaurants in Arizona, is projecting an increase of close to $63,000 annually in debit interchange fees as a result of the Final Rule;[37]

---

[32]  In the United States, Auntie Anne's has approximately 800 franchised quick service restaurants owned by 300 franchisees (more than 275 franchisees own fewer than 6 stores each) (*see* Hainthaler Decl. ¶ 3); Burger King has more than 5,600 franchises owned by approximately 1,200 franchisees (*see* Prusher Decl. ¶ 3); CKE Restaurants has 1,928 franchises owned by more than 200 franchisees (*see* Farias Decl. ¶ 3); Dairy Queen has approximately 4,500 franchises owned by thousands of franchisees (*see* O'Callaghan Decl. ¶ 3); Jack in the Box and Qdoba have approximately 1,900 franchises and 260 franchisees (*see* Brigandi Decl. ¶ 3); Wendy's has approximately 4,600 franchises operated by about 440 franchisees (*see* Inzetta Decl. ¶ 4); 7-Eleven has more than 5,800 franchises (*see* 7-Eleven Website, "About Us," http://corp.7-eleven.com/AboutUs/tabid/73/Default.aspx); and Starbucks has more than 4,000 licensed stores owned by licensees (*see* Starbucks Corporation Form 10-K for Fiscal Year Ended October 2, 2011 (Nov. 18, 2011), at 3, http://www.sec.gov/Archives/edgar/data/829224/000119312511317175/d232803d10k.htm).

[33]  For example, 35 percent of Jack in the Box's total transactions are made with payment cards, and debit currently represents 90 percent of its payment card transactions (or more than 32% of total transactions) (*see* Brigandi Decl. ¶¶ 6-7; and 42 percent of Wendy's total transactions are made with payment cards, and debit represents 81 percent of its payment card transactions (or more than 34% of total transactions) (*see* Inzetta Decl. ¶¶ 7-8).

[34]  We are providing detail regarding the harmful impact of the Final Rule on Amici and their franchisees and licensees merely to illustrate the impact that the Final Rule is having on these businesses and to demonstrate that the ample detail in the record that was before the Board regarding this potential impact should have been adequately taken into account by the Board.

[35]  *See* Hainthaler Decl. ¶ 7.

[36]  *See* Prusher Decl. ¶ 7.

[37]  *See* Prusher Decl. ¶ 8.

- Wendy's believes that its stores are paying an average of $2,400 per store per year in additional debit interchange fees;[38]

- Hardee's and Carl's Jr.'s domestic company-operated and franchise-owned restaurants combined are projected to pay more than $4 million annually in higher debit interchange fees because of the Final Rule;[39]

- Pat O'Neil, who owns seven Dairy Queen locations in Indiana, projects that he will double the amount he pays in debit interchange annually as a result of the Final Rule; for example, in one location alone he projects an increase of more than $9,000 annually in debit interchange fees;[40] and

- Coinstar, Inc., owner of the Redbox movie-rental kiosk chain with more than 30,000 locations in the United States, recently announced that it was forced to raise (for the first time in eight years) Redbox's $1 DVD rentals by 20 percent "primarily due to the increase in operating expenses, including the recent increase in debit card interchange fees as a result" of the Final Rule.[41]

In evaluating the punitive nature of these increases, it is critical that they are falling, in many cases, on small businesses and therefore risk impacting job creation. Moreover, although these price increases are cutting into already-thin margins during a difficult economic period, none of these small businesses have stopped accepting debit cards to avoid these price increases. Dropping debit cards is simply not an option, as doing so would be tantamount to commercial suicide.

## ARGUMENT

Confronted with Congress's clear directive to remedy the failure of competition in the debit market, the Board ignored the text of the Durbin Amendment as well as its underlying objectives. Instead, it effectively endorsed a price increase that, depending on the ticket size, can range from 15 percent to more than 200 percent on the fastest-growing segment of debit

---

[38] *See* Inzetta Decl. ¶ 11.

[39] *See* Farias Decl. ¶ 8.

[40] *See* O'Callaghan Decl. ¶ 6.

