# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NACS; NATIONAL RETAIL FEDERATION; FOOD MARKETING INSTITUTE; MILLER OIL CO.; BOSCOV'S DEPARTMENT STORE, LLC; and NATIONAL RESTAURANT ASSOCIATION, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Case No. 11-02075 (RJL) |
| v. | ) ) | |
| BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, | ) ) ) | |
| Defendant. | ) | |

*54*

## MEMORANDUM OPINION
July **31**, 2013 [Dkts. ##20, 23]

Plaintiffs NACS (formerly, the National Association of Convenience Stores),

National Retail Federation ("NRF"), Food Marketing Institute ("FMI"), Miller Oil Co.,

Inc. ("Miller"), Boscov's Department Store, LLC ("Boscov's") and National Restaurant

Association ("NRA") (collectively, "plaintiffs") bring this action against the Board of

Governors of the Federal Reserve System ("defendant" or "the Board") to overturn the

Board's Final Rule setting standards for debit card interchange transaction fees

("interchange fees") and network exclusivity prohibitions.  Before the Court are the

parties' cross-motions for summary judgment [Dkts. ##20, 23].  Upon consideration of

the pleadings, oral argument, and the entire record therein, the Court concludes that the

Board has clearly disregarded Congress's statutory intent by inappropriately inflating all

1

debit card transaction fees by billions of dollars and failing to provide merchants with multiple unaffiliated networks for each debit card transaction.  Accordingly, the plaintiffs' motion is **GRANTED** and defendant's motion is **DENIED**.

## FACTUAL BACKGROUND

Four of the six plaintiffs in this case are major trade associations in the retail industry.  NACS is an international trade association comprised of more than 2,100 retail members and 1,600 supplier members in the convenience store industry, most located in the United States.  Am. Compl. ¶ 15 [Dkt. #18].  NRF is "the world's largest retail trade association," representing department, specialty, discount, catalog, Internet, and independent stores, as well as chain restaurants, drug stores, and grocery stores in over 45 countries.  *Id.* ¶ 17.  FMI advocates for 1,500 food retailers and wholesalers, including large multi-store chains, regional firms, and independent supermarkets.  *Id.* ¶ 19.  NRA is the "leading national association representing th[e] [restaurant and food-service] industry, and its members account for over one-third of the industry's retail locations." *Id.* ¶ 23. According to plaintiffs, these trade associations and their members accept debit card payments and therefore are directly affected by the Board's interchange fee and network non-exclusivity regulations.  *Id.* ¶¶ 16, 18, 20, 23–25.

The remaining plaintiffs are individual retail operations.  Miller is a convenience store and gasoline retailer that also sells heating oil, heating and air-conditioning service, and commercial and wholesale fuels in the United States.  *Id.* ¶ 21.  Boscov's is an in-store and online retailer with a chain of forty full-service department stores located in five states in the mid-Atlantic region.  *Id.* ¶ 22.  Both accept debit cards.  *See id.* ¶¶ 21–22.

2

The Board is a federal government agency responsible for the operation of the Federal Reserve System and promulgation of our nation's banking regulations. *Id.* ¶ 26.

## I.   Debit Cards and Networks

Although now ubiquitous, debit cards were first introduced as a form of payment in the United States in only the late-1960s and early-1970s. *See* Final Rule, *Debit Card and Interchange Fees and Routing*, 76 Fed. Reg. 43,394, 43,395 (July 20, 2011) (codified at 12 C.F.R. §§ 235.1–235.10) ("Final Rule"). Unlike other payment options, debit cards allow consumers to pay for goods and services at the point of sale using cash drawn directly from their bank accounts, and to withdraw and receive cash back as part of the transaction. *Id.* Prior to debit cards, consumers had to use paper checks or make in-person withdrawals from human bank tellers in order to access their accounts. *Id.*

After decades of slow growth, the volume of debit card transactions increased rapidly in the mid-1990s, as did transactions involving other forms of electronic payment such as credit cards. *Id.* at 43,395 & n.5. This upsurge in debit card usage continued into the 2000s, reaching approximately 37.9 billion transactions in 2009. *Id.* at 43,395. By 2011, debit cards were "used in 35 percent of noncash payment transactions, and have eclipsed checks as the most frequently used noncash payment method." *Id.*

Most debit card transactions involve four parties, in addition to the network that processes the transaction. *Id.* at 43,395 & n.14. These parties are: (1) the cardholder (or consumer), who provides the debit card as a method of payment to a merchant; (2) the issuer (or issuing bank), which holds the consumer's account and issues the debit card to the consumer; (3) the merchant, who accepts the consumer's debit card as a method of

payment; and (4) the acquirer (or acquiring bank), which receives the debit card transaction information from the merchant and facilitates the authorization, clearance, and settlement of the transaction on behalf of the merchant. *Id.* at 43,395–96. The network provides the software and infrastructure needed to route debit transactions; it transmits consumer account information and electronic authorization requests from the acquirer to the issuer; and it returns a message to the acquirer either authorizing or declining the transaction. *See* 15 U.S.C. § 1693o-2(c)(11) (defining "payment card network"); 76 Fed. Reg. at 43,396. In addition, "[b]ased on all clearing messages received in one day, the network calculates and communicates to each issuer and acquirer its net debit . . . position for settlement." 76 Fed. Reg. at 43,396.

There are two types of debit card transactions—PIN (or "personal identification number") and signature—each of which requires its own infrastructure. In a PIN transaction, the consumer enters a number to authorize the transaction, and the data is carried in a single message over a system evolved from automated teller machine ("ATM") networks. *Id.* at 43,395. In a signature transaction, the consumer authenticates the transaction by signing something (like a receipt), and the data is routed over a dual-message system utilizing credit card networks. *Id.*[1] "Increasingly, however, cardholders authorize 'signature' debit transactions without a signature and, sometimes, may authorize a 'PIN' debit transaction without a PIN." 76 Fed. Reg. at 43,395 & n.10.

---

[1] *See also* Steven C. Salop et al., *Economic Analysis of Debit Card Regulation Under Section 920* ¶ 20 (Oct. 27, 2010) [Dkt. #33] (Joint Appendix 0332–0460) ("Salop").

The vast majority of debit cards (excluding prepaid cards) support authentication by *both* PIN and signature, but which one is used in a given transaction depends in large part on the nature of the transaction and the merchant's acceptance policy. *Id.* at 43,395. For instance, hotel stays and car rentals are not easily processed on PIN-based systems because the transaction amount is unknown at the time of authorization. *Id.* Internet, telephone, and mail-based merchants also generally do not accept PIN transactions. *Id.* Of the eight million merchants in the United States that accept debit cards, the Board estimates that *only* one-quarter have the ability to accept PIN transactions. *Id.*

## II.    Debit Card Fees

There are several fees associated with debit card transactions. The largest is the interchange fee, which is set by the network and paid by the acquirer to the issuer to compensate the latter for its role in the transaction. *Id.* at 43,396; *see also* § 1693o-2(c)(8) (defining "interchange transaction fee"). The network also charges acquirers and issuers a switch fee to cover its own transaction-processing costs. 76 Fed. Reg. at 43,396; *see also* § 1693o-2(c)(10) (defining "network fee"). Once these fees are assessed, the acquirer credits the merchant's account for the value of its transactions, less a "merchant discount," which includes the interchange fee, network switch fees charged to the acquirer, other acquirer costs, and a markup. 76 Fed. Reg. at 43,396.

When PIN debit cards were first introduced, most regional networks set their interchange rates at "par," offering no cost subsidization to either merchants or issuers.[2] Some networks, however, implemented "reverse" interchange fees, which issuers paid to acquirers to offset the cost to merchants of installing terminals and other infrastructure needed to accept PIN at the point of sale. 76 Fed. Reg. at 43,396; Salop, *supra* note 1, ¶ 21; Mott, *supra* note 2, ¶ 7. Because this model eliminated the costs associated with paper checks and human bank tellers, issuers could provide debit services at a profit, even without collecting interchange fees.[3] Furthermore, issuers touted the convenience of PIN-debit to their customers, and customers in turn maintained higher account balances, which issuers could loan out at a profit. Mott, *supra* note 2, ¶ 3.

As debit cards became more popular, interchange fee rates and the direction in which the fees flowed began to shift. *See* 76 Fed. Reg. at 43,396. By the early-2000s, acquirers were paying issuers ever-increasing interchange fees for PIN transactions. *See id.* Interchange fees for signature transactions, meanwhile, were modeled on credit card fees and were even higher than for PIN. *Id.*; Salop, *supra* note 1, ¶ 23.

In recent years, interchange fees have climbed sharply with PIN outpacing signature debit fees. From 1998 to 2006, merchants faced a 234 percent increase in interchange fees for PIN transactions, Mott, *supra* note 2, ¶ 24, and by 2009, interchange

---

[2] Stephen Craig Mott, *Industry Facts Concerning Debit Card Regulation Under Section 920* ¶ 7 (Oct. 27, 2010) [Dkt. #33] (Joint Appendix 0292–0331) ("Mott"); Salop, *supra* note 1, ¶ 21.

[3] Merchants Payments Coalition ("MPC"), *Comments in Response to Notice of Proposed Rulemaking on Debit Card Interchange Fees and Routing* at 1 (Feb. 22, 2011) [Dkt. #33] (Joint Appendix 0149–0238) ("MPC Comments"); Salop, *supra* note 1, ¶ 21.

fee revenue for debit cards totaled $16.2 billion, 76 Fed. Reg. at 43,396. For most

retailers, debit card fees represent the single largest operating expense behind payroll.[4]

Because debit card transaction fees, including interchange fees, are set by the

relevant network and paid by the acquirer (on behalf of merchants) to the issuer, perhaps

the best way to understand why such fees have skyrocketed over the past two decades is

to recognize the market dynamics among the networks, issuers, and merchants. Although

there are many debit card networks in the United States, networks under Visa's and

MasterCard's ownership account for roughly 83 percent of all debit transactions and

nearly 100 percent of signature transactions.[5] Visa also owns Interlink, the largest PIN

network.[6] Due to their hefty market share, Visa and MasterCard exercise considerable

market power over merchants with respect to debit card acceptance. *See Salop, supra*

note 1, ¶ 35. Hundreds of millions of consumers use cards that operate on Visa's and

MasterCard's debit networks. *Id.* ¶ 36. Merchants know that if they do not accept those

cards and networks, they risk losing sales, and "losing the sale would be costlier to the

merchant than accepting debit and paying the high interchange fee." *Id.*

At the same time, Visa, MasterCard, and other debit networks vie for issuers to

issue cards that run on their respective networks. *Id.* ¶¶ 33, 43. They can entice issuers

---

[4] NACS, *Comments in Response to Notice of Proposed Rulemaking on Debit Card Interchange Fees and Routing* at 1 (Feb. 22, 2011) [Dkt. #33] (Joint Appendix 0239–0248) ("NACS Comments").

[5] Salop, *supra* note 1, ¶ 26; Senator Richard J. Durbin, *Comments in Response to Notice of Proposed Rulemaking on Debit Card Interchange Fees and Routing* at 1 (Feb. 22, 2011) [Dkt. #33] (Joint Appendix 0125–0140) ("Durbin Comments").

[6] Salop, *supra* note 1, ¶ 26. Today, there are approximately 15 PIN debit networks, the largest of which are Interlink (owned by Visa), Star (owned by First Data Corp.), PULSE (owned by Discover), and NYCE (owned by FIS). *Id.* ¶ 22.

by emphasizing their relative market power and ability to set interchange and other fees. *Id.*; *see also* 76 Fed. Reg. at 43,396. Networks thus have an incentive to continuously raise merchants' interchange fees—which, again, flow from merchants to issuers—as a way to attract issuers to the network.[7] Visa, for instance, more than tripled the Interlink interchange fee since the early-1990s, forcing small competitor PIN networks to increase their fees as well. Mott, *supra* note 2, ¶¶ 23–24; Salop, *supra* note 1, ¶¶ 40, 46. Within each network, issuers all receive the same interchange fee, regardless of their efficiency in processing transactions or their efforts to prevent fraud. *See* Durbin Comments, *supra* note 5, at 5, 9.