[41] *See, e.g.*, Coinstar News Release, "Coinstar, Inc. Announces 2011 Third Quarter Results," *PRNewswire* (Oct. 27, 2011), http://phx.corporate-ir.net/phoenix.zhtml?c=92448&p=irol-newsArticle_pf&ID=1622858&highlight=.

transactions, an outcome that, by itself, should result in the invalidation of the Final Rule under either prong of the analysis in *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984).  This result simply cannot be squared with a statute that was designed to curb the networks' ability to raise debit interchange rates.  No rational interpretation of "reasonable and proportional" to issuer costs would have resulted in a price increase on the fastest-growing segment of debit transactions.  This conclusion is reinforced by the Board's inadequate response to small-ticket merchants' concern that the Board's actions could result in higher debit interchange.  To this fundamental concern, the Board merely noted that the Final Rule did not "require" the networks to raise prices.  To the extent the Board's response means anything at all, it can be reduced to the following erroneous proposition: we can trust the networks (or competition between them) to keep prices from going up.  The Board offered no support for this assumption because, after two decades of failed competition in this industry, there was nothing in the record to support it.  In fact, given the overwhelming evidence to the contrary, not to mention Senator Dubin's impassioned floor statements about the lack of competition in this market, it is hard to imagine a starker and more compelling example of the Board's failure to properly implement the Durbin Amendment than its mishandling of the small-ticket issue.[42]

In fact, had the Board adhered to the statute, it would have set standards that limited debit interchange to the incremental authorization, clearing and settlement costs of a particular debit

---

[42]  Tellingly, the Board's analysis of the impact of the Final Rule on small-ticket transactions made no reference to the growing importance of such transactions in the debit market.  Nor did it consider the fact that merchants could not counteract a price increase by imposing a minimum transaction amount for debit.  *See, e.g.*, *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999) (If an agency "failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action."); *Motor Vehicle Mfrs.*, 463 U.S. at 43 (Agency actions are found to be arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.").

transaction.[43]  Those costs do not vary materially by transaction and, thus, this principled

approach would have avoided much of the administrative complexities that the Board used to

justify its many erroneous exercises of discretion.[44]  Had the Board done that, the debit

networks' ability to exercise market power over merchants would have been substantially

restrained, debit interchange rates would be falling across the board for all merchants large and

small, and the market would have moved a long way towards the competitive at-par pricing

model that thrives around the world.[45]

## I.      The Final Rule is Not Entitled to Judicial Deference

Judicial deference may only be accorded "[i]f the agency interpretation is not in conflict

with the plain language of the statute." *Nat'l R.R. Passenger Corp. v. Boston & Me. Corp.*, 503

U.S. 407, 417 (1992) (citation omitted).  In evaluating this question, in addition to examining the

text of the statute, the Court may look at the Act's legislative history and purpose.  Had the

Board done that, it would have found the statute clear and unambiguous.[46]

---

[43]  *See* Mott Report at 1 and ¶ 35 ("The incremental costs of authorizing, clearing and settling PIN debit transactions—which occur in a single electronic message—are roughly $0.0033.  The incremental costs of authorizing, clearing and settling signature debit transactions related to an issuer's DDA system are approximately $0.0136.") (citations omitted).

[44]  To cite one example, the Board contends that it would be "an absurd result" to configure a rule that limited debit interchange "to the cost incurred by *that* issuer for *that* particular transaction" given the purported complexity of that approach.  Defendant's Combined Memorandum of Points and Authorities in Support of its Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment (Apr. 13, 2012) at 36 (emphasis in original).  Whatever complexity may be involved, however, is entirely created by the Board's inclusion of numerous additional costs in the calculation.  Had the Board followed the statute and limited the costs to incremental authorization, clearing and settlement costs, it could have easily configured a workable regulation that reflected the costs that issuers incur per debit transaction.

[45]  A classic indicator of "[m]arket power is the ability to raise prices above those that would be charged in a competitive market."  *NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 109 n.38 (1984); *Jefferson Parish*, 466 U.S. at 27 n.46 ("As an economic matter, market power exists whenever prices can be raised above the levels that would be charged in a competitive market.").  A 15 percent to over 200 percent price increase is an exercise of market power.