In addition, Visa's and MasterCard's "Honor All Cards" rules force merchants that accept their networks' ubiquitous credit cards also to accept their signature debit cards with their corresponding high signature transactions fees.[8] As a practical matter, then, merchants cannot put downward pressure on interchange fees by rejecting network-affiliated debit cards. Durbin Comments, *supra* note 5, at 2, 5. And issuers have implemented reward programs, special promotions, and penalty fees to encourage debit

---

[7] Salop, *supra* note 1, ¶¶ 34, 44; *see also id.* ¶ 49 ("When debit networks raise their interchange fee, they gain issuance and cardholders, but they do not lose merchant acceptance."); Durbin Comments, *supra* note 5, at 5 ("[C]ompetition between networks does not lead to downward pressure on interchange rates because networks compete to attract issuers and do so by raising interchange fees."); MPC Comments, *supra* note 3, at 1 ("As banks became accustomed to receiving high interchange rates . . . which bore no relationship to costs . . . a dynamic of merchants being forced to pay ever-increasing interchange rates to underwrite network competition for issuers became the norm for the industry.").

[8] Mott, *supra* note 2, ¶ 13; MPC Comments, *supra* note 3, at 1; NRF, *Comments in Response to Notice of Proposed Rulemaking on Debit Card Interchange Fees and Routing* at 4 (Feb. 22, 2011) [Dkt. #33] (Joint Appendix 0249–0256) ("NRF Comments").

(especially signature-debit) usage.  Mott, *supra* note 2, ¶¶ 16–18; Salop, *supra* note 1, ¶ 47.  Merchants have responded by raising the price of goods and services to offset the fees.  *See* Durbin Comments, *supra* note 5, at 5, 9; NRF Comments, *supra* note 8, at 5.

The major card networks, not surprisingly, have also increased their own network fees, facilitated in part by exclusivity deals between the leading networks and debit issuers.  Mott, *supra* note 2, ¶¶ 26–27; Salop, *supra* note 1, ¶¶ 30–31.  Although there has been some network competition for PIN transactions, Visa and MasterCard have long-standing operating rules that disallow any other network from handling signature transactions on their cards.  76 Fed. Reg. at 43,396; Mott, *supra* note 2, ¶¶ 26–27; Salop, *supra* note 1, ¶¶ 30–31.  Within the PIN market, too, Visa has agreements with particular issuers that create exclusivity via "volume commitments that are pegged to incentives such as reduced fees" or require that Interlink be their sole PIN debit network.  Salop, *supra* note 1, ¶ 30.  Thus, the dominant networks have been able to raise their network fees on merchants without concern for lost transaction volume because merchants have no other alternatives for routing transactions.  *Id.* ¶ 31.  According to information collected by the Board, total network fees exceeded $4.1 billion in 2009, with networks charging issuers and acquirers more than $2.3 billion and $1.8 billion, respectively.  76 Fed. Reg. at 43,397.

## III.    The Durbin Amendment

On July 21, 2010, Congress passed legislation to address the rise of debit card fees.  Coined the "Durbin Amendment" after its sponsor, Illinois Senator Richard J. Durbin, the legislation seeks to implement Section 920 of the Electronic Fund Transfer

Act ("EFTA"), 15 U.S.C. § 1693o-2, as enacted by Section 1075 of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"), Pub. L. No. 111-203, 124 Stat. 1376, 2068–2074 (2010). The Durbin Amendment imposes various standards and rules governing debit fees and transactions. *See id.*; 76 Fed. Reg. at 43,394. The regulations apply only to issuers with assets exceeding $10 billion. § 1693o-2(a)(6)(A).

### A. Interchange Fees

The Durbin Amendment first addresses interchange transaction fees, which are defined as "any fee established, charged or received by a payment card network for the purpose of compensating an issuer for its involvement in an electronic debit transaction." § 1693o-2(c)(8). It provides that the fee charged by the issuer "with respect to an electronic debit transaction *shall be reasonable and proportional* to the cost incurred by the issuer with respect to the transaction." *Id.* § 1693o-2(a)(2) (emphasis added). It then directs the Board to establish standards to determine whether the amount of a debit card interchange fee is "reasonable and proportional to the cost incurred by the issuer" with respect to the transaction. *Id.* § 1693o-2(a)(3)(A). To promulgate these standards, Congress instructs the Board that it:

shall—

(A)    consider the functional similarity between—

(i)    electronic debit transactions; and

(ii)    checking transactions that are required within the Federal Reserve bank system to clear at par; [and]

(B)    distinguish between—

10

> (i)     the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered under [§ 1693o-2(a)(2)]; and
>
> (ii)     other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered under [§ 1693o-2(a)(2)]

*Id.* § 1693o-2(a)(4)(A)–(B).

Once the Board establishes this interchange transaction fee standard, Congress authorizes the Board to adjust the fee to allow for fraud-prevention costs, provided the issuer complies with standards established by the Board relating to fraud prevention:

> (5)     Adjustment to interchange transaction fees for fraud prevention costs
>
> (A)     Adjustments. The Board may allow for an adjustment to the fee amount received or charged by an issuer under [§ 1693o-2(a)(2)], if—
>
> > (i)     such adjustment is reasonably necessary to make allowance for costs incurred by the issuer in preventing fraud in relation to electronic debit transactions involving that issuer; and
> >
> > (ii)     the issuer complies with the fraud-related standards established by the Board under [§ 1693o-2(a)(5)(B)], which standards shall—
> >
> > > (I)     be designed to ensure that any fraud-related adjustment of the issuer is limited to the amount described in clause (i) and takes into account any fraud-related reimbursements (including amounts from charge-backs) received from consumers, merchants, or payment card networks in relation to electronic debit transactions involving the issuer; and
> > >
> > > (II)     require issuers to take effective steps to reduce the occurrence of, and costs from, fraud in relation to electronic debit transactions, including through the

11

> development and implementation of cost-effective
> fraud prevention technology.

*Id.* § 1693o-2(a)(5)(A).[9]

## B. Network Regulation

The Durbin Amendment also instructs the Board to regulate network fees by

prescribing rules related to network non-exclusivity for routing debit transactions.  76

Fed. Reg. at 43,394.  Preferring a market-oriented approach to network fees,[10] the Durbin

Amendment provides that the Board may regulate such fees only as necessary to ensure

that they are not used to "directly or indirectly compensate an issuer with respect to an

electronic debit transaction" or "circumvent or evade the restrictions . . . and regulations"

prescribed by the Board under this subsection.  § 1693o-2(a)(8)(B)(i)–(ii).  At the same

time, the Amendment requires the Board to adopt rules that prohibit issuers and networks

from entering into exclusivity arrangements or imposing restrictions on the networks

through which merchants may route a transaction.  Specifically, Congress directs the

Board to promulgate regulations providing that issuers and networks "shall not directly or

through any agent . . . restrict the number of payment card networks[11] on which an

---

[9] This fraud-prevention cost adjustment was the subject of a separate rulemaking by the Board.  *See* Final Rule, *Debit Card and Interchange Fees and Routing*, 77 Fed. Reg. 46,258 (adopted Aug. 3, 2012) (codified at 12 C.F.R. § 235.4).

[10] "The term 'network fee' means any fee charged and received by a payment card network with respect to an electronic debit transaction, other than an interchange transaction fee."  § 1693o-2(c)(10).

[11] "Payment card network" is defined as "an entity that directly, or through licensed members, processors, or agents, provides the proprietary services, infrastructure, and software that route information and data to conduct debit card or credit card transaction authorization, clearance, and settlement, and that a person uses in order to accept as a form of payment a brand of debit card."  § 1693o-2(c)(11).

electronic debit transaction may be processed" to one such network or two or more affiliated networks or "inhibit the ability of any person who accepts debit cards for payments to direct the routing of electronic debit transactions for processing over any payment card network that may process such transactions." § 1693o-2(b)(1)(A)–(B).

## IV.   The Board's Rule

After the enactment of the Dodd-Frank Act, the Board sought information from various industry participants to assist the agency in its initial rulemaking.  The Board met with debit card issuers, payment card networks, merchant acquirers, consumer groups, and industry trade associations on a number of occasions to discuss a host of issues including debit transaction processing flows, transaction fee structures and levels, fraud-prevention activities, fraud losses, routing restrictions, card-issuing arrangements, and incentive programs.[12]  In September 2010, the Board circulated surveys to financial organizations with assets totaling $10 billion or more, networks that process debit card transactions, and the largest nine merchant acquirers in order to collect data on PIN, signature, and prepaid debit card operations and, for each card type, the costs associated with interchange and other network fees, fraud losses, fraud-prevention and data-security activities, network exclusivity arrangements, and debit-card routing restrictions.  75 Fed. Reg. at 81,724–25.  In both the proposed and final rulemaking, the Board provided a

---

[12] Notice of Proposed Rulemaking, *Debit Card Interchange Fees and Routing*, 75 Fed. Reg. 81,722, 81,724 (proposed Dec. 28, 2010) (to be codified at 12 C.F.R. §§ 235.1–235.10) ("NPRM"); *see also* Durbin Comments, *supra* note 5, at 2 (describing Board's "information-gathering process" as "notable for its transparency and thoroughness").

detailed summary of the survey responses, *see id.* at 81,724–26; 76 Fed. Reg. at 43,397–98, and upon issuing the Final Rule, it released a full report including survey statistics.[13]

## A. Proposed Rule

On December 28, 2010, the Board issued a NPRM implementing the Durbin Amendment and requesting public comments. 75 Fed. Reg. at 81,722. Stemming from its determination to include "only those costs that are specifically mentioned for consideration in the statute," the Board proposed that the interchange transaction fee standard be limited to the costs associated with the authorization, clearing, and settlement ("ACS") of an electronic debit transaction that vary with the number of transactions sent to the issuer within the reporting period. *Id.* at 81,734–35, 81,739. The Board noted that, by focusing on the issuer's variable, per-transaction ACS costs, it was carrying out Congress's mandate to establish standards to assess whether an interchange fee is reasonable and proportional to the cost incurred by the issuer with respect to the transaction. *Id.* Consequently, in the NPRM, the Board suggested that network processing fees,[14] as well as fixed[15] and overhead[16] costs common to all debit transactions

---

[13] *See generally* Bd. of Governors of the Federal Reserve Sys., *2009 Interchange Revenue, Covered Issuer Cost, and Covered Issuer and Merchant Fraud Loss Related to Debit Card Transactions* [Dkt. #33] (Joint Appendix 0261–0291), *available at* http://www.federalreserve.gov/paymentsystems/files/debit fees_costs.pdf.

[14] 75 Fed. Reg. at 81,735–36, 81,739; 76 Fed. Reg. at 43,424. The Board proposed in the NPRM that network fees be excluded from the interchange fee standard. 75 Fed. Reg. at 81,735. Including them in allowable costs would risk putting merchants "in the position of effectively paying all network fees associated with debit card transactions" because "an acquirer would pay its own network processing fees directly to the network and would indirectly pay the issuer's network processing fees through the allowable costs included in the interchange fee standard." *Id.*

and not attributable to the ACS of any one transaction, be excluded from recovery under the interchange transaction fee standard.  Fraud losses and the costs of fraud-prevention and reward programs were also deemed unallowable because they are not attributable to the variable ACS costs incurred by an issuer.  75 Fed. Reg. at 81,755, 81,760.

While merchants overwhelmingly supported the Board's plan to limit allowable costs within the interchange transaction fee standard to only incremental ACS costs, networks and issuers advocated expanding the proposed set of allowable costs.  76 Fed. Reg. at 43,424–25.  Indicating that its proposal was still subject to change, the Board "request[ed] comment on whether it should allow recovery through interchange fees of the other costs of a particular transaction beyond authorization, clearing, and settlement" and, if so, "on what other costs of a particular transaction, including network fees paid by issuers for the processing of transactions, should be considered allowable costs."  75 Fed. Reg. at 81,735.