[46]  The Court must "employ[] traditional tools of statutory construction" to ascertain whether "Congress had an intention on the precise question at issue ...."  *Chevron*, 467 U.S. at 843 n.9.  "The traditional tools include examination of the statute's text, legislative history, and structure," *see S. Cal. Edison Co. v. FERC,* 116 F.3d 507, 515 (D.C. Cir. 1997); as well as its purpose, *see First Nat'l Bank & Trust Co. v. Nat'l Credit Union Admin.*, 90 F.3d 525, 529-30 (D.C. Cir. 1996).  "This inquiry using the traditional tools of construction may be characterized as a

The Board's interpretation of "reasonable and proportional to the cost incurred by the issuer"—which resulted in massive price increases on small-ticket merchants like Amici—is in conflict with the plain language of the statute.  The Durbin Amendment stipulates that the interchange fee standard must reflect only the considerations outlined by Congress.  Significantly, those considerations include the functional similarity between debit transactions and checks, which clear at par.  In specifying as a core consideration the at-par pricing model that was thriving in the debit industry until the market was distorted by the dominant networks, Congress signaled its intention to remedy the market failure that moved the debit market towards high supracompetitive interchange fees for debit transactions.  Moreover, with respect to costs, Congress permitted *only* the consideration of the incremental authorization, clearing and settlement costs associated with a particular debit transaction.  The singular emphasis on the similarity between debit cards and checks, and the incremental authorization, clearing and settlement costs for particular debit transactions indicates that the Final Rule should have restricted debit card interchange to levels below those proposed in the NPRM.  That result certainly would have limited the dominant networks' ability to exercise market power over merchants and would have restored the competitive dynamic that was destroyed when the at-par model was replaced with credit card-style interchange for debit transactions.  That result would have been consistent with the plain language of the statute as well as its clear intent.

---

search for the plain meaning of the statute.  If this search yields a clear result, then Congress has expressed its intention as to the question, and deference is not appropriate."  *Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997) ("Context serves an especially important role in textual analysis of a statute when Congress has not expressed itself as univocally as might be wished."); *Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 663 (D.C. Cir. 2009) (instructing courts to use "all 'traditional tools of statutory interpretation,' including 'text, structure, purpose, and legislative history,' to ascertain Congress' intent at *Chevron* step one") (quoting *Pharm. Research and Mfrs. of Am. v. Thompson*, 251 F.3d 219, 224 (D.C. Cir. 2001)).

## II.     The Board's Analysis is Not Reasonable

Even if this case is not decided under the first prong of the *Chevron* test, the Board's analysis cannot withstand scrutiny under *Chevron*'s second prong.  Given the extent to which the Board exercised its discretion—discretion it did not have in the first place—in a manner fundamentally at odds with the statute, this issue is not a close call.

"[I]n making the factual inquiry concerning whether an agency decision was 'arbitrary or capricious,' the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' This inquiry must 'be searching and careful,' but 'the ultimate standard of review is a narrow one.'" *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) (internal citation omitted).  "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs.*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 (1962)).  "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*; *see also Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) ("The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result … and respond to 'relevant' and 'significant' public comments.") (citing *Home Box Office, Inc. v. FCC,* 567 F.2d 9, 35 & n.58 (D.C. Cir. 1977)) (internal citation omitted).

If an agency "failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action." *Cnty. of Los Angeles v. Shalala*, 192 F.3d at 1021. A reviewing court can also require that "the [agency] come to grips with the obvious ramifications of its approach and address them in a reasoned fashion.'" *NRDC v. EPA*, 859 F.2d 156, 209-10 (D.C. Cir. 1988) (footnotes omitted). Deference may not be warranted if an agency "overlook[s] key evidence and ignore[s] arguments that it previously had accepted." *United Parcel Serv., Inc. v. U.S. Postal Serv.*, 184 F.3d 827, 841 (D.C. Cir. 1999).

Rather than address all of the numerous problems in the Board's analysis, we instead focus below on two examples that best highlight its complete failure to interpret the Durbin Amendment in a manner consistent with its underlying objectives or that takes into account key evidence in the record.

A.    The Inclusion of Fraud Losses in the Interchange Standard is Unreasonable

The inclusion of fraud losses in debit interchange over the past twenty years provides stark evidence of the market power that has distorted the development of debit in the United States. Nothing better demonstrates the Board's flagrant disregard for Congress than its decision to reward debit issuers for fraud losses via debit interchange.