---

[15] The Board proposed that fixed costs—even if incurred for activities related to the ACS of debit card transactions—*not* be factored into allowable costs within the interchange fee calculus.  75 Fed. Reg. at 81,736 ("This [proposed] measure would *not* consider costs that are common to all debit card transactions and could never be attributed to any *particular* transaction [*i.e.*, fixed costs], even if those costs are specific to debit transactions as a whole.").  Indeed, the Board specifically contemplated that costs that do not vary with the number of transactions sent to the issuer over the calendar year, such as network connectivity fees and fixed costs of production, would be excluded as "unallowable, fixed costs," or "those costs that do not vary, up to existing capacity limits, with the number of transactions sent to the issuer over the calendar year," under the interchange transaction fee standard.  *Id.* at 81,736, 81,739, 81,760.

[16] In the NPRM, the Board recommended that the cost of an issuer's facilities, human resources, and legal staff, as well as its costs in operating a branch office, be categorized as common overhead costs that cannot be allocated for the purpose of calculating its permissible interchange transaction fee.  75 Fed. Reg. at 81,735, 81,760.

Drawing on its comprehensive survey data relating to debit transaction fees, the Board proposed two alternative standards to govern interchange fees. The first, which the Board called "Alternative 1," allowed each issuer to recover its actual incremental ACS costs up to a safe harbor of seven cents ($.07) per transaction if the issuer chose not to determine its individual allowable costs, and up to a cap of twelve cents ($.12) if it did. 75 Fed. Reg. at 81,736–38. The second, "Alternative 2," set a cap at a flat twelve cents ($.12) per transaction. *Id.* at 81,738.

With respect to network non-exclusivity for routing debit transactions, the Board requested comment on two alternative methods for implementation. The first, called "Alternative A," required at least two unaffiliated payment card networks active on each debit card, even if one network processed only signature transactions and one handled only PIN transactions. *See* 75 Fed. Reg. at 81,749. The second, "Alternative B" required at least two active unaffiliated payment card networks for each type of authorization method—*i.e.*, at least two to process PIN transactions and two to process signature. 75 Fed. Reg. at 81,749. In either case, issuers and networks could not inhibit a merchant's ability to direct the routing of an electronic debit transaction over any available network. *Id.* at 81,751.

More than 11,500 commenters—including several of the named plaintiffs, as well as various issuers, payment card networks, consumers, consumer advocates, trade associations and members of Congress—replied to the Board's request for comment. 76

Fed. Reg. at 43,394.[17]  In drafting the Final Rule, the Board relied on the voluminous

comments, the statutory provisions, the available cost data, its understanding of the debit

payment system, and other relevant information.  76 Fed. Reg. at 43,394.

### B. Final Rule

The Board's Final Rule was published on July 20, 2011 and became effective on

October 1, 2011.  *See id.*  As its standard for assessing whether the interchange fee for a

debit transaction is reasonable and proportional to the issuer's costs, the Board adopted "a

modified version of proposed Alternative 2."  *Id.* at 43,404.  It permits each issuer to

receive a fee as high as twenty-one cents ($.21) per transaction plus an *ad valorem*

amount of five basis points of the transaction's value (0.05%).  12 C.F.R. § 235.3(b).

The Board increased the allowable interchange fee (from twelve cents in

Alternative 2 to twenty-one cents in the Final Rule) after concluding that the language

and purpose of the Durbin Amendment allow the Board to consider additional costs not

explicitly excluded from consideration by the statute.  *Id.* at 43,426–27.  According to the

Board, § 1693o-2(a)(4)(B) on the one hand *requires* the Board to consider incremental

ACS costs incurred by issuers, and on the other hand *prohibits* consideration of any

issuer costs that are not specific to a particular transaction; but it is *silent* with respect to

costs that fall into neither category (*e.g.*, costs specific to a particular transaction but are

---

[17] 76 Fed. Reg. at 43,394; *see generally* Durbin Comments, *supra* note 5; FMI,
*Comments in Response to Notice of Proposed Rulemaking on Debit Card Interchange
Fees and Routing* (Feb. 22, 2011) [Dkt. #33] (Joint Appendix 0141–0148); NACS
Comments, *supra* note 4; NRF Comments, *supra* note 8.

not incremental ACS costs). *Id.* at 43,426. The Board concluded that it had discretion to consider costs on which the statute is silent. *Id.*

In setting the final interchange transaction fee standard, the Board considered all costs for which it had data, other than those prohibited under subsection (a)(4)(B). *Id.* Based on survey data and public comments, the Board found that issuers incur transaction costs other than the variable ACS costs that the Board originally proposed as the only allowable costs in the interchange fee, and that "no electronic debit transaction can occur without incurring these [non-variable ACS] costs, making them . . . specific to each and every electronic debit transaction" under the statute. *Id.* at 43,427; *see also id.* at 43,404. Consequently, the Board amended its final interchange transaction fee standard to include, in addition to variable ACS costs: (1) fixed costs related to processing a particular transaction, such as network connectivity and software, hardware, equipment, and labor; (2) transaction monitoring costs; (3) an allowance for fraud losses (the *ad valorem* component); and (4) network processing fees. *Id.* at 43,404, 43,429–31.[18]

As to the network non-exclusivity rule, the Board concluded that "[t]he plain language of the statute does not require that there be two unaffiliated payment card networks available to the merchant for each method of authentication." *Id.* at 43,447; *see also id.* ("[T]he statute does not expressly require issuers to offer multiple unaffiliated signature *and* multiple unaffiliated PIN debit card network choices on each card."

---

[18] The Board still excluded from the final interchange transaction fee standard other costs not incurred as a consequence of effecting a transaction, including costs related to customer inquiries, reward programs, corporate overhead (*e.g.*, executive compensation), establishing the account relationship, card production and delivery, marketing, research and development, and network membership fees. *Id.* at 43,404, 43,427–29.

(emphasis added)).  Hence, the Board adopted Alternative A, which requires only that two unaffiliated networks be available for each debit card, not for each authorization method.  12 C.F.R. § 235.7(a)(2) & Official Cmt. 1; 76 Fed. Reg. at 43,404.

On the same day that the Board adopted its Final Rule on debit card interchange fees and network non-exclusivity, it also published a separate Interim Final Rule on a proposed adjustment to the interchange fee for fraud-prevention costs under 15 U.S.C. § 1693o-2(a)(5).  *See* 76 Fed. Reg. at 43,478.  The Board has since finished that rulemaking, and on August 2, 2012 it adopted a final rule governing the fraud-prevention cost adjustment.  *See* 77 Fed. Reg. 46,258; 12 C.F.R. § 235.4.[19]

## V.     This Litigation

On November 22, 2011, plaintiffs sued the Board, seeking a declaratory judgment that the Final Rule's interchange fee and network non-exclusivity provisions (12 C.F.R. §§ 253.3(b) and 235.7(a)(2)) are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law.  *See generally* Compl. [Dkt. #1].  Moreover, plaintiffs seek costs and reasonable attorneys' fees pursuant to 28 U.S.C. § 2412, and such other relief as the Court deems reasonable and proper.  *See generally* Am. Compl. Plaintiffs amended their complaint on March 2, 2012.  *Id.*

---

[19] The Board allows issuers to "receive or charge an amount of no more than 1 cent per transaction in addition to any interchange transaction fee it receives or charges" if the issuer "develop[s] and implement[s] policies and procedures reasonably designed to take effective steps to reduce the occurrence of, and costs to all parties from, fraudulent electronic debit transactions, including through the development and implementation of cost-effective fraud-prevention technology."  12 C.F.R. § 235.4(a), (b)(1).

As individual retailers that accept debit cards and trade associations comprised of merchants, *see supra* p. 2, plaintiffs contend that the Final Rule is an unreasonable interpretation of the Durbin Amendment because it ignores Congress's directives regarding interchange fees and network exclusivity. *See* Am. Compl. ¶¶ 5, 11. As to the former, plaintiffs assert that the Durbin Amendment limits the Board's consideration of allowable costs to the "incremental cost" of "authorization, clearance and settlement of a particular electronic debit transaction," and that, by including other costs in the fee standard, the Board "acted unreasonably and in excess of its statutory authority." *Id.* ¶¶ 6, 70–73, 82–83. Regarding the latter, plaintiffs argue that the Board disregarded the plain meaning of the Durbin Amendment and misconstrued the statute by adopting a network non-exclusivity rule requiring all debit *cards* be interoperable with at least two unaffiliated payment networks, rather than requiring that all debit *transactions* be able to run over at least two unaffiliated networks. *Id.* ¶¶ 9–10, 91–93.

Plaintiffs moved for summary judgment on March 2, 2012, arguing that the Final Rule's interchange transaction fee and network non-exclusivity regulations should be declared invalid under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), because the Board impermissibly implemented the Durbin Amendment's statutory command and thus exceeded its authority. Pls.' Mot. for Summ. J. ("Pls.'s Mot.") at 1 [Dkt. #20]; Pls.' Mem. in Supp. of Pls.' Mot. for Summ. J. ("Pls.' Mem.") at 2 [Dkt. #20]. The Court permitted amicus curiae briefs to be filed by three different parties: (1) a consortium of major nationwide bank and credit union trade associations in the United

States;[20] (2) Senator Richard J. Durbin, a member of Congress and the primary author of the Durbin Amendment;[21] and (3) a group of convenience stores, quick-service restaurants and specialty coffee shops that operate small business franchises and licensed stores.[22] The latter two groups of amici filed briefs in support of plaintiffs' motion for summary judgment; the bank and credit union amici supported neither party.

On April 13, 2012, the Board filed a cross-motion for summary judgment. contending that plaintiffs' claims lack merit and that the Board is entitled to judgment as a matter of law. Def.'s Cross-Mot. for Summ. J. ("Def.'s Cross-Mot.") at 1 [Dkt. #23]; Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. and in Opp'n to Pls.' Mot. for Summ. J. ("Def.'s Mem.") at 1–2 [Dkt. #23]. On October 2, 2012, I heard oral argument from the parties as well as the bank and credit union amici. *See* Civ. Case No. 11-2075, Minute Entry, Oct. 2, 2012. For the reasons set forth below, I agree with the plaintiffs and GRANT summary judgment in their favor.

---

[20] *See generally* Amici Curiae Brief of The Clearing House Ass'n L.L.C. et al. ("Clearing House Amicus Br.") [Dkt. #22]. Amici are The Clearing House Association L.L.C., American Bankers Association, Consumer Bankers Association, Credit Union National Association, The Financial Services Roundtable, Independent Community Bankers of America, Mid-Size Bank Coalition of America, National Association of Federal Credit Unions, and National Bankers Association. *Id.*

[21] *See generally* Amicus Curiae Brief of Senator Richard J. Durbin ("Durbin Amicus Br.") [Dkt. #27].

[22] *See generally* Amici Curiae Brief of 7-Eleven, Inc. et al. ("7-Eleven Amicus Br.") [Dkt. #30]. Amici are 7-Eleven, Inc., Auntie Anne's, Inc., Burger King Corporation, CKE Restaurants, Inc., International Dairy Queen, Inc., Jack in the Box Inc., Starbucks Corporation, and The Wendy's Company. *Id.*

## STANDARD OF REVIEW

### I.      Summary Judgment

Summary judgment is appropriate when the record evidence demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden is on the moving party to demonstrate an "absence of a genuine issue of material fact" in dispute. *Celotex*, 477 U.S. at 323. In a case involving judicial review of final agency action under the APA, however, "the Court's role is limited to reviewing the administrative record." *Air Transp. Ass'n of Am. v. Nat'l Mediation Bd.*, 719 F. Supp. 2d 26, 32 (D.D.C. 2010) (citations omitted). "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to made the decision it did." *Select Specialty Hosp.–Bloomington, Inc. v. Sebelius*, No. 09-2362, 2012 WL 4165570, at *2 (D.D.C. Sept. 19, 2012) (citations and internal quotation marks omitted).