For starters, including fraud losses in the standard conflicts with the plain language of the statute, which permits only adjustments for certain costs associated with fraud prevention. *See* 15 U.S.C. § 1693o-2(a)(5) (EFTA Section 920(a)(5)). Moreover, as various commentators, including the Merchants Payments Coalition, pointed out in their comments to the Board, excessive debit interchange has perversely encouraged issuers to push consumers toward riskier debit transactions.[47] They have done so by pushing signature debit in riskier environments such

---

[47] *See, e.g.*, Submission of the Merchants Payments Coalition to the Board of Governors of the Federal Reserve System Regarding Section 920 of the Electronic Fund Transfer Act (Oct. 27, 2011) at pp. 4, 11,

as the Internet to earn higher interchange and by suppressing PIN debit, despite its lower fraud and greater efficiency.[48]  Simply put, this conduct is a function of the market failure that motivated the passage of the Durbin Amendment.  Even though the record before the Board demonstrated this market failure and the perverse incentives it creates, the Board disregarded this backdrop when it chose to reward debit issuers for fraud losses via the interchange standard going forward.  The extent to which the Final Rule improperly rewards issuers for fraud is readily apparent from an examination of the survey upon which the Board relied to configure the Final Rule.  The fees that the Board permits in the Final Rule (up to $0.24 for the average debit transaction) are approximately 600 percent of issuers' mean transaction costs ($0.04) as reported in the Board's survey[49]—an astounding figure that, by including fraud losses, permits many issuers to profit from fraud.  There is no policy justification for a result that, all else being equal, will chill issuers' incentives to reduce fraud.  Had the Board set out to perpetuate the market failure that propelled the Durbin Amendment, it could not have done a better job.  This extreme distortion of the statute should be set aside.[50]

---

http://www.federalreserve.gov/newsevents/files/merchants_payment_coalition_meeting_20101102.pdf ("[h]igher interchange fees have driven networks and issuers to encourage consumers to favor signature debit, despite the superiority of PIN debit"); *see also* Merchants Payments Coalition Comments (Feb. 22, 2011), at 1 (same); Mott Report ¶¶ 12-21 (discussing same and efforts to suppress PIN debit).

[48]  *See, e.g.*, Board of Governors of the Federal Reserve System, *2009 Interchange Revenue, Covered Issuer Cost, and Covered Issuer and Merchant Fraud Loss Related to Debit Card Transactions* (June 2011) ("Board Survey"), at 12, http://www.federalreserve.gov/paymentsystems/files/debitfees_costs.pdf ("About $1.11 billion of [the approximately $1.34 billion in 2009 industry-wide fraud] losses arose from signature debit card transactions, about $181 million arose from PIN debit card transactions and almost $18 million arose from prepaid card transactions.").

[49]  As reflected in the NPRM, the Board's survey estimated that "per-transaction variable costs [*i.e.*, authorization, clearing and settlement costs] were approximately 4 cents per transaction when each issuer's costs are weighted by the number of its transactions."  75 Fed. Reg. at 81,737; *see also* Board Survey at Table 4 (reflecting $0.04 in variable costs across all debit transaction types; 76 Fed. Reg. at 43,402 ("4 cents (*i.e.*, the average per-transaction allowable costs across all transactions and issuers)").  Other sources calculate that issuers' costs are actually closer to $0.01 or less.  *See, e.g.*, *supra*, n.43.

[50]  *See* 5 U.S.C. § 706(2) (The APA requires the Court to "set aside agency action ... not in accordance with law"); *Sierra Club v. EPA*, 294 F.3d 155, 160-62 (D.C. Cir. 2002) (vacating rule that was "contrary to the intent of Congress" and would "subvert the purposes of the Act"); *United Parcel Service*, 184 F.3d at 841 (where an agency "overlook[s] key evidence and ignore[s] arguments that it previously had accepted," deference may not be warranted).