### II.     Administrative Procedure Act

Under the APA, the Court must set aside agency action that exceeds the agency's "statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). To determine whether an agency has acted outside its authority, I must apply the two-step framework under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *See Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 441 (D.C. Cir. 2012).

A *Chevron* analysis first requires the reviewing court to determine "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842.

22

To resolve whether "the intent of Congress is clear" under this first step, *id.*, the court

must exhaust the "traditional tools of statutory construction," including textual analysis,

structural analysis, and (when appropriate) legislative history, *id.* at 843 n.9; *Bell Atl. Tel.*

*Cos. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997). "If the intent of Congress is clear,

that is the end of the matter; for the court, as well as the agency, must give effect to the

unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43.

If after employing these tools, however, the Court concludes that the statute is

silent or ambiguous on the specific issue, the Court moves on to step two and defers to

any agency interpretation that is based on a permissible construction of the statute. *Id.* at

843. An agency's construction is permissible "unless it is arbitrary or capricious in

substance, or manifestly contrary to the statute." *Mayo Found. for Med. Educ. &*

*Research v. United States*, 131 S. Ct. 704, 711 (2011) (citations and internal quotation

marks omitted). "[T]he whole point of *Chevron* is to leave the discretion provided by the

ambiguities of a statute with the implementing agency." *Ass'n of Private Sector Colls.*,

681 F.3d at 441 (citations and internal quotation marks omitted).

## ANALYSIS

### I.     Plaintiffs Have Met Their Burden of Production for Article III Standing.

Curiously, the Board contends in a footnote that plaintiffs have failed to establish

Article III standing because they failed in their opening brief to provide affidavits or

other evidence that set forth specific facts demonstrating standing. *See* Def.'s Mem. at 13

n.7 (citing *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002)). But reading on, the

*Sierra Club* court explicitly recognized that:

> In many if not most cases the petitioner's standing to seek review of administrative action is self-evident; no evidence outside the administrative record is necessary for the court to be sure of it. In particular, if the complainant is an object of the action (or forgone action) at issue—as is the case usually in review of a rulemaking . . . —there should be little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.

292 F.3d at 899–900 (citation and internal quotation marks omitted).

Indeed, our Court of Appeals has expressly rejected the use of the *Sierra Club* rule as a procedural "gotcha" in cases where standing was reasonably thought to be self-evident. *See Am. Library Ass'n v. FCC*, 401 F.3d 489, 493–95 (D.C. Cir. 2005); *see also Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 733 (D.C. Cir. 2003) ("*Sierra Club*, however, does not require parties to file evidentiary submissions in support of standing in every case. To the contrary, our decision made clear that '[i]n many if not most cases the petitioner's standing to seek review of administrative action is self-evident.'"). For instance, in *American Library Association*, our Circuit Court explained that interpreting *Sierra Club* as requiring long jurisdictional statements in opening briefs was inconsistent with precedent, a waste of judicial resources, and an unnecessary burden on litigants. 401 F.3d at 494. Indeed, the court went on to clarify that *Sierra Club* need only "remind[] petitioners challenging administrative actions that, *when they have good reason to know that their standing is not self-evident*, they should explain the basis for their standing at the earliest appropriate stage in the litigation." *Id.* at 493.

Here, plaintiffs had every reason to believe that their standing was self-evident and no cause to suspect that standing would be challenged in this court at all, much less in a

footnote on summary judgment![23]   Moreover, the administrative record contains

countless examples of how plaintiffs are injured by the Board's interchange transaction

fee and network non-exclusivity regulations.[24]   *Cf. Am. Chemistry Council v. Dep't of*

*Transp.*, 468 F.3d 810, 822, 824 (D.C. Cir. 2006) (standing can be "self-evident" from

the administrative record).   The Board's own rulemaking recognizes that it is merchants

that pay interchange and network fees and are thus directly affected by the Board's Final

Rule regulating both.[25]   *See Fund for Animals*, 322 F.3d at 734 ("[F]or the purpose of

determining whether standing is self-evident, we see no meaningful distinction between a

regulation that directly regulates a party and one that directly regulates the disposition of

a party's property.").   Accordingly, it was reasonable for each plaintiff to assume that it

(or in the case of the trade associations, one of its members) would suffer an Article III

injury when the Board's Final Rule was implemented.   And in their reply brief, plaintiffs

submitted declarations demonstrating what was already self-evident: that they will suffer

cognizable harms as a result of the Board's regulations.   *See* Pls.' Reply at 7–9; *cf. Cmtys.*

---

[23] The Board chose not to file a motion to dismiss for lack of standing and gave plaintiffs no indication that it would challenge their claims on justiciability grounds. *See* Pls.' Reply Mem. in Supp. of Pls.' Mot. for Summ. J. and in Opp'n to Def.'s Mot. for Summ. J. ("Pls.' Reply") [Dkt. #26] at 7 n.3.

[24] *See, e.g.*, 76 Fed. Reg. at 43,462 ("[I]it is possible that merchants with a large proportion of small-ticket transactions may experience an increase in total interchange fees . . . ."); *id.* at 43,448 ("Alternative A provides merchants fewer routing options with respect to certain electronic debit transaction compared to Alternative B.").

[25] *See, e.g.*, 76 Fed. Reg. at 43,396 ("The interchange fee is set by the relevant network and paid by the [merchant] acquirer to the issuer . . . . [T]he [merchant] acquirer charges the merchant a merchant discount . . . that includes the interchange fee"); 75 Fed. Reg. at 81,727 ("[I]n point-of-sale transactions, these [network-exclusivity prohibition and routing] provisions improve the ability of a merchant to select the network that *minimizes* its cost . . . and otherwise provides the most advantageous terms.").

*Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 684–85 (D.C. Cir. 2004)

(affidavits submitted with reply brief are sufficient under *Sierra Club* because they made

associational standing "patently obvious" and respondent was not prejudiced). In short,

plaintiffs have easily met their burden of production with regard to Article III standing

here, and this Court will thus proceed to the merits.

## II.     The Interchange Transaction Fee Regulation Is Invalid Under the APA.

Plaintiffs contend that the Final Rule's interchange transaction fee standard, 12

C.F.R. § 235.3(b), is plainly foreclosed by the text, structure, and purpose of the Durbin

Amendment and is arbitrary, capricious, and contrary to law. According to plaintiffs, the

plain language and legislative history of the statute make clear which issuer costs may be

included in the interchange transaction fee standard, and the Board's inclusion of other

costs cannot survive scrutiny under *Chevron*'s first step. The Board, meanwhile, takes

the position that the Durbin Amendment is silent, and therefore ambiguous, with respect

to issuer costs not explicitly addressed in the statute. And because the final interchange

fee provision is a reasonable construction of the statute, says the Board, it is entitled to

*Chevron* deference. For the following reasons, I agree with the plaintiffs.

### A. The Durbin Amendment Plainly Limits the Costs Allowable Within the Interchange Transaction Fee Standard to Those Identified in 15 U.S.C. § 1693o-2(a)(4)(B)(i).

Determining whether Congress has spoken to the precise question at issue through

"the [statutory] language itself, the specific context in which that language is used, and

the broader context of the statute as a whole" is, of course, this Court's first task.

*Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). Our Court of Appeals has directed

26

this Court to use "all traditional tools of statutory interpretation, including text, structure,

purpose, and legislative history, to ascertain Congress's intent at *Chevron* step one."

*Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 663 (D.C. Cir. 2009) (citation

and internal quotation marks omitted).  If this examination yields a clear result, "then

Congress has expressed its intention as to the question, and deference is not appropriate."

*Natural Res. Def. Council, Inc. v. Daley*, 209 F.3d 747, 752 (D.C. Cir. 2000).

To discern the text's plain meaning, the Court is to look to "the language of the

statute itself."  *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 132 S. Ct. 1670, 1680

(2012) (citation omitted).  "[W]hen the statute's language is plain, the sole function of the

courts—at least where the disposition required by the text is not absurd—is to enforce it

according to its terms."  *Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530

U.S. 1, 6 (2000) (citation and internal quotation marks omitted).  "Unless otherwise

defined, statutory terms are generally interpreted in accordance with their ordinary

meaning."  *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006); *see also FCC v. AT & T

Inc.*, 131 S. Ct. 1177, 1182 (2011).

An analysis of the statutory text, however "does not end here, but must continue to

'the language and design of the statute as a whole.'"  *Am. Scholastic TV Programming

Found. v. FCC*, 46 F.3d 1173, 1178 (D.C. Cir. 1995) (quoting *Fort Stewart Sch. v. FLRA*,

495 U.S. 641, 645 (1990)).[26]  The Court must also "exhaust the traditional tools of

---

[26] *See also Roberts v. Sea-Land Servs., Inc.*, 132 S. Ct. 1350, 1357 (2012) ("It is a
fundamental canon of statutory construction that the words of a statute must be read in
their context and with a view to their place in the overall statutory scheme." (citation
omitted)); *Bell Atl. Tel. Cos.*, 131 F.3d at 1047 ("The literal language of a provision taken

statutory construction, including examining the statute's legislative history to shed new light on congressional intent, notwithstanding statutory language that appears superficially clear." *Sierra Club v. EPA*, 551 F.3d 1019, 1027 (D.C. Cir. 2008) (citations omitted); *see also AFL-CIO v. FEC*, 333 F.3d 168, 172 (D.C. Cir. 2003) ("We consider the provisions at issue in context, using traditional tools of statutory construction and legislative history.").

### i. Subsection (a)(4)(B) Bifurcates the Universe of Electronic Debit Transaction Costs into the Allowable and the Impermissible.

The Durbin Amendment instructs the Board to ensure that any interchange fee charged by an issuer "is reasonable and proportional to the cost incurred by the issuer with respect to the transaction," § 1693o-2(a)(3), and in so doing it must "distinguish between" two categories of costs. *Id.* § 1693o-2(a)(4)(B)(i)–(ii). Plaintiffs contend that these categories bifurcate the entire universe of costs into two, and only two, groups: (1) costs that are "incremental" or variable, incurred by an issuer for its role in the "authorization, clearance, or settlement," and that relate to a "particular" or single electronic debit transaction, which "*shall* be considered," § 1693o-2(a)(4)(B)(i) (emphasis added); and (2) "*other* costs" "incurred by an issuer which are not specific to a particular electronic debit transaction," which "*shall not* be considered," § 1693o-2(a)(4)(B)(ii) (emphasis added). The Board disagrees, arguing that subsection (a)(4)(B) is silent when it comes to costs that are specific to a particular electronic debit transaction but that are not incremental ACS costs, as those costs do not fit into either subsection

---

out of context cannot provide conclusive proof of congressional intent, any more than a word can have meaning without context to illuminate its use.'").

(a)(4)(B)(i) or (a)(4)(B)(ii).  According to the Board, this creates ambiguity that the Board has the discretion to resolve.  How convenient.

Starting with subsection (a)(4)(B)'s text, I have *no* difficulty concluding that the statutory language evidences an intent by Congress to bifurcate the entire universe of costs associated with interchange fees.  Indeed, Congress directed the Board to "distinguish between"—or, according to its plain and ordinary meaning, "separate into different categories" or "make a distinction"[27]—between: (1) incremental ACS costs relating to a particular transaction, which "*shall* be considered" in establishing the interchange transaction fee standard, and (2) "other costs" which are not specific to a particular transaction, which the Board "*shall not*" consider.  § 1693o-2(a)(4)(B)(i)–(ii) (emphases added).  By using strategically placed "shall" and "shall not" terms—which plainly indicate the inclusion of the first category of costs and exclusion of the second— Congress expressed its clear intent to separate costs that must be included in the interchange transaction fee standard and "other costs" that must be excluded.  *See Ass'n of Civilian Technicians, Mont. Air Chapter No. 29 v. Fed. Labor Relations Auth.*, 22 F.3d 1150, 1153 (D.C. Cir. 1994) ("The word 'shall' generally indicates a command that admits of no discretion on the part of the person instructed to carry out the directive.").