B.     The Inclusion of Network Fees in the Interchange Standard is Unreasonable

The Board's decision to permit the inclusion of network fees in the interchange fee

standard was similarly misguided.  The Board was advised that network fees have been

increasing in the past few years and, while network fee increases have not been as substantial as

interchange fee increases, the same market failure that enables ever-increasing interchange fees

can also be exploited to increase network fees.[51]  Moreover, the Board itself acknowledged

merchants' concern that permitting the recovery of issuer network fees through merchant-paid

interchange fees opened the door to merchants paying all network fees going forward, and the

Board further acknowledged merchants' argument that it contradicted its previous position on

this issue.[52]  That the Board countenanced this result nonetheless is yet another powerful

example of its failure to take into account the underlying rationale for the Durbin Amendment.

At the end of the day, the Board turned the Durbin Amendment on its head in all respects.

Instead of cabining market power in debit, networks (and their issuing banks) can now impose

---

[51]  *See, e.g.*, Mott Report ¶¶ 70-72 ("In recent years, particularly since they went public, MasterCard and Visa have added numerous network fees that are ultimately paid by merchants, and constitute another form of compensation to issuers and their networks."); Salop Report ¶¶ 51, 53 ("This analysis of the exercise of debit network market power over merchants and competition for issuers has important implications for the regulation of … network fees. … The networks have the power and incentive to set high network fees to merchants.  The network then could retain the fees as profits, or they could use these fees to finance higher payments to issuers.  In this sense, interchange fees and network fees levied on merchants can serve as substitutes for the network.").

[52]  *See* 76 Fed. Reg. at 43,443 n.156 ("Merchants also commented that in permitting networks to raise their network fees for merchants or to decrease them for issuers (or both) so long as net compensation is not provided, the Board contradicted its own reasoning for excluding network fees as an allowable cost that can be recovered through the interchange transaction fee standards, that is, to prevent merchants from having to pay all processing fees.").  *See also* Merchants Payments Coalition Comments (Feb. 22, 2011), at 27 ("[W]e are troubled that the NPRM explicitly permits networks to raise their network fees to merchants or decrease them to issuers (or both), even if those increases (or decreases) are designed to circumvent the regulations to the extent that net compensation is not provided.  This result expressly contradicts (and thus would 'circumvent') the Board's rationale for excluding fees paid to networks from [authorization, clearing and settlement] costs allowed to be recovered under the standard: '[T]he Board recognizes that if network processing fees were included in allowable costs, acquirers (and, by extension, merchants) might be in the position of effectively paying all network fees associated with debit card transactions.  That is, an acquirer would pay its own network processing fees directly to the network and would indirectly pay the issuer's network processing fees through the allowable costs included in the interchange fee standard.'") (citing and quoting 75 Fed. Reg. at 81,735; 81,747) (footnote omitted).

"take it or leave it" pricing on both interchange and network fees.  The exercises of discretion that attempt to justify this result are unreasonable and should be set aside.[53]

## III.    The Final Rule on Network Routing Also Should Be Invalidated

The Board's egregious failure to take into account the interests of small-ticket merchants is made worse by its decision not to require two unaffiliated signature debit and two unaffiliated PIN debit networks ("Alternative B" in the NPRM) for all debit transactions as the statue clearly requires.  15 U.S.C. § 1693o-2(b)(1)(A) (EFTA Section 920(b)(1)(A)) (directing the Board to "prescribe regulations providing that an issuer or payment card network shall not directly or through any agent, processor, or licensed member of a payment card network, by contract, requirement, condition, penalty, or otherwise, restrict the number of payment card networks on which an electronic debit transaction may be processed" to less than two unaffiliated networks).[54]  In this regard, the Board essentially swatted away the concerns of small-ticket merchants by implicitly trusting that competition would protect them against the networks exploiting the Final Rule to raise debit interchange fees.  And then the Board did nothing, through its rulemaking on routing, to encourage that competition.  As if that were not bad enough, in limiting this rule to the addition of one network per card ("Alternative A" in the NPRM), the Board acknowledged the concern expressed by numerous merchants, including Amici and their representatives, that the Board's approach would leave many merchants without

---

[53]  *See supra*, n.50.