Furthermore, Congress used the inclusive phrase "other costs," as opposed to just "costs," to refer to those costs *not* to be considered in the interchange transaction fee

---

[27] *Webster's New College Dictionary* 337 (3d ed. 2008) (defining "distinguish" as "to recognize as being different or distinct; separate into different categories; perceive or indicate differences; discriminate"); *Black's Law Dictionary* 542 (9th ed. 2009) (defining "distinguish" as "to make a distinction").

standard. The plain import of Congress's word choice, according to the ordinary definition of "other" and relevant case law, is that this second, prohibited category of "other costs" was intended to subsume *all* costs not explicitly addressed in the first, permissible category of costs. *See Merriam-Webster's Collegiate Dictionary* 878–79 (11th ed. 2009) (defining "other" as "being the one (as of two or more) remaining or not included; being the one or ones distinct from that or those first mentioned or implied").[28] In other words, the plain text makes clear that the incremental ACS cost of a particular electronic debit transaction is the *only* cost the Board was expressly authorized to consider in its interchange transaction fee standard.

The Board's counterargument—that Congress directed it not to consider "other costs incurred by an issuer *which* are not specific to a particular electronic debit transaction," § 1693o-2(a)(4)(B)(ii) (emphasis added), meaning that only costs "not specific to a particular . . . transaction" are barred from consideration—is wholly unpersuasive. *See* Def.'s Mem. at 20–21. The non-restrictive pronoun "which" is a descriptor, rather than a qualifier, and Congress has repeatedly utilized this term to further *describe* the preceding phrase—here, "other costs"—rather than to condition or limit it. *See United States v. Indoor Cultivation Equip. from High Tech Indoor Garden Supply*, 55 F.3d 1311, 1315 (7th Cir. 1995) (concluding that Congress's use of the

---

[28] *See also Ass'n of Private Sector Colls.*, 681 F.3d at 443–44 (holding that Congress intended the phrase "other incentive payment" to broadly cover abuses not enumerated); *FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1100 (D.C. Cir. 2008) ("This interpretation, one which gives meaning to the word 'other' by reading sequentially to understand 'other' as meaning 'different from that already stated in subsections (a)–(c),' gives coherent effect to all sections . . . ." (quoting *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 71–72 (2d Cir. 1998))).

pronoun "which," as in "[a]ll conveyances, including aircraft, vehicles, or vessels, which

are used to . . . facilitate [drug transactions]," did not limit the meaning of the word it

amended, "conveyance," to a vehicle or vessel used or intended to be used to facilitate a

drug transaction).[29]  Not surprisingly, the Board fails to cite any persuasive definition or

case law to the contrary, and its focus on commas is a red herring.  *See, e.g., Barrett v.*

*Van Pelt*, 268 U.S. 85, 91 (1925) ("Punctuation is a minor, and not a controlling, element

in interpretation, and courts will disregard the punctuation of a statute, or re-punctuate it,

if need be, to give effect to what otherwise appears to be its purpose and true meaning."

(citation omitted)).

Finally, statements by Senator Richard J. Durbin, the Amendment's chief sponsor,

confirm that Congress intended to bifurcate the universe of costs into incremental ACS

costs includable in the interchange transaction fee standard and all other costs to be

excluded.  Specifically, in addressing the meaning of the Amendment on the floor of the

Senate prior to its final passage, Senator Durbin stated:

> Paragraph (a)(4) [of the Amendment] makes clear that the *cost* to be
> considered by the Board in conducting its reasonable and proportional
> analysis is the incremental cost incurred by the issuer for its role in the
> authorization, clearance, or settlement of a particular electronic debit
> transaction, *as opposed to other costs incurred by an issuer which are not
> specific to the authorization, clearance, or settlement of a particular
> electronic debit transaction.*

---

[29] *See also* William Strunk Jr. & E.B. White, *The Elements of Style* 1, 3 (2d ed. 1972)
(describing an "elementary rule[ ] of usage" that a "nonrestrictive clause is one that does
not serve to identify or define the antecedent noun"); *cf. In re Connors*, 497 F.3d 314,
319 (3d Cir. 2007) ("The word 'that' is a relative pronoun that restricts and, therefore,
modifies, the preceding noun[.]")

156 Cong. Rec. S5,925 (daily ed. July 15, 2010) (emphasis added). Although the Board

admits that Senator Durbin's statement appears to divide the universe of costs into two

categories, it argues nonetheless that the actual language of the statute overrides any floor

statement by the bill's sponsor. *See* Def.'s Mem. at 20. *Chevron*, however, contemplates

that legislative history—including history that does not match the text of the statute

verbatim—will be read *along with* the statute to determine Congress's intent. *See*

*Chevron*, 467 U.S. at 851–53, 862–64; *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321

F.3d 1166, 1176–78 (D.C. Cir. 2003) (using legislative history, in tandem with plain

language of statute, in *Chevron* step one). In this case, Senator Durbin's statement, read

in conjunction with the statute's text, confirms that Congress intended to divide all costs

into two categories: those that can and those that cannot be considered in setting the

interchange fee standard.

### ii. Congress Intended to Exclude All Costs Other than the Incremental ACS Costs Incurred by the Issuer for a Particular Debit Transaction from the Interchange Fee Standard.

Further parsing of the statute confirms that Congress intended to narrow the scope

of costs considered in the interchange transaction fee standard. Subsection (a)(4)(B)(i)

directs the Board to include in the standard those ACS costs that are "*incremental* [to the]

cost incurred by an issuer for the *role of the issuer* in . . . a particular electronic debit

transaction." § 1693o-2(a)(4)(B)(i) (emphasis added). The term "incremental" limits the

includable costs to "variable, as opposed to fixed," ACS costs. *Me. Pub. Serv. Co. v.*

*FERC*, 964 F.2d 5, 9 (D.C. Cir. 1992).[30]  And the subsection includes only those costs

incurred for the issuer's role in processing the transaction.  § 1693o-2(a)(4)(B)(i).

In addition, subsection (a)(4)(B)(ii) instructs the Board to exclude from the

standard any "other costs incurred by an issuer which are not *specific* to a *particular . . .*

transaction." §1693o-2(a)(4)(B)(ii) (emphases added).  Congress thus directed the Board

to omit "other costs incurred by an issuer which are not [unique] to a [distinct or

individual] transaction."[31]  The plain text of the Durbin Amendment thus precludes the

Board from considering in the interchange fee standard any costs, other than variable

ACS costs incurred by the issuer in processing each debit transaction.

The Board contends that the statute's failure to define the terms "incremental cost"

or "authorization, clearance, or settlement," or to delineate which types of costs are "not

specific to a particular electronic debit transaction," renders those terms ambiguous,

thereby giving the Board the authority to fill those statutory gaps.  *See* Def.'s Mem. at

26–27.  Not quite!  If I were to accept the Board's argument, then every term in the

statute would have to be specifically defined or otherwise be deemed ambiguous.  This

result makes no sense, and more importantly, it is not the law.  When a term is not

defined in a statute, a court must assume that "the legislative purpose is expressed by the

---

[30]*See also* 75 Fed. Reg. at 81,735 (in NPRM, proposing that "incremental cost" be
defined as an average, variable and per-transaction cost that varies with the number of
transactions); *Webster's New College Dictionary* 575 (3d ed. 2008) (defining
"increment" as "a small positive or negative change in a variable").

[31] *Webster's New College Dictionary* 1085 (3d ed. 2008) (defining "specific" as
"distinctive or unique; intended for, applying to, or acting on a given thing; definite");
*Merriam-Webster's Collegiate Dictionary* 903 (11th ed. 2009) (defining "particular" as
"a separate part of a whole; an individual fact, point, circumstance or detail; an individual
or a specific subclass . . . falling under some general concept or term.").

ordinary meaning of the words used." *AT&T*, 131 S. Ct. at 1182; *United States v. Locke*, 471 U.S. 84, 95 (1985) (distinguishing "filling a gap left by Congress' silence" from "rewriting rules that Congress has affirmatively and specifically enacted") (citation omitted).

"[T]he meaning of statutory language, plain or not, depends on context," *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991), and the relevant provisions, statutory design, and legislative history here clearly support my reading of the statute. First, the statute's information collection provision explicitly requires public disclosure only of information "concerning the costs incurred, and interchange transaction fees charged or received . . . *in connection with the authorization, clearance or settlement of electronic debit transactions*." § 1693o-2(a)(3)(B) (emphasis added). That disclosure is limited to the same costs specified in subsection (a)(4)(B)(i) reinforces that those ACS costs are the only ones Congress intended to include in the interchange transaction fee standard.[32]

Subsection (a)(4)(A) of the statute also directs the Board to consider the "functional similarity" between "electronic debit transactions" and "checking transactions that are required within the Federal Reserve bank system to clear *at par*" when prescribing standards used to assess whether an interchange transaction fee is reasonable and proportional to the issuer's transactions. § 1693o-2(a)(4)(A) (emphasis added). The Board is thus *required* to consider how debit and checking transactions are "like" or

---

[32] Conversely, if Congress had intended to provide the Board with discretion to consider additional, unspecified costs "that are specific to a particular electronic debit transaction but that are not incremental ACS costs," as the Board contends, Def.'s Mem. at 17, then Congress would have told the Board to report its findings concerning those costs, too.

34

"[r]esembling though not completely identical" in terms of their "capab[ility] of performing" or "ab[ility] to perform a regular function."[33]  Congress understood that debit card transactions are "akin to writing a check" because "[a]ll that happens . . . is you deduct money from your bank account." *See* 156 Cong. Rec. S3,696 (daily ed. May 13, 2010) (statement of Sen. Richard J. Durbin) ("That is why debit cards are advertised as check cards.").  However, as Senator Durbin explained, "there are zero transaction fees deducted when you use a check," unlike interchange fees, which "are deducted from every [debit] transaction left for the seller." *Id.*  The Board even proposed in its NPRM to limit "allowable costs . . . to those that the statute specifically allows to be considered, and *not be expanded to include additional costs that a payor's bank in a check transaction would not recoup through fees from the payee's bank*." 75 Fed. Reg. at 81,735 (emphasis added).

The Board argues that the plain language of subsection (a)(4)(A) merely requires the Board to *consider* the functional similarity between electronic debit transactions and checking transactions in determining its interchange fee standard (which it did) and does not preclude the Board's consideration of differences.  "Were courts to *presume* a delegation of power absent an express *withholding* of such power," however, "agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron*[.]" *Ry. Labor Execs. Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir.

---

[33] *Webster's New College Dictionary* 1053 (3d ed. 2008) ("similar" defined as "like; resembling though not completely identical"); *id.* 462 (defining "functional" as "designed for or adapted for a specific function or use; capable of performing; operative"); *Merriam-Webster's Collegiate Dictionary* 507 (11th ed. 2009) ("functional" means "performing or able to perform a regular function").

1994); *see also Am. Bar Ass'n v. FTC*, 430 F.3d 457, 468 (D.C. Cir. 2005) ("[I]f there is

the sort of ambiguity that supports an implicit congressional delegation of authority to the

agency to make a deference-worthy interpretation of the statute, we must look elsewhere

than the [statute's] failure to negate[.]").  In fact, it defies common sense to read an

explicit directive to consider "functional *similarity*" as authorization to consider

*differences*, as well

      Lastly, subsection (a)(5)(A)(i) directs the Board "to make allowance for costs

incurred by the issuer in preventing fraud" via an "*adjustment* to the fee amount received

or charged by an issuer" under the interchange fee standard.  § 1693o-2(a)(5)(A)(i)

(emphasis added).  At first glance, Congress's choice of words here appears to sanction a

wholesale inclusion of fraud-prevention costs within the interchange transaction fee

standard.  However, subsection (a)(5)(A)(i) limits "any fraud-related adjustment" to the

amount "reasonably necessary . . . to prevent[] fraud in relation to electronic debit

transactions involving that issuer," and (a)(5)(A)(ii) conditions that adjustment on an

issuer's compliance with fraud-related standards that "require issuers to take effective

steps to reduce the occurrences and costs of, and costs from, fraud in relation to

electronic debit transactions." § 1693o-2(a)(5)(A)(i)–(ii).  Senator Durbin's discussion of

subsection (a)(5) sheds further light on this provision:

> It should be noted that any fraud prevention adjustment to the fee amount
> would occur *after* the base calculation of the reasonable and proportional
> interchange fee amount takes place, and fraud prevention costs *would not
> be considered* as part of the incremental issuer costs upon which the
> reasonable and proportional fee amount is based. Further, *any* fraud
> prevention cost adjustment would be made on an *issuer-specific basis*, as
> each issuer must individually demonstrate that it complies with the

> standards established by the Board, and as the adjustment would be limited
> to what is reasonably necessary to make allowance for fraud prevention
> costs incurred by that particular issuer.