[54]  That the statute was designed to introduce a competitive option for all debit transactions was made clear by Senator Durbin on the Senate floor when he stated that the network exclusivity prohibitions are "intended to enable each and every electronic debit transaction—no matter whether that transaction is authorized by a signature, PIN, or otherwise—to be run over at least two unaffiliated networks, and the Board's regulations should ensure that networks or issuers do not try to evade the intent of this amendment by having cards that may run on only two unaffiliated networks where one of those networks is limited and cannot be used for many types of transactions." 156 Cong. Rec. S5,926 (daily ed. July 15, 2010), http://www.gpo.gov/fdsys/pkg/CREC-2010-07-15/pdf/CREC-2010-07-15-pt1-PgS5902.pdf.

a competitive option to which they could route transactions.[55]  *See, e.g.*, 76 Fed. Reg. at 43,448

("The Board acknowledges that Alternative A provides merchants fewer routing options with

respect to certain electronic debit transactions compared to Alternative B.").  This concern is

particularly relevant to the Amici that accept only signature debit or that accept a substantial

portion of their debit volume at drive-through locations where PIN debit is not a viable option.[56]

Against that backdrop, it is hardly surprising that the networks were not at all constrained by the

upcoming changes in routing options when they exercised market power by raising the prices on

small-ticket transactions by approximately 15 percent to more than 200 percent.  The Board's

failure to follow Congress's plain language regarding network routing, and assess the

implications of that decision on the interchange to be paid going forward by numerous small

businesses, reinforces the conclusion that the Final Rule cannot and should not stand.

---

[55]  For instance, the IFA/NCCR comments (adopted by amicus Wendy's in its submission, as well as by McDonald's) reiterated the issues that the Board, itself, previously recognized in the NPRM; *i.e.*, that "'the effectiveness of the rule promoting network competition could be limited in some circumstances if an issuer can satisfy the requirement simply by having one payment card network for signature debit transactions and a second unaffiliated payment card network for PIN debit transactions.'"  IFA/NCCR Comments at 8 (quoting NPRM, 75 Fed. Reg. at 81,749).  *See also* 75 Fed. Reg. at 81,749 ("In particular, the Board understands that only about 2 million of the 8 million merchant locations in the United States that accept debit cards have the capability to accept PIN debit transactions.  Thus, in those locations that accept only signature debit, potentially under Alternative A only a single payment card network would be available to process electronic debit transactions.");  Merchants Payments Coalition Comments (Feb. 22, 2011), at 16 ("certain merchants accept only signature debit and, as the Board acknowledged, some merchants cannot readily accept PIN debit and, thus, the marketplace will not receive the benefit of competitive choice and price pressures for entire classes of transactions if Alternative A is adopted").

[56]  For example, Jack in the Box does not accept PIN debit because most of its business comes from the drive-though and PIN debit slows down the process.  *See* Brigandi Decl. ¶ 5.  Wendy's, Burger King and Hardee's do not accept PIN debit at all, and Carl's Jr.'s debit transactions are primarily signature debit.  *See* Inzetta Decl. ¶ 6; Prusher Decl. ¶ 5; Farias Decl. ¶ 4.  And the vast majority of Dairy Queen franchises do not accept PIN debit.  *See* O'Callaghan Decl. ¶ 5.

**CONCLUSION**

For the foregoing reasons, Amici urge this Court to invalidate the Final Rule's

interchange fee standard (12 C.F.R. § 235.3) and the rules concerning network routing (12

C.F.R. § 235.7), and remand to the Board with a direction to adopt rules that comply with the

plain language of the Durbin Amendment.

Dated: New York, New York
            May 14, 2012

                                        Respectfully submitted,


                                           /s/  David D. Golden
                                        David D. Golden (DC Bar No. 985047)
                                          dgolden@constantinecannon.com
                                        CONSTANTINE CANNON LLP
                                        1301 K Street, NW, Suite 1050 East
                                        Washington, DC 20005
                                        Tel: (202) 204-3500
                                        Fax: (202) 204-3501

                                        Jeffrey I. Shinder
                                        Alee N. Scott
                                        CONSTANTINE CANNON LLP
                                        335 Madison Avenue, 9th Floor
                                        New York, NY 10017
                                        Tel: (212) 350-2700
                                        Fax: (212) 350-2701