156 Cong Rec. S5,925 (daily ed. July 15, 2010) (statement of Sen. Richard J. Durbin)

(emphases added); *see also* Durbin Comments, *supra* note 5, at 9.

Accordingly, I find that the text and structure of the Durbin Amendment, as

reinforced by its legislative history, are clear with regard to what costs the Board may

consider in setting the interchange fee standard:  Incremental ACS costs of individual

transactions incurred by issuers may be considered.  That's it!

### B. The Board's Interchange Fee Regulation Accounts for Costs That Are Unambiguously Foreclosed from Consideration by Congress.

The Durbin Amendment is explicit about what costs the Board could consider in

setting the interchange transaction fee, and the Board was required "to give effect to the

unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43.  As the

"final authority on issues of statutory construction," federal courts are charged with

"reject[ing] administrative constructions which are contrary to clear congressional

intent." *Id.* at 843 n.9.  For the following reasons, I reject the Board's construction of the

Durbin Amendment as non-compliant with Congress's clear mandate.

First, the Board's understanding that a third category of costs can be recovered

under the interchange transaction fee standard is irreconcilable with the statute.  In its

Final Rule, the Board concluded that it could, in its discretion, factor into the interchange

fee any costs "that are specific to a particular electronic debit transaction but that are not

incremental costs related to the issuer's role in authorization, clearance, and settlement."

76 Fed. Reg. at 43,426.  According to the Board, the statute is silent as to costs not

addressed in § 1693o-2(a)(4)(B)(i) or (ii), and Congress did "not restrict the factors the

Board may consider in establishing standards for assessing whether interchange

transaction fees are reasonable and proportional to cost." 76 Fed. Reg. at 43,424.[34]

In exercising this purported discretion, the Board reads the statutory language

prohibiting it from considering costs "not specific to a *particular* electronic debit

transaction," § 1693o-2(a)(4)(B)(ii), as prohibiting it from considering only "those costs

that are not incurred in the course of effecting *any* electronic debit transaction," 76 Fed.

Reg. at 43,426 (emphasis added).  The Board, to its credit, still *did not* consider costs

associated with corporate overhead (*e.g.*, executive compensation), establishing and

maintaining an account relationship, debit card production and delivery, marketing,

research and development, insufficient funds handling, network membership fees, reward

programs, and customer support, *id.* at 43,427–29.  But the Board *did*, contrary to the

expressed will of Congress, consider "*any cost that is not prohibited—i.e.*, any cost that

is incurred in the course of effecting an electronic debit transaction," *id.* at 43,426,

including fixed costs (*i.e.*, network connectivity and software, hardware, equipment, and

associated labor), network processing fees, transaction monitoring, and fraud losses, *id.* at

---

[34] *See also id.* at 43,426–27 ("[T]he requirement that one set of costs be considered and
another set of costs be excluded suggests that Congress left to the implementing agency
discretion to consider costs that fall into neither category to the extent necessary and
appropriate to fulfill the purposes of the statute. . . . By considering all costs for which it
had data other than prohibited costs, the Board has complied with the statutory mandate
not to consider costs identified in [(a)(4)(B)(ii)], has fulfilled the statutory mandate
requiring consideration of the costs identified in [(a)(4)(B)(i)], and has chosen to consider
other costs specific to particular electronic debit transactions to the extent consistent with
the purpose of the statute, in establishing its [interchange transaction fee] standard.").

43,429–31. As a result, the final regulation sets a maximum fee that an issuer could recover at twenty-one cents ($.21) per transaction, plus an *ad valorem* amount of .05% of each transaction's value,  12 C.F.R. § 235.3(b); 76 Fed. Reg. at 43,422—well above the NPRM's seven- ($.07) and twelve-cent ($.12) proposals, 75 Fed. Reg. at 81,736–38.

This interpretation runs completely afoul of the text, design and purpose of the Durbin Amendment.  By improperly narrowing the scope of *excluded* costs in subsection (a)(4)(B)(ii) to only those costs "not incurred in the course of effecting *any* electronic debit transaction," the Board expanded the range of *allowable* costs in subsection (a)(4)(B)(i) to "*any* cost that is incurred in the course of effecting an electronic debit transaction." 76 Fed. Reg. at 43,326.  In so doing, the Board not only ignored critical statutory terms such as "distinguish between," "other," "specific," "particular," "incremental," and "authorization, clearance, or settlement"[35]—which provide clear guidance, *see supra* pp. 28–30—but also shoehorned a whole array of excluded costs into the interchange fee standard.

Under the Final Rule, it is inconsequential whether costs are variable and result only from an individual transaction or are fixed and common to all transactions; so long as a cost is incurred to effect "debit card transactions as a whole," the Board concluded that it may be considered in its interchange fee standard.  76 Fed. Reg. at 43,426; *see also* Def.'s Mem. at 27 ("The Board further determined that a cost is specific to a particular

---

[35] The Board somehow found that it was "not . . . necessary to determine whether costs are 'incremental,' fixed or variable, or incurred in connection with authorization, clearance, and settlement," 76 Fed. Reg. at 43,427, even though those are operative words in the statute.

electronic debit transaction if no such transaction can occur without incurring that cost."). Please!  This reading of the law contradicts Congress's clear mandate that the Board is precluded from considering all costs, other than an issuer's *variable ACS* costs related to an *individual* debit transaction, in setting the interchange standard.  Costs that are "not specific *to a particular debit transaction*," § 1693o-2(a)(4)(B)(ii) (emphasis added), simply are not the same as costs that are "not specific *to debit transactions as a whole*," 76 Fed. Reg. at 43,426 (emphasis added).  And "the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction," § 1693o-2(a)(4)(B)(i), is not the same as "any cost that is incurred in the course of effecting an electronic debit transaction," 76 Fed. Reg. at 43,426 (emphasis added).

In short, the Board's interpretation is utterly indefensible.  As explained above, the statute is *not* silent or ambiguous.  Rather, the plain text of subsection (a)(4)(B) and the statutory structure and legislative history of the Durbin Amendment clearly demonstrate that Congress intended for the Board to exclude *all* "other costs" not specified in the statute as requiring consideration in the interchange transaction fee standard.  That Congress could have used other, more definitive language, as the Board argues, *see* Def.'s Mem. at 18–19, is irrelevant when its statutory import is nonetheless clear.[36]

---

[36] *See Locke*, 471 U.S. at 95 ("[T]he fact that Congress might have acted with greater clarity or foresight does not give courts a *carte blanche* to redraft statutes in an effort to achieve that which Congress is perceived to have failed to do."); *Brown v. Gardner*, 513 U.S. 115, 118 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context . . . ."); *S. Cal. Edison Co. v. FERC*, 195 F.3d 17, 24 (D.C. Cir. 1999) ("[T]he court has repeatedly rejected the notion that the absence of an express

"[When] the agency has either violated Congress's precise instructions or exceeded the statute's clear boundaries then, as *Chevron* puts it, 'that is the end of the matter'—the agency's interpretation is unlawful." *Vill. of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 660 (D.C. Cir. 2011) (quoting 467 U.S. at 842).[37] And it is quite clear that the statute did not allow the Board to consider the additional costs factored into the interchange fee standard—*i.e.*, (1) fixed ACS costs, (2) transaction monitoring costs, (3) an allowance for an issuer's fraud losses, and (4) network processing fees. 76 Fed. Reg. at 43,429–31. How so?

    *(1)*    **Fixed ACS Costs.** The final interchange fee standard includes *total* transaction processing costs, including costs reported as variable *and fixed* ACS costs, within allowable interchange fees. *Id.* at 43,429. Instead of citing statutory text to justify this interpretation of the law, the Board simply noted that it is administratively difficult to discern a transaction's incremental ACS costs. *See id.* at 43,426–27; Def.'s Mem. at 32–

---

proscription allows an agency to ignore a proscription implied by the limiting language of a statute[.]"); *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1088 (D.C. Cir. 1996) ("[I]f [the text] clearly requires a particular outcome, then the mere fact that it does so implicitly rather than expressly does not mean that it is 'silent' in the *Chevron* sense.").

[37] Moreover, *Chevron* step two is not implicated whenever a statute does not expressly negate the existence of a claimed administrative power, as the Board would have me believe. Rather, "it is only legislative *intent to delegate* such authority that entitles an agency to advance its own statutory construction for review under the deferential second prong of *Chevron*." *City of Kan. City, Mo. v. Dep't of Hous. & Urban Dev.*, 923 F.2d 188, 191–92 (D.C. Cir. 1991); *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1060 (D.C. Cir. 1995) ("We refuse, once again, to presume a delegation of power merely because Congress has not expressly withheld such power."). Put simply by plaintiffs, "[t]here is no indication in the Durbin Amendment's text, purpose, or legislative history that Congress meant, by carefully delineating the cost factors that the Board must consider and not consider in setting an interchange fee standard, to delegate to the Board by what it *did not say* the unbounded discretion to consider any other cost factor relating to a debit card transaction." Pls.' Mem. at 37.

33, 41. But Congress instructed the Board to consider only *variable* ACS costs incurred

for the issuer's role in processing a particular transaction. *See supra* pp. 32–33. The

legislative mandate to consider incremental ACS costs in setting the interchange standard

is not a "minimum," as the Board argues, *see* Def.'s Mem. at 29, but rather a *ceiling*. The

fact that "there is simply no bright line test to identify exactly ACS versus non-ACS

costs," *id.* at 33, or that the Board "provided a reasoned explanation for considering

certain fixed costs and excluding others," *id.* at 30, does not empower the Board to flout

the statute and then brandish its *Chevron* defense. *See Chevron*, 467 U.S. at 843–44; *Vill.

of Barrington*, 636 F.3d at 659–60. The Board's inclusion of fixed ACS costs in the

interchange transaction fee standard was impermissible.

      *(2)*    *Transaction Monitoring Costs.* The Board also included transaction

monitoring costs—*i.e.*, the costs of fraud-prevention activities that authenticate the

cardholder and confirm whether a debit card is valid[38]—in the final standard because

such costs are related to the authorization of a particular transaction. 76 Fed. Reg. at

43,430–31. But according to the statutory language and the final Conference Report,

Congress allowed for fraud-prevention costs only as a *separate adjustment to*, rather than

a component of, the interchange transaction fee standard, and only *if* the issuer complies

with fraud-related standards established by the Board. *See* § 1693o-2(a)(5)(A); *supra* pp.

11–12, 36–37. In fact, subsection (a)(5)'s adjustment to the interchange fee for fraud-

---

[38] In both its NPRM and Final Rule, the Board classified transaction monitoring as fraud-
prevention activity. *See* 75 Fed. Reg. at 81,741 ("[I]ssuers engage in a variety of fraud-
prevention activities . . . . such as transaction monitoring[.]"); 76 Fed. Reg. at 43,397
("The most commonly reported fraud-prevention activity was transaction monitoring.").

prevention costs was the subject of a distinct rulemaking. *See* 77 Fed. Reg. 46,258; 12 C.F.R. § 235.4; *supra* notes 9, 19 and accompanying text.