                                        *Counsel for Amici Curiae 7-Eleven, Inc., Auntie*
                                        *Anne's, Inc., Burger King Corporation, CKE*
                                        *Restaurants, Inc., International Dairy Queen, Inc., Jack*
                                        *in the Box Inc., Starbucks Corporation, and The*
                                        *Wendy's Company*

**APPENDIX**

# Despite Durbin, Debit Still Offers Issuers Many Benefits, MasterCard Exec Says

Print    Email    Reprints    Feedback    RSS    Share |

PaymentsSource | Tuesday, May 1, 2012

By Kate Fitzgerald

BALTIMORE–The Durbin amendment to the Dodd-Frank law so far has had a positive effect on MasterCard Worldwide's debit card market share, according to a top executive for the network.

Moreover, though some banks may view debit cards as being less profitable under new Federal Reserve rules that in October essentially halved the interchange merchant acquirers pay issuers, debit remains a powerful growth tool for banks that market it effectively, Carlos Menendez, MasterCard's group executive, global debit, said at an April 30 presentation here at NACHA's Payment 2012 conference.

The Fed's rate cut might have affected issuers adversely, but another provision of the Durbin amendment that went into effect April 1 has been a boon for MasterCard, Menendez said. It requires issuers to provide merchants with the choice of at least two unaffiliated point-of-sale networks for processing debit card payments.

MasterCard also owns the international Maestro POS PIN-debit network, whose mark U.S. issuers early on included on their debit cards as a last resort in case the cardholder was outside the main regional debit PIN-debit network's market. More recently, MasterCard and Visa Inc. negotiated exclusive deals with issuers to use only their debit brands, which the new Durbin rules no longer allow. Visa negotiated most of those exclusive deals, with issuers tying Visa's Interlink POS PIN-debit debit brand to their Visa check cards.

"Durbin has been an opportunity for us in the sense of gaining market share," Menendez explained to attendees at a session focusing on bank strategies to increase debit card volume in a sluggish economy.

Declining to specify which banks recently have added Maestro to the back of their cards to satisfy the new network-routing rules, Menendez said the shift in card transactions routed through the network because of Durbin has been "significant."

MasterCard plans to announce its first-quarter earnings May 2.

Despite the Maestro gains, most of MasterCard's overall debit growth continues to come from displacing cash transactions, Menendez said.

Though the reduction in debit-interchange revenue caused many issuers to eliminate debit rewards programs, debit remains one of the most-powerful tools for banks looking to win and keep consumers' business, Menendez said.

But many issuers are falling short in effectively marketing debit to their customers, he said.

"Debit is the key to (bank) account relationships," Menendez said, noting MasterCard research has found that, unlike with credit cards, most consumers concentrate their everyday spending on a single debit card.

Moreover, women drive some 60% of debit card spending globally. Yet very few banks target women in their debit card marketing, Menendez said.

"Women make purchasing decisions on key everyday purchases like groceries, clothing, gas and lunch," he said. "Getting the right (debit) card to the right person drives purchase volume, and (banks) get better results if they communicate the benefits" of debit card use.

Asked about their debit cards' benefits, some 40% of consumers "have no recollection," Menendez noted.

Issuers could do more to tout additional benefits debit cards offer, including zero-liability provisions for lost and stolen debit cards. They also could offer enhancements, including beefed-up fraud protection, he said.

Banks also could drive more transaction volume by promoting debit card use in new categories, such as gasoline purchases, online shopping and bill payment, Menendez said.

"The holy grail" for increasing debit card purchase volume is increasing small-ticket purchases across a broad array of everyday expenditures, he said.

Another key for issuers looking to increase debit card use is to recognize that more consumers younger than 35 rely on cash or its equivalent to manage their finances, Menendez said.

"(Younger consumers) don't like to balance checkbooks; they like to know exactly how much money they have right now," he said.

Promoting debit card use for small transactions consumers might otherwise pay for with cash can drive up card purchase volume, Menendez added.

"Debit cards combine the convenience of credit cards and the comfort of cash," he said. "While it may not be as profitable (as it once was), there are ways (for banks) to make money with debit and to use it as an entry point" for longstanding bank relationships.

What do you think about this? Send us your feedback. **Click Here**.