Although the Board recognizes that the plain language of subsection (a)(5)(A) provides a separate adjustment to the interchange transaction fee standard for fraud-prevention costs, it nonetheless takes the position that the statute does not prohibit the consideration of those costs when setting the interchange fee standard. *See* Def.'s Mem. at 43. No so. It would be nonsensical for Congress to make fraud-prevention costs the basis for a *conditional adjustment* to the interchange fee standard, and at the same time implicitly allow for fraud-prevention costs to factor into the standard itself without any conditions being met. To the contrary, by linking the fraud-prevention adjustment with a statutory requirement that the issuer comply with fraud-related standards, Congress sought to prevent what the Board has allowed: rewarding *every* issuer with an interchange fee increase to cover fraud-prevention costs, regardless of whether the issuer complies with the fraud-related standards established under subsection (a)(5)(B). As Senator Durbin explained in a comment letter, "The current system of network-established interchange fees creates precisely the wrong incentives for issuers when it comes to fraud prevention" because "[u]nder the current system, all issuing banks in a network receive the same network-established interchange fee rates" regardless of whether they minimize actual fraud. Durbin Comments, *supra* note 5, at 9. "In contrast to the current inefficient system, [15 U.S.C. §1693o-2(a)(5)] will incentivize regulated

issuing banks to reduce fraud by allowing banks that take successful fraud prevention steps to receive increased interchange fees." *Id.*[39]

(3)     ***Allowance for Fraud Losses.***  The Board also included an allowance for fraud losses, or "losses incurred by the issuer, other than losses related to nonsufficient funds, that are not recovered through chargebacks to merchants or debits to or collections from customers," such as losses associated with lost, stolen, or counterfeit card fraud. *Id.* Not proposed for inclusion as an allowable cost in its NPRM, the Board concluded that fraud losses should be considered within the final interchange transaction fee standard because they "are generally the *result* of the authorization, clearance, and settlement of an apparently valid transaction that the cardholder later identifies as fraudulent." *Id.* (emphasis added).  But the costs associated with the *consequence* of ACS—as opposed to ACS costs themselves—are not to be considered under the plain language of the statute. The Board's decision to "[p]ermit[] issuers to recover at least some fraud losses through interchange fees . . . given that the source of fraud could be any participant in an electronic debit transaction and that the exact source of fraud often is unknown," 76 Fed. Reg. at 43,431, is a blatant act of policymaking that runs counter to Congress's will.

(4)     ***Network Processing Fees.***  Finally, the Board included network processing fees in the interchange fee standard because they are incurred for the issuer's role in ACS and are specific to a particular transaction.  76 Fed. Reg. at 43,430.  Again, this ignores

---

[39] The Board tries to distinguish transaction monitoring from the types of activities considered under the separate fraud-prevention rulemaking, thereby rationalizing the inclusion of transaction monitoring costs in the interchange fee.  *See* 76 Fed. Reg. at 43,431.  But the statute provides no basis for this distinction.

the plain language of the statute, which demonstrates that Congress did not intend for network fees to be incorporated into the interchange transaction fee standard.  Under the statute's definitional provisions, a "network fee" is "any fee charged and received by a payment card network with respect to an electronic debit transaction, *other than an interchange transaction fee*."  § 1693o-2(c)(10) (emphasis added).  Furthermore, subsection (a)(4)(B)(i) of the statute limits the Board's authority to permit recovery of issuer costs to those incurred "for the role of the *issuer*," not the *network*, in processing a transaction.  § 1693o-2(a)(4)(B)(i) (emphasis added); *see supra* p. 32–33.  Last, subsection (a)(8)(B) states that the only authority Congress granted the Board to issue regulations regarding network fees is "to ensure that "(i) a network fee is not used to directly or indirectly compensate an issuer with respect to an electronic debit transaction; and (ii) a network fee is not used to circumvent or evade the restrictions of this subsection and regulations prescribed under such subsection."  § 1693o-2(a)(8)(B).  Thus, the interchange fee cannot be used to compensate an issuer for network fees.

Ultimately, the Board asserts that it was given broad discretion to fill statutory gaps in establishing the interchange transaction fee standard.  *See* Def.'s Mem. at 23–26.  But even if this were true, which it is not, such discretion does not give the Board the authority to ignore the expressed will of Congress.  *See Bd. of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 374 (1986) ("The statute may be imperfect, but the Board has no power to correct flaws that it perceives in the statute it is empowered to administer.  Its rulemaking power is limited to adopting regulations to carry into effect the will of Congress as expressed in the statute."); *Ry. Labor Execs.*

*Ass'n*, 29 F.3d at 671 ("'Congress has directly spoken to the precise question at issue' in this case . . . so there is no gap for the agency to fill." (citation omitted)). By including in the interchange fee standard costs that are expressly prohibited by the statute, the final regulation represents a significant price *increase* over pre-Durbin Amendment rates for small-ticket debit transactions under the $12 threshold. *See* 7-Eleven Amicus Br. at 17–18; *see also* Durbin Amicus Br. at 23 ("[B]y setting a high fee cap that far exceeds the customary fees levied on small ticket transactions, the [Board] has given its regulatory blessing to the setting of interchange rates by Visa and MasterCard that are over three times larger than rates previously charged on small dollar transactions."). Congress did not empower the Board to make policy judgments that would result in significantly *higher* interchange rates. Accordingly, the Board's interpretation of the interchange fee standard is foreclosed by the law and must be invalidated under *Chevron*'s first step.

## III. The Network Non-Exclusivity Regulation Is Invalid Under the APA.

Subsection (b)(1)(A) of the Durbin Amendment directs the Board to issue regulations prohibiting issuers and networks from "restrict[ing] the number of payment card networks on which an electronic debit transaction may be processed" to one network or multiple affiliated networks. § 1693o-2(b)(1)(A). Subsection (b)(1)(B), meanwhile, instructs the Board to promulgate regulations that prohibit issuers and networks from "inhibit[ing] the ability of any person who accepts debit cards for payments to direct the routing of electronic debit transactions for processing over any payment card network that may process such transactions." § 1693o-2(b)(1)(B). The Board determined that subsection (b)(1)(A) requires issuers and networks to make available two unaffiliated

46

networks for *each debit card*, not for *each method of authentication* (signature and PIN). 12 C.F.R. § 235.7(a)(2) & Official Cmt. 1; *see also* 76 Fed. Reg. at 43,404, 43,447–48.

Plaintiffs argue that this interpretation disregards the statute's language and purpose, which require that merchants be given a choice between multiple unaffiliated networks not only for each card, but for each *transaction*. They say that the Board's non-exclusivity regulation cannot survive *Chevron* step one because it contravenes both the letter and spirit of the Durbin Amendment. The Board characterizes plaintiffs' arguments as being "unmoored from the statutory text," which the Board says is ambiguous on this issue. Moreover, the Board claims that its interpretation of the law is permissible and fully implements Congress's directive. I disagree. The plaintiffs' interpretation is, in my judgment, the one true to Congress's intent. How so?

### A. The Statute Requires that Merchants Be Provided with a Choice Between Multiple Unaffiliated Networks for Each Transaction.

First, the Court must determine "whether Congress has directly spoken to the precise question at issue," *Chevron*, 467 U.S. at 84, by considering whether "the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill," *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982–83 (2005). In determining whether Congress has spoken to the issue, the Court, of course, begins with the plain meaning of the statutory text. *S. Cal. Edison*, 195 F.3d at 23.

The language of the network non-exclusivity provision favors the plaintiffs' interpretation at *Chevron* step one. First, there is no question that subsection (b)(1)(A)

47

mandates that "an issuer or payment card network shall not . . . restrict the number of

payment card networks on which an electronic debit *transaction* may be processed" to

fewer than two unaffiliated networks, and that the Board must promulgate regulations to

enforce this restriction.  § 1693o-2(b)(1)(A) (emphasis added); *see Zivotofsky v. Sec'y of

State*, 571 F.3d 1227, 1243 (D.C. Cir. 2009) ("'Shall' has long been understood as 'the

language of command.'" (citation omitted)).  Put differently, the statute instructs the

Board to ensure that issuers and networks stop restricting merchants' ability to route *each*

*transaction* over different networks.  Congress's focus was on the number of networks

over which each *transaction*—as opposed to each debit card—can be processed.

Although the Board admits that the statute calls for debit cards to be able to

function over two or more unaffiliated networks, it insists that the law is silent as to

whether merchants must have routing choices for each transaction.  Def.'s Reply to Pls.'

Reply Mem. in Supp. of Pls.' Mot. for Summ. J. and in Opp'n to Def.'s Mot. for Summ.

J. ("Def.'s Reply") at 31 [Dkt. # 32].  Congress resolved this uncertainty, however, by

using the statutorily defined term "electronic debit transaction."  *See* § 1693o-2(c)(5)

(defining "electronic debit transaction" as "a transaction in which a person uses a debit

card"); *id.* § 1693o-2(c)(2)(A) ("debit card" defined as "any card . . . issued or approved

for use through a payment card network to debit an asset account . . . whether

authorization is based on signature, PIN, or other means").  When the definitions are read

into the statute, subsection (b)(1)(A) provides that networks and issuers "shall not . . .

restrict the number of payment card networks [to process] '*a transaction* in which a

person uses [any card . . . issued or approved for use through a payment card network to

debit an asset account . . . *whether authorization is based on signature, PIN, or other means*]'" to less than two unaffiliated networks.  The plain text of the statute thus supports the conclusion that Congress intended for each transaction to be routed over at least two competing networks for each authorization method.

Indeed, the Durbin Amendment's legislative history confirms my reading of the statute.  It is axiomatic when interpreting a Congressional statute that this Court must consider, among other things, the problem Congress sought to resolve when it adopted the law at issue.  *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 796 (D.C. Cir. 2004).  Even when the statute's plain meaning is clear from its terms, legislative history can be "equally illuminating."  *Planned Parenthood Fed'n of Am., Inc. v. Heckler*, 712 F.2d 650, 656–57 (D.C. Cir. 1983).

As Senator Durbin explained, the Amendment was enacted at a time when network fees were on the rise due to exclusivity deals between dominant card networks and issuers.[40]  Total network fees exceeded $4.1 billion in 2009, 76 Fed. Reg. at 43,397, due in large part to the lack of competition resulting from exclusivity agreements.  As the Board explained in its NPRM:

---

[40] *See* 156 Cong. Rec. S10,996 (daily ed. Dec. 22, 2010) (statement of Senator Richard J. Durbin) ("In recent years . . . the biggest networks like Visa have begun requiring banks to sign exclusive agreements under which they become the sole network on the banks' cards.  This diminishes competition between networks and leads to higher prices.  My amendment will restore this competition."); *see also* Durbin Comments, *supra* note 5, at 11 ("This trend toward exclusivity agreements . . . limits merchant and consumer choice; it diminishes competition by threatening to drive competing debit networks out of business; and it creates significant barriers to entry for new debit networks." (citation and internal quotation marks omitted)).

> From the merchant perspective, the availability of multiple card networks on a debit card is attractive because it gives merchants the flexibility to route transactions over the network that will result in the lowest cost to the merchant. This flexibility may promote direct price competition among the debit card networks that are enabled on the debit card. Thus, debit card network exclusivity arrangements limit merchants' ability to route transactions over lower-cost networks and may reduce price competition.

75 Fed. Reg. at 81,748.

Congress adopted the network non-exclusivity and routing provisions "to inhibit the continued consolidation of the dominant debit networks' market power and to ensure competition and choice in the debit network market." Durbin Comments, *supra* note 5, at 11; *see also* 156 Cong. Rec. S5,926 (daily ed. July 15, 2010) (statement of Sen. Richard J. Durbin) ("All these provisions say is that [f]ederal law now blocks payment card networks from engaging in certain specific enumerated anti-competitive practices, and the provisions describe precisely the boundaries over which payment card networks cannot cross with respect to these specific practices."). It is clear that Congress intended to put an end to exclusivity agreements and increase merchants' choice among debit-processing networks, not restrict that choice or even preserve the status quo.

Accordingly, it defies both the letter and purpose of the Durbin Amendment to read the statute as allowing networks and issuers to continue restricting the number of networks on which an electronic debit transaction may be processed to fewer than two per transaction. Indeed, prior to the Amendment's passage, Senator Durbin explicitly confirmed that Congress wanted subsection (b)(1)(A) to ensure the availability of at least two competing networks for each method of cardholder authentication on which an electronic debit transaction may be processed:

> This paragraph is intended to *enable each and every* electronic debit transaction—*no matter whether that transaction is authorized by signature, PIN, or otherwise*—to be run over at least two unaffiliated networks, and the Board's regulations should ensure that networks or issuers *do not try to evade the intent of this amendment by having cards that may run on only two unaffiliated networks where one of those networks is limited and cannot be used for many types of transactions.*

156 Cong. Rec. S5,926 (daily ed. July 15, 2010) (statement of Sen. Richard J. Durbin) (emphases added).  In short, Congress adopted the network non-exclusivity and routing provisions to ensure that for multiple unaffiliated routing options were available for each debit card transaction, regardless of the method of authentication.  The Board's Final Rule not only fails to carry out Congress's intention; it effectively countermands it!

### B.  The Board's Network Non-Exclusivity Regulation Is Inconsistent with the Statute.

The Board's network non-exclusivity regulation requires at least two unaffiliated payment card networks be enabled on each *debit card*, meaning that a card complies with the regulation if it has been enabled with only one PIN network and one signature network.  12 C.F.R. § 235.7(a)(2) & Official Cmt. 1; *see also* 76 Fed. Reg. at 43,447–48. According to the Board, "[t]he plain language of the statute does not require that there by two unaffiliated payment card networks available to the merchant for each method of authentication." 76 Fed. Reg. at 43,447.  I disagree.

The Board's interpretation of subsection (b)(1)(A) cannot be reconciled with the plain meaning or spirit of the statute because it still allows networks and issuers to make only one network available for many transactions.  Indeed, by the Board's own admission, several common transaction types cannot be authenticated using the PIN

method, leaving signature-debit as the only available option. *See* 76 Fed. Reg. 43,395. "[H]otel stays or car rentals," not to mention "Internet, telephone, and mail transactions," are typically incompatible with PIN authorization technology. *Id.* Under a rule that allows issuers to provide just one signature network and one PIN network per card, merchants in these signature-only industries are left with no network options. *See* 75 Fed. Reg. at 81,748. This result cannot be reconciled with Congress's goal of providing all merchants with a choice between multiple unaffiliated networks for every transaction.

The Board contends that where a merchant can process both signature and PIN transactions, the customer determines the authentication method at the point of sale by choosing "debit" for PIN authentication or "credit" for signature authentication. 76 Fed. Reg. at 43,448. In this scenario, the Board says that its network non-exclusivity rule technically provides for multiple available networks, but "the consumer, and not the issuer or the payment card network, . . . restrict[s] the available routing choices" for the merchant. *Id.* The Board forgets, however, that it is issuers and networks who establish the availability of different routing options, well before consumers ever enter the picture. And the Board cannot be relieved of its statutory obligation to ensure that *network* and *issuer* practices do not inhibit merchant choice simply because, in many transactions, consumers choose the authentication method. In the end, any reading that denies *merchants* the ability to choose between multiple networks for each transaction cannot be squared with a statute that plainly requires at least two networks per transaction.

The Board's network non-exclusivity regulation is also inconsistent with other related statutory provisions. For example, subsection (b)(1)(B) instructs the Board to

establish regulations that bar issuers and networks from "inhibit[ing] the ability of any person who accepts debit cards for payments to direct the routing of electronic debit transactions for processing over any payment card network that may process such transactions." § 1693o-2(b)(1)(B). This sister provision to subsection (b)(1)(A) makes sense only if merchants have a *choice* between multiple networks. It would defy all logic for Congress to safeguard merchants' ability to route transactions over the networks of their choosing while at the same time leaving it up to the Board to decide whether issuers give merchants any choice in the first place. *See Greenlaw v. United States*, 554 U.S. 237, 251 (2008) ("We resist attributing to Congress an intention to render a statute so internally inconsistent."); *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("It is true that interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."). Even the Board has recognized that its interpretation of subsection (b)(1)(A) limits the effectiveness of subsection (b)(1)(B) under the Durbin Amendment.[41]

The Board further defends its network non-exclusivity regulation by pointing out that it is not "the most aggressively pro-merchant position" that the Board could have taken. Def.'s Reply at 27. The Board obviously misses the point! Where a court concludes that a statute is unambiguous, an agency's interpretation must be rejected if it is inconsistent with clearly expressed legislative intent. *See Chevron*, 467 U.S. at 842–43; *Vill. of Barrington*, 636 F.3d at 659–60. It is not about whether the rule favors

---

[41] *See* 75 Fed. Reg. at 81,749–50 ("[T]he Board notes that Alternative A could limit the effectiveness of the separate prohibition on merchant routing restrictions under [§ 1693o-2(b)(1)(B)]").

merchants or issuers; rather, it is about whether the rule implements Congress's will.
And Congress's use of clear, defined language in the network non-exclusivity and routing
provisions leaves *no* ambiguity or statutory gap for the agency to fill. *See United States
v. Home Concrete & Supply, LLC*, 132 S. Ct. 1836, 1843 (2012) ("*Chevron* and later
cases find in unambiguous language a clear sign that Congress did *not* delegate gap-
filling authority to an agency[.]").

Lastly, the Board noted that its two-networks-per-card approach "minimiz[es] the
compliance burden on institutions" and "present[s] less logistical burden on the payment
system overall as it would require little if any re-programming of routing logic" than
would a rule requiring two networks for each payment type. 76 Fed. Reg. at 43,447.
That might be the case, but the law does not impose those burdens. In fact, the Durbin
Amendment does not specify how the Board should go about achieving the statute's
requirement. It was possible for the Board to implement the law without requiring brand
new networks be added to each card. As explained during the comment period on the
NPRM, the Board could have guaranteed "multiple routing options for every transaction
by barring the dominant networks' anti-competitive rules to allow PIN-only networks to
process signature transactions, and vice versa." Pl.'s Mem. at 51.[42] In other words, the
Board could have required networks to allow cross-routing of signature and PIN

---

[42] *See, e.g.*, Adam J. Levitin, *Comments in Response to Notice of Proposed Rulemaking
on Debit Card Interchange Fees and Routing* at 2–3 (Feb. 22, 2011) ("I would suggest
that the Board also be explicit in permitting PIN debit networks to process signature-debit
transactions as long as the merchant and/or network is willing to assume the chargeback
risk . . . . Restricting limitations on cross-routing on debit cards between PIN and
signature debit networks would enhance the competition among networks for processing
transactions, which is precisely the goal of the Durbin Interchange Amendment.").

transactions, thereby ensuring that each debit card had multiple unaffiliated dual message

network options on which every type of debit transaction could be processed.  The Board

chose instead to adopt a different approach—one that, unfortunately, is inconsistent with

the statute.  The final network non-exclusivity regulation therefore cannot stand under

*Chevron* step one.  *See Catawba Cnty.*, 571 F.3d at 35.

### IV.    The Appropriate Remedy Is Vacatur and Remand, Staying Vacatur.

The Court concludes that the proper remedy here is to remand to the Board with

instructions to vacate the Board's interchange transaction fee (12 C.F.R. § 235.3(b)) and

network non-exclusivity (12 C.F.R. § 235.7(a)(2)) regulations.  *See* 5 U.S.C. § 706(2)

(directing that a court "shall . . . set aside agency action . . . found to be arbitrary,

capricious . . . or otherwise not in accordance with law.").  Although I recognize that

vacatur is not required by our Circuit, *Advocates for Highway & Auto Safety v. Fed.*

*Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005), I conclude that both

factors to be considered when deciding whether to vacate—(1) "the seriousness of the

[regulation's] deficiencies" and (2) "the disruptive consequences of an interim change

that may itself be changed," *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988

F.2d 146, 150–51 (D.C. Cir. 1993) (citation omitted)—weigh in favor of vacating the

specified regulations *before* remanding to the Board.

First, the interchange transaction fee and network non-exclusivity regulations are

fundamentally deficient.  It appears that the Board completely misunderstood the Durbin

Amendment's statutory directive and interpreted the law in ways that were clearly

foreclosed by Congress.  Because "[t]he Court cannot be sure that the agency will

interpret the statute in the same way and arrive at the same conclusion after further review," *Int'l Swaps & Derivatives Ass'n v. U.S. Commodity Futures Trading Comm'n*, No. 11-2146, 2012 WL 4466311, at *25 (D.D.C. Sept. 28, 2012), let alone whether, "on further judicial review, this or a similar Final Rule will withstand challenge under the APA," *Humane Soc'y of U.S. v. Kempthorne*, 579 F. Supp. 2d 7, 21 (D.D.C. 2008), this factor weighs heavily in favor of vacatur.

Second, any disruptive effect of vacatur can be curtailed by a stay. This Court is mindful that interchange and network fees are critical components of the debit card system, and that the Board's Final Rule has been in effect since October 1, 2011, such that regulated interests have already made extensive commitments in reliance on it.[43] But in light of the seriously deficient nature of the regulations at issue, and the fact that the Board must develop entirely new rules to correct these errors, remand *without* vacatur would be inappropriate here. *Compare Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1048 (D.C. Cir. 2002) (vacatur appropriate if rule is "irredeemable"), *with WorldCom, Inc. v. FCC*, 288 F.3d 429, 434 (D.C. Cir. 2002) (where there is a "non-trivial likelihood" that agency could justify rule on remand, vacatur is not necessary). I will stay vacatur, however, to provide the Board an opportunity to replace the invalid portions

---

[43] *See* Ronald M. Levin, *"Vacation" at Sea: Judicial Remedies and Equitable Discretion in Administrative Law*, 53 Duke L.J. 291, 300 (2003) ("Frequently, when a rule is held invalid after it has already gone into effect, private citizens will already have arranged their expectations around it. Companies may have entered into contracts, made capital investments, and shifted business operations in light of the rule."); *MCI Telecomms. Corp. v. FCC*, 143 F.3d 606, 609 (D.C. Cir. 1998) ("Here, vacating the order would leave payphone service providers all but uncompensated for coinless calls made from their payphones, and disrupt the business plans they have made on the basis of their expectation of compensation.").

of the Final Rule.  In so doing, I can prevent the Board from adopting similar regulations while at the same time avoid the disruption of vacating the entire regime.  *See Anacostia Riverkeeper, Inc. v. Jackson*, 713 F. Supp. 2d 50, 55 (D.D.C. 2010) (although pollution limits promulgated by EPA were inconsistent with Clean Water Act and thus invalid, vacatur stayed pending limits' revision because "neither the Court, nor the parties, wants the . . . waters at issue in this action to go without pollutant limits while EPA develops new pollutant limits, which will obviously take some time").

To properly effect the stay of vacatur, two issues remain: (1) the appropriate length of the stay; and (2) whether current standards should remain in place until they are replaced by valid regulations or the Board should develop interim standards sufficient to allow the Court to lift the stay.  *See, e.g., Friends of the Earth, Inc. v. EPA*, 446 F.3d 140, 148 (D.C. Cir. 2006); *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 872 (D.C. Cir. 2001); *Columbia Falls Aluminum Co. v. EPA*, 139 F.3d 914, 924 (D.C. Cir. 1998); *Anacostia Riverkeeper*, 713 F. Supp. 2d at 52–55.  Because the parties failed to address the proper remedy in their motions, the Court will invite supplemental briefing on these issues, keeping in mind that I am inclined toward a stay of vacatur "for months, not years," *Natural Res. Def. Council v. EPA*, 489 F.3d 1250, 1265 (D.C. Cir. 2007) (Rogers, J., concurring in part and dissenting in part) (citations omitted).

## CONCLUSION

For the foregoing reasons, the Court GRANTS plaintiffs' Motion for Summary Judgment and DENIES defendant's Cross-Motion for Summary Judgment.  Accordingly, the Court will vacate the interchange transaction fee (12 C.F.R. § 235.3(b)) and network

non-exclusivity (12 C.F.R. § 235.7(a)(2)) regulations, staying vacatur until further Order

of this Court, and will remand to the Board for further proceedings consistent with this

Memorandum Opinion.  An appropriate order shall follow.

RICHARD J. LEON
United States District Judge